ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
LARA HADDAD
Supervising Deputy Attorney General
SHIWON CHOE (SB 320041)
CAROLYN F. DOWNS (SB 353455)
ZELDA VASSAR (SB 313789)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-4400
  Fax:  (415) 703-5480
  E-mail:  Zelda.Vassar@doj.ca.gov
*Attorneys for Plaintiffs State of California and*
*Gavin Newsom, in his official capacity as Governor*
*of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA and GAVIN NEWSOM, in his official capacity as Governor of California,**<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD J. TRUMP, in his official capacity as President of the United States; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; DEPARTMENT OF HOMELAND SECURITY; PETE R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and U.S. CUSTOMS AND BORDER PROTECTION,**<br><br>Defendants. | Case No. 25-cv-_____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.    President Donald J. Trump has launched an unprecedented tariff regime by relying on the International Economic Emergency Powers Act (IEEPA) and a purported national emergency arising from persistent trade deficits.

2.    In just the last two weeks, President Trump has imposed a universal 10% tariff on virtually all imported goods and sweeping "reciprocal" tariffs on dozens of countries, before pausing the reciprocal tariffs for 90 days, and then increasing retaliatory tariffs on China to 145% in response to its countermeasures.

3.    President Trump also invoked IEEPA and a purported national emergency arising from the trafficking of drugs and persons to impose, then pause, then re-impose, and then partially exempt, tariffs of up to 25% on Canada and Mexico, all in just over a month in February and March 2025.

4.    Tariffs, however, are not among the numerous actions that IEEPA authorizes the President to take under a declared emergency; indeed, the word "tariff" does not appear in the relevant statute at all.  *See* 50 U.S.C. § 1702.  And no President has previously relied on IEEPA to impose tariffs in the half a century since its enactment.

5.    The United States Constitution vests the authority to impose tariffs in Congress, *see* U.S. Const. art. I, § 8, and Congress has enacted numerous statutes delegating tariff authority to the President that expressly authorize imposition of tariffs, generally following required process and notice.

6.    Rather than comply with the process and notice requirements set forth in those statutes, President Trump issued over a dozen executive orders invoking IEEPA, under the view that IEEPA grants him unilateral authority to impose unprecedented tariffs.

7.    President Trump's new tariff regime has already had devastating impacts on the economy, creating chaos in the stock and bond markets, wiping out hundreds of billions of dollars in market capitalization in hours, chilling investment in the face of such consequential Presidential action with no notice or process, and threatening to push the country into recession. These harms will only continue to grow, as President Trump's tariffs are projected to shrink the

1

economy by $100 billion annually.[1]

8.      As the fifth largest economy in the world, the State of California, along with its residents and small businesses, is directly harmed by the tariffs.  All will face higher costs due to the 10% universal tariffs now in effect on virtually all imported goods and the substantial additional tariffs imposed on Chinese, Mexican, and Canadian goods, with even higher costs threatened by the still-looming reciprocal tariffs.  And certain industries and businesses, including agriculture and entertainment, now face retaliatory tariffs imposed by China and threatened by other countries.

9.      Under our constitutional system, the President may not rule by fiat.  Instead, "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

10.     And where the economic and political significance is as staggering, and the power asserted is so novel and transformative as it is with the unprecedented tariffs that President Trump has imposed here, the President must have "clear congressional authorization" to justify his executive actions.  *Biden v. Nebraska*, 600 U.S. 477, 506 (2023).

11.     IEEPA provides no such clear congressional authorization for President Trump's tariffs, nor the vast expansion of Presidential power to tax all goods entering the United States on a whim.

12.     Through this action, the State of California and California Governor Gavin Newsom seek declaratory and injunctive relief to block the tariffs imposed by President Trump pursuant to IEEPA because they are not authorized by that statute.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

13.     This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the Constitution or laws of the United States).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and the Court may grant declaratory relief, injunctive

---

[1] *Where We Stand: The Fiscal, Economic, and Distributional Effects of All U.S. Tariffs Enacted in 2025 Through April 2*, THE BUDGET LAB AT YALE UNIV. (Apr. 2, 2025), https://budgetlab. yale.edu/research/where-we-stand-fiscal-economic-and-distributional-effects-all-us-tariffs-enacted-2025-through-april.

1    relief, and other relief against Defendants pursuant to 28 U.S.C. §§ 2201–02 and the Court's

2    equitable powers.

3        14.    Venue is proper in this District under 28 U.S.C. § 1391(e) because this is a judicial

4    district in which the State of California resides.

5        15.    Under Civil Local Rules 3-2(c) and 3-5(b), Plaintiffs allege that there is no basis for

6    assignment of this action to any particular location or division of this Court.

7    **PARTIES**

8        16.    Plaintiff State of California, by and through Attorney General Rob Bonta, brings this

9    action as a sovereign state in the United States of America.  The Attorney General is the chief law

10    officer of the State and has the authority to file civil actions in order to protect public rights and

11    interests.  Cal. Const. art. V, § 13; Cal. Gov't Code § 12511.  This challenge is brought under the

12    Attorney General's independent constitutional, statutory, and common-law authority to bring suit

13    and obtain relief on behalf of the State.

14        17.    Plaintiff Gavin Newsom is the Governor of California.  Governor Newsom brings this

15    challenge in his official capacity.

16        18.    Defendant Donald J. Trump is the President of the United States.  He is sued in his

17    official capacity.

18        19.    Defendant Kristi Noem is the Secretary of Homeland Security.  She is sued in her

19    official capacity.

20        20.    Defendant Department of Homeland Security (DHS) is an independent federal

21    agency.

22        21.    Defendant Pete R. Flores is the Acting Commissioner for U.S. Customs and Border

23    Protection (CBP).  He is sued in his official capacity.

24        22.    Defendant U.S. Customs and Border Protection is an independent federal agency.

25        23.    Defendants Noem, DHS, Flores, and CBP are collectively referred to as Agency

26    Defendants.

27

28

3

**FACTUAL BACKGROUND**

I.   **No President Has Ever Imposed Tariffs Under IEEPA in Its Near-Half-Century History—Until President Trump Cited IEEPA to Unilaterally Issue Over a Dozen Executive Orders to Impose or Modify Tariffs in the Last Two-and-a-Half Months**

24.   No President other than President Trump has ever imposed tariffs under IEEPA in the nearly half century since its enactment in 1977.

25.   President Trump has become the first and only such President, issuing over a dozen executive orders imposing or modifying tariffs pursuant to IEEPA since February 1, 2025 to date.[2]

26.   A tariff is a tax placed on goods imported into a country.  It is assessed on the good at the port of entry, so the cost is borne by the distributor who is receiving the goods in the United States, *not* on the country of origin.  The tariffs' effects are thus immediate.

27.   DHS and CBP are the agencies collecting and enforcing President Trump's tariffs.

28.   These executive orders fall into two broad categories: (1) country-specific tariffs on Mexico, Canada, and China; and (2) universal tariffs and reciprocal tariffs.

**A.   President Trump's Country-Specific Tariffs**

29.   On February 1, 2025, the President issued three executive orders imposing tariffs on imports from California's three largest trading partners: Mexico, Canada, and China.

30.   As described in detail below, Mexico and Canada are currently subject to tariffs of 25% (with certain exceptions), and China is subject to tariffs of 145% in total.

**1.   Tariffs on Mexico**

31.   On February 1, 2025, President Trump issued an executive order imposing 25% tariffs on all products imported from Mexico, to go into effect just three days later, on February 4, 2025.[3]

32.   In the executive order imposing these tariffs, President Trump cited to IEEPA

---

[2] Although President Trump threatened to impose tariffs under IEEPA in his first term, he suspended the implementation of those tariffs.

[3] Exec. Order 14,194 (Feb. 1, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/imposing-duties-to-address-the-situation-at-our-southern-border/.

(50 U.S.C. § 1701 *et seq*.), the National Emergencies Act (50 U.S.C. § 1601 *et seq*.) (NEA),

section 604 of the Trade Act of 1974, as amended (19 U.S.C. § 2483), and section 301 of title 3,

United States Code, but he specifically invoked authority for the order under section

1702(a)(1)(B) of IEEPA.[4]

33.     In the order, President Trump also cited a Proclamation issued on January 20, 2025,

in which he declared a national emergency at the U.S.-Mexico border "with respect to the grave

threat to the United States posed by the influx of illegal aliens and illicit drugs into the United

States."  The order "expand[ed]" the scope of that emergency to include "the failure of Mexico to

arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human

traffickers, criminals at large, and illicit drugs."

34.     Just two days later, on February 3, 2025, President Trump issued another executive

order announcing a pause on the 25% tariff on Mexican goods for one month.[5]

35.     The tariffs went into effect on March 4, 2025.

36.     Two days later, on March 6, 2025, President Trump issued another executive order

exempting goods covered by the U.S.-Mexico-Canada Agreement (USMCA) from the tariffs,

effective March 7, 2025.[6]  USMCA-covered goods account for approximately half of imports

from Mexico; the other half remain subject to the 25% tariffs, which are currently in effect.

---

[4] The NEA, section 604 of the Trade Act, and section 301 of title 3, do not give presidents any substantive authority to take any actions.  The NEA provides a framework for declaring a national emergency but does not itself provide for the President to exercise any authority to take action pursuant to that declaration.  *See* 50 U.S.C. § 1631 ("When the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act.").  Section 604 is a ministerial statute that provides that the President periodically update the Harmonized Tariff Schedule of the United States, a schedule that sets out the tariff rates for all merchandise imported into the United States. 19 U.S.C. § 2483.  Section 301 is a general statute that simply provides that the President may delegate functions to subordinate officials.  3 U.S.C. § 301.

[5] Exec. Order 14,198 (Feb. 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/progress-on-the-situation-at-our-southern-border/.

[6] Exec. Order 14,232 (Mar. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/amendment-to-duties-to-address-the-flow-of-illicit-drugs-across-our-southern-border/.

### 2.     Tariffs on Canada

37.     On February 1, 2025, President Trump issued an executive order imposing 25%
tariffs on all imports from Canada, with the exception of energy resources, on which he imposed
a 10% tariff.[7]  The tariffs were slated to go into effect just three days later, on February 4, 2025.

38.     In the executive order imposing these tariffs, President Trump cited to IEEPA, the
NEA, section 604 of the Trade Act of 1974, as amended, and 3 U.S.C. § 301, but he specifically
invoked authority for the order under section 1702(a)(1)(B) of IEEPA.

39.     Despite this order pertaining to Canada, President Trump cited the same Proclamation
declaring a national emergency at the U.S.-Mexico border.  He "expand[ed]" this emergency to
Canada, "to cover the threat to the safety and security of Americans, including the public health
crisis of deaths due to the use of fentanyl and other illicit drugs, and the failure of Canada to do
more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug
and human traffickers, criminals at large, and drugs."

40.     The same day the President issued his executive order, Canada announced it planned
to impose 25% retaliatory tariffs on $155 billion worth of various goods imported from the
United States.  In doing so, Canada noted that "[l]ess than 1 per cent of the fentanyl and illegal
crossings into the United States come from Canada."

41.     Two days later, on February 3, 2025, President Trump issued another executive order
announcing a pause on the tariffs on Canada for one month.

42.     The tariffs went into effect on March 4, 2025.

43.     Canada announced it was moving forward with 25% retaliatory tariffs on $30 billion
of U.S. goods, which are currently in place.  Some of the goods affected by Canada's retaliatory
tariffs, such as wine, have a particularized impact on California, which produces approximately
80% of American wine.

44.     Two days later, President Trump exempted goods covered by the U.S.-Mexico-

---

[7] Exec. Order 14,193 (Feb. 1, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/
imposing-duties-to-address-the-flow-of-illicit-drugs-across-our-national-border/.

Canada Agreement from the tariffs, effective March 7, 2025.[8]  USMCA-covered goods account for approximately 38% of goods from Canada; the majority of goods imported from Canada (62%) remain subject to the 25% tariffs.

### 3.    Tariffs on China

45.    On February 1, 2025, President Trump issued an executive order imposing a 10% tariff on China.[9]  This was imposed on top of pre-existing tariffs on certain Chinese goods (not imposed under IEEPA), for an effective tariff rate of 20%.

46.    In the executive order imposing these tariffs, President Trump cited to IEEPA, the NEA, section 604 of the Trade Act of 1974, as amended, and 3 U.S.C. § 301, but he specifically invoked authority for the order under section 1702(a)(1)(B) of IEEPA.

47.    Like the Mexico and Canada executive orders, President Trump's order on China cited the same Proclamation declaring a national emergency at the U.S.-Mexico border.  He similarly now applied it to China: the order "expand[ed]" the scope of that emergency to include "the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs."

48.    On February 4, 2024, the additional 10% tariffs on China went into effect as scheduled, just three days after their initial announcement.  The same day, China announced retaliatory tariffs of 10–15% on a list of eighty U.S. products, effective February 10, 2025.

49.    Unlike the Canada and Mexico tariffs, President Trump did not pause the tariffs on China.  Unsurprisingly, a tit-for-tat trade war with China ensued, with President Trump raising tariffs, and China responding in kind.[10]

---

[8] Exec. Order 14,231 (Mar. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/amendment-to-duties-to-address-the-flow-of-illicit-drugs-across-our-northern-border-0c3c/.

[9] Exec. Order 14,195 (Feb. 1, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/imposing-duties-to-address-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china/.

[10] The United States raised new tariffs on China to 20%, on top of the pre-existing tariffs, effective immediately.  Exec. Order 14,228 (Mar. 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/further-amendment-to-duties-addressing-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china/.  China responded the next day with new 10–15%

50.     As of April 16, 2025, Chinese goods are subject to a staggering 145% effective tariff rate in the United States, and U.S. goods are subject to 125% retaliatory tariffs in China.  China has also suspended all exports of rare-earth materials and magnets, which are crucial for the car, semiconductor, and aerospace industries, and is pausing its purchases of aircraft from Boeing, America's largest exporter.

**B.      President Trump's Universal and "Reciprocal" Tariffs**

51.     President Trump did not stop at imposing the aforementioned country-specific tariffs on the United States' largest trading partners.

52.     On April 2, 2025—a day he dubbed "Liberation Day"—President Trump broadened the scope of his IEEPA tariffs to the entire globe by announcing the most sweeping tariff increase since the Great Depression, again relying on a purported emergency in order to do so.[11]

53.     As discussed *infra*, these tariffs include a 10% universal tariff on all U.S. trading partners and "reciprocal" tariffs of up to 50% on almost ninety specific countries.

54.     In the executive orders imposing and modifying these tariffs,[12] President Trump

---

tariffs on various U.S. agricultural products.  The United States then imposed reciprocal tariffs on multiple countries, discussed *infra* in Section I.B.2, adding new tariffs on China of 34%.  Exec. Order 14,257 (Apr. 2, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/; *see also id.* annex I, https://www.whitehouse.gov/wp-content/uploads/2025/04/Annex-I.pdf.  President Trump also issued an executive order eliminating the duty-free *de minimis* treatment of certain Chinese goods.  Exec. Order 14,256 (Apr. 2, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/further-amendment-to-duties-addressing-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china-as-applied-to-low-value-imports/.  China responded with a 34% additional tariff on all U.S. goods.  In turn, the United States raised additional new tariffs on China to 84%.  Exec. Order 14,257 (Apr. 8, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/amendment-to-reciprocol-tariffs-with-updated-duties-as-applied-to-low-value-imports-from-the-peoples-republic-of-china/.  China again responded in kind, raising its tariffs on the United States to 84%.  The same day, the United States raised new tariffs on China to 125%.  Exec. Order 14,266 (Apr. 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/modifying-reciprocal-tariff-rates-to-reflect-trading-partner-retaliation-and-alignment/.  The next day, China responded by matching the U.S. tariff rate of 125%.

[11] Exec. Order 14,257 (Apr. 2, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/.

[12] Exec. Order 14,266 (Apr. 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/modifying-reciprocal-tariff-rates-to-reflect-trading-partner-retaliation-and-alignment/.

claimed authority pursuant to IEEPA, the NEA, section 604 of the Trade Act of 1974, as amended, and 3 U.S.C. § 301.  The White House repeatedly made clear that the tariffs were being imposed "[u]sing [the President's] IEEPA authority," and referred to the executive order as "[t]oday's IEEPA Order[.]"[13]

55.    In the order imposing these tariffs, President Trump declared a national emergency, which he characterized as "underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits" and a decline in U.S. manufacturing capacity dating back to 1997.

### 1.    Universal Tariffs

56.    On April 2, 2025, President Trump issued an executive order imposing a 10% universal tariff, which is a flat-rate import tax that applies to goods from *all* U.S. trading partners.[14]

57.    This tariff took effect on April 5, 2025, and is currently in effect.

### 2.    "Reciprocal" Tariffs

58.    Also on April 2, 2025, President Trump announced individualized "reciprocal"[15]

---

[13] *Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, and Strengthen our National and Economic Security*, THE WHITE HOUSE (Apr. 2, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/ [hereinafter *Fact Sheet* (Apr. 2, 2025)].

[14] These tariffs do not apply to tariffs already announced on a specific product or industry.  They also do not affect current tariffs on Canada and Mexico; as such, tariffs on USMCA-compliant goods remain paused, and non-USMCA-compliant goods remain subject to a 25% tariff.

[15] "Reciprocal" is a misnomer, as the calculation used to formulate the tariff rates is not actually reciprocal.  *See, e.g.*, David Goldman, *This is the dubious way Trump calculated his 'reciprocal' tariffs*, CNN (Apr. 3, 2025), https://www.cnn.com/2025/04/03/economy/reciprocal-tariff-math/index.html.  Rather, President Trump used "a simple calculation: the country's trade deficit divided by its exports to the United States times 1/2."  *Id.*  This approach punishes high-deficit trading partners from which the United States imports a lot and buys little from, not necessarily those with the most restrictive trade regimes.

higher tariffs of up to 50% on nearly ninety specific countries.[16]

59.    These tariffs apply to some of the United States' largest trading partners, such as the European Union, which accounted for $605.76 billion of U.S. imports last year and is subject to a 20% tariff, and Vietnam, which accounted for $135.56 billion of U.S. imports and is subject to a whopping 46% tariff.

60.    China, the United States' third largest trading partner after Mexico and Canada, is subject to a 34% reciprocal tariff, which stacks on top of other tariffs.

61.    Even regions or countries with little or no trading footprint are affected: for example, a 10% reciprocal tariff was placed on remote Australian islands where many penguins but no people live.

62.    The reciprocal tariffs took effect on April 9, 2025, at 12:01 a.m., but that same day, President Trump announced they would be paused for 90 days, until July 9, 2025.[17]

63.    While on pause, the countries that were subject to reciprocal tariff are instead subject to the 10% universal tariff, which is currently in effect.

64.    The pause does not apply to China.

**C.      The Immediate Impact of President Trump's Tariffs**

65.    The impacts of President Trump's tariffs in recent weeks have been felt by countries, businesses, and individuals around the globe.

66.    Particularly, the economic impact of President Trump's April 2, 2025, announcement of universal and reciprocal tariffs was historic and unprecedented.  In the two days following his announcement, the U.S. stock market lost a record $6.6 trillion, *the largest two-day loss in its*

---

[16] Exec. Order 14,257 (Apr. 2, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/.  These new tariffs also do not affect prior orders for Mexico and Canada  There are other exceptions, including: "(1) articles subject to 50 USC 1702(b); (2) steel/aluminum articles and autos/auto parts already subject to Section 232 tariffs; (3) copper, pharmaceuticals, semiconductors, and lumber articles; (4) all articles that may become subject to future Section 232 tariffs; (5) bullion; and (6) energy and other certain minerals that are not available in the United States." *Fact Sheet* (Apr. 2, 2025), *supra* note 13.

[17] Exec. Order 14,266 (Apr. 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/modifying-reciprocal-tariff-rates-to-reflect-trading-partner-retaliation-and-alignment/.

*history*.  While it recovered some of that loss, the stock market has continued to fluctuate wildly.

67.    Notably, the market for U.S. Government bonds—the bedrock of the financial system—has suffered a sharp sell-off since the week of President's Trump announcement.

68.    And President's Trump's tariffs imposed as of April 2, 2025, are projected to shrink the U.S. economy by $100 billion annually, increase inflation by 1.3%, and cost the average American family $2,100.[18]

69.    California, as a leader in global trade, bears an inordinate share of these costs.  And those costs directly impact California's Governor, whose ability to respond to the State's emergencies and enact his policy goals and the prerogatives of the State's Legislature are frustrated by the economic impact of President Trump's tariffs.  *See infra* Section III, Harm to California and the Governor of California.

70.    Furthermore, several countries have either retaliated, or have announced plans for future retaliation, in light of President Trump's tariffs.  This is not limited to China, which, as described above, has imposed retaliatory tariffs on the United States of 125% and has stopped exporting certain critical goods.  The European Union indicated that it was "preparing further countermeasures to protect [its] interests and [its] businesses if negotiations fail."  Other countries, like Brazil, have passed laws that give their governments legal authority to impose retaliatory tariffs.

## II.    President Trump Lacked Legal Authority to Issue the IEEPA Tariff Orders

### A.    Under the Doctrine of Separation of Powers, the President May Not Rule by Fiat

71.    In our constitutional system, the President may not rule by fiat.

72.    Instead, under our democratic system of checks and balances, "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown*, 343 U.S. at 585.

73.    The Constitution does not vest in the President any authority to impose tariffs.

---

[18] These numbers would be even higher today, as tariffs on China have skyrocketed from 20% to 145% since April 2.

74.    Rather, the Constitution expressly vests the authority to impose tariffs solely in Congress, not the President.  U.S. Const. art. I, § 8 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises . . . .").

75.    Congress's power in this area is exhaustive.  *Brushaber v. Union Pac. R.R. Co.*, 240 U.S. 1, 12 (1916) ("the authority conferred upon Congress by § 8 of article 1 'to lay and collect taxes, duties, imposts and excises' is exhaustive and embraces every conceivable power of taxation").

76.    Because the Constitution does not vest in the President any authority to impose tariffs, any authority for the President to do so must come, if at all, from an act of Congress.

**B.    Congress Enacted the International Emergency Economic Powers Act as Part of a Series of Reforms to *Limit* Presidential Authority and to Prevent Presidential Abuse of Power**

77.    President Trump cites IEEPA as the basis for his authority to issue the IEEPA Tariff Orders.

78.    But IEEPA does not authorize President Trump to issue the tariffs he has imposed.

79.    Rather, IEEPA was enacted by Congress as part of a series of reforms to *limit* presidential authority and to prevent presidential abuse of power.

80.    And IEEPA does not so much as mention tariffs, much less authorize President Trump to unilaterally impose unprecedented tariffs at his whim.

81.    In the mid-1970s, following U.S. military involvement in Vietnam, revelations of domestic spying, assassinations of foreign political leaders, the Watergate break-in, and other related abuses of power, Congress increasingly focused on checking the Executive Branch.

82.    The Senate formed a bipartisan special committee chaired by Democratic Senator Frank Church and Republican Senator Charles Mathias to reevaluate delegations of emergency authority to the President.

83.    Among the more controversial statutes highlighted by the committee was the Trading with the Enemy Act.

84.    This Act was originally enacted in 1917 to prevent trade with Germany and the Central Powers during World War I.

12

85.     Over time, however, successive Presidents had invoked the Trading with the Enemy Act to declare that national emergencies existed and assume expansive authority over economic transactions outside the context of a declared war.

86.     The 1970s bipartisan special committee reevaluating delegations of emergency authority to the President issued a report surveying the President's emergency powers in which it asserted that the United States had technically "been in a state of national emergency since March 9, 1933" and that there were four distinct declarations of national emergency then in effect.

87.     The report also noted that the United States had "on the books at least 470 significant emergency statutes without time limitations delegating to the Executive extensive discretionary powers, ordinarily exercised by the Legislature, which affect the lives of American citizens in a host of all-encompassing ways."

88.     In the course of the committee's investigations, Senator Mathias, a committee co-chair, noted, "A majority of the people of the United States have lived all of their lives under emergency government."

89.     Senator Church, the other co-chair, said the central question before the committee was "whether it [was] possible for a democratic government such as ours to exist under its present Constitution and system of three separate branches equal in power under a continued state of emergency."

90.     During the House markup of a bill revising the Trading with the Enemy Act, Representative Jonathan Bingham, Chairperson of the House International Relations Committee's Subcommittee on Economic Policy, described the Act as conferring "on the President what could have been dictatorial powers that he could have used without any restraint by Congress."

91.     The House report on the reform legislation called the Trading with the Enemy Act "essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review."

92.     The report noted how Presidents had been claiming the ability to exercise powers under the Trading with the Enemy Act "so long as there is an unterminated declaration of national emergency on the books, whether or not the situation with respect to which the emergency was

declared bears any relationship to the situation with respect to which the President is using the authorities."

93.    Congress's reforms to this overly expansive use by Presidents of emergency powers came in two acts.

94.    First, Congress enacted the National Emergencies Act in 1976.

95.    The NEA provided for the termination of all existing declarations of national emergencies in 1978 and placed new restrictions on the President as to the manner of declaring and the duration of new states of emergency.

96.    Second, Congress amended the Trading with the Enemy Act in 1977.

97.    Among other things, Congress amended the Trading with the Enemy Act so that it was, as originally intended, only applicable "during a time of war."

98.    To address emergencies outside of wartime, Congress enacted the International Emergency Economic Powers Act to provide certain more limited economic powers for the President to use in genuine times of national emergency.

99.    The Report of the House Committee on International Relations summarized the nature of an "emergency" in its new approach to international emergency economic powers:

> [G]iven the breadth of the authorities, and their availability at the President's discretion upon a declaration of a national emergency, their exercise should be subject to various substantive restrictions. The main one stems from a recognition that emergencies are by their nature rare and brief, and are not to be equated with normal ongoing problems.  A national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose.  The emergency should be terminated in a timely manner when the factual state of emergency is over and not continued in effect for use in other circumstances.  A state of national emergency should not be a normal state of affairs.

100.    The Report further summarized how the amendments to the Trading with the Enemy Act and the new IEEPA statute were specifically intended to *limit* the ability of Presidents to exercise emergency powers unilaterally without proper oversight:

> [G]iven the history of expansive use of emergency powers, the exercise of the emergency economic authorities should also be subject to strict procedural limitations, including consultation with Congress, periodic reporting requirements, and provision for

14

termination of states of emergency by Congress and for veto by Congress of regulations promulgated under the international emergency economic powers statute.  This should be accomplished at a minimum by conforming the use of the authorities to the procedural requirements of the National Emergencies Act.

**C.     The International Emergency Economic Powers Act Does Not Authorize President Trump to Impose Tariffs**

101.   IEEPA does not provide clear congressional authorization for the President to impose tariffs.

102.   Section 1702(a)(1)(B)—the section of IEEPA that President Trump cites—provides that the President may "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]"  50 U.S.C. § 1702(a)(1)(B).  IEEPA further provides that the President may exercise these authorities "only . . . to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter" and "not . . . for any other purpose."  50 U.S.C. § 1701(b).

103.   This fulsome list of authorities does not include the power to impose tariffs, import duties, or taxes.

104.   In the nearly 50-year history of IEEPA, no President has ever used IEEPA to impose tariffs, prior to the unprecedented actions of President Trump in 2025.

105.   IEEPA further provides that "[t]he President, in every possible instance, shall consult with the Congress before exercising any of the authorities granted by this chapter and shall consult regularly with the Congress so long as such authorities are exercised."  50 U.S.C. § 1703(a).

106.   Upon information and belief, President Trump did not consult with Congress before issuing his IEEPA Tariff Orders.

107.   In contrast to IEEPA, which does not mention tariffs or import duties, other Acts of

Congress do expressly mention import duties and authorize imposition of import duties. *See, e.g.*, 19 U.S.C. § 2411.

108.   Those Acts impose specific procedural requirements before the Executive Branch may impose a tariff, however.

109.   Rather than comply with the statutory requirements that Congress established with respect to imposing tariffs, President Trump invoked IEEPA under the view that IEEPA granted him unfettered authority to impose unprecedented and staggering tariffs simply by decree.

110.   The "economic and political significance" of the highly novel tariffs that President Trump has imposed is "staggering by any measure." *Cf. Biden*, 600 U.S. at 502.  And the proposed tariffs of such a scale represent an "unheralded" and "transformative expansion" of Presidential authority. *See West Virginia v. EPA*, 597 U.S. 697, 724 (2022).

111.   As the Supreme Court has held, "[a] decision of such magnitude and consequence on a matter of earnest and profound debate across the country must rest with Congress itself, or an agency acting pursuant to a clear delegation from that representative body." *Biden*, 600 U.S. at 504 (quotation marks and brackets omitted).

112.   In such circumstances, the Executive Branch must have "clear congressional authorization" for the power it claims. *Id.* at 506.

113.   IEEPA does not provide "clear" congressional authorization for President Trump to rule by fiat or to unilaterally impose the tariffs at issue in the IEEPA Tariff Orders.

**III.    President Trump's Unprecedented Tariffs Inflict Harm on California and the Governor of California**

114.   California, as the fifth largest economy in the world and the country's most populous State, stands to suffer unique harm from President Trump's reckless and unprecedented actions on tariffs.

115.   California's economy is larger than every country on earth except the United States, China, Germany, and Japan.  With over 39 million residents, California is the second largest economy in the world on a per capita basis.  It produced a gross state product (GSP) of over $4 trillion in 2024, accounting for 13.7% of the entire U.S. gross domestic product (GDP).

16

116.   California is the largest importer and second-largest exporter among U.S. states.   In 2024, California's total merchandise trade reached $675 billion, accounting for close to 16% of GSP.

117.   Much of this trade flows through California's eleven public ports, two of which are the largest and busiest container ports in North America.   California's ports process one-third of all exports and 40% of all containerized imports for the *entire world*, generating an estimated $9 billion in state and local tax revenue annually.

118.   Mexico, Canada, and China, three countries specifically targeted by Trump's current tariff regime, are California's three largest trading partners.   Over 40% of California imports come from these countries, totaling $203 billion of the more than $491 billion in goods imported by California in 2024.   Additionally, these three countries are California's top three export destinations, buying close to $67 billion in California exports, which was over one-third of the State's $183 billion in exported goods in 2024.

119.   Because of California's outsize economic footprint, it is subject to outsize effects from President Trump's recent whipsaw actions on tariffs.

120.   Considering one aspect, the State of California spends a huge amount of money as a member of the global market.   These goods will or have already become more expensive as a direct result of President Trump's IEEPA Tariff Orders, resulting in drastic impacts on the State's budget and the Governor's ability to deliver on his policy goals.

121.   As a direct participant in the market, California enters into thousands of contracts every year that will be directly affected by President Trump's tariffs: the costs of those contracts will go up, and those costs will be passed onto the State.   The State's ability to plan for the future and enter into contracts with vendors has accordingly been hamstrung by the uncertainty and rapid-fire "emergency" nature of President Trump's tariffs.

122.   Multiple vendors that do business with California have claimed entitlement to pass on tariff-related price increases to the State, and more are expected to do so in the coming weeks and months.

123.   These types of claims will only continue to multiply as President Trump's IEEPA

Tariff Orders continue to wreak havoc.

124.   Retaliatory tariffs imposed by other countries in response to President Trump's tariffs are also certain to impact California in unique and particularized ways.  California is the country's second largest exporter, and ranks first in agricultural exports, which totaled over $23.6 billion in 2022.

125.   For example, California grows 76% of the world's almonds and exports most of them, contributing $9.2 billion to the State's GSP and supporting 110,000 jobs.  If countries that import California's almonds impose high retaliatory tariffs, almond producers will be responsible for the difference in price, and will have to choose to pay these costs themselves or pass them onto customers, thereby depressing demand for the product.  Either way, the State will miss out on tax revenue it currently collects, which will have a negative impact on its policy goals.

126.   California's ports also stand to face drastic and industry-altering consequences from the President's actions on tariffs.  The twelve ports in California, eleven of which are publicly owned, process approximately 40% of all containerized imports and 30% of all exports for the entire United States.  The ports generate an estimated $9 billion in state and local tax revenue annually.  Additionally, port activities employ more than half a million people in California and are linked to nearly three million jobs nationwide.  One in nine Southern California residents are employed through the ports.

127.   These ports are supported by various state agencies, and several were created through state statutes.  The State also directly supports the ports financially; for example, the State appropriated $27 million to support five ports in 2022.  The goal of President Trump's tariffs is to impact trade; if left in place, they will undoubtedly cause decreased activity at the ports, resulting in untold consequences for the hundreds of thousands of Californians who work there.  It will also directly affect the State's tax revenue, which relies on money from the ports to fund various programs.

128.   Furthermore, California is home to over 1.7 million businesses, which generate 90% of the State's GSP.  Over 90% of those are small businesses, including 60,000 small-business exporters.

129.   Corporate taxes are California's third-largest source of revenue—for 2024–2025, the State expects almost 15% of its $228.2 billion budget to be funded by corporate taxes.  As President's Trump's tariffs are projected to shrink the U.S. economy by $100 billion annually, millions of California's businesses will see their profits decline, translating to diminished revenue to fund the State's budget.

130.   Additionally, projections also show the average American family will face increased costs of $2,100 on average, translating to a population with significantly decreased income and purchasing power.  These losses would in turn decrease personal-income-tax revenue, the State's largest source of revenue, and sales and use taxes, the State's second largest source of revenue, drastically impacting the State's budget.

131.   The projected financial impacts from President Trump's tariffs are also likely to raise the cost of State economic-assistance programs, such as unemployment and similar benefits.

132.   Finally, the tariffs also impede the Governor's policy goals and his ability to effectuate the Legislature's priorities.

133.   All told, President Trump's tariffs will transform the State of California's economic situation, put at risk its position as the fifth largest economy in the world, and directly impact Governor Newsom's ability to deliver on his policy goals for all Californians.

## **CLAIMS FOR RELIEF**

### **COUNT I**
### *Ultra Vires* **- Conduct in Excess of Statutory Authority**
### **(Against All Defendants)**

134.   Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

135.   President Trump has claimed a wholly unconstrained authority to unilaterally impose unprecedented tariffs on every single trading partner of the United States.

136.   The President does not have the authority to act unilaterally.

137.   Rather, "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown*, 343 U.S. at 585.

138.   President Trump cites IEEPA as the statutory authority for his tariffs.

139.  IEEPA does not authorize President Trump to issue the IEEPA Tariff Orders.

140.  Accordingly, President Trump's conduct in issuing the IEEPA Tariff Orders has been *ultra vires*.

141.  Agency Defendants' conduct in implementing the tariffs that President Trump has imposed has been *ultra vires*.

142.  Defendants' *ultra vires* conduct has caused and will continue to cause ongoing, irreparable harm to California, its Governor, and its residents.

143.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the IEEPA Tariff Orders are unlawful, void, and of no effect.

144.  Pursuant to 28 U.S.C. §§ 2201–02, Plaintiffs are entitled to injunctive relief, enjoining all Defendants (other than the President) and their officers, employees, agents, servants, attorneys, and others acting in concert with them or subject to their control or direction, from implementing or enforcing the IEEPA Tariff Orders.

**COUNT II**
**Separation of Powers – Usurping Legislative Authority**
**(Against All Defendants)**

145.  Plaintiffs incorporate the preceding allegations as if alleged herein.

146.  The separation-of-powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020).

147.  The Constitution provides that "Congress shall have the Power To lay and collect Taxes, Duties, Imposts and Excises . . . ." U.S. Const. art. I, § 8.

148.  Congress's power in this area is exhaustive. *Brushaber*, 240 U.S. at 12 ("the authority conferred upon Congress by § 8 of article 1 'to lay and collect taxes, duties, imposts and excises' is exhaustive and embraces every conceivable power of taxation").

149.  "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585.

150.  Where, as here, the President or the Executive Branch usurps and exercises a power that the Constitution has vested in Congress that Congress has not validly granted them, it

1    violates the separation-of-powers doctrine.

2        151.   Accordingly, President Trump's conduct in issuing the IEEPA Tariff Orders violates

3    the separation-of-powers doctrine.

4        152.   Agency Defendants' conduct in implementing the tariffs that President Trump has

5    imposed violates the separation-of-powers doctrine.

6        153.   Defendants' unconstitutional conduct has caused and will continue to cause ongoing,

7    irreparable harm to California, its Governor, and its residents.

8        154.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the IEEPA

9    Tariff Orders are unlawful, void, and of no effect.

10       155.   Pursuant to 28 U.S.C. §§ 2201–02, Plaintiffs are entitled to injunctive relief,

11   enjoining all Defendants (other than the President) and their officers, employees, agents, servants,

12   attorneys, and others acting in concert with them or subject to their control or direction, from

13   implementing or enforcing the IEEPA Tariff Orders.

14                              **PRAYER FOR RELIEF**

15       WHEREFORE, Plaintiffs State of California, by and through Attorney General Rob Bonta,

16   and Gavin Newsom, in his official capacity as Governor of California, respectfully request that

17   this Court:

18       1.     Declare that President Trump's IEEPA Tariff Orders are unlawful and void, because

19   they were issued *ultra vires* in excess of statutory authority and/or because they are

20   unconstitutional and violate separation of powers, pursuant to the Declaratory Judgment Act,

21   28 U.S.C. §§ 2201–02;

22       2.     Enjoin Agency Defendants (and all of their officers, employees, agents, servants,

23   attorneys, and others acting in concert with them or subject to their control or direction) from

24   taking any action to implement or enforce President Trump's IEEPA Tariff Orders;

25       3.     Award Plaintiffs costs, expenses, and reasonable attorney's fees, pursuant to the

26   Equal Access to Justice Act, 28 U.S.C. § 2412; and

27       4.     Grant such other relief as the Court deems just and proper.

28

1    Dated:  April 16, 2025                    Respectfully submitted,

2                                             ROB BONTA
                                             Attorney General of California
3                                             THOMAS S. PATTERSON
                                             Senior Assistant Attorney General
4                                             LARA HADDAD
                                             Supervising Deputy Attorney General
5
                                             */s/ Zelda Vassar*
6                                             ZELDA VASSAR
                                             SHIWON CHOE
7                                             CAROLYN F. DOWNS
                                             Deputy Attorneys General
8                                             *Attorneys for Plaintiffs State of California*
                                             *and Gavin Newsom, in his official capacity*
9                                             *as Governor of California*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint (No. 25-cv-_____)