YAAKOV M. ROTH
Acting Assistant Attorney General
ERIC J. HAMILTON
Deputy Assistant Attorney General
PATRICIA M. McCARTHY
Director, National Courts
CLAUDIA BURKE
Deputy Director, National Courts
JUSTIN R. MILLER
Attorney-In-Charge, International Trade Field Office
LUKE MATHERS
Trial Attorney

    U.S. Department of Justice
    Civil Division
    Commercial Litigation Branch
    26 Federal Plaza, Suite 346
    New York, New York 10278
    Telephone: (212) 264-9236
    luke.mathers@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA and GAVIN NEWSOM, in his official capacity as Governor of California, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, et al., <br><br> Defendants. | Case No. 3:25-cv-03372-JSC <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO TRANSFER TO THE U.S. COURT OF INTERNATIONAL TRADE** <br><br> Date: May 22, 2025 <br> Time: 10:00 a.m. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

NOTICE OF MOTION AND MOTION ............................................................................................ 1

ISSUE TO BE DECIDED ................................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................... 1

BACKGROUND .................................................................................................................................. 2

I.    Legal Background ...................................................................................................................... 2

     A.    The International Emergency Economic Powers Act ............................................... 2

     B.    The National Emergencies Act ................................................................................... 2

II.   Executive Orders Under IEEPA ............................................................................................... 3

     A.    Mexico and Canada Executive Orders ...................................................................... 3

     B.    China Executive Orders ............................................................................................... 5

     C.    Reciprocal Tariff Executive Orders ........................................................................... 6

III.  Plaintiffs' Suit ............................................................................................................................ 7

STANDARD OF REVIEW ................................................................................................................. 8

ARGUMENT ........................................................................................................................................ 9

I.    Transfer is Required Because the Court of International Trade Has Exclusive Subject-Matter Jurisdiction Over Plaintiffs' Complaint ....................................................................... 9

CONCLUSION .................................................................................................................................. 13

**TABLE OF AUTHORITIES**

**Cases**

*Alcan Sales, Div. of Alcan Aluminum Corp. v. United States*,
   693 F.2d 1089 (Fed. Cir. 1982) .................................................................................................. 11

*Arjay Associates, Inc. v. Bush*,
   891 F.2d 894 (Fed. Cir. 1989) .................................................................................................... 10

*Commodities Export Co. v. U.S. Customs Serv.*,
   957 F.2d 223 (6th Cir. 1992) ...................................................................................................... 10

*Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*,
   18 F.3d 1581 (Fed. Cir. 1994) ................................................................................................ 9, 10

*Cornet Stores v. Morton*,
   632 F.2d 96 (9th Cir. 1980) ................................................................................................. 11, 12

*Corus Group PLC v. Int'l Trade Comm'n*,
   352 F.3d 1351 (Fed. Cir. 2003) .................................................................................................. 10

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ..................................................................................................................... 2

*Earth Island Institute v. Christopher*,
   6 F.3d 648 (9th Cir. 1990) ......................................................................................................... 11

*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990) ..................................................................................................................... 8

*Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites*,
   456 U.S. 694 (1982) ..................................................................................................................... 8

*K-Mart Corp. v. Cartier, Inc.*,
   485 U.S. 176 (1988) ..................................................................................................................... 9

*Kokkonen v. Guardian Life Ins. Co.*,
   511 U.S. 375 (1994) ..................................................................................................................... 8

*Maple Leaf Fish Co. v. United States*,
   762 F.2d 86 (Fed. Cir. 1985) ...................................................................................................... 10

*Motion Systems Corp. v. Bush*,
   437 F.3d 1356 (Fed. Cir. 2006) .................................................................................................. 10

*Orleans Int'l, Inc. v. United States*,
   334 F.3d 1375 (Fed. Cir. 2003) .................................................................................................... 9

*Pentax Corp. v. Myhra*,
   72 F.3d 708 (9th Cir. 1995) ..................................................................................................... 8, 9

*Regan v. Wald*,
  468 U.S. 222 (1984) .................................................................................................................. 2

*Simon Design Inc. v. United States*,
  609 F.3d 1335 (Fed. Cir. 2010) ............................................................................................. 10

*Solar Energy Indus. Assn. v. United States*,
  111 F.4th 1349 (Fed. Cir. 2024) ............................................................................................ 10

*Totes-Isotoner Corp. v. United States*,
  594 F.3d 1346 (Fed. Cir. 2010) ............................................................................................. 10

*Transpacific Steel LLC v. United States*,
  4 F.4th 1306 (Fed. Cir. 2021) ................................................................................................ 10

*U.S. Shoe Corp. v. United States,*
  523 U.S. 360 (1998) ................................................................................................................ 10

*United States v. Universal Fruits & Vegetables Corp.*,
  370 F.3d 829 (9th Cir. 2004) .................................................................................................. 8

*United States v. Yoshida Int'l*,
  526 F.2d 560 (C.C.P.A. 1975) ............................................................................................... 11

**Constitutional Provisions**

U.S. Const. art. 1, § 8, cl. 1 ........................................................................................................ 10

**Statutes**

28 U.S.C. § 1331 ........................................................................................................................... 9

28 U.S.C. § 1337(c) ...................................................................................................................... 9

28 U.S.C. § 1581 ........................................................................................................................... 1

28 U.S.C. § 1581(i) .......................................................................................................... 1, 11, 12

28 U.S.C. § 1581(i)(1)(A) ............................................................................................................ 9

28 U.S.C. § 1581(i)(1)(B) ....................................................................................................... 9, 11

28 U.S.C. § 1581(i)(1)(D) ....................................................................................................... 9, 11

28 U.S.C. § 1631 .................................................................................................................. 1, 8, 12

50 U.S.C. § 1621(a) ...................................................................................................................... 3

50 U.S.C. § 1622 ............................................................................................................................ 3

50 U.S.C. § 1641 ............................................................................................................................ 3

50 U.S.C. § 1662(d) ................................................................................................................... 3

50 U.S.C. § 1701(a) ................................................................................................................... 2

50 U.S.C. § 1702(a)(1)(B) .................................................................................................... 2, 12

50 U.S.C. §1702(b) .................................................................................................................... 2

Act of May 28, 1926, ch. 411, 44 Stat. 669 ............................................................................. 10

Customs Administration Act of 1890, ch. 407, 26 Stat. 131 ................................................... 10

National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976)...................................... 2

**Executive Orders and Implementing Notices**

*Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,431 (Feb. 12, 2025) ................................................................................................................................. 6

*Amendment to Notice of Implementation of Additional Duties on Products of Canada Pursuant to the President's Executive Order 14193, Imposing Duties To Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 11,743 (Mar. 11, 2025)......................................................... 5

*Amendment to Notice of Implementation of Additional Duties on Products of Mexico Pursuant to the President's Executive Order 14194, Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 11,746 (Mar. 11, 2025) ....................................................................... 5

Executive Order 14193 of February 1, 2025,
*Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025)................................................................................................................. 4

Executive Order 14194 of February 1, 2025,
*Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025) 4

Executive Order 14194 of February 1, 2025,
*Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025). ................................................................................................................................................. 4

Executive Order 14195 of February 1, 2025,
*Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025) ............................................................................................ 5

Executive Order 14197 of February 3, 2025,
*Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9,183 (Feb. 10, 2025) ....................... 4

Executive Order 14198 of February 3, 2025,
*Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 9,185 (Feb. 10, 2025) ....................... 4

Executive Order 14228 of March 3, 2025,
  *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, Exec. Order 14,228, 90 Fed. Reg. 11,463 (Mar. 7, 2025) ...................................................... 6

Executive Order 14231 of March 6, 2025,
  *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,785 (Mar. 11, 2025) ................................................................................................................ 4

Executive Order 14232 of March 6, 2025,
  *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11,787 (Mar. 11, 2025) ................................................................................................................ 4

Executive Order 14257 of April 2, 2025,
  *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025) ............ 6, 7

Executive Order 14259 of April 8, 2025,
  *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025) ......................................................... 7

Executive Order 14266 of April 9, 2025,
  *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment* ................... 7

*Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,426 (Mar. 6, 2025) ................................................................................................................................................. 6

*Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,038 (Feb. 5, 2025) ............................ 6

*Notice of Implementation of Additional Duties on Products of Canada Pursuant to the President's Executive Order 14193, Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,423 (Mar. 6, 2025) ........................................................................................ 5

*Notice of Implementation of Additional Duties on Products of Mexico Pursuant to the President's Executive Order 14194, Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 11,429 (Mar. 6, 2025) ................................................................................................................. 5

Proclamation 10886 of January 20, 2025,
  *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8,327 (Jan. 29, 2025) ................................................................................................................................... 3

**Other Authorities**

Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental Relations, 94th Cong. (Mar. 6, 1975) ......................................................................................................................... 3

S. Rep. No. 94-922 (1976) ...................................................................................................................... 3

S. Rep. No. 95-466 (1977) .................................................................................................................. 2

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 22, 2025, at 10:00 a.m. or as soon thereafter as the matter may be heard, defendants will appear before the Honorable Jacqueline Scott Corley and move to transfer this case to the U.S. Court of International Trade under 28 U.S.C. § 1631, because that court has exclusive jurisdiction over plaintiffs' claims.

## ISSUE TO BE DECIDED

Should the Court, under 28 U.S.C. § 1631, transfer this civil action challenging the imposition of tariffs to the Court of International Trade, a specialized Article III court with nationwide jurisdiction that, under 28 U.S.C. § 1581, possesses exclusive jurisdiction to hear civil actions challenging the imposition of tariffs?

## MEMORANDUM OF POINTS AND AUTHORITIES

In the International Economic Emergency Powers Act of 1977 (IEEPA), Congress confirmed the President's power to, among other things, "regulate importation" of foreign goods to deal with a national emergency. The President, acting under IEEPA, has regulated imports by imposing tariffs on goods from most countries through a series of Executive Orders, to deal with unusual and extraordinary threats to the United States's national security, foreign policy, and economy.

Plaintiffs challenge the President's authority to impose tariffs under IEEPA, on both constitutional and statutory grounds. But all of plaintiffs' arguments concern the imposition of tariffs— over which the Court of International Trade has *exclusive* jurisdiction. 28 U.S.C. § 1581(i). Section 1631 of Title 28 of the U.S. Code requires transfer when there is "a want of jurisdiction" in the original court and where the action could have been brought in another court. Because the Court of International Trade has exclusive jurisdiction over the subject matter in plaintiffs' complaint, the case should be transferred to that court for any further proceedings, including any threshold challenges. The Ninth Circuit has held cases involving tariffs under IEEPA's materially identical predecessor statute cannot be litigated in federal district courts. In addition, exercising jurisdiction over this case would place this Court at odds with the Court of International Trade, which is presently exercising jurisdiction over two cases challenging President Trump's tariffs issued under IEEPA.

BACKGROUND

I.  **Legal Background**

    A.  **The International Emergency Economic Powers Act**

In 1977, Congress enacted IEEPA. *See* S. Rep. No. 95-466, at 1–2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. When adopting IEEPA, Congress modified the existing Trading with the Enemy Act (TWEA) so that it applied only in periods of war, but also extended the President's authority to periods of declared national emergencies. *See Regan v. Wald*, 468 U.S. 222, 227–28 (1984). Although the broad powers granted to the President under IEEPA are "essentially the same as" those under its predecessor TWEA, *id.*; *see Dames & Moore v. Regan*, 453 U.S. 654, 671–72 (1981) (IEEPA was "directly drawn" from the language of TWEA), IEEPA provides authority to exercise those powers during peacetime, "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," 50 U.S.C. § 1701(a). Once the President declares a national emergency relating to such a threat, IEEPA empowers the President to "regulate . . . importation . . . with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B). In full, the relevant subsection authorizes the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States[.]

*Id.* IEEPA also contains narrowly focused exceptions to this broad grant of authority, which, among other things, state that the President may not regulate or prohibit "the importation from any country . . . of any information or informational materials . . . ." *Id.* §1702(b)(1)–(4). But none of the exceptions involves the President's authority to impose tariffs to deal with a declared national emergency.

    B.  **The National Emergencies Act**

The National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601–51), was an effort by Congress to "establish procedural guidelines for the handling of future emergencies with provision for regular Congressional review." S. Rep. No. 94-922, at 1

(1976). The statute includes directives for Presidential declarations of national emergencies with respect to statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). Congress did not place any conditions on the President's ability to declare a national emergency. Instead, Congress committed this determination to the President as "it would be wrong to try to circumscribe with words what conditions a President might be confronted." Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental Relations, 94th Cong. 27 (Mar. 6, 1975) (statement of Sen. Mathias); *see also id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

Recognizing that a declaration of an emergency was essentially a political question to be resolved by the political branches, Congress gave itself the exclusive oversight authority over a President's national emergency declaration. For instance, Congress directs that a declaration of a national emergency be "immediately . . . transmitted to the Congress and published in the Federal Register." 50 U.S.C. § 1621(a). Congress also directs the President to comply with congressional reporting requirements pertaining to that declaration. *Id.* § 1641(a)–(c). Congress may terminate a national emergency through a joint resolution that is subject to fast-track procedures, and Congress is directed to meet "[n]ot later than six months after a national emergency is declared, and [every six months thereafter]," to consider whether the emergency shall be terminated. *Id.* § 1622(a)–(c). A declaration of a national emergency also "terminate[s] on the anniversary of the declaration" unless the President provides notice to Congress that the emergency "continue[s]." *Id.* § 1662(d).

II.   **Executive Orders Under IEEPA**

At issue in this case are four declared national emergencies and the President's actions to deal with these emergencies.

A.   **Mexico and Canada Executive Orders**

In January 2025, the President declared the flow of contraband drugs like fentanyl to the United States through illicit distribution networks, and the resulting public-health crisis, to be a national emergency. Proclamation 10886 of January 20, 2025, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8,327 (Jan. 29, 2025). On February 1, 2025, the President

found that "the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug-trafficking organizations], other drug and human traffickers, criminals at large, and drugs" had contributed to this crisis. Executive Order 14193 of February 1, 2025, § 1, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113, 9,114 (Feb. 7, 2025). Also on February 1, 2025, the President found that Mexico had "fail[ed] to arrest, seize, detain, or otherwise intercept [drug-trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." Executive Order 14194 of February 1, 2025, § 1, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117, 9,118 (Feb. 7, 2025).

Using his broad powers under IEEPA, the President took action to deal with the unusual and extraordinary threat to the United States's national security, foreign policy, and economy, ordering that most Canadian and Mexican imports be assessed a 25% duty (except for energy and energy resources from Canada, which were assessed a 10% duty). *Id.*; Executive Order 14194 of February 1, 2025, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025).

Two days later, on February 3, 2025, the President issued two Executive Orders, recognizing that Canada and Mexico had taken immediate steps to alleviate the flow of illicit drugs and illegal aliens into the United States, but finding that additional time was needed to assess those steps' sufficiency. Executive Order 14197 of February 3, 2025, *Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9,183 (Feb. 10, 2025); Executive Order 14198 of February 3, 2025, *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 9,185 (Feb. 10, 2025). Accordingly, the President paused most of the tariffs on Mexican and Canadian goods until March 4, 2025. *Id.*

Shortly after that pause lapsed, the President issued two Executive Orders exempting all Canadian and Mexican goods that qualify for duty-free entry under the United States-Mexico-Canada Agreement (USMCA). Executive Order 14231 of March 6, 2025, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,785 (Mar. 11, 2025); Executive Order 14232 of March 6, 2025, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11,787 (Mar. 11, 2025). As a result, only goods imported from Canada that are not USMCA-qualifying—generally, goods that do not originate from North America—are subject to the tariffs imposed by Executive Orders 14193 and 14194. In accordance with these

Executive Orders, the U.S. Department of Homeland Security, through U.S. Customs and Border Protection, implemented these tariffs by modifying the Harmonized Tariff Schedule of the United States (HTSUS), which sets forth the duty rates for all imported goods. *Notice of Implementation of Additional Duties on Products of Canada Pursuant to the President's Executive Order 14193, Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,423 (Mar. 6, 2025); *Notice of Implementation of Additional Duties on Products of Mexico Pursuant to the President's Executive Order 14194, Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 11,429 (Mar. 6, 2025); *Amendment to Notice of Implementation of Additional Duties on Products of Canada Pursuant to the President's Executive Order 14193, Imposing Duties To Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 11,743 (Mar. 11, 2025); *Amendment to Notice of Implementation of Additional Duties on Products of Mexico Pursuant to the President's Executive Order 14194, Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 11,746 (Mar. 11, 2025).

### B. China Executive Orders

On February 1, 2025, the President took additional action under IEEPA to specifically address the unusual and extraordinary threat from the People's Republic of China (PRC), including the PRC's failures to stem the flow of contraband drugs to the United States. Executive Order 14195 of February 1, 2025, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025). The President found that the PRC had failed "to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [Transnational Criminal Organizations], criminals at large, and drugs." *Id.* at 9,122. To address the national emergency, the President took "decisive and immediate action" under IEEPA and "decided to impose, consistent with law, ad valorem tariffs on articles that are products of the PRC as set forth in this order." *Id.*

The President then imposed a 10% *ad valorem* duty rate on most goods imported from the PRC and authorized DHS to take any necessary actions to implement the order. *Id.* at 9,122–23. DHS, through CBP, did so shortly thereafter. *See Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing*

*Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,038 (Feb. 5, 2025) (implementing the 10% duty through amendments to the Harmonized Tariff Schedule of the United States set out in an Annex to the Federal Register notice).  On March 3, 2025, the President amended the order to increase the amount of duty to 20%.  Executive Order 14228 of March 3, 2025, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025); *Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,426 (Mar. 6, 2025) (implementing the 20% duty through amendments to the HTSUS set out in an Annex to the Federal Register notice).

### C.   Reciprocal Tariff Executive Orders

On April 2, 2025, the President declared a separate national emergency, finding "that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States."  Executive Order 14257 of April 2, 2025, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025).   That threat, the President found, "has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system."  *Id.*

In particular, these "large and persistent annual U.S. goods trade deficits" have "atrophied" our nation's "domestic production capacity" to the point where, now, the United States' "military readiness" and "national security posture" are "comprise[d]"—an "especially acute" emergency given "the recent rise in armed conflicts abroad."  *Id.* at 15,044–55.  The Executive Order explains, for instance, that "because the United States has supplied so much military equipment to other countries, U.S. stockpiles of military goods are too low to be compatible with U.S. national defense interests."  *Id.* at 15,043. Additionally, "[i]ncreased reliance on foreign producers for goods also has compromised U.S. economic

security by rendering U.S. supply chains vulnerable to geo-political disruption and supply shocks." *Id.* (noting the existence of supply disruptions currently being caused by "Houthi rebels . . . attacking cargo ships in the Middle East"). "The future of American competitiveness depends on reversing" the hemorrhage of manufacturing and manufacturing jobs to create "the industrial base" the nation "needs for national security," as well as safeguarding the vitality of the nation's food and agriculture sectors. *Id.* at 15,044.

Again, using his broad powers under IEEPA, the President took action that he deemed necessary and appropriate to deal with this unusual and extraordinary threat to the United States's national security and economy, and imposed a 10% duty on most imported goods. *Id.* at 15,045. These duties took effect on April 5, 2025, with select countries having additional duties imposed on April 9. *Id.* Since the initial declaration, the President has twice taken additional actions that he deemed necessary and appropriate to address this national emergency, including raising the duty rate for Chinese products. Executive Order 14266 of April 9, 2025, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 15, 2025); Executive Order 14259 of April 8, 2025, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025).

The 10% duty on most imported goods imposed on April 5, and the additional country-specific duties starting on April 9, do not currently apply to Canadian or Mexican goods. Executive Order 14257 of April 2, 2025, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025).

**III.    Plaintiffs' Suit**

On April 16, 2025, plaintiffs, the State of California and Governor of California, Gavin Newsom, filed a complaint in this Court. ECF No. 1. The State of California, through its Attorney General, alleges it is harmed by the tariffs because they "put at risk [California's] position as the fifth largest economy in the world . . . ." Compl. ¶ 133. Governor Newsom alleges he is harmed because the tariffs' alleged effects on the State "directly impact [his] ability to deliver on his policy goals for all Californians." *Id.*

Plaintiffs allege that the Executive Orders imposing tariffs on Mexican, Canadian, and Chinese goods exceed the President's statutory authority and "violate[] the separation of powers doctrine." *Id.* ¶ 151. As a remedy, plaintiffs ask the Court to: (1) "[d]eclare" the challenged Executive Orders "unlawful and void, because they were issued *ultra vires* in excess of statutory authority and/or because they are unconstitutional and violate separation of powers . . . .," *id.* at Prayer for Relief ¶ 1, and (2) "[e]njoin" the agency defendants from "taking any action to implement or enforce" the Orders, *id.* at Prayer for Relief ¶ 2. Plaintiffs also seek fees and costs under the Equal Access to Justice Act. *Id.* at Prayer for Relief ¶ 3.

## STANDARD OF REVIEW

Federal courts have an obligation to ensure in each case that their actions are "limited to those subjects encompassed within a statutory grant of jurisdiction." *Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites*, 456 U.S. 694, 701 (1982). A plaintiff bears the burden to establish the subject matter jurisdiction of the district court. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

Ninth Circuit "precedent requires courts faced with conflicts between the broad grants of jurisdiction to the district courts and the grant of exclusive jurisdiction to the Court of International Trade to resolve those conflicts by upholding the exclusivity of the Court of International Trade's jurisdiction." *United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829, 836 (9th Cir. 2004) (cleaned up). Accordingly, when the Court of International Trade appears to have subject-matter jurisdiction over an action filed in district court, "the prudent thing to do is to . . . transfer the case to the [Court of International Trade,] so that [it] can determine the question of its own jurisdiction." *Pentax Corp. v. Myhra*, 72 F.3d 708, 711 (9th Cir. 1995). Such transfer is accomplished through 28 U.S.C. § 1631, which provides that whenever a civil action is filed and a court finds "there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action or appeal could have been brought at the time it was filed . . . ."

# ARGUMENT

## I. Transfer is Required Because the Court of International Trade Has Exclusive Subject-Matter Jurisdiction Over Plaintiffs' Complaint

This Court lacks jurisdiction to hear this case and should promptly transfer it to the Court of International Trade.

The Court of International Trade possesses "exclusive jurisdiction" over "any civil action commenced against" federal agencies or officers that "arises out of any law of the United States providing for . . . tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue" or under any law providing for "revenue from imports." 28 U.S.C. § 1581(i)(1)(A), (B). The Court of International Trade also has exclusive jurisdiction over any civil action arising out of any law "providing for . . . administration and enforcement with respect to the matters referred to in" any preceding provision of § 1581(i)(1). *Id.* § 1581(i)(1)(D). To emphasize that the district courts lack concurrent jurisdiction over these specialized subject matters, Congress separately provided that "[t]he district courts shall not have jurisdiction under this section of any matter within the exclusive jurisdiction of the Court of International Trade . . . ." *Id.* § 1337(c).

The Supreme Court has confirmed that these statutes mean exactly what they say. When one of the "grants of exclusive jurisdiction to the Court of International Trade" applies, all other district courts are "divested of jurisdiction" over the action. *K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182–83 (1988). Other courts (including the Ninth Circuit) similarly agree that "section 1581(i) removes specific actions from the general federal-question jurisdiction of the district courts (under 28 U.S.C. § 1331) and places them in the jurisdiction of the Court of International Trade." *Orleans Int'l, Inc. v. United States*, 334 F.3d 1375, 1378 (Fed. Cir. 2003); *see also Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1586 (Fed. Cir. 1994); *Pentax Corp.*, 72 F.3d at 711. Thus, where Congress has provided that the Court of International Trade is the exclusive forum for challenges to tariffs imposed on imported merchandise, the district courts have no power to act.

The Court of International Trade's exclusive jurisdiction over tariff cases serves an important function: it consolidates this area of law "in one place . . . with an already developed expertise in international trade and tariff matters," thus ensuring a "degree of uniformity and consistency." *Conoco*,

18 F.3d at 1586. Consolidating tariff matters in a single jurisdiction protects the constitutional requirement that "[a]ll Duties, Imposts, and Excises shall be uniform throughout the United States." U.S. Const. art. 1, § 8, cl. 1. If tariff challenges like those raised by plaintiffs could be brought in any (or every) district court, there would be a risk of inconsistent results and different tariffs imposed in different regions of the country, in direct conflict with Congress' statutory design. Indeed, Congress has consistently placed judicial review of tariff matters in a single forum, beginning with the Board of Appraisers in 1890, *see* Customs Administration Act of 1890, ch. 407, 26 Stat. 131; then the Customs Court in 1926, *see* Act of May 28, 1926, ch. 411, 44 Stat. 669; and finally today's Court of International Trade.

Reflecting the exclusive jurisdiction statutes and their underlying purposes of ensuring uniformity, the Court of International Trade's exclusive jurisdiction is broad, encompassing constitutional challenges to tariffs, duties, exactions, and embargoes. *See*, *e.g.*, *U.S. Shoe Corp. v. United States,* 523 U.S. 360 (1998) (constitutional challenge to Harbor Maintenance Fee); *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1350–51 (Fed. Cir. 2010) (constitutional challenge to Tariff Schedules of the United States); *cf. Arjay Associates, Inc. v. Bush*, 891 F.2d 894 (Fed. Cir. 1989) (constitutional challenge to embargo on imports from certain Japanese companies); *see also Commodities Export Co. v. U.S. Customs Serv.*, 957 F.2d 223, 229–30 (6th Cir. 1992).

Its exclusive jurisdiction also includes challenges to Presidential proclamations imposing duties and tariffs. *See, e.g.*, *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021) (Presidential proclamation imposing tariffs on steel under Section 232 of the Trade Expansion Act of 1962); *Solar Energy Indus. Assn. v. United States*, 111 F.4th 1349, 1351 (Fed. Cir. 2024) (Presidential proclamation imposing tariffs on solar panels pursuant to Section 201 of Trade Act of 1974); *Simon Design Inc. v. United States*, 609 F.3d 1335 (Fed. Cir. 2010) (Presidential proclamation modifying tariff schedules); *Motion Systems Corp. v. Bush*, 437 F.3d 1356 (Fed. Cir. 2006) (en banc) (Presidential proclamation declining to impose China-specific safeguard tariff); *Corus Group PLC v. Int'l Trade Comm'n*, 352 F.3d 1351 (Fed. Cir. 2003) (Presidential proclamation imposing duties on certain steel products, based on Section 201); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) (Presidential proclamation imposing duties on mushrooms based on Section 201); *See N. Am. Foreign*

*Trading Corp. v. United States*, 600 F. Supp. 226, 230 (Ct. Int'l Trade 1984) (upholding validity of Executive Order causing plaintiff's goods to be classified under provision of the Tariff Schedules of the United States).

Here, plaintiffs challenge the President's authority to impose tariffs under IEEPA. This question, including all threshold questions, falls squarely within the exclusive subject matter jurisdiction of the Court of International Trade because they arise out of laws providing for tariffs or the administration or enforcement of those laws. 28 U.S.C. § 1581(i)(1)(B), (D). This Court thus lacks jurisdiction over the case and should transfer it to the Court of International Trade.

This is precisely how similar cases have been treated in this Circuit. Under TWEA (IEEPA's predecessor statute), the Ninth Circuit held that a claim about the imposition of a 10% duty on imports belonged in the Customs Court—the predecessor to the Court of International Trade. *See Cornet Stores v. Morton*, 632 F.2d 96, 99–100 (9th Cir. 1980) (affirming district court's decision that claim seeking recovery of duties paid pursuant to order authorized under TWEA fell within exclusive jurisdiction of the Customs Court); *accord Earth Island Institute v. Christopher*, 6 F.3d 648, 651 (9th Cir. 1990) (holding that challenge to embargo provision fell exclusively within Court of International Trade's jurisdiction under § 1581(i)). Along the same lines, the Court of Customs and Patent Appeals—the Federal Circuit's predecessor that heard appeals from the Customs Court—also adjudicated another TWEA matter brought in the right forum. *See, e.g.*, *United States v. Yoshida Int'l*, 526 F.2d 560 (C.C.P.A. 1975); *accord Alcan Sales, Div. of Alcan Aluminum Corp. v. United States*, 693 F.2d 1089 (Fed. Cir. 1982).

In fact, the Court of International Trade is currently considering two similar challenges to the President's authority under IEEPA. *Barnes v. United States*, No. 25-0043, ECF No. 3 (Compl.); *V.O.S. Selections Inc. v. Trump*, No. 25-00066, ECF No. 2 (Compl.). In both cases, plaintiffs, like the State and the Governor here, claim that the President was not authorized to impose tariffs under IEEPA. In *V.O.S.*, the Court of International Trade has just assigned a three-judge panel to hear the case, under the statute directing the Chief Judge to

> designate any three judges of the court to hear and determine any civil action which the chief judge finds: (1) raises an issue of the constitutionality of an Act of Congress, *a proclamation of the President or an Executive order*; or (2) has broad or significant implications *in the*

*administration or interpretation of the customs laws*. 28 U.S.C. § 255 (emphasis added). And while the United States has asked the court to dismiss the complaint in *Barnes* for lack of standing because Mr. Barnes has not established harm, for the reasons stated above, the consideration of whether to dismiss belongs exclusively to the Court of International Trade. *See Barnes*, ECF No. 9. Because the Court of International Trade's jurisdiction over tariff cases is exclusive, this Court's retention of this case would require the conclusion that the Court of International Trade has erred in exercising jurisdiction over both cases. It would likewise conflict with the Ninth Circuit's *Cornet Stores* transfer of a TWEA-based tariff case because the substantive language in TWEA and IEEPA is the same. Both statutes empower the President to "regulate . . . importation." 50 U.S.C. § 1702(a)(1)(B); *see Cornet Stores*, 632 F.2d at 97 & n.1.

Moreover, over the last several years, the Court of International Trade has entertained thousands of challenges to various Presidential actions imposing tariffs. *See, e.g. HMTX Indus. v. United States*, No. 20-00177 (Ct. Int'l Trade); appeal filed, No. 23-1891, ECF No. 5 (Fed. Cir. May 25, 2023) (identifying the 4,100 similar cases stayed pending resolution of the appeal). Likewise, the Court of International Trade routinely exercises jurisdiction under 28 U.S.C. § 1581(i) to review agency determinations under the Administrative Procedure Act. *See, e.g.*, *Sea Shepherd New Zealand v. United States*, No. 20-00112 (Ct. Int'l Trade); *Maui and Hector's Dolphin Defenders NZ Inc. v. Nat'l Marine Fisheries Svc.*, No. 24-00218 (Ct. Int'l Trade). This complaint should be treated no differently.

Because only the Court of International Trade has jurisdiction to hear this dispute regarding the imposition of tariffs, this Court lacks jurisdiction, so it is in the interests of justice to promptly transfer this action to the Court of International Trade. 28 U.S.C. § 1631.

# CONCLUSION

For these reasons, defendants respectfully request that the Court transfer this action in its entirety to the Court of International Trade.

DATED: April 17, 2025

| | |
|---|---|
| OF COUNSEL: | Respectfully submitted, |
| | YAAKOV M. ROTH<br>Acting Assistant Attorney General |
| ALEXANDER K. HAAS<br>Director | ERIC J. HAMILTON<br>Deputy Assistant Attorney General |
| STEPHEN M. ELLIOTT<br>Assistant Director<br>U.S. Department of Justice<br>Civil Division<br>Federal Programs Branch | PATRICIA M. McCARTHY<br>Director<br><br>*s/Claudia Burke*<br>CLAUDIA BURKE<br>Deputy Director |
| SOSUN BAE<br>Senior Trial Counsel<br>BLAKE W. COWMAN<br>Trial Attorney<br>U.S. Department of Justice<br>Civil Division<br>Commercial Litigation Branch | *s/Justin R. Miller*<br>JUSTIN R. MILLER<br>Attorney-In-Charge<br>International Trade Field Office<br><br>*s/Luke Mathers*<br>LUKE MATHERS<br>Trial Attorney |
| PATRICK ROBBINS<br>Acting United States Attorney<br>PAMELA JOHANN<br>Assistant United States Attorney<br>Chief, Civil Division<br>450 Golden Gate Avenue<br>P.O. Box 36066<br>San Francisco, California 94102<br>(415) 436-7025 | U.S. Department of Justice<br>Civil Division<br>26 Federal Plaza, Room 346<br>New York, New York 10278<br>(212) 264-9236<br>luke.mathers@usdoj.gov<br><br>Attorneys for Defendants |