ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
LARA HADDAD
Supervising Deputy Attorney General
SHIWON CHOE (SB 320041)
CAROLYN F. DOWNS (SB 353455)
ZELDA VASSAR (SB 313789)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-4400
  Fax: (415) 703-5480
  E-mail:  Shiwon.Choe@doj.ca.gov
          Carolyn.Downs@doj.ca.gov
          Zelda.Vassar@doj.ca.gov
*Attorneys for Plaintiffs State of California and*
*Gavin Newsom, in his official capacity as Governor*
*of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA and GAVIN NEWSOM, in his official capacity as Governor of California,**<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD J. TRUMP, in his official capacity as President of the United States, et al.,**<br><br>Defendants. | Case No. 3:25-cv-03372-JSC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER TO THE U.S. COURT OF INTERNATIONAL TRADE**<br><br>Date/Time:  May 22, 2025 at 10:00 a.m.<br>Location:  Courtroom 8, 19th Floor |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .................................................................................................................. 1

BACKGROUND ..................................................................................................................... 2

I.    The Trading With the Enemy Act (TWEA) ............................................................. 2

    A.    Congress Enacted the TWEA During World War I to Prohibit Trade with Enemy Countries and to Conserve and Utilize Enemy Property in the United States—Not to Impose Tariffs ..................................... 2

    B.    In 1933, During the Great Depression, President Roosevelt Invoked the TWEA to Prevent Domestic Hoarding of Gold—Not to Impose Tariffs ....................................................................................................... 3

    C.    In 1941, After the United States' Entry Into World War II, Congress Enacted the First War Powers Act (FWPA), Which Amended the TWEA to Provide for Freezing and Seizing Enemy Property—Not to Impose Tariffs ...................................................... 4

II.    Reforms to Limit Presidential Authority and to Prevent Abuses of Power ................ 5

    A.    In the Post-War Era, Presidents Invoked National Emergencies and the TWEA to Impose Economic Sanctions on Foreign Countries and to Carry Out Monetary Policy—Not to Impose Tariffs ............................. 5

    B.    In 1977, Congress Enacted IEEPA as a Successor to the TWEA as Part of a Series of Reforms Designed to Limit, Not Expand, Presidential Authority, and to Prevent Presidential Abuses of Power .............. 6

III.    The International Emergency Economic Powers Act (IEEPA)................................... 7

LEGAL STANDARD ............................................................................................................. 9

I.    28 U.S.C. § 1631 ........................................................................................................ 9

II.    28 U.S.C. § 1581(i) .................................................................................................. 10

ARGUMENT ......................................................................................................................... 10

I.    This Court Has Jurisdiction Over This Action Alleging That President Trump's Tariff Actions Are Ultra Vires and Violate the Separation of Powers ................................................................................................................... 10

II.    28 U.S.C. § 1581(i) Does Not Vest Exclusive Jurisdiction in the Court of International Trade (CIT), Because It Applies Only to Actions That Arise Out of a Law That Provides for Tariffs, and IEEPA Does *Not* Provide for Tariffs........................................................................................................... 11

i

A.  The Plain Language of IEEPA, Its Context, and Its Overall Statutory Scheme Confirm That IEEPA Does Not Provide for Tariffs ................................................................................... 12

B.  The History of IEEPA (and Its Predecessor, the TWEA) Further Confirms That IEEPA Does Not Provide for Tariffs ...................................... 16

C.  The Doctrine of Constitutional Avoidance Further Confirms That IEEPA Does Not Provide for Tariffs ............................................... 18

D.  The Court of Customs and Patent Appeals' Decision in *United States v. Yoshida International, Inc.*, Does Not Control Here or Establish That IEEPA Provides for Tariffs ....................................... 19

III.  Defendants' Argument for Transfer to the CIT Are Unpersuasive and Unavailing........................................................................................... 23

CONCLUSION ............................................................................................................. 25

1

## TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ................................................................................................. 15, 22

5

*Alcan Sales v. United States*,
528 F. Supp. 1159 (Ct. Int'l Trade 1981) (*Alcan I*),
6
*aff'd*, 693 F.2d 1089 (Fed. Cir. 1982) ................................................................. 24

7

*Alcan Sales v. United States*,
693 F.2d 1089 (Fed. Cir. 1982) (*Alcan II*) ........................................................ 24
8

9

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ................................................................................................ 11

10

*BP P.L.C. v. Mayor of Balt.*,
11
141 S. Ct. 1532 (2021) ........................................................................................... 23

12

*Brown v. Gardner*,
513 U.S. 115 (1994) ................................................................................................ 14

13

*California v. Arizona*,
14
440 U.S. 59 (1979) ............................................................................................. 18, 19

15

*Cornet Stores v. Morton*,
632 F.2d 96 (9th Cir. 1980) ........................................................................ 22, 23, 24

16

*Corus Grp. PLC v. Int'l Trade Comm'n*,
17
352 F.3d 1351 (Fed. Cir. 2003) ......................................................................... 10, 12

18

*Diginet, Inc. v. Western Union ATS, Inc.*,
958 F.2d 1388 (7th Cir. 1992) ............................................................................... 13
19

*Dir. of Revenue v. CoBank ACB*,
20
531 U.S. 316 (2001) .......................................................................................... 17, 22

21

*Earth Island Inst. v. Christopher*,
6 F.3d 648 (9th Cir. 1993) ..................................................................................... 23
22

*Gonzalez v. United States*,
23
553 U.S. 242 (2008) ...................................................................................... 18, 19, 23

24

*Hose v. INS*,
180 F.3d 992 (9th Cir. 1999) (en banc) .............................................................. 9, 10

25

*In re Border Infrastructure Env't Litig.*,
26
915 F.3d 1213 (9th Cir. 2019) ............................................................................... 23

27

*In re Section 301 Cases*,
570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ......................................................... 25
28

*Itility, LLC v. United States*,
  124 Fed. Cl. 452 (2015) ........................................................................................... 25

*K Mart Corp. v. Cartier, Inc.*,
  485 U.S. 176 (1988) ........................................................................................... 10, 24

*Leath v. Stetson*,
  686 F.2d 769 (9th Cir. 1982) ....................................................................................... 11

*Maple Leaf Fish Co. v. United States*,
  762 F.2d 86 (Fed. Cir. 1985) ...................................................................................... 12

*Markham v. Cabell*,
  326 U.S. 404 (1945) ............................................................................................. 16, 17

*Marshall v. Marshall*,
  547 U.S. 293 (2006) ..................................................................................................... 11

*McDonnell v. United States*,
  579 U.S. 550 (2016) ..................................................................................................... 13

*Michael Simon Design, Inc. v. United States*,
  609 F.3d 1335 (Fed. Cir. 2010) ................................................................................. 11

*Motion Sys. Corp. v. Bush*,
  437 F.3d 1356 (Fed Cir. 2006) ................................................................................... 12

*Murphy Co. v. Biden*,
  65 F.4th 1122 (9th Cir. 2023) ..................................................................................... 11

*N. Am. Foreign Trading Corp. v. United States*,
  600 F. Supp. 226 (Ct. Int'l Trade 1984) .................................................................... 12

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) ......................................................................................... 14

*Nw. Env't Advocs. v. EPA*,
  537 F.3d 1006 (9th Cir. 2008) .................................................................................... 11

*Ohno v. Yasuma*,
  723 F.3d 984 (9th Cir. 2013) ...................................................................................... 22

*Orleans Int'l, Inc. v. United States*,
  334 F.3d 1375 (Fed. Cir. 2003) ............................................................................. 23, 25

*Pentax Corp. v. Myhra*,
  72 F.3d 708 (9th Cir. 1995) ........................................................................................ 10

*Sierra Club v. U.S. Dep't of Energy*,
  __ F.4th __, No. 20-1503, 2025 WL 1107681 (D.C. Cir. Apr. 15, 2025) ................... 11

*Solar Energy Indus. Ass'n v. United States*,
  111 F.4th 1349 (Fed. Cir. 2024) ................................................................................. 11

iv

*Sprint Commc'ns, Inc. v. Jacobs*,
    571 U.S. 69 (2013) ................................................................................................................ 11

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ................................................................................................................ 25

*Tinoco v. Ridge*,
    359 F. Supp. 2d 1042 (S.D. Cal. 2005) ................................................................................ 10

*Transpacific Steel LLC v. United States*,
    4 F.4th 1306 (Fed. Cir. 2021) .............................................................................................. 11

*Trayco, Inc. v. United States*,
    994 F.2d 832 (Fed. Cir. 1993) ...................................................................................... 10, 24

*United States v. Jacobs*,
    306 U.S. 363 (1939) ...................................................................................................... 14, 19

*United States v. Patel*,
    762 F.2d 784 (9th Cir. 1985) ................................................................................................ 13

*United States v. Patterson*,
    119 F.4th 609 (9th Cir. 2024) .............................................................................................. 16

*United States v. Universal Fruits & Vegetables Corp.*,
    370 F.3d 829 (9th Cir. 2004) ................................................................................................ 10

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) (*Yoshida II*) ............................................................ 19, 21, 22, 23

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ...................................................................................................... 14, 22

*V.O.S. Selections, Inc. v. Trump*,
    No. 25-00066, 2025 WL 1178581 (Ct. Int'l Trade Apr. 22, 2025) ...................................... 25

*Webber v. DHS*,
    No. 25-26-GF-DLC, 2025 WL 1207587 (D. Mont. Apr. 25, 2025) ...................................... 25

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ...................................................................................................... 13, 22

*Whitman v. Am. Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001) .............................................................................................. 16, 17, 19, 22

*Ye v. INS*,
    214 F.3d 1128 (9th Cir. 2000) ................................................................................................ 9

*Yoshida Int'l, Inc. v. United States*,
    378 F. Supp. 1155 (Cust. Ct. 1974) (*Yoshida I*),
    *rev'd*, 526 F.2d 560 (C.C.P.A. 1975) ............................................................................ 20, 21

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .............................................................................................................. 1

v

*Ysleta del Sur Pueblo v. Texas,*
    596 U.S. 685 (2022) ........................................................................................ 12

**Statutes**

19 U.S.C. § 1338 .............................................................................................. 15

19 U.S.C. § 1671 .............................................................................................. 15

19 U.S.C. § 2132 .............................................................................................. 15

28 U.S.C. § 1331 ........................................................................................ 2, 11

28 U.S.C. § 1581 ...................................................................................... passim

28 U.S.C. § 1582 (1976) .................................................................................. 24

28 U.S.C. § 1631 ................................................................................... 2, 9, 25

50 U.S.C. § 1622 ................................................................................................ 9

50 U.S.C. § 1631 .............................................................................................. 20

50 U.S.C. § 1701 ................................................................................................ 8

50 U.S.C. § 1702 ...................................................................................... passim

50 U.S.C. § 1703 ................................................................................................ 8

50 U.S.C. § 4305 ................................................................................................ 7

Act of Dec. 28, 1
    977, Pub. L. No. 95-223, 91 Stat. 1625 (1977) ................................... 7, 8

Customs Court Act of 1980,
    Pub. L. No. 96-417, 94 Stat. 1727 (1980) ............................................. 24

Emergency Banking Relief Act,
    Pub. L. No. 73-1, 48 Stat. 1 (1933) ......................................................... 4

First War Powers Act,
    Pub. L. No. 77-354, 55 Stat. 838 (1941) ........................................... 4, 17

National Emergencies Act,
    Pub. L. No. 94-412, 90 Stat. 1255 (1976) ............................................... 7

Trading With the Enemy Act,
    Pub. L. No. 65-91, 40 Stat. 411 (1917) ....................................... 2, 3, 16

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ........................................................................... 14

U.S. Const. art. I, § 9, cl. 5 ........................................................................... 19

**Legislative Materials**

H.R. Rep. No. 65-85 (1917) ........................................................................................... 3, 16

H.R. Rep. No. 65-155 (1917) (Conf. Rep.) .......................................................................... 3

H.R. Rep. No. 77-1507 (1941) ........................................................................................ 5, 17

H.R. Rep. No. 95-459 (1977) .............................................................................. 3, 7, 9, 18, 23

S. Rep. No. 77-911 (1941) ............................................................................................. 5, 17

S. Rep. No. 94-922 (1976) ............................................................................................... 6, 7

S. Rep. No. 95-466 (1977) ........................................................................................ 9, 18, 23

S. Special Comm. on Nat'l Emergencies and Delegated Emergency Powers, 93d
    Cong., *A Brief History of Emergency Powers in the United States* (Comm. Print
    1974) .................................................................................................................... 7

**Executive Proclamations**

Proclamation No. 3564,
    28 Fed. Reg. 13,247 (Dec. 6, 1963) .............................................................................. 5

Proclamation No. 4074,
    36 Fed. Reg. 15,724 (Aug. 17, 1971) ................................................................... 6, 20, 24

Proclamation No. 4098,
    36 Fed. Reg. 24,201 (Dec. 22, 1971) ........................................................................... 20

Proclamation No. 5631,
    52 Fed. Reg. 13,412 (Apr. 17, 1987) ............................................................................. 6

**Other Authorities**

Cong. Rsch. Serv., *The International Emergency Economic Powers Act: Origins,
    Evolution, and Use* (Jan. 30, 2024) ............................................................................. 5

Cong. Rsch. Serv., *U.S. Tariff Policy: Overview* (Jan. 31, 2025) ....................................... 13

*Regulate*, American Heritage Dictionary (1976) .............................................................. 12

*Regulate*, Black's Law Dictionary (5th ed. 1979) ............................................................ 12

*Regulate*, Black's Law Dictionary (12th ed. 2024) ........................................................... 12

*Regulate*, Random House College Dictionary (rev. ed. 1975) ............................................. 12

*Regulate*, Webster's Third International Dictionary (1986) ................................................ 12

**INTRODUCTION**

This Court has jurisdiction to decide whether President Donald Trump lacks the authority to unilaterally impose unprecedented tariffs on every single trading partner of the United States.

Under our constitutional system, the President may not rule by fiat. Instead, "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). But over the last several months, President Trump, acting alone and without the consent of Congress, has issued a flurry of executive orders that have variously imposed, then paused, then reimposed and escalated tariffs on all of the United States' trading partners. Currently, President Trump's tariff regime imposes a universal tariff of 10% on nearly all U.S. trading partners, with country-specific increases of up to 50% set to go into effect on July 9. Canada and Mexico are subject to tariffs of up to 25%, and China is subject to ever-increasing tariffs of 145%.

Congress has enacted certain statutes that authorize tariffs, which are codified in Title 19 of the U.S. Code (Customs Duties). But those statutes require specific processes and notices before tariffs can be imposed. Rather than adhere to those requirements for his tariffs, President Trump turned to a separate statute codified in Title 50 (War and National Defense): the International Economic Emergency Powers Act of 1977 (IEEPA), 50 U.S.C. §§ 1701–06. In the first three months of his term, President Trump issued over a dozen executive orders, citing to purported national emergencies regarding immigration, drugs, and trade deficits, that invoked IEEPA to impose across-the-board tariffs on imported goods and all U.S. trading partners generally. This was done apparently with the view that IEEPA allows him to sidestep Congress and grants him unilateral authority to impose unprecedented tariffs by decree.

This view is wrong. IEEPA does *not* provide for tariffs. To the contrary, IEEPA never mentions tariffs (or imposts, duties, taxes, or revenue) at all and grants the President no authority to impose tariffs. Indeed, no other President has ever invoked IEEPA to impose tariffs.

The State of California and Governor Gavin Newsom have brought this action to block these unilateral tariffs that President Trump has imposed, because they (1) are ultra vires and in excess of statutory authority and (2) violate the constitutional requirement of separation of

1

1   powers.  This Court has jurisdiction under 28 U.S.C. § 1331 to decide this lawsuit.

2          Defendants seek to transfer this action to the Court of International Trade (CIT) in New

3   York City under 28 U.S.C. § 1631, arguing that this Court lacks jurisdiction because 28 U.S.C.

4   § 1581(i) vests exclusive jurisdiction over actions that "arise out of laws providing for tariffs" in

5   the CIT.  Defs.' Mot. 11.  But § 1581(i) does not apply here, because this action does not arise out

6   of a law providing for tariffs.  This action relates to IEEPA, which *does not provide for tariffs*.

7          Defendants do not and cannot dispute that IEEPA never mentions tariffs.  Instead, they

8   argue that IEEPA allows the President to "regulate . . . importation" of foreign goods and appear

9   to claim that "regulate . . . importation" implies the power to impose tariffs.  *See* Defs.' Mot. 1–2

10  (citing 50 U.S.C. § 1702(a)(1)(B)).  But "regulate," as used in IEEPA, does not provide for tariffs.

11  The statutory language of IEEPA, its context, and its overall statutory scheme confirm this.  The

12  history of IEEPA (and its predecessor statute, the Trading With the Enemy Act) confirms this.

13  And the doctrine of constitutional avoidance confirms this—if IEEPA really granted Presidents

14  the power to impose tariffs that President Trump now claims, it would raise serious constitutional

15  doubts.  In short, IEEPA does *not* provide for tariffs.  And because IEEPA does not provide for

16  tariffs, it does not satisfy § 1581(i), and thus § 1581(i) cannot divest this Court of its jurisdiction.

17         The Court should deny Defendants' § 1631 motion to transfer to the CIT.

18                                    **BACKGROUND**

19  **I.      The Trading With the Enemy Act (TWEA)**

20         IEEPA was enacted in 1977 and took much of its language, including the "regulate . . .

21  importation" language on which Defendants rely, from section 5(b) of a predecessor statute, the

22  Trading With the Enemy Act, that was first promulgated in 1917.  The legislative history of

23  IEEPA and section 5(b) of the TWEA confirm that neither provides for tariffs.

24         **A.      Congress Enacted the TWEA During World War I to Prohibit Trade with
                    Enemy Countries and to Conserve and Utilize Enemy Property in the United**
25                  **States—Not to Impose Tariffs**

26         In 1917, as the United States entered World War I, Congress enacted the TWEA.  Trading

27  With the Enemy Act, Pub. L. No. 65-91, 40 Stat. 411 (1917).  Its purpose was to (1) "interdict[],"

28  i.e., prohibit, "trade in time of war" with the enemy and (2) "conserve and utilize . . . enemy

                                            2

1    property found within the jurisdiction of the United States."  H.R. Rep. No. 65-85, at 1 (1917).

2         To serve its first purpose—interdiction—section 3 of the TWEA prohibited outright any

3    trade by individuals in the United States with the "enemy" (residents of nations with which the

4    United States was at war and certain other categories) or any "ally of [the] enemy."  Pub. L. No.

5    65-91, § 3(a).  To serve its second purpose—conserving and utilizing enemy property—section 6

6    of the TWEA provided for the appointment of a new official to be known as the "alien property

7    custodian," to hold money or property belonging to the "enemy" or any "ally of [the] enemy"

8    during the pendency of the war.  *Id.* § 6.

9         A separate section of the TWEA, section 5(b), addressed a separate "new subject matter":

10   transactions in foreign exchange or in gold or silver, credit transfers, and transfers of evidences of

11   indebtedness (e.g., bonds or promissory notes) or ownership (e.g., deeds or stock certificates),

12   between the United States and foreign nationals.  *See* H.R. Rep. No. 65-155, at 10 (1917) (Conf.

13   Rep.).  Specifically, section 5(b), as originally enacted in the TWEA in 1917, provided that:

14        [T]he President may investigate, regulate, or prohibit, under such rules and
          regulations as he may prescribe, by means of licenses or otherwise, any transactions
15        in foreign exchange, export or earmarkings of gold or silver coin or bullion or
          currency, transfers of credit in any form (other than credits relating solely to
16        transactions to be executed wholly within the United States), and, transfers of
          evidences of indebtedness or of the ownership of property between the United States
17        and any foreign country, whether enemy, ally of enemy or otherwise, or between
          residents of one or more foreign countries, by any person within the United States[.]
18
     Pub. L. No. 65-91, § 5(b).  It contained no mention of imports, tariffs, taxes, or revenue.  *Id.*
19
20        **B.    In 1933, During the Great Depression, President Roosevelt Invoked the
               TWEA to Prevent Domestic Hoarding of Gold—Not to Impose Tariffs**

21        In 1933, during the Great Depression, President Roosevelt invoked the TWEA during

22   peacetime.  "[C]iting the authority of section 5(b)," President Roosevelt "declared a national

23   emergency and, under that emergency, a bank holiday to prevent hoarding of gold, despite the

24   fact that at the time section 5(b) was explicitly limited by its terms to wartime use."  H.R. Rep.

25   No. 95-459, at 4 (1977).  In response, Congress passed the Emergency Banking Relief Act, which

26   retroactively approved the President's action and amended section 5(b) to provide that its powers

27   could be used during a period of "national emergency declared by the President," not just during

28   wartime, and to remove the requirement that the transactions being investigated, regulated, or

3

Pls.' Opp'n to Defs.' Mot. to Transfer (No. 3:25-cv-03372-JSC)

prohibited involve a foreign country.  Emergency Banking Relief Act, Pub. L. No. 73-1, § 2, 48

Stat. 1 (1933).  Even after this amendment, however, section 5(b) remained limited to financial

transactions (foreign exchange, credit transfers, bank payments, and activities regarding gold and

silver).  *Id.*  It contained no mention of imports, tariffs, taxes, or revenue.  *Id.*

**C.**    **In 1941, After the United States' Entry Into World War II, Congress Enacted the First War Powers Act (FWPA), Which Amended the TWEA to Provide for Freezing and Seizing Enemy Property—Not to Impose Tariffs**

Following the attack on Pearl Harbor and the United States' entry into World War II,

Congress passed the First War Powers Act, which amended section 5(b) to read in relevant part:

> (1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—
>
> (A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and
>
> (B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit any acquisition[,] holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

First War Powers Act, Pub. L. No. 77-354, § 301, 55 Stat. 838 (1941).

Section 5(b)(1)(A) was a repromulgation of the prior section 5(b) with some amendments:

it reenacted the power to "investigate," "regulate," or "prohibit" certain financial transactions.

Section 5(b)(1)(B) was new and pertained to property in which foreign countries or foreign

nationals had any interest.  It listed eleven activities relating to such property that would be

subject to the TWEA ("acquisition," "holding," "withholding," "use," "transfer," "withdrawal,"

"transportation," "importation or exportation of," "dealing in," "exercising any right, power, or

privilege with respect to," or "transactions involving").  It also added four new powers ("direct

and compel," "nullify," "void," and "prevent") to the three preexisting ones ("investigate,"

"regulate," and "prohibit") that could be exercised with respect to those eleven listed activities.

This amendment marked the first time that "importation"—as part of the combined activity

4

Pls.' Opp'n to Defs.' Mot. to Transfer (No. 3:25-cv-03372-JSC)

"importation or exportation of"—appeared in the same paragraph as "regulate."

The congressional reports discussed Congress's purpose behind amending section 5(b). Under the old section 5(b), "the Government [had] exercise[d] supervision over transactions in foreign property, either by prohibiting such transactions or by permitting them on condition and under license." H.R. Rep. No. 77-1507, at 3 (1941). The FWPA amended section 5(b) to give the government the power to *seize* (take, control, use, etc.) foreign property, in addition to simply freezing it. *See id.*; S. Rep. No. 77-911, at 2 (1941).

The amended section 5(b) contained no mention of tariffs, taxes, or revenue. Nor does any such mention appear anywhere in the FWPA or the accompanying congressional reports.

## II.     Reforms to Limit Presidential Authority and to Prevent Abuses of Power

### A.     In the Post-War Era, Presidents Invoked National Emergencies and the TWEA to Impose Economic Sanctions on Foreign Countries and to Carry Out Monetary Policy—Not to Impose Tariffs

Following World War II, multiple Presidents cited section 5(b) to impose economic sanctions (blocks or prohibitions on trade or financial transactions) on foreign countries. For example, in 1950, President Truman declared a national emergency and cited section 5(b) to impose economic sanctions on North Korea and China. *See* Cong. Rsch. Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 6 (Jan. 30, 2024), https://www.congress.gov/crs-product/R45618 (last visited May 1, 2025). Subsequent Presidents referenced President Truman's 1950 declaration to impose sanctions on Vietnam, Cuba, and Cambodia. *Id.*

Presidents also invoked section 5(b) to carry out monetary policy. *Id.* President Truman, for example, used section 5(b) to maintain regulations on foreign exchange, credit transfers, and coin and currency exports. *Id.* Presidents Eisenhower and Kennedy referenced President Roosevelt's 1933 emergency declaration to maintain and modify regulations controlling the hoarding and exporting of gold. *Id.* President Johnson used President Truman's 1950 emergency declaration to limit direct foreign investment by U.S. companies. *Id.*

No President ever invoked section 5(b) to impose tariffs.[1] But Presidents did use claims of

---

[1] Instead, Presidents invoked other trade-specific statutes to impose tariffs, not the TWEA. *See, e.g.*, Proclamation No. 3564, 28 Fed. Reg. 13,247 (Dec. 6, 1963) (President Johnson invoking

5

1    national emergency to exercise other "extraordinary powers—powers to seize property and

2    commodities, seize control of transportation and communications, organize and control the means

3    of production, assign military forces abroad, and restrict travel."  S. Rep. No. 94-922, at 1 (1976).

4    In light of these extraordinary actions, Congress acted in the 1970s to limit presidential authority.

5         **B.**    **In 1977, Congress Enacted IEEPA as a Successor to the TWEA as Part of a**
6                   **Series of Reforms Designed to Limit, Not Expand, Presidential Authority, and**
               **to Prevent Presidential Abuses of Power**

7         In 1972, in the wake of U.S. military involvement in Vietnam without any congressional

8    declaration of war, the Senate formed a bipartisan special committee chaired by Democratic

9    Senator Frank Church and Republican Senator Charles Mathias to reevaluate delegations of

10   emergency authority to the President.  *See* S. Rep. No. 94-922, at 1–2.  The Special Committee

11   began its work in January 1973 and quickly realized that Congress did not even know all of the

12   emergency laws and procedures that were in effect.  *Id.* at 2–3.  The Special Committee observed

13   that Presidents had been claiming extraordinary powers under these emergency declarations, and

14   yet "no recent comprehensive record of statutes effective during times of emergency had been

15   compiled" and "[n]o consistent procedure was being followed in declaring, administering, and

16   terminating states of national emergency."  *Id.* at 3–4.

17        Upon review, the Special Committee found:

18          The United States has been in a state of national emergency since March 9, 1933.  In
       fact, there are now in effect four Presidentially proclaimed states of national
19          emergency. . . .  Concomitantly, especially since the days of the 1933 economic
       emergency, it has been Congress' habit to delegate extensive emergency authority—
20          which continues even when the emergency has passed—and not to set a terminating
       date.  The United States thus has on the books at least 470 significant emergency
21          powers statutes without time limitations delegating to the Executive extensive
       discretionary powers, ordinarily exercised by the Legislature, which affect the lives of
22          American citizens in a host of all-encompassing ways.  This vast range of powers,
       taken together, confer enough authority to rule this country without reference to
23          normal constitutional processes.  These laws make no provision for congressional
       oversight nor do they reserve to Congress a means for terminating the "temporary"
24          emergencies which trigger them into use.  No wonder the distinguished political

25   Trade Expansion Act of 1962 and Tariff Act of 1930 to impose tariffs); Proclamation No. 4074,
36 Fed. Reg. 15,724 (Aug. 17, 1971) (President Nixon invoking Tariff Act of 1930 and Trade
26   Expansion Act of 1962 to impose tariffs); Proclamation No. 5631, 52 Fed. Reg. 13,412 (Apr. 17,
1987) (President Reagan invoking Trade Act of 1974 to impose tariffs).  As discussed below,
27   *infra* Section II.D, in one instance, the government made a retrospective argument that tariffs that
had originally been imposed under other trade-specific statutes were authorized under section
28   5(b) of the TWEA—but no President has ever invoked section 5(b) to impose tariffs at the outset.

6

Pls.' Opp'n to Defs.' Mot. to Transfer (No. 3:25-cv-03372-JSC)

scientist, the late Clinton Rossiter, entitled his post-World War II study on modern democratic states, "Constitutional Dictatorship."

S. Special Comm. on Nat'l Emergencies and Delegated Emergency Powers, 93d Cong., *A Brief History of Emergency Powers in the United States* v (Comm. Print 1974). The Special Committee described this framework—where "emergency authority intended for use in crisis situations has been available to the Executive" without sufficient oversight by Congress—as a "dangerous state of affairs[.]" S. Rep. No. 94-922, at 1.

In response, Congress enacted a series of reforms designed to "restor[e] Congress to its proper legislative role" and limit presidential authority. *Id.* As part of that effort, Congress enacted the National Emergencies Act (NEA) in 1976. National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976). The NEA provided for the termination of all existing declarations of national emergencies in 1978, and placed new restrictions on the President as to the manner of declaring and the duration of new states of emergency. *Id.* § 101.

Congress also worked to amend the TWEA. The House Committee Report noted how "[s]uccessive Presidents have seized upon the open-endedness of section 5(b) [of the TWEA] to turn that section, through usage, into something quite different from what was envisioned in 1917." H.R. Rep. No. 95-459, at 8–9. In response, Congress in 1977 amended section 5(b) to revert it to what it originally was: a statute that could be invoked only during an actual war declared by Congress. *Id.* at 10; Act of Dec. 28, 1977, Pub. L. No. 95-223, § 101, 91 Stat. 1625 (1977); *see* 50 U.S.C. § 4305(b)(1). Concurrently, Congress promulgated a new statute—IEEPA—to provide for a new set of international emergency economic powers. Pub. L. No. 95-223, § 201–08; *see* 50 U.S.C. § 1701–06. These powers were "limited to the regulation of international economic transactions," were "more restricted than those available during time of war," and were subject to various procedural and substantive restrictions, "stem[ming] from a recognition that emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." H.R. Rep. No. 95-459, at 10–11.

## III.    The International Emergency Economic Powers Act (IEEPA)

The first restriction in IEEPA is that its emergency powers may only be exercised "to deal

with an[] unusual and extraordinary threat, which has its source in whole or substantial part

outside the United States," and "may not be exercised for any other purpose."  50 U.S.C. § 1701.

The emergency powers that IEEPA grants are delineated in the statute and were largely

taken from the powers previously set forth in section 5(b) of the TWEA, revised to limit those

powers to only transactions involving foreign countries or nationals (and not wholly domestic

transactions).  Specifically, IEEPA provides that:

> At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—
>
> (A) investigate, regulate, or prohibit—
> (i) any transactions in foreign exchange,
> (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
> (iii) the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States; [and]
>
> (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit,
>
> any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving,
>
> any property in which any foreign country or a national thereof has any interest
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

50 U.S.C. § 1702(a)(1) (line breaks inserted in § 1702(a)(1)(B) for readability).

As a further restriction on presidential power, IEEPA provides that "[t]he President, in

every possible instance, shall consult with the Congress before exercising any of the authorities

granted by this chapter and shall consult regularly with the Congress so long as such authorities

are exercised."  50 U.S.C. § 1703(a).  IEEPA further requires the President to deliver ongoing

reports to Congress about his use of such emergency powers.  50 U.S.C. § 1703(b)–(c).

As originally enacted, IEEPA and the NEA included another restriction to limit presidential

power and prevent potential abuse: they vested Congress with the power to override a President's

national-emergency declaration, and thereby terminate a President's claim to IEEPA powers,

through a concurrent resolution—a mechanism that a President cannot veto.  Pub. L. No. 95-223,

8

1   § 207(b) (citing Pub. L. No. 94-412, § 202).  The Supreme Court subsequently held that such a

2   structure would be unconstitutional, however, so the current versions of IEEPA and the NEA

3   have now departed from Congress's original intent and only allow Congress to override a

4   President's national-emergency declaration through a joint resolution (as opposed to a concurrent

5   resolution), a mechanism that the President can veto.  50 U.S.C. § 1622(a)(1).

6        The enumerated powers in IEEPA do not include the power to impose tariffs.  50 U.S.C.

7   § 1702.  IEEPA contains no mention of tariffs, taxes, or revenue.  And Congress has never stated,

8   at any point in the history of either IEEPA or the TWEA, that either provides for tariffs.  To the

9   contrary, as Congress was enacting IEEPA, it explained that the powers that had existed in

10  section 5(b) of the TWEA and that were being transferred to IEEPA were the powers to regulate

11  financial transactions (foreign exchange and banking, currency, and securities transactions) and to

12  freeze foreign property transactions.  H.R. Rep. No. 95-459, at 14–15; S. Rep. No. 95-466, at 5

13  (1977).  At no point did Congress state that IEEPA included the power to impose tariffs.

14       In the nearly half century since IEEPA was enacted, no President has ever invoked IEEPA

15  to impose tariffs—other than President Trump.

16                                      **LEGAL STANDARD**

17  **I.       28 U.S.C. § 1631**

18       Defendants seek to transfer this case to the CIT under 28 U.S.C. § 1631.  Section 1631

19  applies only if the original court (i.e., this Court) lacks jurisdiction.  This Court has jurisdiction to

20  determine its own jurisdiction, even if assessing jurisdiction overlaps with assessing the merits.

21  *See Ye v. INS*, 214 F.3d 1128, 1131 (9th Cir. 2000) (where statute divested courts of jurisdiction

22  over removal orders against noncitizens convicted of an "aggravated felony," court had

23  jurisdiction to determine if law under which petitioner was convicted actually constituted an

24  "aggravated felony," even if that jurisdictional question overlapped with the merits).

25       Additionally, "[i]n order for a case to be transferred pursuant to [§ 1631], the transferee

26  court must be able to hear the matter upon transfer."  *Hose v. INS*, 180 F.3d 992, 995–96 (9th Cir.

27  1999) (en banc).  "If the transferee court lacks jurisdiction, the transfer is obviously improper."

28  *Id.* at 996.  This Court thus must make a determination as to the jurisdiction of the transferee

9

1 | court before any transfer.  *Id.*; *Tinoco v. Ridge*, 359 F. Supp. 2d 1042, 1048 (S.D. Cal. 2005).[2]

2 | **II.      28 U.S.C. § 1581(i)**

3 | Defendants claim that 28 U.S.C. § 1581(i) vests exclusive jurisdiction in the CIT and thus

4 | divests this Court of jurisdiction.  That subsection grants the CIT exclusive jurisdiction over:

> any civil action commenced against the United States, its agencies, or its officers,[3] that arises out of any law of the United States providing for—
> (A) revenue from imports or tonnage;
> (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;
> (C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
> (D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)–(h) of this section.

"Congress did not commit to the Court of International Trade's exclusive jurisdiction *every* suit against the Government challenging customs-related laws and regulations."  *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 188 (1988) (emphasis in original).  Rather, the CIT "'operates within precise and narrow jurisdictional limits' granted by Congress" and "cannot exercise jurisdiction over actions not addressed by a specific jurisdictional grant."  *Trayco, Inc. v. United States*, 994 F.2d 832, 836 (Fed. Cir. 1993); *see K Mart*, 485 U.S. at 188–89 (actual precise statutory language of § 1581 controls).

**ARGUMENT**

**I.      This Court Has Jurisdiction Over This Action Alleging That President Trump's Tariff Actions Are Ultra Vires and Violate the Separation of Powers**

It is well settled that federal courts have an "unflagging obligation" to exercise the

---

[2] Neither *Pentax Corp. v. Myhra*, 72 F.3d 708 (9th Cir. 1995), which predated the Ninth Circuit's en banc decision in *Hose*, nor *United States v. Universal Fruits and Vegetables Corp.*, 370 F.3d 829 (9th Cir. 2004), which only cited *Pentax*, supports the premise that the Court should simply transfer the case to the CIT to let the CIT determine the question of jurisdiction.  *Cf.* Defs.' Mot. 8.  In both cases, the court to which the transfer request was made assessed its own jurisdiction before any transfer.  *See Pentax*, 72 F.3d at 710–11 (assessing whether 28 U.S.C. § 1581(i) applied, and holding it did because law at issue (19 U.S.C. § 1304) provided for "duties," before ordering any transfer); *Universal Fruits*, 370 F.3d at 833–36 & n.12 (assessing whether 28 U.S.C. § 1582(3) applied, and holding it did because action was "commenced by the United States" to "recover customs duties," and government admitted the same, before ordering any transfer).

[3] The Federal Circuit has held that § 1581(i) does *not* apply to actions against the President. *Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1359 (Fed. Cir. 2003).  This action is brought against the President.

1    jurisdiction that is given to them.  *See, e.g.*, *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77

2    (2013).  While a "[c]ourt will not take jurisdiction if it should not[, ] it is equally true, that it must

3    take jurisdiction if it should" and "ha[s] no [] right to decline the exercise of jurisdiction which is

4    given[.]"  *Marshall v. Marshall*, 547 U.S. 293, 298 (2006).

5           This Court has jurisdiction over this action under 28 U.S.C. § 1331.  The State of California

6    and Governor Newsom bring claims that President Trump's tariff orders (1) are ultra vires and in

7    excess of statutory authority and (2) violate the constitutional requirement of separation of

8    powers.  This Court has jurisdiction over such claims.  *Axon Enter., Inc. v. FTC*, 598 U.S. 175,

9    182, 185 (2023) (district courts have subject-matter jurisdiction over separation-of-powers claims

10   against Executive Branch under § 1331); *Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1015 (9th

11   Cir. 2008) (same re ultra vires claim against Executive Branch under § 1331); *Murphy Co. v.*

12   *Biden*, 65 F.4th 1122, 1129–30 (9th Cir. 2023) (jurisdiction exists over ultra vires and separation-

13   of-powers claims brought directly against the President).  This Court therefore has an unflagging

14   obligation to exercise that jurisdiction, unless another statute divests the Court of jurisdiction.  As

15   discussed below, no such other statute exists.

16   **II.    28 U.S.C. § 1581(i) Does Not Vest Exclusive Jurisdiction in the Court of
        International Trade (CIT), Because It Applies Only to Actions That Arise Out of a**
17      **Law That Provides for Tariffs, and IEEPA Does *Not* Provide for Tariffs**

18          Defendants claim that 28 U.S.C. § 1581(i)(1)(B) and (D) vest exclusive jurisdiction over

19   this action in the CIT.  Defs.' Mot. 11.  But in order for those provisions to apply, this action must

20   "arise[] out of any law of the United States providing for . . . tariffs" or "administration and

21   enforcement" of the same.  To the extent that this action can be said to arise out of any law of the

22   United States, the only such law is IEEPA.[4]  But *IEEPA does not provide for tariffs—and thus*

23   _____

24   [4] President Trump's executive orders are not "law[s] of the United States."  *See, e.g.*, *Sierra Club
     v. U.S. Dep't of Energy*, ___ F.4th ___, No. 20-1503, 2025 WL 1107681, at *4 (D.C. Cir. Apr. 15,
25   2025); *Leath v. Stetson*, 686 F.2d 769, 771 (9th Cir. 1982).  Thus, even if the executive orders
     provide for tariffs, they cannot give rise to jurisdiction under § 1581(i) where (as here) no actual
26   law of the United States provides for tariffs.  Defendants' list of cases involving challenges to
     presidential proclamations, Defs.' Mot. 10–11, is inapposite, because each of those cases involved
27   other underlying laws, whereas there is no law of the United States that provides for tariffs here.
     *Cf. Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021) (Trade Expansion Act
     of 1962); *Solar Energy Indus. Ass'n v. United States*, 111 F.4th 1349 (Fed. Cir. 2024) (Trade Act
28   of 1974); *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335 (Fed. Cir. 2010) (Omnibus

11

this action does not arise from a law of the United States providing for tariffs, and § 1581(i)(1)(B)

and (D) do not apply.  Defendants' strained contrary argument that IEEPA's reference to the

power to "regulate . . . importation" can be construed as implicitly providing for tariffs (despite

never actually mentioning tariffs), Defs. Mot. 1, is wrong as a matter of law.

**A.** **The Plain Language of IEEPA, Its Context, and Its Overall Statutory Scheme Confirm That IEEPA Does Not Provide for Tariffs**

IEEPA provides the President with emergency authority to:

> investigate, block during the pendency of an investigation, regulate, direct and
> compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use,
> transfer, withdrawal, transportation, importation or exportation of, or dealing in, or
> exercising any right, power, or privilege with respect to, or transactions involving,
> any property in which any foreign country or a national thereof has any interest by
> any person, or with respect to any property, subject to the jurisdiction of the United
> States[.]

50 U.S.C. § 1702(a)(1)(B).  From this, Defendants select just two words—"regulate . . .

importation"—and claim this provides for the power to impose tariffs.  Defendants are wrong.

First, as a matter of plain language, "regulate . . . importation" does not mean "impose

tariffs."  As used in a statute, "to *regulate* something is usually understood to mean to 'fix the

time, amount, degree, or rate' of an activity 'according to rule[s],'" *Ysleta del Sur Pueblo v.

Texas*, 596 U.S. 685, 697 (2022) (quoting *Regulate*, Webster's Third International Dictionary

1913 (1986)), or "[t]o 'control' (an activity or process) esp. through the implementation of rules."

*Regulate*, Black's Law Dictionary (12th ed. 2024); *accord, e.g.*, *Regulate*, Black's Law

Dictionary 1156 (5th ed. 1979) ("fix, establish or control; to adjust by rule, method, or established

mode; to direct by rule or restriction; to subject to governing principles or laws"); *Regulate*,

Random House College Dictionary 1112 (rev. ed. 1975) ("to control or direct by a rule, principle,

method, etc."); *Regulate*, American Heritage Dictionary 1096 (1976) ("[t]o control or direct

according to a rule").

This does not encompass the power to impose tariffs.  One could reasonably construe the

---

Trade and Competitiveness Act of 1988); *Motion Sys. Corp. v. Bush*, 437 F.3d 1356 (Fed Cir.
2006) (en banc) (Trade Act of 1974 and U.S.-China Relations Act of 2000); *Corus*, 352 F.3d
1351 (Trade Act of 1974); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985)
(Trade Act of 1974); *N. Am. Foreign Trading Corp. v. United States*, 600 F. Supp. 226 (Ct. Int'l
Trade 1984) (Trade Act of 1974).

power to "regulate" importation as including controls like the power to fix the amount of imports that can be brought into the country, or the times when they can be brought in, or how quickly they can be brought in, or whether they would be subject to inspections upon arrival.  But a tariff is fundamentally different.  A tariff is not a control on importation and does not fix its time, amount, degree, or rate.  Rather, a tariff is simply a *tax* imposed on imports.  *See, e.g.*, *United States v. Patel*, 762 F.2d 784, 791 (9th Cir. 1985) (tariffs and duties are "a tax imposed by law on the import or export of goods"); Cong. Rsch. Serv., *U.S. Tariff Policy: Overview* 1 (Jan. 31, 2025), https://www.congress.gov/crs-product/IF11030 (a tariff is a tax).  And to tariff or tax is not to "regulate."  *See, e.g.*, *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992) ("The legal power to regulate is not necessarily the legal power to tax.").  Other than extracting payment, tariffs place no controls on imports—imports can continue to come in unrestricted, so long as the tariffs are paid.  Tariffs no more "regulate" imports than income taxes "regulate" an individual's livelihood or employment.

Additionally, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).  "Where the statute at issue is one that confers authority upon [the Executive Branch], that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the [Executive] has asserted."  *Id.* (quotation marks omitted).  Viewing the words "regulate" and "importation" as used in IEEPA and their place in the overall statutory scheme further confirms that "regulate . . . importation" does not provide for tariffs.

That "regulate" does not encompass the power to impose tariffs is evident when "regulate" is read in context with the other powers granted in § 1702(a)(1)(B).  *See McDonnell v. United States*, 579 U.S. 550, 568–69 (2016) ("Under the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps.'").  The powers granted in § 1702(a)(1)(B) reflect an overall statutory scheme designed to control and restrict transactions ("block," "direct and compel," "nullify," "void," "prevent," "prohibit").  This is fundamentally different than a scheme that provides for tariffs, which allow imports to *continue* so long as the tariffs are paid.

13

Similarly, that "regulate" does not encompass the power to impose tariffs on "importation" is evident when "importation" is read in context with the other activities listed in § 1702(a)(1)(B). "Regulate" modifies eleven different activities ("acquisition," "holding," "withholding," "use," "transfer," "withdrawal," "transportation" "importation or exportation of [property]," "dealing in [property]," "exercising any right, power, or privilege with respect to [property]," or "transactions involving [property]") and must have a consistent meaning with respect to all of them. *See, e.g.*, *Brown v. Gardner*, 513 U.S. 115, 118 (1994) (a given term "mean[s] the same thing throughout a statute"). And construing "regulate" to encompass the power to tariff or tax does not make sense, and contorts plain English, when "regulate" is applied to these other activities. To take just one of these other activities as an example, to "regulate . . . use," as a matter of plain English, does not mean to *tariff or tax* use. To "regulate use" of lead in paint, say, or to "regulate use" of ingredients in baby formula, means to control such use or fix its time, amount, degree, or rate—it does not mean to *tax* such use. Given that "regulate" does not mean to tariff or tax with respect to the other activities listed in § 1702(a)(1)(B), it cannot mean to tariff or tax for "importation."

Finally, where, as here, the Executive Branch "claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' [courts] typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted). That IEEPA does not provide for tariffs is further confirmed by the expectation that "Congress [] speak clearly if it wishes to assign to [the Executive Branch] decisions of vast 'economic and political significance.'" *Id.*; *accord Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024); *see also Su*, 121 F.4th at 17–20 (R. Nelson, J., concurring) (major-questions doctrine applies equally to delegations to the President as to any other Executive Branch official). The unheralded power that Defendants claim IEEPA grants to impose tariffs has vast economic and political significance and represents a newfound and transformative expansion of presidential authority. It further goes to the heart of one of Congress's core constitutional powers—the power to impose tariffs and taxes—a power so fundamental that the Constitution lists it first among Congress's powers and sets it out separately and above Congress's general power to regulate commerce. U.S. Const. art. I, § 8, cl. 1; *see United States v. Jacobs*, 306 U.S. 363, 370 (1939)

14

("No more essential or important power has been conferred upon the Congress" than "the 'Power

To lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the

common Defence and general Welfare.'").  And yet Defendants would have the Court believe

that Congress delegated such a fundamental and significant power to the President simply through

the use of the word "regulate"—just one power nestled in a list of eight—linked together with

half an activity in a list of eleven ("importation or exportation," without the "exportation").  The

only way to reach Defendants' construction that "regulate" includes the power to impose tariffs is

to construe "regulate" so broadly as to mean "almost anything," "shorn of all context" and

leaving "the word [] an empty vessel." *Cf. West Virginia*, 597 U.S. at 732.  "Such a vague

statutory grant is not close to the sort of clear authorization required[.]"  *Id.*; *see also Ala. Ass'n of

Realtors v. HHS*, 594 U.S. 758, 764–65 (2021) (rejecting government's broad interpretation of

statute as "a wafer-thin reed on which to rest such sweeping power").[5]

Defendants' expansive interpretation becomes all the more untenable when one considers

that the word "regulate" must have a consistent meaning across all of the activities listed in

§ 1702(a)(1)(B).  If "regulate" confers upon the President the power to tax importation, then it

also must be understood to confer upon the President the power to tax acquisitions, holdings,

withholdings, uses, transfers, withdrawals, and so on.  In other words, on Defendants' reading of

the statute, Congress granted the President the authority to place not just a 145% tax on

"importation" from China, but also to place a 145% tax on, e.g., any "acquisition" by a U.S.

company of a foreign business, or any "holding" by a U.S. citizen of funds in a joint bank account

she shares with her noncitizen mother to help pay her medical expenses, and so on.  The vast

economic and political significance of such a taxing power would be unprecedented.  And yet

---

[5] Where Congress has desired to authorize the President or the Executive Branch to impose or modify tariffs, it has spoken clearly.  *See, e.g.*, 19 U.S.C. § 2132(a) (Trade Act of 1974) ("Whenever [conditions], the President shall proclaim, for a period not exceeding 150 days . . . a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties . . . on articles imported into the United States . . . ."); *see also* § 1338(a) (Tariff Act of 1930) ("The President . . .  shall by proclamation specify and declare new or additional duties as hereinafter provided upon articles wholly or in part the growth or product of, or imported in a vessel of, any foreign country whenever he shall find [conditions]."), § 1671(a) (Tariff Act of 1930) ("If [conditions], then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net countervailable subsidy.").  IEEPA, which contains no mention of tariffs or duties at all, stands in stark contrast to these laws.

15

1    Defendants would have the Court believe that Congress delegated such a huge portion of its

2    taxing power through so unclear a statement as § 1702(a)(1)(B).  But Congress "does not . . . hide

3    elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

4        Defendants' claim that IEEPA provides for tariffs is not supported by the statutory

5    language of IEEPA, its context and overall scheme, or Supreme Court precedent, and generally

6    strains credulity.  Rather, the proper construction is that IEEPA does not provide for tariffs.

7        **B.    The History of IEEPA (and Its Predecessor, the TWEA) Further Confirms
              That IEEPA Does Not Provide for Tariffs**

8
9        In addition to statutory language and the context and structure of a statutory scheme, courts

10    also look to a statute's history and the reason for any amendments to construe its terms.  *United

11    States v. Patterson*, 119 F.4th 609, 612 (9th Cir. 2024).  Here, the history of IEEPA (and its

      predecessor, the TWEA) further confirms that IEEPA does not provide for tariffs.

12
13        1917 TWEA:  First, "regulate" did not provide for tariffs in the original TWEA.  In fact, in

14    the original TWEA, there was no provision to "regulate . . . importation" at all.   Rather, the

      TWEA set a default rule that imports from (and exports to) the "enemy" would be prohibited

15    outright—and implemented this prohibition in section 3, without using the word "regulate" in

16    connection with imports at all.  Pub. L. No. 65-91, § 3.

17
18        By contrast, the word "regulate" was used only in section 5(b)—which did not relate to

19    imports at all but instead was limited to financial transactions (foreign exchange, gold and silver,

20    currency, and financial instruments like stocks and bonds).  *Id.* § 5(b).  "Regulate" did not mean

      to impose tariffs, as this would make no sense in a provision that has no reference to imports at

21    all.  The context of the other powers with which "regulate" appeared—"investigate" and

22    "prohibit"—collectively reflect a design to restrict transactions, not to allow transactions to

23    continue as long as monies were paid as would be the case under a tariff.  This makes sense when

24    one considers the context in which the TWEA was enacted, i.e., shortly after the United States

25    had entered World War I, where the United States was not looking to impose tariffs on continuing

26    trade but instead was looking to *restrict* trade with the enemy.  *See* H.R. Rep. No. 65-85, at 1–2;

27    *accord Markham v. Cabell*, 326 U.S. 404, 414 n.1 (1945) (Burton, J., concurring).

28

16

1    <u>1941 FWPA:</u>  Nor did "regulate" provide for tariffs in any later version of the TWEA.  In

2    fact, "regulate" and "importation" did not even appear in the same paragraph until nearly a

3    quarter century later, after the FWPA amended section 5(b) in 1941.  The amended section 5(b)

4    did not use "regulate" only in connection with "importation," however—the FWPA used

5    "regulate" both in reissuing (with some amendments) section 5(b), which was limited to financial

6    transactions, as section 5(b)(1)(A), and adding a new section 5(b)(1)(B), which addressed foreign

7    property.  Pub. L. No. 77-354, § 301.  (Sections 5(b)(1)(A) and (B) were the predecessors to

8    IEEPA's 50 U.S.C. § 1702(a)(1)(A) and (B), respectively.)  As discussed above, the context of

9    the other powers and activities with which "regulate" and "importation," respectively, appeared,

10   collectively reflect a design to restrict transactions and seize enemy property for the benefit of the

11   United States' war effort, not to allow transactions to continue as long as monies were paid as

12   would be the case under a tariff.  This, again, makes sense when one considers the context in

13   which the FWPA was enacted, i.e., just days after the attack on Pearl Harbor and the United

14   States' entry into World War II, where the United States was not looking to impose tariffs on

15   continuing trade but instead was looking to *restrict* trade with the enemy and seize enemy

16   property.  *See* H.R. Rep. No. 77-1507, at 3 (purpose of War Powers Act amendment to section

17   5(b) was to allow for freezing and seizing of foreign property, with no mention of tariffs); S. Rep.

18   No. 77-911, at 2 (same); *Markham*, 326 U.S. at 411 & n.5 (same).

19        It is further clear that Defendants' attempt to cherry-pick the words "regulate" and

20   "importation" and tie them together with an ellipsis to impose tariffs fails when one considers that

21   there was no mention in the FWPA or its legislative history that the addition of "importation" to

22   section 5(b) created a newfound power to impose tariffs.  It strains credulity to think that

23   Congress delegated to the Executive Branch such an expansive power—one of its core

24   constitutional functions—without a single mention that it was doing so.  *See, e.g.*, *Whitman*, 531

25   U.S. at 468 ("Congress, we have held, does not alter the fundamental details of a regulatory

26   scheme in vague terms or ancillary provisions"); *Dir. of Revenue v. CoBank ACB*, 531 U.S. 316,

27   323–24 (2001) (rejecting construction of statute that "would mean that Congress made a radical—

28   but entirely implicit—change in the taxation of banks" in statutory amendment where "there

1    [wa]s no indication that Congress intended to change the taxation of banks" because "it would be

2    surprising, indeed," if Congress made such a significant change "*sub silentio*").

3        1977 IEEPA:  Nor does "regulate" provide for tariffs when the language from section 5(b)

4    was adopted for IEEPA in 1977.  Congress enacted IEEPA as a reform to *limit* presidential

5    authority; it certainly did not grant the President *more* authority than section 5(b) had.  The

6    legislative history of IEEPA further confirms that the powers that existed in section 5(b) that were

7    transferred to IEEPA were to regulate financial transactions and to freeze foreign property

8    transactions—not to impose tariffs.  H.R. Rep. No. 95-459, at 14–15; S. Rep. No. 95-466, at 5.

9        The legislative history of IEEPA further confirms that IEEPA does not provide for tariffs.

10       **C.    The Doctrine of Constitutional Avoidance Further Confirms That IEEPA**
             **Does Not Provide for Tariffs**

11

12       Finally, to the extent there is any doubt about whether IEEPA provides for tariffs, the

13   doctrine of constitutional avoidance demands that it be construed so as not to provide for tariffs,

14   to avoid the significant constitutional issues that would otherwise arise.

15       As the Supreme Court explained, when "a statute is susceptible of two constructions, by

16   one of which grave and doubtful constitutional questions arise and by the other of which such

17   questions are avoided, [a court's] duty is to adopt the latter." *Gonzalez v. United States*, 553 U.S.

18   242, 251 (2008).  A court need not decide that a particular construction is definitively

19   unconstitutional; the constitutional-avoidance doctrine applies even if just a "serious doubt" of

20   constitutionality is raised.  *California v. Arizona*, 440 U.S. 59, 66 (1979).  As discussed above,

21   IEEPA is clearly susceptible to a construction that it does not provide for tariffs.  (Plaintiffs

22   maintain this is the *only* proper construction, but even if the Court were to disagree, it clearly is at

23   least a possible construction.)  This raises no constitutional questions.  Defendants' construction

24   that IEEPA's reference to the power to "regulate . . . importation" provides for tariffs, by contrast,

25   raises serious constitutional questions, and thus should be avoided and rejected.

26       First, if, as Defendants claim, the power to "regulate . . . importation" provides for tariffs on

27   imports, the concomitant power to "regulate . . . exportation" similarly must provide for tariffs on

28   exports.  The powers arise out of the same section, 50 U.S.C. § 1702(a)(1)(B), and not only use

18

the same word "regulate" but the same *instance* of the same word "regulate." Further, as explained above, "importation" is not a standalone activity under § 1702(a)(1)(B)—the relevant activity is "importation or exportation of" as a collective unit, as evidenced by the fact that the statute links the two with the word "or" as a single phrase, as opposed to a comma as it would if they were separate. There thus is no way to read IEEPA as providing for tariffs on imports without also including exports. But the Constitution expressly bars tariffs on exports. U.S. Const. art. I, § 9, cl. 5. Either "regulate . . . importation or exportation of" provides for tariffs on both imports and exports and IEEPA is unconstitutional, or "regulate . . . importation or exportation of" does not provide for tariffs on either. The doctrine of constitutional avoidance obligates the Court to adopt the latter construction that IEEPA does not provide for tariffs.

Second, if, as Defendants claim, IEEPA provides for tariffs, it would raise serious doubts about whether IEEPA is an unconstitutional delegation of legislative power. The Supreme Court has held that when Congress delegates legislative power to the Executive Branch, it must "lay down by legislative act an intelligible principle to which [the Executive] is directed to conform." *Whitman*, 531 U.S. at 472. IEEPA contains no such intelligible principle with respect to tariffs (a core legislative power, *see Jacobs*, 306 U.S. at 370). *Cf. supra* note 5 (discussing the clear language Congress has used in statutes that provide for tariffs). Rather, President Trump's decision to invoke IEEPA as the claimed authority for his tariffs is based on his view that IEEPA places *no* principle or restriction on the tariffs he can impose (or pause, or reimpose, or raise). Construing IEEPA to provide for tariffs thus raises serious doubts about its constitutionality. The Court need not definitively decide if IEEPA, if it provided for tariffs, would be unconstitutional, *see California*, 440 U.S. at 66—the mere fact that this raises serious doubts about IEEPA's constitutionality obligates the Court to adopt the construction that does not raise such doubts, namely, that IEEPA does not provide for tariffs. *Gonzalez*, 553 U.S. at 251.

> **D.    The Court of Customs and Patent Appeals' Decision in *United States v. Yoshida International, Inc.*, Does Not Control Here or Establish That IEEPA Provides for Tariffs**

There exists a solitary decision from the Court of Customs and Patent Appeals (CCPA) (the predecessor to the Federal Circuit), *United States v. Yoshida International, Inc.*, 526 F.2d 560

19

(C.C.P.A. 1975) (*Yoshida II*), that has held that section 5(b) of the TWEA authorized limited

tariffs. But *Yoshida* does not control here or establish that IEEPA provides for tariffs.

In August 1971, President Nixon issued Proclamation No. 4074 imposing a tariff on

imported goods, 36 Fed. Reg. 15,724, which was then rescinded four months later, Proclamation

No. 4098, 36 Fed. Reg. 24,201 (Dec. 22, 1971). President Nixon did not invoke or mention

section 5(b)—instead, he cited only the Tariff Act of 1930 and the Trade Expansion Act of 1962.

In 1972, after the tariffs had been rescinded, an importer filed a lawsuit in the U.S. Customs

Court (the predecessor to the CIT), claiming that it had been assessed tariffs on imported zippers

in 1971 and challenging the validity of those tariffs. *Yoshida Int'l, Inc. v. United States*, 378 F.

Supp. 1155, 1157 (Cust. Ct. 1974) (*Yoshida I*), *rev'd*, *Yoshida II*, 526 F.2d 560. Counsel for the

federal government argued that the tariffs were proper under the Tariff Act of 1930 and the Trade

Expansion Act of 1962—the two acts the Proclamation had cited—and also advanced an

alternative argument that the tariffs were authorized by section 5(b) of the TWEA. *Id.* On cross-

motions for summary judgment, a three-judge Customs Court panel held that the Tariff Act and

the Trade Expansion Act did not authorize President Nixon's tariffs but went on examine whether

section 5(b) could be read as having authorized the tariffs, notwithstanding that President Nixon's

tariff proclamation had made no mention of section 5(b).[6] The court held that section 5(b) did not

authorize the tariffs, holding that the power to "regulate" did not necessarily include the power to

impose tariffs, *id.* at 1171, that the context of the TWEA demonstrated that "regulate" as used in

section 5(b) did not include the imposition of tariffs, *id.* at 1172, and that if the power to "regulate

. . . importation" were construed as including the power to impose tariffs, a President could

declare a national emergency and impose tariffs "at will, without regard to statutory rates

prescribed by the Congress and without the benefit of standards or guidelines which must

accompany any valid delegation of a constitutional power by the Congress," *id.* In a concurring

opinion, Judge Maletz undertook a comprehensive review of the history of section 5(b), finding

that "nowhere in the Congressional debates, committee hearings or reports on section 5(b) and the

---

[6] Congress has since banned these sorts of retrospective changes to the claimed authority for
emergency actions—the 1976 NEA expressly bars Presidents from exercising emergency powers
unless they specify the statutory provisions under which they propose acting. 50 U.S.C. § 1631.

1   amendments thereto is there even a glimmer of a suggestion that Congress ever intended—or

2   even considered—this section as a vehicle for delegating any of its tariff-making authority," and

3   noting that Congress had affirmatively *rejected* prior attempts to allow the President "carte

4   blanche authority" to impose tariffs.  *Id.* at 1176–84 (Maletz, J., concurring).

5          On appeal, however, the CCPA reversed.  The CCPA recognized that "no undelegated

6   power to regulate commerce, or to set tariffs, inheres in the Presidency."  *Yoshida II*, 526 F.2d at

7   572.  The CCPA further recognized that "[t]here [is] nothing in the TWEA or in its history which

8   specifically either authorizes or prohibits the imposition of a surcharge," i.e., tariff.  *Id.* at 572–73.

9   The CCPA further recognized that the power to "regulate . . . importation" in section 5(b) of the

10  TWEA "could not constitutionally have been [] the full and all-inclusive power to regulate

11  foreign commerce."  *Id.* at 574 (quotation marks omitted); *see also id.* at 582 n.35.  The CCPA

12  further recognized that "Congress did not specify that the President could use a surcharge in a

13  national emergency."  *Id.* at 576.  Despite all this, however, the CCPA concluded that because

14  nothing in the legislative history of section 5(b) indicated an intent to *prohibit* tariffs, section 5(b)

15  necessarily must have authorized the *imposition* of tariffs.  *Id.*  Even after reaching that

16  conclusion, the CCPA cabined its decision, writing that "[t]o uphold the specific surcharge

17  imposed by Proclamation 4074 is not to approve in advance any future surcharge of a different

18  nature, or any surcharge differently applied or any surcharge not reasonably related to the

19  emergency declared."  *Id.* at 577.  Recognizing that holding that the TWEA authorized tariffs

20  presented significant constitutional questions, the CCPA limited its decision to only the 1971

21  tariffs and not to any potential future tariffs.  *Id.*  The CCPA also stressed how the 1971 tariffs did

22  not actually apply to all imports but only to imports where there had been prior tariff concessions,

23  *id.*, that the tariffs were capped at tariff rates that had been set by Congress and that, if the new

24  rates exceeded congressionally-set rates, Congress's rates would control, *id.* at 577–78, that the

25  tariffs were short-lived (less than five months), *id.* at 582 n.33, and that the CCPA "do[es] not

26  here sanction the exercise of an unlimited power, which, we agree with the Customs Court, would

27  be to strike a blow to our Constitution," *id.* at 583.

28

*Yoshida II*, as a CCPA decision, is not binding on this Court.[7]  And *Yoshida*'s analysis is

unpersuasive, particularly in light of more recent Supreme Court precedent, which *Yoshida* did

not have the benefit of (and which is binding on this Court).  *Yoshida*'s holding that section 5(b)'s

reference to "regulate . . . importation" provides for tariffs because Congress did not specify it

does not, 526 F.2d at 576, cannot be sustained in light of the Supreme Court's later holdings that

"Congress [must] speak clearly if it wishes to assign to [the Executive Branch] decisions of vast

'economic and political significance.'"  *Util. Air*, 573 U.S. at 324; *accord, e.g.*, *West Virginia*,

597 U.S. at 723 ("[I]n certain extraordinary cases, both separation of powers principles and a

practical understanding of legislative intent make us reluctant to read into ambiguous statutory

text the delegation claimed to be lurking there.") (quotation marks omitted); *Whitman*, 531 U.S. at

468 ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in

vague terms or ancillary provisions—it does not . . . hide elephants in mouseholes."); *CoBank*,

531 U.S. at 323–24 (rejecting statutory construction that "Congress made a radical—but entirely

implicit—change in the taxation" sub silentio).[8]  Additionally, *Yoshida* failed to fully grapple

with the serious constitutional doubts raised by a construction that section 5(b) provides for tariffs

on imports, including that section 5(b) then (1) also must (unconstitutionally) provide for tariffs

on exports and (2) may (unconstitutionally) be an improper delegation of legislative power.

*Yoshida* itself recognized that construing section 5(b) as allowing for broad tariffs might well be

unconstitutional.  *Yoshida II*, 526 F.2d at 583.  The doctrine of constitutional avoidance, as

articulated in more recent Supreme Court precedent, obligates the Court to reject such

construction, in lieu of the better and more well-reasoned construction that the former section 5(b)

---

[7] In *Cornet Stores v. Morton*, 632 F.2d 96 (9th Cir. 1980), the Ninth Circuit cited *Yoshida II* and stated what *Yoshida*'s holding was but did not adopt that holding.  *Id.* at 97.  The mere fact that the Ninth Circuit cited *Yoshida* does not render *Yoshida* binding precedent.  *See, e.g.*, *Ohno v. Yasuma*, 723 F.3d 984, 999 n.17 (9th Cir. 2013) (that Ninth Circuit cited decisions from other courts "do[es] not mean to adopt or sanction any of their specific holdings").

[8] Under *Yoshida*'s logic that power in section 5(b) to "regulate" necessarily includes the power to impose tariffs because Congress did not express an intent to prohibit tariffs, 526 F.2d at 576, "[i]t is hard to see what measures this interpretation would place outside the [] reach" of the word "regulate."  *Cf. Ala. Ass'n of Realtors*, 594 U.S. at 764–65.  The Supreme Court properly rejects such attempts to claim "such sweeping power" on such a "wafer-thin reed."  *Id.* at 765; *accord West Virginia*, 597 U.S. at 732 (rejecting construction of statutory term that would leave term open to mean "almost anything").

22

1    and the current IEEPA do *not* provide for tariffs.  *See, e.g.*, *Gonzalez*, 553 U.S. at 251.[9]

2    **III.    Defendants' Argument for Transfer to the CIT Are Unpersuasive and Unavailing**

3    Because IEEPA does not provide for tariffs, 28 U.S.C. § 1581(i)(1)(B)—which only applies

4    to civil actions that "arise[] out of any law of the United States providing for . . . tariffs"—does

5    not apply here.  There thus is nothing that divests this Court of jurisdiction over this action or that

6    authorizes a transfer of this action to the CIT.[10]

7    Defendants' principal argument in support of their transfer motion is their claim that the

8    Ninth Circuit and the CCPA held in *Cornet Stores*, 632 F.2d 96, and *Yoshida II*, respectively, that

9    cases arising under the TWEA belonged in the Customs Court.  Defs.' Mot. 11.[11]  But Defendants

10   neglect to mention that those cases were brought before § 1581(i) even existed and thus have no

11

12   [9] To the extent that Defendants argue that Congress necessarily adopted *Yoshida II*'s construction
of section 5(b) when it used section 5(b) as the basis for IEEPA, and thus Congress necessarily
made the choice to have IEEPA provide for tariffs, they are wrong.  A single decision by a lower

13   court construing a statute does not give rise to a presumption that Congress adopted that
construction.  *BP P.L.C. v. Mayor of Balt.*, 141 S. Ct. 1532, 1541 (2021).  While the House

14   Committee on the markup of the bill that would become IEEPA was aware of *Yoshida*, H.R. Rep.
No. 95-459, at 5, there is no indication that Congress adopted *Yoshida* or agreed that section 5(b)

15   included the power to impose tariffs, much less that Congress included such a power in IEEPA.
To the contrary, as discussed, that same House Committee, as well as the Senate Committee,

16   described the section 5(b) powers that were being transferred to IEEPA as being the powers to
regulate financial transactions and to freeze foreign property transactions, with no mention of

17   tariffs.  *Id.* at 15; S Rep. No. 95-466, at 5.

18   [10] In addition to § 1581(i)(1)(B), Defendants mention in passing § 1581(i)(1)(A), which applies
only to actions arising out of a law of the United States providing for "revenue from imports or

19   tonnage."  Defendants do not make any argument regarding § 1581(a)(1)(A), which does not
apply here, given that IEEPA does not provide for revenue from imports or tonnage.  Amicus

20   curiae America First Legal Foundation, for its part, argues for the application of
§ 1581(i)(1)(C)—which Defendants do *not* argue.  Section 1581(i)(1)(C) applies to embargoes or

21   other quantitative import restrictions for reasons other than public health or safety.  But no
embargoes or quantitative restrictions are alleged here, and whether IEEPA might otherwise

22   provides for embargoes does not govern jurisdiction here where no embargoes are being
challenged.  *See Orleans Int'l, Inc. v. United States*, 334 F.3d 1375, 1379 (Fed. Cir. 2003) (that

23   portion of Beef Act imposes import fees on beef can give rise to CIT jurisdiction over challenges
to those import fees but does not give rise to jurisdiction over Beef Act claims not challenging

24   those fees); *In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1221–22 (9th Cir. 2019)
(claims that Executive Branch acted ultra vires only "arise from" statute when they challenge

25   action that Executive Branch pursuant to authority under that statute, but not where they do not).
And § 1581(i)(1)(D) applies only to "administration and enforcement" of matters in

26   § 1581(i)(1)(A)–(C)—as none of (A)–(C) applies here, (D) does not either.

27   [11] Defendants also cite *Earth Island Institute v. Christopher*, 6 F.3d 648 (9th Cir. 1993), but that
case does not relate to either IEEPA or the TWEA and instead relates only to an embargo

28   pursuant to an amendment to the Endangered Species Act, which has no relevance here.

23

1    bearing on § 1581(i)—the only jurisdictional statute Defendants cite here.

2        The CIT was established in 1980, as a successor to the Customs Court.  Customs Court Act

3    of 1980, Pub. L. No. 96-417, 94 Stat. 1727 (1980).  Prior to then, the jurisdiction of the prior

4    Customs Court was governed by 28 U.S.C. § 1582, not § 1581.  28 U.S.C. § 1582 (1976),

5    *available at* https://www.loc.gov/item/uscode1976-008028095/ (last visited May 1, 2025).  That

6    version of § 1582 provided that the Customs Court had jurisdiction over actions brought by

7    parties "whose protest pursuant to the Tariff Act of 1930, as amended, has been denied[.]"  *Id.*

8        *Cornet Stores* and *Yoshida* were brought by importers who were protesting tariffs that had

9    been charged against them under President Nixon's 1971 tariff order—which had expressly

10   invoked the Tariff Act of 1930 (not IEEPA or the TWEA) to impose its tariffs.  36 Fed. Reg.

11   15,724.  Those cases were held to be within the scope of the pre-1980 version of § 1582.  *See*

12   *Cornet Stores*, 632 F.3d at 98–100 (citing § 1582).[12]  This action, by contrast, would not be,

13   because it is not being brought by plaintiffs who filed protests pursuant to the Tariff Act of 1930

14   and had their protests denied.  In any event, what the scope is of a version of § 1582 that no

15   longer exists is immaterial.  The question here is whether this action is within the scope of the

16   modern § 1581(i).  *Cornet Stores* and *Yoshida* have no bearing on that question or on whether

17   § 1581(i)'s "arises out of any law of the United States providing for . . . tariffs" limitation—which

18   did not exist back then but which serves as the only hook for Defendants' transfer claim now—is

19   satisfied here.  *Cf. K Mart*, 485 U.S. at 188–89 (actual precise language of § 1581 matters because

20   "Congress did not commit to the Court of International Trade's exclusive jurisdiction *every* suit

21   against the Government challenging customs-related laws and regulations.") (emphasis in

22   original); *Trayco*, 994 F.2d at 836 (CIT "operates within precise and narrow jurisdictional limits"

23   and "cannot exercise jurisdiction over actions not addressed by a specific jurisdictional grant").[13]

24       Defendants also argue that several other cases challenging President Trump's tariffs are

25   [12] The new statutes defining the CIT's jurisdiction were enacted five months after *Cornet Stores*
26   was argued and one month before it was decided.  The opinion makes clear that the case was
     decided on the basis of the pre-amendment § 1582.

27   [13] Defendants also cite *Alcan Sales v. United States*, 693 F.2d 1089 (Fed. Cir. 1982) (*Alcan II*),
28   *aff'g* 528 F. Supp. 1159 (Ct. Int'l Trade 1981) (*Alcan I*).  But the CIT exercised jurisdiction there
     pursuant to § 1581(*a*).  *Alcan I*, 528 F. Supp. at 1161.  That case says nothing about § 1581(i).

24

1    pending before the CIT.  Defs.' Mot. 11–12.  But whether the CIT does or does not have

2    jurisdiction has not yet been decided in any of those cases, much less whether those cases are

3    sufficiently similar to this action such that the same analyses would apply.[14]  In any event, "[t]he

4    district courts and the Court of International Trade can both have jurisdiction over actions arising

5    out of the same act—it simply does not matter that there will be similar legal issues litigated in

6    different courts."  *Orleans*, 334 F.3d at 1379.

7         Finally, Defendants claim that the CIT has entertained "thousands of challenges" to

8    presidential actions imposing tariffs.  Defs.' Mot. 12 (citing *HMTX Indus. v. United States*, No.

9    20-00177 (Ct. Int'l Trade)).  But those cases pertain to different laws, *see, e.g.*, *In re Section 301*

10   *Cases*, 570 F. Supp. 3d 1306, 1315 (Ct. Int'l Trade 2022) (HMTX cases pertain to Trade Act of

11   1974), and do not alter the fact that the law in *this* action—IEEPA—does not provide for tariffs,

12   and thus that § 1581(i) does not apply and does not vest jurisdiction over this action in the CIT.

13                                    *    *    *

14        The plain language of IEEPA, its context and statutory scheme, its history and amendments,

15   and the doctrine of constitutional avoidance, all confirm that IEEPA does not provide for tariffs.

16   And because IEEPA does not provide for tariffs, 28 U.S.C. § 1581(i) does not apply and does not

17   divest this Court of jurisdiction.  Defendants' transfer motion thus should be denied.

18                                  **CONCLUSION**

19        The Court should deny Defendants' 28 U.S.C. § 1631 motion to transfer to the CIT.

20   _____

21   [14] For example, while the District of Montana recently transferred a case challenging President's
     Trump's tariffs to the CIT, that case is different from this one, as that case also challenged tariffs
     imposed under the Trade Act of 1962, *Webber v. DHS*, No. 25-26-GF-DLC, 2025 WL 1207587,
22   at \*4 (D. Mont. Apr. 25, 2025), whereas this action does not.  (The court there also cited *Cornet
     Stores* and *Yoshida II* in support of its transfer decision.  *Id.* at \*5.  From the briefing in that case,
23   it does not appear that the federal government, when it cited *Cornet Stores* and *Yoshida* in arguing
     for transfer to the CIT in that case, alerted the court that those cases had been brought before
24   § 1581(i) existed and instead had operated under entirely different jurisdictional statutes.)
        The CIT has ruled on a motion for a temporary restraining order in one tariffs case, *V.O.S.
25   Selections, Inc. v. Trump*, No. 25-00066, 2025 WL 1178581 (Ct. Int'l Trade Apr. 22, 2025), but
     that order contained no jurisdictional analysis and thus does not establish whether the CIT does or
26   does not have jurisdiction over that case, much less this one.  *See, e.g.*, *Itility, LLC v. United
     States*, 124 Fed. Cl. 452, 460 (2015) (dismissing case for lack of jurisdiction and holding that
27   court's prior issuance of a TRO "is not a persuasive precedent" that jurisdiction exists where TRO
     order "contains no discussion of jurisdiction and thus has no power to persuade on the topic")
28   (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998)).

                                       25

Dated:  May 1, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
LARA HADDAD
Supervising Deputy Attorney General

*s/Shiwon Choe*
SHIWON CHOE
ZELDA VASSAR
CAROLYN F. DOWNS
Deputy Attorneys General
*Attorneys for Plaintiffs State of California*
*and Gavin Newsom, in his official capacity*
*as Governor of California*

26