ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
LARA HADDAD
Supervising Deputy Attorney General
SHIWON CHOE (SB 320041)
CAROLYN F. DOWNS (SB 353455)
ZELDA VASSAR (SB 313789)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-4400
  Fax:  (415) 703-5480
  E-mail:  Shiwon.Choe@doj.ca.gov
          Carolyn.Downs@doj.ca.gov
          Zelda.Vassar@doj.ca.gov
*Attorneys for Plaintiffs State of California and
Gavin Newsom, in his official capacity as Governor
of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA and GAVIN NEWSOM, in his official capacity as Governor of California,**<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD J. TRUMP, in his official capacity as President of the United States, et al.,**<br><br>Defendants. | Case No. 3:25-cv-03372-JSC<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date/Time:  June 26, 2025 at 10:00 a.m.<br>Location:  Courtroom 8, 19th Floor |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... iii

NOTICE OF MOTION ............................................................................................................ 1

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

   I.    President Trump has recently claimed authority under IEEPA to issue
        multiple executive orders imposing tariffs on every U.S. trading partner.................. 2

   II.   The impact of President Trump's unprecedented IEEPA tariffs is
        devastating .......................................................................................................... 3

   III.  President Trump's IEEPA tariffs especially harm California....................................... 4

LEGAL STANDARD ............................................................................................................... 6

ARGUMENT ........................................................................................................................... 7

   I.    Plaintiffs Have Article III Standing .......................................................................... 7

   II.   Plaintiffs Are Likely to Succeed on the Merits That President Trump's
        IEEPA Tariff Orders Are Unlawful ....................................................................... 8

        A.    The Plain Language of IEEPA Confirms It Does Not Authorize
             Tariffs .................................................................................................... 8

        B.    The Legislative History of IEEPA Confirms It Does Not Authorize
             Tariffs .................................................................................................. 13

        C.    The Major-Questions Doctrine and the Doctrine of Constitutional
             Avoidance Confirm IEEPA Does Not Authorize Tariffs............................... 14

        D.    The *Yoshida* Case Does Not Establish That IEEPA Authorizes
             Tariffs .................................................................................................. 18

   III.  Plaintiffs Will Suffer Irreparable Injury in the Absence of an Injunction ................. 20

        A.    Plaintiffs Face Irreparable Injury in Their Ability to Procure Goods ............. 20

        B.    Plaintiffs Face Irreparable Injury From Lost Revenue.................................... 21

        C.    Plaintiffs Face Irreparable Injury From the Unpredictable, Ever-
             Changing Tariff Landscape ....................................................................... 23

        D.    Plaintiffs' Harms Cannot Be Redressed By Order for Damages .................... 24

IV.    The Balance of Equities and the Public Interest Weigh in Favor of an
         Injunction ........................................................................................................ 25

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

Page

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021) ................................................................................. 11, 15

*Astrue v. Ratliff*,
  560 U.S. 586 (2010) ....................................................................................... 11

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ....................................................................................... 7, 8

*BP P.L.C. v. Mayor of Balt.*,
  141 S. Ct. 1532 (2021) ...................................................................................... 20

*Brown v. Gardner*,
  513 U.S. 115 (1994) ........................................................................... 9, 10, 11, 17

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ............................................................................ 8, 24

*City & Cnty. of S.F. v. USCIS*,
  981 F.3d 742 (9th Cir. 2020) ............................................................................... 24

*City of Oakland v. Lynch*,
  798 F.3d 1159 (9th Cir. 2015) ............................................................................... 8

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004) ............................................................................... 7

*Cnty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017) ..................................................... 20, 23, 25

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988) ........................................................................................ 16

*Diginet, Inc. v. Western Union ATS, Inc.*,
  958 F.2d 1388 (7th Cir. 1992) ............................................................................... 9

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ............................................................................... 24

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976) .................................................................................... 12, 14

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2024) (en banc) ................................................... 6, 7, 25

*Fischer v. United States*,
  603 U.S. 480 (2024) ........................................................................................ 13

*Florsheim Shoe Co. v. United States*,
  744 F.2d 787 (Fed. Cir. 1984).................................................................................... 17

*Georgia v. President*,
  46 F.4th 1283 (11th Cir. 2022) ............................................................................... 15

*Gustafson v. Alloyd Co., Inc.*,
  513 U.S. 561 (1995)............................................................................... 9, 11, 17, 19

*In re Joye*,
  578 F.3d 1070 (9th Cir. 2009)................................................................................. 12

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
  478 U.S. 221 (1986) ............................................................................................... 15

*Jefferson Cnty. v. Acker*,
  527 U.S. 423 (1999)................................................................................................. 9

*Kansas v. United States*,
  249 F.3d 1213 (10th Cir. 2001)............................................................................... 22

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ................................................................................... 15

*L.A. Mem'l Coliseum Comm'n v. NFL*,
  634 F.2d 1197 (9th Cir. 1980)................................................................................. 25

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014)................................................................................... 25

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ........................................................................... 15, 24

*Louisiana v. U.S. Dep't of Energy*,
  90 F.4th 461 (5th Cir. 2024) ..................................................................................... 7

*Maner v. Dignity Health*,
  9 F.4th 1114 (9th Cir. 2021) ......................................................................... 9, 10, 17

*Marshall Field & Co. v. Clark*,
  143 U.S. 649 (1892) ............................................................................................... 16

*Maryland v. U.S. Dep't of Agric.*,
  __ F. Supp. 3d __, No. JKB-25-0748, 2025 WL 973159 (D. Md. Apr. 1, 2025),
  *appeal docketed*, No. 25-1338 (4th Cir. Apr. 3, 2025) ......................................... 24

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir. 2023),
  *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023) ................................................... 15

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024)............................................................................ 14, 15, 19

*Orangeburg v. FERC*,
  862 F.3d 1071 (D.C. Cir. 2017)................................................................................. 7

iv

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) .................................................................................. 25

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
   102 F.3d 12 (1st Cir. 1996) ....................................................................................... 22

*Scribner v. WorldCom, Inc.*,
   249 F.3d 902 (9th Cir. 2001) .................................................................................... 11

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,
   695 F.3d 676 (7th Cir. 2012) .................................................................................... 22

*Touby v. United States*,
   500 U.S. 160 (1991) ................................................................................................. 13

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ................................................................................................. 16

*United States v. Baxley*,
   982 F.2d 1265 (9th Cir. 1992) .................................................................................. 12

*United States v. Spawr Optical Rsch., Inc.*,
   685 F.2d 1076 (9th Cir. 1982) .................................................................................. 15

*United States v. U.S. Shoe Corp.*,
   523 U.S. 360 (1998) ................................................................................................. 17

*United States v. Wells*,
   519 U.S. 482 (1997) ................................................................................................. 20

*United States v. Yoshida Int'l, Inc.*,
   526 F.2d 560 (C.C.P.A 1975) ..................................................................... 13, 18, 19

*Weissman v. Nat'l R.R. Passenger Corp.*,
   21 F.4th 854 (D.C. Cir. 2021) .................................................................................... 7

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ..................................................................... 9, 15, 17, 19

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................................. 13

*Ysleta del Sur Pueblo v. Texas*,
   596 U.S. 685 (2022) ....................................................................................... 8, 10, 13

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) ................................................................................................. 16

**Statutes**

19 U.S.C. § 1862 ............................................................................................................. 11, 12

50 U.S.C. § 1702 ............................................................................................................. passim

v

Pls.' Mot. for Prelim. Inj. (No. 3:25-cv-03372-JSC)

Trade Act of 1974,
    Pub. L. No. 93-617, 88 Stat. 1978 (1975)................................................................. 19

Trade Expansion Act of 1962,
    Pub. L. No. 87-794, 576 Stat. 877 (1962)................................................................. 11

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl. 5.................................................................................................. 17

**Legislative Materials**

H.R. Rep. No. 95-459 (1977).......................................................................................... 19, 20

S. Rep. No. 95-466 (1977).................................................................................................. 20

**Executive Proclamations**

Proclamation No. 4074,
    36 Fed. Reg. 15,724 (Aug. 17, 1971)................................................................... 18, 19

Proclamation No. 4098,
    36 Fed. Reg. 24,201 (Dec. 22, 1971) ......................................................................... 19

**Other Authorities**

*Regulate*, Black's Law Dictionary (12th ed. 2024)....................................................... 8, 10

*Regulate*, Black's Law Dictionary (5th ed. 1979)......................................................... 9, 10

*Regulate*, Webster's Third International Dictionary (1986) ............................................. 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on June 26, 2025, at 10:00 a.m., Plaintiffs will move under Federal Rule of Civil Procedure 65(a) for a preliminary injunction restraining and enjoining Defendants Kristi Noem, U.S. Department of Homeland Security ("DHS"), Pete R. Flores, and U.S. Customs and Border Protection ("CBP") (collectively, "Agency Defendants") from implementing or enforcing any order, proclamation, or directive pursuant to the International Economic Emergency Powers Act that purports to impose tariffs or directs the imposition of tariffs, and from collecting any such tariffs.  The motions are based on this Notice; the following Memorandum of Points and Authorities; the Declarations of Dr. Kimberly Clausing, Erica York, Angela Shell, Lori Bradley, Jesse Bignami, Dr. Somjita Mitra, and Colby White; the prior filings in this action; and all other matters properly before the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In the past three months, President Trump—acting alone and without the consent of Congress—has issued a flurry of executive orders imposing across-the-board tariffs on imports from every U.S. trading partner at staggering rates.  These tariffs cause exponential and irreparable harm to the State of California and Governor Newsom on myriad levels: As a major and direct procurer of billions of dollars-worth of goods, California now faces having to thwart its own negotiated contracts and accept price increases or forgo essential purchases; has significantly downgraded revenue forecasts that fund the Governor's budget due to tariff impact and uncertainty; has been unable to rely on the Legislature's approved budget; and has already spent countless hours and resources in addressing the anticipated unavailability of goods as a result of the tariffs.  California suffers crippling outsize impacts due to its status as the fourth largest economy in the world; the harm to it is irreparable.

President Trump has issued these devastating and unprecedented tariffs without authorization of law.  He invokes the International Emergency Economic Powers Act ("IEEPA") as the purported legal basis for his tariffs.  But IEEPA does not authorize tariffs.  Defendants pick two words out of one section of IEEPA, 50 U.S.C. § 1702 (a)(1)(B), string them together with an

1

ellipsis to read "regulate . . . importation," and try to construe this ellipted phrase—in isolation and shorn of context—as authorizing tariffs. But this cannot be squared with IEEPA's statutory text. Indeed, Defendants cannot come up with an internally consistent construction of the word "regulate," and have taken the astonishing position that "regulate" "need not carry the same meaning" consistently within IEEPA. Transfer Reply 12 (emphasis added). Apparently, under Defendants' view, the meaning of "regulate" is not fixed and can change within a single statute, such that "regulate" happens to mean to tariff or tax when paired with "importation," even though this meaning is inconsistent with the rest of the statute. That Defendants cannot provide an internally consistent construction of "regulate" that supports their claim that "regulate . . . importation" authorizes tariffs, confirms that IEEPA does not authorize tariffs. President Trump's orders purporting to impose tariffs pursuant to IEEPA ("IEEPA Tariff Orders") thus are unlawful, ultra vires, and violate the constitutional requirement of separation of powers.

Plaintiffs are entitled to a preliminary injunction restraining Agency Defendants from implementing or enforcing the IEEPA Tariff Orders. First, Plaintiffs are likely to succeed on the merits, because IEEPA does not authorize tariffs. Second, Plaintiffs will suffer irreparable harm absent an injunction: their contracts are upended by vendors seeking to pass on increased costs to the State, and they have diverted significant resources to determine whether to pay more for necessary goods or forgo those goods altogether; they also stand to lose billions of dollars in tax revenue, all due to these tariffs. An immediate injunction is the only adequate remedy. Third, the balance of equities and public interest tip sharply in Plaintiffs' favor, because there is no public harm from an injunction that merely ends an unlawful practice and preserves the status quo that existed prior to the unlawful IEEPA Tariff Orders' cataclysmic economic effects.

## BACKGROUND

**I.      President Trump has recently claimed authority under IEEPA to issue multiple executive orders imposing tariffs on every U.S. trading partner**

In the past few months, President Trump has issued over a dozen executive orders pursuant to IEEPA imposing, pausing, reimposing, and escalating tariffs on every U.S. trading partner. *See generally* York ¶¶ 28-42 (timeline of IEEPA tariff actions). These tariffs are "broad and

2

1  unprecedented[,]" Clausing ¶ 13, and affect up to 60 percent of U.S. goods imports, York ¶ 28.

2  The current IEEPA tariff regime imposes a universal tariff of 10% on nearly all U.S. trading

3  partners, with tariff increases as high 50% on more than fifty specific trading partners set to go

4  into effect on July 9, 2025.  York. ¶¶ 37, 39; *see also id.* ¶¶ 36, 41 (exemptions).  Separately,

5  Canada and Mexico are subject to IEEPA tariffs of up to 25%.  *Id.* ¶¶ 29-30, 32-34; *see also id.*

6  ¶¶ 32-33 (exemptions).  And China is subject to an ever-changing combination of IEEPA tariffs

7  that reached a staggering rate of 145%.[1]  *Id.* ¶¶ 9-32, 37-40; *see also id.* ¶¶ 36, 41 (exemptions).

8  The claimed rationale for these tariffs is wide-ranging, from trade deficits to immigration, crime,

9  and illicit drugs.  Clausing ¶ 13.  In response to President Trump's tariffs, major U.S. trading

10  partners including China, Canada, and the EU imposed or announced retaliatory tariffs.  York ¶¶

11  43-44 (listing billions of dollars in retaliatory tariffs on U.S. exports).

12      Tariffs are a type of excise tax imposed by governments, generally applied to imported

13  goods.  *Id.* ¶ 12.  They are not paid by foreign governments—rather, if the importer is a U.S.

14  person or company, that U.S. person or company is the one who has to pay the tariff.  *Id.* ¶12.

15  **II.    The impact of President Trump's unprecedented IEEPA tariffs is devastating**

16      "The scope, impact, and swiftness of the Trump Administration's 2025 tariffs are

17  unprecedented[,]" generating "enormous economic damage to both the U.S. economy and the

18  California economy."  Clausing ¶¶ 10, 47.  Economic modeling simulates that the effects of the

19  IEEPA tariffs will reduce U.S. economic output by more than $178 billion, reduce labor supply

20  by 546,000 full-time equivalent jobs, and lower after-tax incomes on average by nearly a full

21  percentage point.  *Id.* ¶¶ 51, 53.  President Trump's tariffs "will be the largest tax increase in

22  more than a generation for U.S. consumers."  Clausing ¶ 47.

23      The tariffs will also cause higher prices and less availability of goods, leading to shortages

24  _____

[1] On May 12, 2025, the Trump Administration announced that tariffs on China would be lowered
25  to 30% for 90 days.  Joint Statement on U.S.-China Economic and Trade Meeting in Geneva
(May 12, 2025), https://tinyurl.com/4cxy22zv.  The damage posed by tariffs even with this pause
is still approximately 60% of the damage forecasted prior to the pause.  Clausing ¶ 10 n.1.
26  Additionally, on May 4, 2025, President Trump announced via social media post that he was
"authorizing" agencies to impose 100% tariffs "on any and all Movies coming into our Country
27  that are produced in Foreign Lands[,]" although no orders have been issued nor legal authority
identified.  Donald J. Trump (@realDonaldTrump), Truth Social (May 4, 2025, 4:18 PM),
28  https://truthsocial.com/@realDonaldTrump/posts/114452117143235155.

and supply chain disruptions.  York ¶ 46.  The Port of Los Angeles alone saw a third of its import volume disappear as of the first week of May, which will affect the availability of goods in stores in only a few weeks.  *See* Clausing ¶ 34.  And nationally, as a "preview of the shortages which will follow," container bookings from China dropped 60 percent after the imposition of a 125 percent tariff on imports from China.  York ¶ 46.

President Trump's tariffs also "risk pushing the larger macroeconomy into a recession, and will have lasting harm on unemployment, economic growth, and government budgets."  Clausing ¶ 10; *see also id.* ¶ 41 (forecasters have reduced their estimates of U.S. gross domestic product (GDP) growth and "substantially raised the probability of a recession due to the tariffs.").  Recessions are damaging to public finance and state budgets and "can also mean abrupt curtailment of spending in areas of pressing need, such as public safety, education, and disaster preparedness."  Clausing ¶ 45.

Finally, the "on-again, off-again" nature of recent tariffs (with messaging that reprieves are only temporary, and higher tariffs may yet be imposed) has left economic actors, including Plaintiffs, uncertain—which itself causes harm.  Clausing ¶ 42.  "Uncertainty itself has a chilling effect on the economy, as businesses and people pause decision-making, or cancel and lose out on opportunities altogether."  York ¶ 45.  In particular, this uncertainty "frustrates and impairs the ability of state and local governments to budget and plan" due to the difficulty forecasting project costs.  Clausing ¶ 42.  As follows, this is especially true for California.

## III.    President Trump's IEEPA tariffs especially harm California

Plaintiffs the State of California and Governor Newsom are suffering and will continue to suffer particularized and outsized harm from the IEEPA tariffs.  This harm will compound exponentially the longer the tariffs remain in effect, with more to come as pauses soon expire.  "While the economic losses from tariffs will be felt across the entire U.S. economy, California will experience an outsized share of its losses due to its larger economy and workforce as well as exposure to trade."  York ¶ 66.  Economic modeling estimates that the loss to California's economy would be $25 billion, with job losses of more than 64,000.  *Id.* ¶ 59.

California's Chief Procurement Officer, who oversees the awarding of leveraged

4

procurement agreements with vendors for specialized goods and services, reports that California spends over $5 billion annually on goods, including goods purchased from other countries. Shell ¶ 8; *see, e.g.*, Bradley ¶ 6; Bignami ¶ 6. Many of these goods are subject to the IEEPA tariffs and thus will become more expensive.[2] York ¶¶ 28, 60. Indeed, in recent weeks, some vendors and suppliers to the State have already sought to increase their prices or add surcharges of 3.5-10% due to tariffs. Shell ¶¶ 9, 11; *see also id.* ¶ 12 (Department of General Services anticipates receiving at least 18 individual contract price increase requests due to the tariffs).

These increased procurement costs harm California's core functions and goals. For example, the California Department of Health Care Services ("DHCS"), which is the largest healthcare purchaser in California and serves more than half of all of California's children, recently contracted to authorize purchases of $8 billion of pharmaceuticals from various foreign countries. *Id.* ¶¶ 3, 6. In another example, the California Department of Public Health ("CDPH") recently spent almost $200,000 to procure key laboratory instruments from China used to conduct gene sequencing of various viruses. Bignami ¶¶ 6-7. If a price increase due to tariffs causes a purchase to exceed the budget of a program, the purchase cannot be made, *id.* ¶ 7, and California may be forced to terminate the contract, Shell ¶ 15. California's Chief Procurement Officer "does not anticipate being able to find alternate sources, on a large scale, for goods to mitigate against the price increases attributable to tariffs." *Id.* ¶ 12. As such, the tariffs confront California with the impossible choice of whether to accept increased costs, no matter how high, or to try to re-procure (at a huge scale), so that agencies can access critically needed supplies. *Id.* ¶¶ 21-23. And because of anticipated shortages due to the tariffs, Clausing ¶ 34, California runs the risk that it may not be able to procure the goods it needs at all, Shell ¶ 23. The inability to procure needed goods in a timely and predicable matter threatens these Departments' very purpose and mission.

For the Procurement Division, which oversees more than approximately $17 billion in annual purchases of goods and services, the sheer resources it takes to anticipate and respond to

---

[2] For example, the California Department of Public Health recently purchased $430,990 worth of computer monitors, Bignami ¶ 6; as a result of the tariffs, the cost for the same amount is now projected to be $568,906, York ¶ 63. Given that this represents a relatively low purchase of just two items that one California department procures, the harm to the State is exponential.

1   tariff price increases alone imparts significant harm. Shell ¶¶ 8, 19. The Division has already

2   "expended considerable effort and numerous work hours" assessing, reacting, and responding to

3   tariff induced procurement issues, and the mere act of reviewing individual justifications for each

4   tariff-related price increase request is an arduous process on such a scale. Shell ¶ 19. Further, the

5   uncertainty caused by "[t]he application of abrupt and ever-changing tariff amounts applied on an

6   ad hoc basis and outside of the Legislature's budgeting process makes it impossible for State

7   agencies to abide by their legislatively approved budgets." *Id.* ¶ 22.

8        The harms from the current tariffs and their uncertain nature are reflected in California's

9   recently downgraded economic and tax revenue projections for the 2025-2026 Governor's Budget

10  due the potential impact of tariffs. Mitra ¶¶ 8-11; White ¶¶ 5-8. Specifically, the California

11  Economic Forecast increased its projections for unemployment and inflation, and considerably

12  downgraded its projected wage, salary, job, and personal-income growth. Mitra ¶¶ 8-11. In turn,

13  the California Tax Revenue Forecast downgraded its projection for state corporate taxable profit

14  growth, attributing approximately $1.7 billion of the downgrade to the negative effect of tariffs.

15  White ¶ 5; *see also id.* ¶¶ 6-8 (multiple other revenue sources were downgraded by billions of

16  dollars due to projected tariff impact, including but not limited to taxable wages, partnership

17  income, and business income). These fiscal impacts have immediate and devastating effects on

18  California's budget, which in turn could yield foreseeable cuts to programs and services.

19                               **LEGAL STANDARD**

20       A preliminary injunction is appropriate when a plaintiff establishes "that [(1)] he is likely to

21  succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of

22  preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is

23  in the public interest." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of

24  Educ.*, 82 F.4th 664, 683-84 (9th Cir. 2024) (en banc) (*FCA*). The third and fourth factors merge

25  where the party opposing injunctive relief is a government entity. *Id.* at 695. Courts "evaluate

26  these factors on a sliding scale, such that a stronger showing of one element may offset a weaker

27  showing of another." *Id.* at 684 (quotation marks omitted). "When the balance of equities tips

28  sharply in the plaintiff's favor, the plaintiff must raise only 'serious questions' on the merits—a

6

Pls.' Mot. for Prelim. Inj. (No. 3:25-cv-03372-JSC)

1   lesser showing than likelihood of success." *Id.* (quotation marks omitted).

2          In determining whether an injunction seeks to alter or maintain the status quo, where the

3   government has changed a policy, courts look not to the time when the action was filed but

4   instead to the time prior to the government's policy change. *Id.* at 684-85.  The status quo here is

5   the status prior to President Trump's tariff orders. *Id.*

6                                          **ARGUMENT**

7   **I.      Plaintiffs Have Article III Standing**

8          Plaintiffs have standing because they are directly harmed by the IEEPA Tariff Orders and

9   that harm would be redressed by declaring them unlawful and enjoining their enforcement.  States

10  have standing when they have "suffered an injury in fact—a concrete and imminent harm to a

11  legally protected interest, like property or money—that is fairly traceable to the challenged

12  conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

13  Those injuries may be economic, *see id.*, or harm proprietary interests, which "are as varied as a

14  [state's] responsibilities, powers, and assets" and include "its powers of revenue collection." *City

15  of Sausalito v. O'Neill*, 386 F.3d 1186, 1197-98 (9th Cir. 2004).

16         Defendants' unlawful IEEPA tariffs are causing and will continue to cause Plaintiffs

17  economic harm and harm to their proprietary interests.  First, as a market participant, California

18  buys necessary foreign-manufactured goods, which will become more expensive, or even

19  unavailable, due to the IEEPA tariffs. York ¶ 60; Clausing ¶ 10; *see also* Shell ¶¶ 9, 11 (vendors

20  notifying California of price-increase requests due to tariffs).  Plaintiffs' loss of the opportunity to

21  purchase desirable lower-priced goods satisfies the injury-in-fact requirement.  *See, e.g.,*

22  *Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854, 857 (D.C. Cir. 2021) ("the lost

23  opportunity to purchase a desired product constitute[s] an injury-in-fact"); *Orangeburg v. FERC*,

24  862 F.3d 1071, 1078-80 (D.C. Cir. 2017) (city had standing where it lost opportunity to purchase

25  wholesale power on desirable terms, even where substitutable products existed and existing

26  contracts precluded a status quo change for five years); *Louisiana v. U.S. Dep't of Energy*, 90

27  F.4th 461, 467-69 (5th Cir. 2024) (states had standing as direct purchasers of dishwashers and

28  laundry machines where they lost opportunity to purchase more desirable models).

                                                7

Additionally, injury to California from the IEEPA tariffs is ongoing, as the tariffs have a direct impact on California's tax revenue streams that fund the government. White ¶ 5 (one singular revenue stream in the tax revenue forecast attributes "approximately $1.7 billion of the downgrade in fiscal year 2025-26 to the negative effect of tariffs."); *see supra* Background III. This too, and the resulting harm to Plaintiffs in the performance of their public functions, is a sufficient injury-in-fact to confer Article III standing. *See, e.g.*, *Nebraska*, 600 U.S. at 491 (finding direct injury to state where President's student-loan forgiveness plan would cut revenues of state-created corporation and thus impair its efforts to aid state's college students, constituting harm in the performance of its public function); *City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (city had standing based on projected $1.4 million lost tax revenue from action against medical marijuana dispensaries).

Plaintiffs' injuries are both traceable to the IEEPA Tariff Orders and are redressable by this Court declaring them unlawful and enjoining Agency Defendants from implementing or enforcing them. To the extent there is a "causal chain" linking a state to the harm, this "does not foreclose standing[.]" *California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018) (states established standing where some female residents would lose at least some healthcare coverage due to challenged actions, in turn inflicting economic harm to the States). For these reasons, Plaintiffs have standing to challenge the IEEPA Tariff Orders and whether IEEPA authorizes tariffs.

## II.    Plaintiffs Are Likely to Succeed on the Merits That President Trump's IEEPA Tariff Orders Are Unlawful

### A.    The Plain Language of IEEPA Confirms It Does Not Authorize Tariffs

The plain language of IEEPA confirms that it does not authorize tariffs. *See* Transfer Opp'n 12-16. And Defendants' theory that the "regulate . . . importation" language they cherry-picked and pulled out of context from 50 U.S.C. § 1702(a)(1)(B) authorizes tariffs, fails.

As used in a statute, "to *regulate* something is usually understood to mean to 'fix the time, amount, degree, or rate' of an activity 'according to rule[s],'" *Ysleta del Sur Pueblo v. Texas*, 596 U.S. 685, 697 (2022) (quoting *Regulate*, Webster's Third International Dictionary 1913 (1986)), or "[t]o control (an activity or process) esp. through the implementation of rules." *Regulate*,

8

Pls.' Mot. for Prelim. Inj. (No. 3:25-cv-03372-JSC)

Black's Law Dictionary (12th ed. 2024); *accord, e.g.*, *Regulate*, Black's Law Dictionary 1156

(5th ed. 1979).  This does not encompass the power to impose tariffs, which are not controls but

instead are simply *taxes* on imports.  Clausing ¶¶ 17-19.  A tariff simply extracts funds from the

importer; it does not control imports or fix their time, amount, degree, or rate.  *Id.*; *see also, e.g.*,

*Jefferson Cnty. v. Acker*, 527 U.S. 423, 440 (1999) (discussing how imposing a tax on federal

officials does "no[t] in any way regulate[] them in the performance of their duties"); *Diginet, Inc.

v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992) ("The legal power to regulate is

not necessarily the legal power to tax.").  Imposing tariffs on imports does not fall within the

plain language of § 1702(a)(1)(B) or within the power to "regulate . . . importation."

   That "regulate . . . importation" does not encompass the power to impose tariffs is further

evident when "regulate" and "importation" are read in context.  As the Supreme Court has held,

"[i]t is a fundamental canon of statutory construction that the words of a statute must be read in

their context and with a view to their place in the overall statutory scheme."  *West Virginia v.

EPA*, 597 U.S. 697, 721 (2022).  Additionally, where a statute contains a list of words, parties and

courts must read the entire list in context and may not just select "but one word in a list, a word [a

party] reads altogether out of context," and then "ascrib[e] to one word a meaning so broad that it

is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of

Congress.'"  *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574-75 (1995); *accord, e.g.*, *Maner v.

Dignity Health*, 9 F.4th 1114, 1123 (9th Cir. 2021) (same).  And, of course, a given term

"mean[s] the same thing throughout a statute."  *Brown v. Gardner*, 513 U.S. 115, 118 (1994).

   "Regulate" is one entry in a list of eight emergency powers listed in IEEPA:

> [(1)] investigate, [(2)] block during the pendency of an investigation, [(3)] regulate,
> [(4)] direct and compel, [(5)] nullify, [(6)] void, [(7)] prevent or [(8)] prohibit[.]

50 U.S.C. § 1702(a)(1)(B).  "Importation" is one entry in a list of twelve activities to which those

emergency powers can be applied:

> any [(1)] acquisition, [(2)] holding, [(3)] withholding, [(4)] use, [(5)] transfer,
> [(6)] withdrawal, [(7)] transportation, [(8)] importation or [(9)] exportation of, or
> [(10)] dealing in, or [(11)] exercising any right, power, or privilege with respect to, or
> [(12)] transactions involving, any property in which any foreign country or a national
> thereof has any interest.

9

*Id.*[3] "Regulate" must have a consistent meaning when applied to that list of activities. That meaning does not include tariffs or taxes, as reading the full list of activities readily demonstrates. *See Brown*, 513 U.S. at 119-20 (rejecting government's interpretation of statutory phrase where interpretation could not be applied to all items in statutory list without "incongruity"). Consider, for example, "regulate . . . use." As a matter of plain English, this does not mean to *tariff or tax* use. No one would say, for example, that to "regulate . . . use" of pesticides in organic food or chemicals in drinking water, or to "regulate . . . use" of confidential trade secrets or protected patient medical records, or to "regulate . . . use" of steroids in sporting events, etc., means to *tariff or tax* such use. Instead, "regulate . . . use" means to control use or to fix the time, amount, degree, or rate of use. *Accord Ysleta del Sur Pueblo*, 596 U.S. at 697; *Regulate*, Black's Law Dictionary (12th ed. 2024); *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979). Likewise, "regulate . . . importation" means to control importation or fix its time, amount, degree, or rate, perhaps by limiting the times when imports can be brought in, or subjecting them to inspections. It does not mean to *tariff or tax* importation. This conclusion is further confirmed when one reads "regulate" in context with *its* list: the list of powers (in addition to the list of activities). The other powers (block, direct and compel, nullify, void, prevent, and prohibit) reflect an overall statutory scheme to *control or restrict* activities, not to *tariff or tax* them. *See Maner*, 9 F.4th at 1123 (statutory list of words "should be assigned a permissible meaning that makes them similar").

Consider too the converse—suppose "regulate" were to include the power to impose tariffs or taxes. That would mean that § 1702(a)(1)(B) provides for an immense and unheralded power to tariff or tax not just "importation" but all of the other activities listed in § 1702(a)(1)(B), i.e., the power to tax acquisitions, tax holdings, tax withholdings, tax use, tax exportation, etc., all of which are as much a part of the statute as importation is. Nothing in IEEPA allows for so tremendous and unheralded a power, representing such a transformative expansion in presidential authority with such a vast economic and political significance as this would be, through so

---

[3] The Transfer Opposition characterized this as a list of eleven activities, reading importation and exportation as a single linked activity. But it may be that the "or" in between them is meant to be part of the list of the first nine items together. As the general statutory-interpretation principles are the same whether "importation" and "exportation" are linked specifically to each other or just linked as separate entries in the broader list, this brief assumes that they are separate entries.

"wafer-thin [a] reed" as the lone, cherry-picked word "regulate" in § 1702(a)(1)(B). *Cf. Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764-65 (2021).

Defendants do not even try to construe "regulate" in a consistent way. Instead, Defendants take the startling position that "regulate" "need not carry the same meaning" but instead can mean different things when paired with the different activities listed in § 1702(a)(1)(B). Transfer Reply 12; *cf. Scribner v. WorldCom, Inc.*, 249 F.3d 902, 905 (9th Cir. 2001) ("'When *I* use a word,' Humpty Dumpty said in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less.'") (quoting Lewis Carroll, *Through the Looking Glass*, in The Complete Works of Lewis Carroll 154, 196 (1994)). Defendants fail to come up with a single case that supports such an audacious position. *Cf. Scribner*, 249 F.3d at 905 ("[L]anguage is not infinitely elastic."); *Brown*, 513 U.S. at 118 (a given term "mean[s] the same thing throughout a statute"); *Gustafson*, 513 U.S. at 575 (a party may not "ascrib[e] to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress'").[4] Defendants' claim that "regulate" means to tariff or tax when paired with "importation"—and only "importation"—flies in the face of the fundamental precepts of statutory construction.

Defendants analogize their construction of § 1702(a)(1)(B) to section 232 of the Trade Expansion Act of 1962 (codified at 19 U.S.C. § 1862), but this argument falls flat. *Contra* Transfer Reply 8-9. The Trade Expansion Act is an entirely different statute that does not bear on the proper construction of IEEPA. First and foremost amongst its differences is that the Trade Expansion Act *expressly provides for tariffs and duties*, whereas IEEPA contains no reference to tariffs or duties at all. *See* Trade Expansion Act of 1962, Pub. L. No. 87-794, 576 Stat. 877 (1962). Defendants focus on one snippet of section 232 that provides that if the Treasury Secretary finds that "an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President is authorized (subject to various statutory prerequisites) to take action to "adjust the imports of the article and

---

[4] Defendants argue that "regulate" is a transitive verb that requires an object, Transfer Reply 12, but that is entirely irrelevant—that a verb is transitive and requires an object does not mean it can *change its meaning* depending on what that object is. *Cf., e.g., Astrue v. Ratliff*, 560 U.S. 586, 592-93 (2010) (noting how the word "award" as used in statute was a "transitive verb" but nonetheless holding that it had a "settled meaning")

11

its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C.

§ 1862(c).[5] Defendants claim that the Supreme Court held that "section 232's 'adjust . . .

imports' means that 'the President's authority extends to the imposition of monetary exactions,

i.e., license fees and duties,'" Transfer Reply 8 (quoting *Fed. Energy Admin. v. Algonquin SNG,*

*Inc.*, 426 U.S. 548, 562 (1976)), and claim that this must mean that IEEPA's reference to

"regulate . . . importation" necessarily authorizes the President to impose tariffs as well.

Ironically, Defendants thus simultaneously try to argue that (1) the single word "regulate" within

a single statute (IEEPA) means *different* things, Transfer Reply 12, while claiming that (2) the

different words "regulate" versus "adjust" across two wholly different statutes (IEEPA versus the

Trade Expansion Act) mean the *same* thing, *id.* at 8. But accepting that the phrase "adjust . . .

imports" might provide for imposing tariffs when used in a statute that devotes dozens of sections

to discussing tariffs, does not establish that the entirely different phrase "regulate . . . importation"

provides for imposing tariffs when used in a wholly different statute (IEEPA) that contains no

mention of tariffs whatsoever. *See, e.g.*, *United States v. Baxley*, 982 F.2d 1265, 1269 (9th Cir.

1992) (even the use of the *same* word in "an entirely different statute with entirely different

import and purposes" can mean entirely different things); *In re Joye*, 578 F.3d 1070, 1078 (9th

Cir. 2009) (same). Additionally, the sentence of the Trade Expansion Act that Defendants cite

contains only *one* verb, "adjust," and only *one* object for that verb, "imports." The sentence of

IEEPA that Defendants cite, by contrast, contains *eight* powers paired with *twelve* activities, and

the meanings of those various powers and activities must be consistent across that sentence. As

discussed, there is no internally consistent way to construe the word "regulate" or "regulate . . .

importation" in the context in § 1702(a)(1)(B) and within IEEPA's statutory scheme, to hold that

"regulate" authorizes tariffs or taxes on imports (or, at the very least, without holding that it also

authorizes tariffs and taxes on acquisitions, holdings, use, exportations, etc., as well).

    In a last-ditch effort to claim that "regulate" as used in § 1702(a)(1)(B) authorizes tariffs or

---

[5] The statutory prerequisites include that the Commerce Secretary must conduct an investigation, hold public hearings, allow interested parties an opportunity to be heard, and publish a report on his findings in the Federal Register. 19 U.S.C. § 1862(b)-(c). President Trump may have invoked IEEPA for his more recent tariffs precisely to try to sidestep such statutory requirements.

taxes, Defendants point to the word "regulate" as used in the Constitution's Commerce Clause

and claim that the power to impose tariffs falls within the constitutional "power to regulate

commerce."  Transfer Reply 8 (quoting *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48,

58 (1933)).  But "regulate," when used in a statute, carries its plain English meaning, not the full

scope of "regulate" as used in the Commerce Clause.  *See Ysleta del Sur Pueblo*, 596 U.S. at 697

(construing "regulate" in the context of a statute by reference to dictionaries, not the Commerce

Clause).  If "regulate" as used in § 1702(a)(1)(B) really were equivalent to "regulate" as used in

the Commerce Clause, it would render the listing of all of the other powers in § 1702(a)(1)(B)

("block," "prevent," "prohibit," etc.) wholly superfluous, because the power to "regulate" under

the Commerce Clause already encompasses those powers.  *Cf. Fischer v. United States*, 603 U.S.

480, 490 (2024) (rejecting construing one item in statutory list so broadly that it would cover all

other items in list as well).  More fundamentally, Defendants' attempt to equate "regulate" as

used in § 1702(a)(1)(B) with "regulate" as used in the Commerce Clause ignores the fundamental

difference between the two provisions and, indeed, between the different branches of government.

The Commerce Clause power to "regulate" is the power to *write laws* to regulate, i.e., the power

to *legislate.*  By contrast, the President and the Executive Branch are not lawmakers.  *Youngstown

Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).  And "Congress may not constitutionally

delegate its legislative power to another branch of Government," *Touby v. United States*, 500 U.S.

160, 165 (1991), and much less may the Executive Branch seize such power from Congress.[6]

That Defendants must resort to claiming that their power to "regulate" as set forth in

§ 1702(a)(1)(B) is equivalent to *Congress's* power to "regulate" as set forth in the Commerce

Clause, does not establish that § 1702(a)(1)(B) provides for tariffs—to the contrary, it only

highlights how Defendants' position violates the constitutional separation of powers.

### B.    The Legislative History of IEEPA Confirms It Does Not Authorize Tariffs

The legislative history of IEEPA further confirms that it does not authorize tariffs.  *See*

---

[6] Even Defendants' favored case *United States v. Yoshida International, Inc.*, 526 F.2d 560
(C.C.P.A 1975) (discussed further below in Argument II.D), holds it self-evident that "[e]xercise
of the regulatory power by the President differs substantially from its exercise by the Congress"
and that "regulate" as used in a statute is "of course" not "co-equal" to "regulate" as used in the
Commerce Clause.  *Id.* at 582 & n.35.

13

Transfer Opp'n 2-9, 16-18.  Nothing in the legislative history of IEEPA or its predecessor, the

Trading With the Enemy Act (TWEA), supports that either Act authorized the imposition of

tariffs.  Defendants' reference to the Trade Expansion Act of 1962 provides for a stark

comparison.  The Supreme Court held that Trade Expansion Act's reference to "adjust . . .

imports" authorized tariffs only after reviewing the legislative history of that Act and seeing how

that history was rife with express discussions of tariffs and evinced a congressional intent to have

the "adjust . . . imports" phrase in that Act include the power to impose tariffs.  *Algonquin*, 426

U.S. at 562-67.  There is nothing comparable in the legislative history of IEEPA or the TWEA.

### C.    The Major-Questions Doctrine and the Doctrine of Constitutional Avoidance Confirm IEEPA Does Not Authorize Tariffs

Because the plain statutory language of IEEPA and its legislative history confirm that

IEEPA does not authorize tariffs, the Court need not even reach the major-questions doctrine or

the doctrine of constitutional avoidance.  But were the Court to do so, these doctrines also

confirm that IEEPA does not authorize tariffs.  *See* Transfer Opp'n 14-15, 18-19.

First, the major-questions doctrine provides that where (1) Executive Branch action is

"unheralded" and represents a "transformative expansion" in the Executive's authority in the

vague language of a long-extant, but rarely used, statute, and (2) the Executive's action is of "vast

economic and political significance" and "extraordinary" enough to trigger the doctrine, courts

should greet the Executive's assertion of authority with "skepticism" and require the Executive to

identify "clear congressional authorization" for its action.  *Nebraska v. Su*, 121 F.4th 1, 14 (9th

Cir. 2024).  That standard is satisfied here.  President Trump's IEEPA Tariff Orders are

unheralded—no President in history has ever issued an order invoking IEEPA or its predecessor

(the TWEA) to impose tariffs.  Transfer Opp'n 5-6 & n.1.  The Orders are a transformative

expansion in Executive authority based on a long-extant statute that has never before been used

this way.  *Id.*  And the Orders have vast economic and political significance with extraordinary

effects.  *See, e.g.*, Clausing ¶¶ 10, 21-48; York ¶¶ 51-65.  And there is no clear congressional

authorization for such action, as IEEPA does not breathe a word about tariffs.  Defendants claim

that IEEPA "clearly" authorizes the President to impose tariffs through its use of the words

14

1    "regulate . . . importation"—but then, in their very next paragraph, claim that "regulate" "*need*

2    *not carry the same meaning*" when paired with the other words in the very same statutory

3    provision. *Compare* Transfer Reply 12:12-17 *with id.* at 12:21-28 (emphasis added). It is hard to

4    imagine a more *un*clear authorization than one that hinges on a word ("regulate") that does not

5    keep a consistent meaning even within its own sentence. *Cf. West Virginia*, 597 U.S. at 732

6    (rejecting government's attempt to pluck single word out of statute and define it so broadly that it

7    could mean "almost anything," "shorn of all context," leaving the word "an empty vessel"); *Ala.*

8    *Ass'n of Realtors*, 594 U.S. at 764-75 (generally same).[7]

9        Defendants try to argue that the major-questions doctrine does not apply to actions by the

10   President, as opposed to other Executive Branch officials. Transfer Reply 11. But the Supreme

11   Court has never held this, and every Court of Appeals that has confronted the issue has applied

12   the major-questions doctrine equally to actions by the President as any other Executive Branch

13   official or agency. *See Louisiana v. Biden*, 55 F.4th 1017, 1031 n.40 (5th Cir. 2022); *Kentucky v.*

14   *Biden*, 23 F.4th 585, 606-08 (6th Cir. 2022); *Georgia v. President*, 46 F.4th 1283, 1295-96 (11th

15   Cir. 2022); *see also Su*, 121 F.4th at 17-20 (R. Nelson, J., concurring) (explaining logic of why

16   major-questions doctrine applies equally to the President as to any other Executive Branch

17   official).[8] Defendants also try to argue that the major-questions doctrine does not apply to

18   national-security or foreign-policy matters, but the Supreme Court has never held that either, *cf.,*

19   *e.g.*, *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 229-30 (1986) ("[I]t is 'error to

20   ───────────────
     [7] Defendants use brackets and insertions to claim that the Ninth Circuit has held the language
21   from the TWEA predecessor to IEEPA to "*clearly* show[] that the President's actions [imposing
     tariffs] were in accordance with the power Congress delegated." Transfer Reply 12 (emphasis,
     brackets, and insertions added by Defendants) (quoting *United States v. Spawr Optical Rsch.,*
22   *Inc.*, 685 F.2d 1076, 1081 n.10 (9th Cir. 1982)). But in actuality, *Spawr* never once mentions
     tariffs and had nothing to do with tariffs at all. It instead dealt with a *prohibition* on the export of
23   laser mirrors to the Soviet Union without a license, where the Ninth Circuit held that the powers
     listed in the TWEA to "regulate," "prevent," and "prohibit" exportation authorized this
24   restriction. *Spawr*, 685 F.2d at 1078-81 & n.10. Whether the statutory language to "regulate,"
     "prevent," and "prohibit" exportation is sufficiently clear so to authorize the restriction there does
25   not establish that the word "regulate" (alone) is sufficiently clear so as to authorize the wholly
     different Executive action of imposing *tariffs or taxes*, much less tariffs or taxes as unheralded,
26   transformative, and vast and significant as President Trump's IEEPA Tariff Orders here.

27   [8] The only Court of Appeals decision to hold to the contrary, *Mayes v. Biden*, 67 F.4th 921 (9th
     Cir. 2023), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023), has been vacated and is no longer
28   good law. *Su*, 121 F.4th at 9 n.2.

suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'")—particularly with respect to *tariffs*, which are not simply a general foreign-policy matter but instead are one of the core powers that the Constitution vests specifically in *Congress*. Defendants also quote a case that was not about the major-questions doctrine, and instead concerned judicially-created *Bivens* remedies, to argue that national-security and foreign-policy matters are "the prerogatives of Congress and the President," Transfer Reply 11 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017)).  But this is a non sequitur, as *all* cases involving the major-questions doctrine are about prerogatives of Congress and the President or Executive Branch, by definition: the doctrine concerns how those prerogatives are delegated and divided *between* those branches of government, which Defendants' inapposite case cites do not address.[9]

Nor does *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), support Defendants—if anything, it undermines their position.  The Supreme Court reaffirmed there that "Congress cannot delegate legislative power to the President," including its legislative tariff power.  *Id.* at 692.  In that case, Congress enacted a law providing that certain U.S. free-trade rules would be suspended if other countries imposed duties on U.S. goods.  *Id.*  "Congress itself prescribed, in advance, the duties to be levied, collected, and paid, on sugar, molasses, coffee, tea or hides . . . while the suspension lasted.  Nothing involving the expediency or the just operation of such legislation was left to the determination of the President."  *Id.* at 692-93.  The President's only role was to determine when other countries imposed tariffs on U.S. goods—after that, he had no discretion as to what tariffs to impose (or raise or suspend), as all of those decisions were properly the purview of Congress, not the President.  *Id.* at 693 ("Legislative power was exercised when Congress declared that the suspension should take effect upon a named contingency.  What the President was required to do was simply in execution of the act of Congress.  It was not the making of law.  He was the mere agent of the law-making department to ascertain and declare the

---

[9] *Cf. Ziglar*, 582 U.S. 120, 135-46 (discussing whether *courts* should create a new *Bivens* remedy where neither Congress nor the Executive have done so); *Trump v. Hawaii*, 585 U.S. 667, 684-85 (2018) (reviewing whether President's actions satisfied statutory requirements in underlying Act, despite case involving foreign affairs); *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (addressing whether courts should weigh in on Executive's security-clearance determination in the absence of "Congress specifically [] provid[ing] otherwise").

16

event upon which its expressed will was to take effect."). *Marshall Field* in no way supports the premise that IEEPA delegated to the President the power to legislate what tariffs to impose, or when, much less that it could do so through so unclear a provision as "regulate . . . importation."[10]

Second, were there any ambiguity in whether IEEPA authorizes tariffs or not, the doctrine of constitutional avoidance requires the Court to interpret IEEPA such that it does not authorize tariffs, to avoid the significant constitutional questions that would arise if it did.

If, as Defendants posit, § 1702(a)(1)(B)'s reference to "regulate . . . importation" authorizes tariffs on imports, "regulate . . . exportation" must authorize tariffs on exports too.  Contrary to Defendants' position, they cannot be simply separated, with "regulate" meaning something different when applied to one versus the other. *See West Virginia*, 597 U.S. at 721; *Gustafson*, 513 U.S. at 574-75; *Brown*, 513 U.S. at 118; *Maner*, 9 F.4th at 1123; *contra* Transfer Reply 12. And it is indisputable that the Constitution prohibits tariffs on exports.  U.S. Const. art. I, § 9, cl. 5; *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998).  Thus, if IEEPA authorizes tariffs on imports, it also necessarily authorizes tariffs on exports—and thus is unconstitutional.[11] Defendants' claim that the Export Clause does not bar "user fees," Transfer Reply 13 (citing *U.S. Shoe*, 523 U.S. at 363), does not help them.  To constitute a permissible "user fee" as opposed to an impermissible tariff, the fee must be to compensate the government for services that it rendered and must bear relation to the value of those services. *U.S. Shoe*, 523 U.S. at 369-70 (holding that an ad valorem charge was an unconstitutional tariff and not a permissible user fee). If § 1702(a)(1)(B)'s reference to "regulate" authorizes tariffs or taxes beyond these limited user fees, IEEPA is unconstitutional.  Conversely, if "regulate" is limited to user fees, President

---

[10] *Florsheim Shoe Co. v. United States*, 744 F.2d 787 (Fed. Cir. 1984) (cited by Transfer Reply 11), similarly has no bearing here, as it involved a statute that expressly authorized the President to "withdraw, suspend, or limit the application of [] *duty-free* treatment" based on various factors, including whether other countries "are extending generalized preferential tariff treatment to such country." *Id.* at 792 & n.8.  Whether a statute that expressly says it authorizes the President to suspend duty-free treatment and thereby impose tariffs is clear enough to authorize the President to impose tariffs, does not establish that IEEPA—which, by contrast, never once mentions tariffs—is a clear enough congressional authorization for the President to do so.

[11] This is true even before examining whether a construction of "regulate" that authorizes tariffs and taxes, when applied to the other activities in § 1702(a)(1)(B)—e.g., acquisition, holding, withholding, use, transfer, etc.—would also be unconstitutional.

17

1    Trump's tariffs—which are in no way user fees—are not authorized by IEEPA.  Defendants offer

2    no coherent response on this point, other than to try to handwave the issue away by claiming that

3    exportation is not squarely presented by this case.  Transfer Reply 13.  But Defendants cannot

4    artificially cabin this case and claim it involves only the phrase "regulate . . . importation"

5    (Defendants' ellipsis inserted), to the exclusion of everything else.  This case squarely presents

6    the question, what does "*regulate*" mean?  The question of whether construing "regulate" as

7    authorizing tariffs violates the Constitution, whether the Export Clause or any other clause, is

8    squarely presented here.  And because Defendants' construction *would* violate the Export Clause,

9    the doctrine of constitutional avoidance weighs against it, in lieu of a construction that does not

10   implicate similar constitutional concerns—namely, that IEEPA does *not* authorize tariffs.

11            **D.     The *Yoshida* Case Does Not Establish That IEEPA Authorizes Tariffs**

12           IEEPA's plain language, its statutory history, and the major-questions doctrine and the

13   doctrine of constitutional avoidance all confirm that IEEPA does not authorize tariffs.  Because

14   all of these factors weigh against them, Defendants rely heavily on the non-binding decision in

15   *Yoshida*, 526 F.2d 560.  But *Yoshida* is inapplicable here for numerous reasons and does not

16   establish that IEEPA authorizes tariffs.  *See* Transfer Opp'n 19-22 & n.8,

17           Significantly, the tariffs at issue in *Yoshida*—which President Nixon imposed *not* under

18   IEEPA (which did not exist at that point) or its predecessor, the TWEA, but instead imposed only

19   under the Tariff Act of 1930 and the Trade Expansion Act of 1962, *see* Proclamation No. 4074,

20   36 Fed. Reg. 15,724 (Aug. 17, 1971)—did not apply to all imports across the board.  *Yoshida*,

21   526 F.2d at 577.  Instead, the limited issue there was the reductions or removals of certain tariff

22   *concessions*, which could bring tariffs back up to the levels that had been authorized by Congress,

23   but which expressly *were not permitted to exceed the levels that Congress had authorized*.  *Id.* at

24   577-78.  *Yoshida* thus does not establish that the TWEA (much less IEEPA) authorizes a

25   President any freestanding power to impose tariffs or taxes beyond those that *Congress* has

26   expressly approved.  *Cf. id.* at 578 (discussing how the "limited surcharge" imposed by

27   Proclamation 4074 that was the subject of the *Yoshida* decision was "quite different from

28

1    'imposing whatever tariff rates [the President] deems desirable'").[12]

2        Further, the legislative history and Congress's actions in response to President Nixon's

3    tariffs and the *Yoshida* litigation further confirm that the TWEA did not authorize tariffs (and,

4    thus, that IEEPA does not either).  In 1974, while *Yoshida* was still being litigated and the CCPA

5    had yet to issue its decision, Congress enacted a new statute—the Trade Act of 1974—that

6    contained a section (section 122) that specifically provided *express* statutory authorization for

7    tariffs of the type that were at issue in *Yoshida*.[13]  *Compare* 36 Fed. Reg. 15,724 (tariffs were for

8    balance-of-payment purposes) *with* Trade Act of 1974, Pub. L. No. 93-617, § 122, 88 Stat. 1978

9    (1975) (providing express statutory authorization for tariffs to address balance-of-payment

10   deficits).  *Yoshida* itself noted as much, holding that any future tariffs of this type would have to

11   comply with the requirements of this new law.  *Yoshida*, 526 F.2d at 582 n.33.  The fact that

12   Congress enacted a new statutory provision expressly authorizing the type of tariffs at issue in

13   *Yoshida* confirms that the preexisting TWEA did *not* authorize such tariffs—if it had, the new

14   provision would have been superfluous.  *See, e.g.*, *Su*, 121 F.4th at 13 (rejecting government's

15   claim that statute that provides President with authority to implement policies he "considers

16   necessary" allows President to impose minimum wage for federal contractors in light of fact that

17   Congress enacted more specific statutes that authorize express minimum-wage mandates).  And

18   when IEEPA adopted the TWEA's language, it did not adopt any power to impose tariffs,

19   because Congress never agreed that such power existed in the TWEA to begin with.[14]  Since the

20   ───────────────

21   [12] And even if *Yoshida* were not so limited, it would be unpersuasive.  Like Defendants, *Yoshida* focused only on "regulate . . . importation," 526 F.2d at 573, and did not follow the Supreme
22   Court maxims that control now that require courts to examine those words in their full context. *See, e.g.*, *West Virginia*, 597 U.S. at 721; *Gustafson*, 513 U.S. at 574.  *Yoshida* also does not
23   address the major-questions doctrine (which had not been articulated at the time), nor does it sufficiently grapple with the doctrine of constitutional avoidance.  *See* Transfer Opp'n 22-23.

24   [13] By the time of the *Yoshida* litigation, the actual tariffs had been rescinded.  Proclamation No. 4098, 36 Fed. Reg. 24,201 (Dec. 22, 1971).  Congress nonetheless included in the Trade Act of
25   1974 a section providing express statutory authorization for that type of tariff going forward.

26   [14] While the House Committee writing the bill that would become IEEPA was aware that *Yoshida* had reversed a lower court decision holding that the TWEA did not authorize tariffs, H.R. Rep.
27   No. 95-459, at 5 (1977), it expressly did not "either endors[e] or disclaim[]" prior uses of the TWEA, *see id.* at 10, and instead characterized the powers that were being transferred from the
28   TWEA to IEEPA as being the powers regulate financial transactions and to freeze foreign

1    TWEA did not authorize tariffs then, IEEPA does not now either.

2                                    *    *    *

3        The plain language of IEEPA, its context and statutory scheme, its legislative history, the

4    major-questions doctrine, and the doctrine of constitutional avoidance, all confirm that IEEPA

5    does not authorize tariffs.  Plaintiffs thus are likely to succeed on the merits, and do in fact

6    succeed on the merits, that President Trump's IEEPA Tariff Orders are unlawful.

7    **III.    Plaintiffs Will Suffer Irreparable Injury in the Absence of an Injunction**

8        **A.    Plaintiffs Face Irreparable Injury in Their Ability to Procure Goods**

9        As a market participant that procures over $5 billion in goods annually on average,

10   California purchases goods subject to the challenged tariffs which will become more expensive.

11   Shell ¶¶ 3-8, Clausing ¶ 27; York ¶ 13.  State agencies have already experienced unprecedented

12   difficulties procuring and paying for necessities, such as basic items like computer equipment and

13   medical supplies.  Bignami ¶ 6; Bradley ¶ 6; *see also* Shell ¶ 9.  State agencies are already being

14   forced to grapple with their vendors demanding higher prices due to these tariffs.  Shell ¶¶ 8-9,

15   11-13.  California is thus confronted with the impossible choice of accepting significant price

16   increases in order to retain access to these essential goods or to try to re-procure on a vast scale,

17   and then facing the real possibility of being unable to source alternative goods.  *See* Shell ¶¶ 9-13,

18   15-16; *see Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (placing

19   funds in reserve and making cuts to services are irreparable harms).

20       Unlike a business, the State does not have the option to simply pass the price of the tariffs

21   to customers in an effort to mitigate its losses.  Instead, the State must absorb those losses and

22   face the budgetary consequences.  Shell ¶ 15; *see id.* ¶¶ 9, 11 (vendors have already notified State

23   of increased prices), *id.* ¶¶ 10, 12 (tariffs expected to pose financial harm and increase cost of

24   procurement and renegotiating contracts will most likely result in higher prices for goods).

25   property transactions—with no mention of the power to impose tariffs, *id.* at 14-15; *accord* S.
     Rep. No. 95-466, at 5 (1977).  Nothing supports that Congress agreed with *Yoshida*'s
26   interpretation of the TWEA or that Congress, in enacting IEEPA, imbued in IEEPA the power to
     authorize tariffs.  *See BP P.L.C. v. Mayor of Balt.*, 141 S. Ct. 1532, 1541 (2021); *United States v.*
27   *Wells*, 519 U.S. 482, 495-96 (1997) (holding that "the significance of subsequent congressional
     action or inaction necessarily varies with the circumstances" and that "it is at best treacherous to
28   find in congressional silence alone the adoption of a controlling rule of law") (brackets omitted).

                                                        20

1    And putting aside the astronomical cost increases California will face, there will simply be

2    less product available for California to purchase, as importers have already reduced the volume of

3    product they are bringing into the United States.  Background III; *see also* Shell ¶ 9 (State has

4    "expended considerable effort and numerous work hours in the past months" in anticipation of

5    tariff-related shortages).  For example, California ports account for 17% of overall U.S. imports,

6    and imports from China account for a quarter of all imports into California.  York ¶ 57.  Already,

7    the Port of Los Angeles lost a third of its import volume in the first week of May because of the

8    tariffs.  Clausing ¶ 34; Background III.  It is not just consumers who will feel the pain from empty

9    shelves: the State stands to lose its supply of necessary goods as well, goods that allow it to

10   provide essential services to the people of California such as products to assist public school

11   student with disabilities, Bradley ¶ 6, vital hospital supplies, Bignami ¶ 6, raw materials for

12   roadway projects, office furniture, or even fuel, Shell ¶ 7.  California is already seeing vendors

13   seeking to increase contract prices, even when already-agreed-upon contracts are in place, and

14   anticipates many more, and has no way to avoid those increases.  *Id.* ¶¶ 9, 11-13; Background III.

15   And when State departments have mandatory contracts for certain goods, they cannot procure

16   them on the open market, leaving the departments no other option but to pay any tariff-related

17   price increase for goods in those contracts.  Shell ¶¶ 3, 10.

18   **B.    Plaintiffs Face Irreparable Injury From Lost Revenue**

19   California also stands to lose tax revenue that will damage its economy and have a

20   profound impact not remediable by monetary damages.  California will lose significant personal

21   income tax and corporate revenue as a result of the tariffs' impact on California taxpayers and

22   revenue from corporate profits.  York ¶ 16.  The Department of Finance forecast a loss of $1.6

23   billion in tax revenue from the projected negative impact of the tariffs on the growth rate of

24   economic wages and proprietor income.  White ¶ 6.  Capital-gains revenue—a significant portion

25   of California's personal income-tax revenue—is projected to fall by $4.5 billion because of

26   volatility and decline in the S&P 500 due to these tariffs.  *Id.* ¶ 7.  Corporate tax revenue is

27   forecast to fall $1.7 billion as a result in the tariffs, due to downgrades in projected corporate

28   profit growth.  *Id.* ¶ 5.  These decreases alone come to a staggering $7.8 billion loss to the State's

21

Pls.' Mot. for Prelim. Inj. (No. 3:25-cv-03372-JSC)

tax revenue, and is an imminent irreparable harm. *See Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (irreparable harm where evidence presented that challenged policy would "negatively affect [plaintiff's] revenue, possibly even to a considerable extent").

The loss in revenue from personal income tax comes from two sources: reduced wages and increased unemployment. Workforce loss means less taxable wages available for State revenue because unemployed workers do not have personal income for the State to tax. The challenged tariffs inflict a real threat of workforce reductions at California's ports. As the country's largest importer and second largest exporter, California's ports account for much of the country's import needs, and many people and businesses rely on international trade for their livelihoods. Clausing ¶ 38. California also imports more from China than any other country, so it will be "particularly harmed" by the China tariffs. *Id.* Even a 1% decline in cargo volume—a conservative estimate—at the Port of Los Angeles and the Port of Long Beach—two of California's twelve ports—would result in the loss of more than 2,700 jobs. York ¶ 57; *see also* Clausing ¶ 34 (Port of Los Angeles has already seen a one-third decline in import volume in the first week of May).

In addition to the price increases for products purchased by California in its ordinary course of business, this loss of tax revenue forces Plaintiffs to reallocate resources from their policy priorities and use available revenue to pay for price increases and fulfill its budgetary obligations. Injuries where "sovereign interests and public policies [are] at stake" are irreparable. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001). But the injury to public policy does not stop there. The Governor's policy priorities include, for example, building more housing, making healthcare more affordable, and bettering equal access to the economy.[15] The tariffs and their on-again-off-again implementation threaten the Governor and California's reputation as a reliable trade partner and stymie the Governor's ability to enact and effectuate the Legislature's prerogatives. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages[,]" and "is often held to be irreparable.").

---

[15] *Priorities and Progress: Priorities, Governor Gavin Newsom*, https://www.gov.ca.gov/priorities-and-progress/priorities/ (last visited May 11, 2025).

1

2

### C.    Plaintiffs Face Irreparable Injury From the Unpredictable, Ever-Changing Tariff Landscape

The extraordinary loss of essential revenue is exacerbated by the unpredictable and ever-changing status of the tariffs, which has made it extremely difficult for California to budget and plan. *See, e.g.*, Shell ¶¶ 21-22 (State budget, "a critical and time-intensive process" to create, "will no longer be a reliable financial and internal control tool" and ever-changing tariffs "makes it impossible for State agencies to abide by their legislatively approved budgets").  The harm from the uncertainty of the IEEPA tariffs is only highlighted by the President's May 12 announcement that tariffs on China will be lowered from 145% to 30% for 90 days.  While the pause offers some temporary reprieve, Plaintiffs do not know how long the pause will last—tariffs on Mexico and Canada were paused, but then were reinstated.  York ¶¶ 30, 32; Clausing ¶ 40 n.40.  Under the President's claimed authority under IEEPA, there is nothing to stop him from reinstating the 145% tariffs tomorrow.  In the face of these tariffs, California's choices are "to pay higher costs than what is stated in the contract, amend thousands of contracts to allow for higher costs solely due to tariffs, or cancel all contracts and begin re-procuring for every contract hit by tariffs even though that means agencies will be left without access to critically needed supplies and still not be able to procure goods at a price on par with the previous contracted price."  Shell ¶ 23.  It is exactly these irreparable harms—which Plaintiffs are currently suffering—that Plaintiffs seek to address with a preliminary injunction.

The "schizophrenic approach to" imposing tariffs that are not approved by Congress or authorized by law has made it extremely difficult for the California and its agencies to effectively "budget, plan for the future, and properly serve their residents," which constitutes irreparable harm.  *Santa Clara*, 250 F. Supp. 3d at 537, 526 (loss of federal grants has a "real and concrete impact[] on the Counties' ability to budget and plan for the future.").  California must "make contingency plans" to deal with the ever-changing landscape, including deciding whether to "plac[e] funds in a budget reserve in lieu of spending that money on needed programs," raising concerns about its "obligation to mitigate potential harm to [its] residents" and to avoid making "drastic cuts to services."  *Id.*; *see* Bignami ¶ 7 (discussing delays in purchase, receipt, or

23

installation of critical items for laboratories and how tariffs could have significant impacts to CDPH's ability to meet the needs of the people of California); Shell ¶¶ 20-23.

The uncertainty also costs California real dollars in terms of lost productivity, because the State must spend its resources and time figuring out what tariffs are actually in effect and negotiating with vendors about price increases or product availability, instead of focusing on implementing and managing the many programs it provides to its citizens. Such a "diversion of resources" is an irreparable harm when those resources cannot be recovered. *Louisiana*, 55 F.4th at 1033. This is true here as the State cannot recover the "staff time and organizational resources" expended by having "to divert resources away from its core programs to address the new [tariff] policy" and the imminent loss of financial resources as a result of the tariffs. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 678 (9th Cir. 2021); *see City & Cnty. of S.F. v. USCIS*, 981 F.3d 742, 762 (9th Cir. 2020) (irreparable harm where plaintiffs "likely are bearing and will continue to bear heavy financial costs" because of federal policy change and "because of the unavailability of monetary damages"). These "consequence[s] of having to divert resources and personnel to accommodate the shifting [tariff] landscape" have cascading effects on the State's ability to effectively and efficiently implement its many public programs. *Maryland v. U.S. Dep't of Agric.*, __ F. Supp. 3d __, No. JKB-25-0748, 2025 WL 973159, at *31 (D. Md. Apr. 1, 2025), *appeal docketed*, No. 25-1338 (4th Cir. Apr. 3, 2025). California has already diverted significant resources to assess, react, and respond to tariff issues with vendors and find alternative goods. Shell ¶ 19; *see also id.* ¶ 12 (significant resources spent on conducting market analyses), ¶ 15 (burden of re-soliciting contracts terminated because of tariffs); Background III.

### D.    Plaintiffs' Harms Cannot Be Redressed By Order for Damages

Economic harm is considered irreparable when "the state[] will not be able to recover monetary damages connected to" the challenged action—here, the tariffs. *Azar*, 911 at 581.

It is administratively infeasible to collect damages to recoup the monetary harm California is experiencing from the challenged tariffs. Recovery of any tariffs would likely mean litigating individual claims for recovery, or at least would require the State to negotiate and manage each of those claims, where the surcharges are paid across many state agencies and departments. Shell

24

Pls.' Mot. for Prelim. Inj. (No. 3:25-cv-03372-JSC)

¶¶ 14-15; Bradley ¶ 6; Bignami ¶ 6.  Typically, California's subcontractors, vendors, and suppliers are the importers of record (not California itself) meaning that they would receive any tariff reimbursement from CBP, and there is no effective mechanism for California to be made aware of the vendors' challenges to paying the tariffs, much less any recovery.  Shell ¶¶ 14, 16.  Further, the impact on the State's ability to provide resources to its citizens, and the diversion of resources to identifying tariff surcharge payments, will cause damage that will persist regardless of any subsequent monetary recovery.  *Santa Clara*, 250 F. Supp. 3d at 537.

## IV.    The Balance of Equities and the Public Interest Weigh in Favor of an Injunction

The federal government cannot suffer harm and the public interest benefits from "an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns."  *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).  Where, as here, Defendants are acting unlawfully, in excess of statutory authority, and in violation of the constitutional separation of powers, the public interest and balance of equities necessarily favor a preliminary injunction.  *See id.*  Furthermore, the requested relief would serve the "basic function of a preliminary injunction" which is "to preserve the status quo ante litem pending a determination of the action on the merits."  *L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1200 (9th Cir. 1980); *see FCA*, 82 F.4th at 684-85 (status quo is status prior to government's change in policy).  Both Plaintiffs and the public have a profound interest in maintaining the status quo where, as here, the President's unprecedented tariffs have caused cataclysmic impacts on the entire global economy, and have an "outsized" impact on California.  York Decl. ¶ 60; *see also* Clausing Decl. ¶ 10 ("If continued, the tariffs would generate enormous economic damage to both the U.S. economy and the California economy"); *see, e.g.*, *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (the public interest inquiry addresses the impact on non-parties).  In light of the staggering effects of the President's unlawful IEEPA tariffs, the public interest and balance of equities tip sharply in favor of preserving the status quo through a preliminary injunction.

## CONCLUSION

The Court should grant Plaintiffs' motion for preliminary injunction.

25

1    Dated:  May 13, 2025                                    Respectfully submitted,

2                                                            ROB BONTA
                                                             Attorney General of California
3                                                            THOMAS S. PATTERSON
                                                             Senior Assistant Attorney General
4                                                            LARA HADDAD
                                                             Supervising Deputy Attorney General
5
                                                             *s/Zelda Vassar*
6                                                            ZELDA VASSAR
                                                             SHIWON CHOE
7                                                            CAROLYN F. DOWNS
                                                             Deputy Attorneys General
8                                                            *Attorneys for Plaintiffs State of California*
                                                             *and Gavin Newsom, in his official capacity*
9                                                            *as Governor of California*

26