# EXHIBIT 1

1   WARRINGTON S. PARKER III (SBN 148003)
        wparker@crowell.com
2   JOANNA ROSEN FORSTER (SBN 244943)
        jforster@crowell.com
3   CROWELL & MORING LLP
    3 Embarcadero Center, 26th Floor
4   San Francisco, CA 94111
    Telephone:  415.986.2800
5   Facsimile:   415.986.2827

6   MICHAEL W. MCCONNELL (*pro hac vice* pending)
        mcconnell@law.stanford.edu
7   559 Nathan Abbott Way
    Stanford, CA 94305
8   Telephone: (650) 736-1326

9   Attorneys for *AMICI CURIAE*

10

11                  UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                      SAN FRANCISCO DIVISION

14

15  STATE OF CALIFORNIA and GAVIN          Case No. 3:25-cv-03372-JSC
    NEWSOME, in his official capacity as
16  Governor of California,                **JOINT BRIEF OF AMICI CURIAE
                                           FORMER SENATOR AND
17                    Plaintiffs,          GOVERNOR GEORGE F. ALLEN,
                                           PROFESSOR STEVEN CALABRESI,
18            v.                           ATTORNEY JOSHUA A.
                                           CLAYBOURN, FORMER SENATOR
19  DONALD J. TRUMP, in his official capacity   AND AMBASSADOR TO THE UNITED
    as President of the United States, et al.,  NATIONS JOHN C. DANFORTH,
20                                         PROFESSOR RICHARD A. EPSTEIN,
                      Defendants.          FORMER SENATOR AND
21                                         SECRETARY OF DEFENSE CHARLES
                                           T. HAGEL, PROFESSOR AND
22                                         FORMER DEAN HAROLD HONGJU
                                           KOH, PROFESSOR GERARD N.
23                                         MAGLIOCCA, PROFESSOR AND
                                           FORMER JUDGE MICHAEL W.
24                                         MCCONNELL, FORMER ATTORNEY
                                           GENERAL AND JUDGE MICHAEL B.
25                                         MUKASEY, PROFESSOR ALAN
                                           SYKES, FORMER JUDGE JOHN
26                                         DANIEL TINDER, FORMER WHITE
                                           HOUSE COUNSEL PETER
27                                         WALLISON, FORMER STATE
                                           DEPARTMENT COUNSELOR AND
28                                         DIRECTOR OF THE 9/11
                                           COMMISSION PHILIP ZELIKOW IN**

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

Date:   June 26, 2025
Time:   10:00 a.m.
Ctrm:   Courtroom 8, 19th Floor
Judge:  Hon. Jacqueline Scott Corley

CROWELL
& MORING LLP
ATTORNEYS AT LAW

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE .................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

ARGUMENT ............................................................................................................... 3

I.      Congress, Not the President, Has the Power to Impose Tariffs. ...................... 3

II.     IEEPA Does Not Authorize Tariffs. ............................................................... 6

        A.      IEEPA Does Not Mention Tariffs—Because It Was Never Meant To. ................. 6

        B.      Congress Deliberately Rejected Tariff Authority In IEEPA................................... 9

        C.      The Government's Contrary Arguments Lack Merit............................................. 12

        D.      These Tariffs Are Permanent Policy Rather Than Emergency Measures.............. 14

        E.      No President Has Ever Used IEEPA This Way. .................................................... 15

        F.      The Court Has Repeatedly Rejected Sweeping Power From Ambiguous Text. ... 15

CONCLUSION ........................................................................................................... 17

CROWELL
& MORING LLP
ATTORNEYS AT LAW

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
5
    594 U.S. 758 (2021) ..................................................................................... 3, 16

6

*FDA v. Brown & Williamson Tobacco Corp.,*
7
    529 U.S. 120 (2000) ........................................................................................ 16

8

*INS v. Chadha,*
    462 U.S. 919 (1983) .................................................................................. 11, 14

9

*J.W. Hampton, Jr. & Co. v. United States,*
10
    276 U.S. 394 (1928) ........................................................................................ 17

11

*Morton v. Mancari,*
    417 U. S. 535 (1974) ......................................................................................... 8

12

13

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor,*
    595 U.S. 109 (2022) ........................................................................................ 16

14

*Posadas v. National City Bank,*
15
    296 U. S. 497 (1936) ......................................................................................... 8

16

*Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit*
    *Comm'n,*
17
    393 U. S. 186 (1968) ......................................................................................... 8

18

*Util. Air Regul. Group (UARG) v. EPA,*
19
    573 U.S. 302 (2014) ........................................................................................ 15

20

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) .................................................................................. 16, 17

21

22

*Yoshida Int'l, Inc. v. United States,*
    378 F.Supp. 1155 (C.C. 1974) ................................................................. *passim*

23

*Yoshida Int'l, Inc. v. United States,*
    526 F.2d 560 (C.C.P.A. 1975) ................................................................ 10, 11, 13

24

25

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ............................................................................. 1, 3, 13, 17

26

**Statutes**

27

19 U.S.C. § 1862(a) ............................................................................................... 8

28

19 U.S.C. § 2251(a)(3)(A) ..................................................................................... 7

CROWELL
& MORING LLP
ATTORNEYS AT LAW

19 U.S.C. § 2251(a)(3)(B) ............................................................................... 7

19 U.S.C. § 2411(c)(1)(B) ............................................................................... 7

50 U.S.C. § 1701(a) ................................................................................... 6, 15

50 U.S.C. § 4302 .......................................................................................... 11

Pub. L. No. 65-91, 40 Stat. 411 (1917) ......................................................... 9

Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1991 (codified at 19 U.S.C. § 2132) ......................... 10

**Other Authorities**

BLACK'S LAW DICTIONARY (2d ed.) .................................................................. 6

Chairman Steve Miran, Hudson Institute Event Remarks, The White House (Apr. 7, 2025), https://www.whitehouse.gov/briefings-statements/2025/04/cea-chairman-steve-miran-hudson-institute-event-remarks/ ....................... 15

Christoper A. Casey, et al., *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 27 (Cong. Res. Serv. R45618, 2020) ......................... 6

Congress. THE FEDERALIST, *No. 62* ................................................................. 5

Fact Sheet: President Donald J. Trump Declares National Emergency to Increase Our Competitive Edge, Protect Our Sovereignty, and Strengthen Our National and Economic Security, The White House (Apr. 2, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/ ................. 15

H.R. Rep. No. 95-459 (1977) .............................................................. 2, 11, 12

H.R. Rep. No. 95-459 (1977) ........................................................................ 12

Michael W. McConnell, THE PRESIDENT WHO WOULD NOT BE KING: EXECUTIVE POWER UNDER THE CONSTITUTION 100-107 (2020) ....................................... 4

Patrick A. Thronson, *Toward Comprehensive Reform of America's Emergency Law Regime*, 46 U. Mich. J. L. Ref. 737, 758 (2013) .......................................... 7

S. Rep. No. 95-466 (1977) ............................................................................ 12

Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 LA. L. REV. 595 (2023) ................................................................................................... 7

U.S. Const. art. I, § 8 ................................................................................... 4

CROWELL
& MORING LLP
ATTORNEYS AT LAW

**INTEREST OF AMICI CURIAE**

Amici are constitutional scholars, legal historians, public lawyers, retired federal appellate judges, a former United States Attorney General, and three former United States Senators united by a common conviction: the endurance of the American Republic depends not only on elections or policy outcomes, but on the faithful preservation of its constitutional structure. They span the ideological spectrum, joined not by partisanship but by a common concern over the erosion of Congress's Article I authority.

Amici do not appear to defend or oppose any particular trade policy. They file this brief because they believe the Constitution draws bright lines between legislative and executive power—and that those lines are being blurred in ways that threaten democratic accountability itself.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This dispute is not about the wisdom of tariffs or the politics of trade. It is about who holds the power to tax the American people. May a President, absent a clear delegation from Congress and without guidance that amounts to an intelligible principle, unilaterally impose sweeping tariffs under laws never designed for that purpose? This is not a debate over outcomes but a test of structure. It asks not what should happen, but who decides.

The Constitution gives a clear answer. Article I vests Congress—not the President—with the power to "lay and collect Taxes, Duties, Imposts and Excises," and to "regulate Commerce with foreign Nations." Unless Congress has delegated that authority through a valid and clearly bounded framework, the President may not impose tariffs. As the Supreme Court made plain in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), presidential power must stem from the Constitution or an act of Congress. Here, it does neither.

In April 2025, President Trump proclaimed a sweeping tariff regime that touches nearly every imported good sold in the United States. The measures include a 10% baseline tariff on all imports and a 34% duty on Chinese goods (raising total tariffs to 65%). These levies did not arise from legislation. They were not the product of congressional debate or any statutory process. Nor were they supported by specific findings under existing trade laws. On April 9, 2025, President

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-1-

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

1  Trump announced a 90-day pause on most of these tariffs, except for those on Chinese imports,

2  which were increased to 145%. The baseline 10% tariffs on nearly every country remained in

3  effect.

4       But no statute authorizes what the President has done. The laws cited permit limited and

5  targeted actions under narrow conditions. They do not authorize sweeping economic realignment.

6  They do not permit unilateral taxation of vast sectors of the U.S. economy. These duties came not

7  from Congress, but from a claim of executive power detached from constitutional limits.

8       The International Emergency Economic Powers Act (IEEPA), the central statute invoked,

9  cannot bear this weight. Enacted in 1977 to rein in presidential overreach, IEEPA allows the

10  President to impose sanctions in response to genuine emergencies—not to reorder the economy in

11  response to long-term trends.

12       The history is revealing. Reacting to President Nixon's unprecedented assertion of

13  authority under the Trading With The Enemy Act of 1917 (TWEA) to impose import surcharges,

14  Congress passed new legislation "for use in time of national emergency which are *both more*

15  *limited in scope than those of [TWEA] and subject to various procedural limitations*." H.R. Rep.

16  No. 95-459, at 2 (1977) (emphasis added). Notably, the Trade Act of 1974 explicitly granted the

17  executive authority to increase tariffs in response to balance of trade deficits, subjecting that

18  authority to strict procedural, substantive, and temporal limits (not satisfied here), while IEEPA

19  was confined to non-tariff economic sanctions, To infer that Congress delegated sweeping

20  emergency tariff authority to the President would precisely invert what really happened. Indeed, if

21  IEEPA were interpreted to allow the President to impose, revoke, or adjust tariffs at will, it would

22  undo the limits on that power embodied in the Trade Act, its sister statute, and produce Nixonian

23  power on steroids.

24       The core principle urged by amici is this: IEEPA and related statutes do not grant the

25  President the power to impose tariffs of this kind or scope. That power remains squarely within

26  the legislative domain. The Constitution places decisions about taxation and commerce in

27  Congress's hands—not as a formality, but as a structural safeguard of democratic accountability.

28       The President's actions here violate the limits of that structure. The statutes he invoked

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-2-

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

1  were never meant to authorize unilateral lawmaking. Yet he used them to bypass bicameralism

2  and presentment—the very processes that make government accountable. He now claims an

3  open-ended emergency power that, if upheld, would let any President reshape the economy

4  without Congress.

5      To be clear, amici do not argue that the Executive lacks all authority under IEEPA or

6  Section 301. Congress has delegated some powers under specific conditions. But those powers do

7  not include imposing across-the-board tariffs untethered from any statutory criteria. They do not

8  include the authority to bypass Congress in matters of taxation. And they do not authorize the

9  President to override constitutional structure by invoking an "emergency."

10     This case is not about trade any more than *Youngstown* was about steel or *Alabama Ass'n*

11 *of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021) was about landlord-tenant law.

12 It is about power—who has it, and who must authorize its use. The principle remains: "[t]he

13 President's power, if any, to issue the order must stem either from an act of Congress or from the

14 Constitution itself." *Youngstown*, 343 U.S. at 585.

15     This case requests this Court apply the principles which have been reaffirmed time and

16 again: that Congress makes the law, and the Executive enforces it; that major policies require

17 explicit legislation; and that the Constitution does not permit taxation by proclamation. These

18 principles are neither new nor partisan. They are the foundation of the American republic.

19     The Court should conclude that plaintiffs are likely to succeed on the merits of showing

20 that the statutes invoked by the President do not authorize the imposition of general tariffs; that

21 such authority remains with Congress; and that the separation of powers is not a matter of

22 convenience, but of constitutional command. Accordingly, the Court should grant plaintiffs the

23 relief they seek.

24                              **ARGUMENT**

25 **I.    Congress, Not the President, Has the Power to Impose Tariffs.**

26     From the founding of the Republic, the power to impose tariffs—like the power to levy

27 taxes—has belonged exclusively to Congress. This is no formality. This nation was born of the

28 slogan "No taxation without representation," which means that the authority to tax, raise revenue,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-3-

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

1    and shape the public's economic obligations must rest with the people's elected representatives.[1]

2        The Constitution is explicit. Article I, Section 8 grants Congress the power "[t]o lay and

3    collect Taxes, Duties, Imposts and Excises" and "[t]o regulate Commerce with foreign Nations."

4    U.S. Const. art. I, § 8. These provisions were not afterthoughts—they were foundational. As

5    James Madison wrote in *The Federalist No. 58*, vesting control of taxation in the legislature

6    served as a deliberate check on executive power, born of colonial resistance to Crown-imposed

7    duties levied without consent. That structural safeguard ensures that only a geographically diverse

8    and representative Congress—not the Executive—may impose economic burdens on the people.

9        Tariffs fall squarely within this constitutional design. If the Framers had merely used the

10   term "taxes," this would have encompassed tariffs, which are taxes. But the Framers went out of

11   their way to list "duties" and "imposts" as within the legislative domain. And no wonder: the

12   Framers expected that the "impost," which meant tariffs, would generate sufficient revenue to pay

13   for most of the ordinary operations of the federal government in peacetime. McConnell, *supra*, at

14   101. Tariffs lay at the core of the taxing power.

15       Congress historically guarded this authority with care. The Tariff Act of 1789—among the

16   first laws passed under the new Constitution—imposed duties across a broad range of imported

17   goods. It was introduced in the House, debated in both chambers, amended, and enacted through

18   the full machinery of legislative deliberation. For more than a century, tariff policy remained one

19   of the most visible and contested areas of congressional action, often shaping party lines and

20   national elections. Tariffs were the centerpiece of Henry Clay's "American System," and the so-

21   called "Tariff of Abominations" was the impetus for the Nullification Crisis of 1832-33. Whether

22   popular or unpopular, it was Congress—not the President—that decided which goods to tax, at

23   what rates, and for what ends.

24       From the beginning of the Republic, Congress has distinguished between delegations of

25   authority to impose taxes, including tariffs, which are the core of Congress's power of the purse,

26   and delegations of authority to impose embargoes and other non-tax economic sanctions, which

27

28   _____

[1] *See* Michael W. McConnell, THE PRESIDENT WHO WOULD NOT BE KING: EXECUTIVE POWER UNDER THE CONSTITUTION 100-107, 214-220 (2020) (explaining that the Constitution vests the powers to tax and regulate commerce in Congress as part of its core structural design).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-4-                        JOINT BRIEF OF AMICI CURIAE ISO PL'S
                          MOT FOR PRELIMINARY INJUNCTION;
                          CASE NO. 3:25-CV-03372-JSC

1    inextricably relate to foreign policy, a largely presidential domain. Both require express

2    congressional delegation, but the President has been given far more latitude to impose and

3    remove embargoes in the service of foreign policy objectives, while tariff authority has invariably

4    been narrowly limited in time, amount, and purpose.

5         The Trade Act of 1974 and the Trade Expansion Act of 1962 exemplify this approach.

6    They allow the Executive to address unfair trade practices or national security threats, but only

7    within carefully prescribed limits. Even then, these statutes do not—and constitutionally cannot—

8    authorize the President to enact a sweeping tariff regime absent new legislation.

9         The Framers' decision to allocate lawmaking to a representative body and execution to a

10   single executive serves practical as well as theoretical purposes. Legislatures – especially

11   bicameral legislatures – are by their nature deliberative, and therefore slower to change course, by

12   comparison to the executive, whose singular virtues include "energy" and "dispatch." They well

13   understood what Madison called the "mischievous effects of a mutable government," and sought

14   to guard against it by the bicameral structure of Congress. THE FEDERALIST, *No. 62*, at 420 (Jacob

15   E. Cooke ed. 1961). As Madison explained, "It will be of little avail to the people, that the laws

16   are made by men of their own choice, if the laws . . .  be repealed or revised before they are

17   promulgated, or undergo such incessant changes that no man, who knows what the law is to-day,

18   can guess what it will be to-morrow." He posed the question: "What prudent merchant will

19   hazard his fortunes in any new branch of commerce when he knows not but that his plans may be

20   rendered unlawful before they can be executed? What farmer or manufacturer will lay himself out

21   for the encouragement given to any particular cultivation or establishment, when he can have no

22   assurance that his preparatory labors and advances will not render him a victim to an inconstant

23   government?" *Id*. at 421-22. So, too of American merchants and manufacturers today, whose

24   decisions are affected by the cost of imported goods and materials. It is not an argument for one

25   tariff policy over another to observe the wisdom of the Constitution's assignment of these powers

26   to the branch most likely to pursue a consistent and predictable policy.

27   //

28   //

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-5-

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

## II.    IEEPA Does Not Authorize Tariffs.

The Administration's statutory claim rests on the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1707. That reliance is misplaced. Unlike every statute delegating tariff-setting authority, IEEPA makes no mention of tariffs, duties, or imposts. No President other than Mr. Trump has ever purported to impose tariffs under IEEPA. Christoper A. Casey, et al., *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 27 (Cong. Res. Serv. R45618, 2020). The statute was never meant, and has never been understood, to authorize the President to impose or revise tariffs. IEEPA's text, context, and legislative history point to a different purpose: to empower the President to block or freeze foreign assets and financial transactions in targeted, temporary ways—not to raise revenue or rewrite the core terms of international commerce.

Another statute, the Trade Act of 1974, enacted just before IEEPA, explicitly authorizes the executive to raise, lower, or revise tariffs, subject to detailed substantive and procedural limitations.  To read IEEPA as implicitly granting *carte blanche* to the President over tariffs without any such limitations, whenever he declares the existence of an emergency, would render the carefully-wrought provisions of the Trade Act pointless.

### A.    IEEPA Does Not Mention Tariffs—Because It Was Never Meant To.

IEEPA grants the President certain defined authorities to regulate international economic transactions upon declaring a national emergency "to deal with any unusual and extraordinary threat … to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Once that condition is met, the statute permits the President to "investigate, regulate, or prohibit . . . transfers of credit or payments . . . involv[ing] any interest of any foreign country or a national thereof, by any person . . . subject to the jurisdiction of the United States." *Id*. § 1702(a)(1)(A)(ii). The term "emergency" does not extend to every problem that is serious or threatening, but only to those that are "sudden, unexpected, or impending." BLACK'S LAW DICTIONARY (2d ed.). The term "regulate . . . importation" of foreign goods does not extend to imposing taxes, but in context refers only to the quantitative limitations traditionally part of the President's foreign affairs

1    authority. *See* Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 L A. L. R EV. 595

2    (2023). Although Congress may use its plenary taxing power to achieve regulatory ends, the

3    converse is not true: the power to regulate is not the power to tax.

4         Upon a presidential proclamation of emergency under IEEPA, Section 1702(b) permits

5    the President to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit" the

6    acquisition, use, or transfer of property owned by a foreign nation or individual.  This enables the

7    executive branch, in a foreign policy crisis, to block transactions, freeze assets, and seize, or

8    sequester foreign property.  *See* Patrick A. Thronson, *Toward Comprehensive Reform of*

9    *America's Emergency Law Regime*, 46 U. Mich. J. L. Ref. 737, 758 (2013) ("The IEEPA thus

10   grants the Executive Branch the power to freeze the assets of, and prohibit financial transactions

11   involving, individuals designated by Executive Order. This includes the power to prohibit bank

12   payments and transfers of credit insofar as they "involve" an interest of a designated person,

13   entity, or country, and to prohibit the holding, use, or transfer of property implicating a relevant

14   foreign interest.") Notably, Congress employed seven different verbs to capture the intended

15   types of economic sanction, but did not include the term "tax" or any of its synonyms. If

16   Congress had intended to delegate the power of taxing ordinary commerce, it surely would have

17   said so.

18        Moreover, all the permitted presidential actions have their effects abroad; IEEPA did not

19   authorize the President to tax or regulate the domestic activities or property of Americans. Tariffs,

20   unlike the foreign sanctions explicitly authorized under IEEPA, are taxes paid by Americans.

21   They fall squarely within Congress's taxing power and, under the Constitution, require the

22   explicit consent of the people's representatives.

23        The absence of tariff language in IEEPA stands in sharp contrast to statutes where

24   Congress has affirmatively granted such power. When Congress intends to authorize duties, it

25   says so. Section 301 of the Trade Act of 1974 allows the President to "impose duties or other

26   import restrictions." 19 U.S.C. § 2411(c)(1)(B). Section 201 of that same Act empowers the

27   President to "proclaim an increase in, or the imposition of, any duty on the imported article" or to

28   "proclaim a tariff-rate quota." 19 U.S.C. § 2251(a)(3)(A), (B). Similarly, Section 232 of the Trade

CROWELL
& MORING LLP
ATTORNEYS AT LAW

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

1   Expansion Act authorizes the adjustment of "duties" on imports, 19 U.S.C. § 1862(a), and grants

2   authority to "adjust the imports." *Id*. § 1862(c). In each case, Congress spoke with clarity when it

3   intended to delegate authority over tariffs and it encumbered the grant of authority with

4   procedural and substantive conditions and prerequisites.

5       If IEEPA meant what the government says it means, it would enable the President to

6   impose, revoke, or change tariffs for essentially any reason he describes as an emergency, without

7   complying with any of the limitations that Congress attached to every statute delegating tariff

8   authority. According to this argument, IEEPA silently repealed all those limits, without any

9   member of Congress seeming to notice. That interpretation is contrary to the time-honored rule

10  that absent "a clearly expressed congressional intention," *Morton v. Mancari*, 417 U. S. 535, 551

11  (1974), "repeals by implication are not favored," *Universal Interpretive Shuttle Corp. v.*

12  *Washington Metropolitan Area Transit Comm'n*, 393 U. S. 186, 193 (1968). An implied repeal

13  will only be found where provisions in two statutes are in "irreconcilable conflict," or where the

14  latter Act covers the whole subject of the earlier one and "is clearly intended as a substitute."

15  *Posadas v. National City Bank*, 296 U. S. 497, 503 (1936). Nor should the court find that the

16  generalized language of IEEPA, which does not even mention tariffs, supersedes the specific

17  language of laws granting the executive branch only circumscribed authority to impose tariffs.

18      The more specific tariff-authorizing statutes cannot support the President's current action

19  either. The President has not specifically invoked the authority of Trade Act of 1974 or the Trade

20  Expansion Act in support of his April 2 tariffs, and for good reason. Section 122 of the Trade Act

21  authorizes import surcharges of 15% for no more than 150 days "to deal with large and serious

22  United States balance-of-payments deficits." President Trumps's tariffs exceed that limit and

23  would last far longer. Section 201 is even farther afield. It allows targeted tariff increases upon a

24  finding by the United States International Trade Commission that increased imports of a product

25  are causing substantial injury to the domestic industry producing that product. There have been no

26  such findings here. Indeed, across-the-board tariffs of 10% on all imports – including nations

27  where the United States enjoys a trade surplus – bear no resemblance to the targeted tariff

28  increases contemplated by this provision. Section 301 of the Act authorizes "duties or other

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-8-

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

import restrictions" on foreign nations that have been found—after notice and investigation—to have committed unfair trade practices or violated trade agreements with the United States. There have been no such investigations, and no notice to the nations involved. In any event, this provision has largely been superseded by investigations and proceedings under the World Trade Organization framework. Section 232 of the Trade Expansion Act concerns national security threats, yet no plausible finding has been made—or could be made—that every product from every nation in the world poses such a threat. The Administration has not even invoked these statutes in support of the tariffs at issue. Their existence, however, makes it even more implausible that IEEPA silently conveys limitless powers that these statutes convey only through express, narrow limits and accompanied by procedural safeguards.

### B.    Congress Deliberately Rejected Tariff Authority In IEEPA.

The context of the enactment of IEEPA makes clear that Congress did not intend to delegate tariff authority to the President. On the contrary, Congress enacted IEEPA in 1977 in response to President Richard Nixon's unprecedented assertion of the authority to increase tariffs under the Trading With The Enemy Act of 1917 (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917), in 1971. The TWEA, a World War I–era statute that originally applied only in wartime, gave the President authority to impose economic sanctions against other nations whose actions threaten our national security. The TWEA did not mention tariffs, and until 1971 was never invoked by any President to impose them.

In that year, President Nixon declared a national emergency and imposed a 10% import surcharge (an extra tariff), purportedly under the authority of the TWEA. Nixon asserted that language in the TWEA allowing the executive to "regulate . . . imports . . . by means of instructions, licenses, or otherwise" was broad enough to permit him to add a 10% surcharge to the existing tariffs that had been imposed by Congress. This surcharge lasted less than five months; it was withdrawn in December 1971. A zipper importer, Yoshida International, filed a lawsuit challenging the legality of the surcharge and seeking a refund of taxes paid. By the time a court could render a decision, the import surcharge had lapsed. Although a three-judge panel of the Customs Court concluded that the tariff surcharge was illegal, *Yoshida Int'l, Inc. v. United*

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-9-

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

1  *States*, 378 F.Supp. 1155 (C.C. 1974), the Court of Customs and Patent Appeals later reversed,

2  upholding Nixon's action. It found that TWEA's "express delegation" of power to the President

3  "is broad indeed," such that the power to impose tariffs could be inferred from the power to

4  "regulate" imports during a crisis, in the absence of any statute "'providing procedures' for

5  dealing with a national emergency involving a balance of payments problem such as that which

6  existed in 1971." *Yoshida Int'l, Inc. v. United States*, 526 F.2d 560, 574–75 (C.C.P.A. 1975),

7  *quoting Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ("legislation delegating

8  restrictive regulatory authority cannot operate, merely upon the declaration of an emergency, to

9  the exclusion of other legislative acts providing procedures prescribed by the Congress for the

10  accomplishment of the very purpose sought to be attained by Presidential Proclamation").[2]

11        While the *Yoshida* litigation was still pending, Congress passed just such a statute. It

12  repealed the TWEA, replacing it with the Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat.

13  1978, 1991 (codified at 19 U.S.C. § 2132), which for the first time gave the executive explicit

14  authority to revise tariffs in response to trade deficits – the very power President Nixon had

15  asserted under the TWEA, subject to strict substantive and procedural guardrails. The Trade Act

16  allowed the President to increase tariffs through an emergency import surcharge, but capped such

17  surcharges at 15% and permitted them to last no more than 150 days in the absence of

18  "affirmative authorization" by Congress. *Id*. Moreover, the Act required specific findings of

19  unfair trade practices by the nations subject to the surcharges. Congress thus made clear that if a

20  President is to have any emergency tariff power, it must come from a specifically tailored statute

21  with clear parameters, not an open-ended mandate.

22        Only after Congress passed the Trade Act did the Court of Customs and Patent Appeals

23  reverse the trial court's holding that the TWEA did not authorize presidential tariff increases.

24

25  [2] In *Yoshida*, the court upheld President Nixon's import surcharge precisely because it adhered to
   previously established congressional tariff limits. Nixon's surcharge applied only to goods
26  already benefiting from tariff reductions, and crucially, rates could never exceed Congress's
   original statutory maximum. By contrast, President Trump's tariffs far exceed any previously
27  authorized congressional tariff ceilings, are not limited to goods previously receiving tariff
   concessions, and impose new duties broadly and independently from any prior legislative
28  framework. This difference underscores why the *Yoshida* precedent does not support the
   Administration's expansive interpretation of executive tariff power here.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-10-

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

1  *Yoshida*, *supra*. By that time, Congress had already enacted a carefully limited tariff authority,

2  which superseded the TWEA.

3       Congress then enacted IEEPA. Having just enacted an explicit, and tightly limited, tariff

4  authority through the Trade Act, Congress did not incorporate any tariff language into IEEPA.

5  Congress's decision in 1977 to retain TWEA's general language ("regulate importation…") in

6  IEEPA without adding any tariff-specific provision strongly suggests that lawmakers did not

7  regard IEEPA as a vehicle for import taxes. Congress had already "provided procedures" for

8  emergency tariffs. *Yoshida* and those procedures – not IEEPA – would govern future imposition

9  of tariffs "dealing with a national emergency involving a balance of payments problem." 526 F.2d

10 at 578. IEEPA was meant for other tools of economic sanctions (like freezing assets or

11 embargoing particular transactions), not for across-the-board duties.

12      Congress further cut back on the power previously imparted by the TWEA in two ways.

13 First, it confined the original TWEA power to wartime, as had been the case between 1917 and

14 1933. *See* 50 U.S.C. § 4302. In peacetime, the President was permitted to impose regulations

15 (with no mention of tariffs) on imports only upon a declaration of emergency under the

16 Emergencies Act, which would be subject to fast-track review and invalidation by Congress. *See*

17 Thronson, 46 U. Mich. J. L. Ref. at 743-53. This effectively barred any future action of the sort

18 taken by President Nixon, unless it was approved by Congress.

19      Over a decade later, the Supreme Court declared legislative vetoes (like the one employed

20 in the Emergencies Act) unconstitutional, which stripped Congress of the central safeguard it had

21 enacted in 1977. *INS v. Chadha*, 462 U.S. 919 (1983). It is nonetheless a fallacy to impute to

22 Congress the intention to give the President unilateral tariff authority, when Congress voted

23 specifically to subject any such decisions to congressional review.

24      The House Committee Report leaves no ambiguity: IEEPA was designed to provide "a

25 new set of authorities for use in time of national emergency which are *both more limited in scope*

26 *than those of [TWEA] and subject to various procedural limitations*." H.R. Rep. No. 95-459, at 2

27 (1977) (emphasis added). The Report expressed Congress's view that President Nixon had used

28 the TWEA for purposes "which would not be contemplated in normal times." *Id.* at 5. The

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-11-

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

1    Senate Committee Report similarly emphasized that IEEPA should not be read to provide "a

2    blank check for presidential control over the economy." S. Rep. No. 95-466, at 5–6 (1977).

3        Nothing in IEEPA's legislative history suggests that Congress intended to give the

4    President tariff-making power. The House Report accompanying the bill identified the key

5    powers carried over from TWEA that were deemed necessary for emergencies: controls on

6    foreign exchange transactions, banking transfers, and securities; regulation of property in which

7    foreign nationals have an interest; vesting (seizing) foreign-owned property; and handling or

8    liquidating such property for the United States' benefit. See H.R. Rep. No. 95-459, at 1–2 (1977).

9    Notably absent from that list is any power to raise import duties or impose new tariffs. In fact,

10   tariffs are only addressed in a historical discussion of past uses of TWEA, not as a contemplated

11   feature of IEEPA. See *id*. at 5–6.

12        **C.    The Government's Contrary Arguments Lack Merit.**

13        The slender thread on which the government bases its reliance on IEEPA is that Congress

14   used the same the term, "regulate . . . imports," in IEEPA that had been present in the TWEA, and

15   which *Yoshida* held had supported Nixon's tariff surcharges.  The government asks this court to

16   infer that IEEPA has the same meaning as the TWEA and that Congress must have embraced the

17   broad interpretation of that language in *Yoshida*. There are multiple reasons to reject that

18   argument.

19        First, the court should interpret IEEPA in light of its language, and not according to

20   speculation that Congress might have accepted the interpretation given by one lower court to a

21   different statute, now repealed. That is especially clear because we know that Congress explicitly

22   set out to cabin that authority, and substitute authorities "which are both more limited in scope

23   than those of [TWEA] and subject to various procedural limitations." H.R. Rep. No. 95-459, at 2

24   (1977). It would turn the congressional intention on its head to read IEEPA as preserving the

25   same unbridled power that Nixon had asserted.

26        Second, the court should not read IEEPA as giving the President sweeping tariff powers

27   when Congress had just enacted the Trade Act, which subjected presidential tariff authority to

28   strict substantive and procedural limits. The government's interpretation would amount to an

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-12-

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

implied repeal of the Trade Act and virtually every other tariff-specific delegation of power. As Justice Frankfurter noted in *Youngstown*, "It is quite impossible, however, when Congress did specifically address itself to a problem, as Congress did to that of seizure, to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld." 343 U.S. at 609.

Third, the *Yoshida* court expressly repudiated the notion that the TWEA empowered the President to "impos[e] whatever tariff rates he deems desirable," which is the power claimed by the government in this case. *Yoshida*, 526 F.2d at 578. The court emphasized the narrow and time-limited nature of the Nixon tariff surcharge, and limited its holding accordingly. The court noted that Nixon's Executive Order "was limited to articles which had been the subject of prior tariff concessions" and that the total tariff, with the surcharge, could not exceed the amount Congress had enacted in "column 2 of the Tariff Schedules of the United States." *Id*. at 577.  The surcharge lasted less than five months. "Far from attempting, therefore, to tear down or supplant the entire tariff scheme of Congress, the President imposed a limited surcharge, as 'a temporary measure' calculated to help meet a particular national emergency." *Id.* Indeed, the court suggested that such a broad interpretation might render the statute unconstitutional. *Id*. at 580-583. To make this point crystal clear, the court declared that "[t]he declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules." *Id*. at 583. Thus, even if this court were to conclude that Congress somehow incorporated the *Yoshida* court's interpretation of the TWEA into the new IEEPA statute, this would not support the government's extravagant claim of an unlimited power to set tariffs in any declared emergency.

The *Yoshida* court further emphasized, no fewer than four times in its opinion, that the generalized provisions of the TWEA could be read to authorize President Nixon's action only because there then existed no statute containing "procedures prescribed by the Congress for the accomplishment of the very purpose sought to be attained by [the presidential order]." 526 F.2d at 570, 578. A specific statute would govern instead of the TWEA. Congress thus knew that its enactment of precisely such procedures in the Trade Act of 1974 would preclude a finding of generalized tariff authority under the TWEA, under the logic and holding of *Yoshida*.

1    The government simply ignores the congressional opposition to the Nixonian tariffs, the

2    enactment of time-limited and procedurally limited tariff authority in the Trade Act, and the

3    elimination of unilateral presidential emergency authority through the fast-track congressional

4    disapproval mechanism of the Emergency Act. To be sure, the congressional disapproval

5    procedure was rendered ineffective by the *Chadha* decision, but that decision came a decade later,

6    and it defies reason to impute to Congress the intention to give to the President precisely the

7    unilateral authority it so carefully (if ineffectually) curtailed.

8          **D.    These Tariffs Are Permanent Policy Rather Than Emergency Measures.**

9          IEEPA was enacted to enable short-term, targeted responses to genuine, extraordinary

10    threats—not to authorize permanent alterations to the nation's trade regime. Its very title—the

11    *International Emergency Economic Powers Act*—underscores this purpose: to grant the

12    Executive narrow powers to act swiftly during unforeseen emergencies. It is not a tool for

13    addressing long-standing policy concerns or for implementing structural reforms that require

14    legislative debate.

15          The tariffs imposed by the President in April 2025 are plainly at odds with that purpose.

16    They are not tied to a discrete or time-sensitive emergency. Nor are they temporary. On the

17    contrary, they are designed to remain in effect indefinitely and to respond to broad, persistent

18    conditions—such as global supply chain realignment, foreign industrial policy, and chronic trade

19    imbalances—that the Administration claims threaten American economic security in a general

20    and enduring way.

21          President Trump has made no effort to conceal this long-term intent. He has explicitly

22    defended his tariff policy as a corrective to economic trends spanning more than two decades.

23    The official White House Fact Sheet explains that the President invoked IEEPA to address "the

24    national emergency posed by the large and persistent trade deficit." It claims that "[f]or

25    generations, countries have taken advantage of the United States," and cites the loss of "around 5

26    million manufacturing jobs" from 1997 to 2024—a 27-year period. It also references Chinese

27    trade practices "between 2001 and 2018"—conduct that began nearly a quarter century ago and

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

concluded seven years prior. [3] These are not unforeseen emergencies. They are longstanding policy grievances, best addressed by Congress—not by emergency proclamation.

The Administration has also touted these tariffs as a means of generating long-term revenue. On April 2, President Trump predicted that the tariffs would generate "trillions and trillions of dollars to reduce our taxes and pay down our national debt." The Chair of the Council of Economic Advisors echoed this aim, stating that "tariffs will help pay for both tax cuts and deficit reduction." [4] But tax cuts and budget deficits—however important—are not "unusual and extraordinary threat[s]" under IEEPA. 50 U.S.C. § 1701(a). They are routine subjects of political debate and legislative negotiation. Their invocation here confirms that these tariffs are not temporary emergency measures, but a shift in fiscal and trade policy pursued through unilateral executive action.

### E.    No President Has Ever Used IEEPA This Way.

The Supreme Court has cautioned that "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' … we typically greet its announcement with a measure of skepticism." *Util. Air Regul. Group (UARG) v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). That skepticism is warranted here. In the nearly five decades since its enactment, IEEPA has never been used to impose a general tariff. Presidents have invoked it to freeze assets, block financial transfers, and impose targeted sanctions on hostile regimes and individuals. But never to levy broad-based duties on imports. That settled practice confirms what the statute's text and legislative record already show: Congress did not grant tariff authority.

### F.    The Court Has Repeatedly Rejected Sweeping Power From Ambiguous Text.

In matters of vast political and economic consequence, the Supreme Court insists on

---

[3] *See* Fact Sheet: President Donald J. Trump Declares National Emergency to Increase Our Competitive Edge, Protect Our Sovereignty, and Strengthen Our National and Economic Security, The White House (Apr. 2, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/.
[4] CEA Chairman Steve Miran, Hudson Institute Event Remarks, The White House (Apr. 7, 2025), https://www.whitehouse.gov/briefings-statements/2025/04/cea-chairman-steve-miran-hudson-institute-event-remarks/.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    unmistakable legislative authority before allowing the Executive Branch to act. It is not a novel

2    doctrine but a longstanding interpretive principle: it is improbable that Congress means to transfer

3    vast swaths of its constitutional power without saying so directly. General language will not

4    suffice. The point here is not (as with the nondelegation doctrine) to limit Congress's ability to

5    legislate, but to protect Congress from having its words twisted to unintended purposes.

6         That principle, dubbed the "major questions doctrine," applies with full force here. The

7    President has proclaimed a fundamental reordering of U.S. trade policy: a baseline 10% tariff on

8    nearly all imports, a 34% tariff on Chinese goods, and a 25% tariff on foreign automobiles—

9    without new legislation or specific congressional approval. The asserted authority rests on

10   statutory language not enacted for this purpose and never before used in this way. That, under

11   binding precedent, is not enough.

12        The Court applied this principle decades ago in *Brown & Williamson*. There, it rejected

13   the FDA's attempt to regulate tobacco under broad statutory language, noting that Congress had

14   legislated extensively in the area without granting that power. "[Congress] could not have

15   intended to delegate a decision of such economic and political significance in so cryptic a

16   fashion." 529 U.S. at 160. The Court refused to assume that Congress had granted sweeping

17   authority without saying so. As the Court warned, Congress does not "hide elephants in

18   mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

19        In *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021), the

20   Court struck down the CDC's attempt to extend a nationwide eviction moratorium under general

21   public health authority. The relevant statute allowed measures to prevent disease transmission,

22   but none of the enumerated measures bore any resemblance to moratorium on evictions. That

23   mattered. The Court emphasized that sweeping economic actions require unmistakable legislative

24   approval—particularly where Congress had considered and declined to extend the policy itself.

25   The CDC's reliance on broad language was not enough.

26        Similarly, *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109 (2022), invalidated

27   OSHA's nationwide vaccine-or-test mandate, holding that such a significant policy required

28   explicit congressional authorization. Though OSHA invoked its general authority to regulate

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-16-

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC

1    workplace safety, the Court found that such sweeping measures could not rest on generalized

2    statutory terms. The Executive may not transform a broad statute into a blank check for

3    nationwide regulation—particularly when fundamental personal and economic rights are at stake.

4         The situation here is analogous to these cases. Like the CDC, the President relies on a few

5    generalized words ("regulate" and "importation") in a statute designed for narrow, targeted

6    emergencies to justify a dramatic, long-term economic intervention. And as in *Alabama*

7    *Association*, Congress has not merely failed to speak clearly—it has expressly declined to

8    authorize the action now claimed. *Cf. Youngstown*, 343 U.S. at 586 (noting that Congress had

9    considered and declined to grant the President authority to seize private property in response to

10   labor disputes). When faced with Richard Nixon's unprecedented assertion of a unilateral tariff

11   power under the TWEA, Congress repealed the TWEA and replaced it with the Trade Act, which

12   allowed adjustment of tariffs under strict procedural, substantive, and temporal limitations,

13   enacted IEEPA to address non-tariff economic sanctions, and subjected all emergency

14   declarations to direct congressional control. That history cannot be rewritten by implication or

15   executive interpretation.

16        Interpreting IEEPA to authorize tariffs would also invite a grave nondelegation problem.

17   The statute supplies no intelligible principle to guide the President in determining when, how, or

18   to what extent duties should be imposed If construed to allow the imposition of tariffs without

19   meaningful limits or standards, IEEPA would amount to an open-ended delegation of legislative

20   power—precisely what the nondelegation doctrine forbids. In *J.W. Hampton, Jr. & Co. v. United*

21   *States*, 276 U.S. 394 (1928), the Court upheld a tariff delegation only because it was governed by

22   an "intelligible principle" and confined to narrow bounds. As the Court explained in *Whitman v.*

23   *American Trucking Associations*, Congress must "lay down by legislative act an intelligible

24   principle to which the person or body authorized to [act] is directed to conform." 531 U.S. 457,

25   472 (2001) (citation omitted). That principle is absent here with respect to trade duties.

26                                  **CONCLUSION**

27        The Court should reject the government vision of executive power—not merely because it

28   lacks statutory support, but because it permits arbitrary taxation untethered from the constitutional

1   processes designed to safeguard liberty. The separation of powers remains the first and strongest

2   safeguard of liberty in a constitutional republic. It must be upheld here.

3          The Court should grant plaintiffs' request for relief because plaintiffs are likely to succeed

4   on the merits.

5   Dated:  May 19, 2025                          CROWELL & MORING LLP

6
                                                 By:  /s/ Warrington S. Parker III
7                                                     Warrington S. Parker III
                                                     Joanna Rosen Forster
8
9   Dated:  May 19, 2025                          MICHAEL W. MCCONNELL

10
                                                 By:  /s/ Michael W. McConnell
11                                                    Michael W. McConnell

12                                               Attorneys for AMICI CURIAE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-18-

JOINT BRIEF OF AMICI CURIAE ISO PL'S
MOT FOR PRELIMINARY INJUNCTION;
CASE NO. 3:25-CV-03372-JSC