# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**EMILY LEY PAPER, INC.,**
d/b/a Simplified**, et al.,**

      **Plaintiffs,**

**v.**                                                          **Case No. 3:25cv464-TKW-ZCB**

**DONALD J. TRUMP, et al.,**

      **Defendants.**

_____/

## <u>ORDER TRANSFERRING CASE</u>

This case is before the Court based on Defendants' motion to transfer (Doc. 5). Upon due consideration of the motion, Plaintiffs' response in opposition (Doc. 21) and its attachment, the amicus briefs (Docs. 7-1, 26-1, 27-1, 32-1), Defendants' replies (Docs. 35, 36), the supplemental authorities (Docs. 16-1, 16-2), and the amended complaint (Doc. 20), the Court finds that the motion is due to be granted.

### Factual Background

On January 20, 2025, the President issued Proclamation 10886 declaring that "a national emergency exists at the southern border of the United States." Doc. 21-1 at 13. The declaration was based, in part, on the "[h]undreds of thousands of Americans [who] have tragically died from drug overdoses because of the illicit narcotics that have flowed across the southern border." *Id*.

On February 1, 2025, the President issued Executive Order (EO) 14195 expanding the national emergency declared in Proclamation 10886 to China based on its complicity in the production and distribution of illicit drugs (particularly fentanyl and other synthetic opioids) and its failure to take meaningful action to stop the flow of those drugs and their precursor chemicals into the United States.[1] *Id.* at 27-28. Among other things, EO 14195 imposed an "additional" 10% tariff on all products imported from China. *Id.* at 28.

On March 3, 2025, the President issued EO 14228 finding that the previously declared national emergency "has not abated" because China "has not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions." *Id.* at 78. Based on that finding, EO 14228 increased the additional tariff on products imported from China to 20%. *Id.*

On April 2, 2025, the President issued EO 14257 declaring a national emergency with respect to the "large and persistent annual U.S. goods trade deficits" caused by the "lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption." *Id.* at 95. Based on that declaration,

---

[1] The President contemporaneously issued EOs imposing tariffs on products imported from Canada and Mexico for their failure to do more to stop the flow of fentanyl and other illicit drugs across their borders into the United States, *see* Doc. 21-1 at 17, 22, but those EOs (and the subsequent EOs "pausing" the tariffs on imports from Canada and Mexico, *id.* at 63, 66) are not relevant to the jurisdictional issue currently before the Court.

EO 14257 imposed "reciprocal" tariffs on products from other countries at varying rates, including a 34% tariff on products imported from China in addition to the previously imposed tariffs. *Id.* at 99, 103.

The following week, based on the retaliatory reciprocal tariffs imposed by China on products from the United States, the President issued EOs increasing the reciprocal tariff on products imported from China—first to 84%, *id.* at 175 (EO 14259), and then to 125%, *id.* at 180 (EO 14266).[2] Thus, at the time the amended complaint was filed, products imported from China were subject to additional tariffs of 145%.[3]

Each of the pertinent EOs was based on the authority vested in the President by "the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 604 of the

---

[2] EO 14266 also "suspended" the reciprocal tariffs imposed on products from countries other than China "in recognition of the sincere intentions by many other trading partners to facilitate a resolution to the national emergency declared in [EO] 14257." Doc. 21-1 at 180. That, however, has no bearing on the jurisdictional issue currently before the Court.

[3] Last week, the United States and China reached an agreement to temporarily reduce the reciprocal tariffs to 10%, *see* https://www.whitehouse.gov/briefings-statements/2025/05/joint-statement-on-u-s-china-economic-and-trade-meeting-in-geneva/, but that agreement does not moot this case or Defendants' motion to transfer because (1) the reduction is only for 90 days, (2) the challenged reciprocal tariffs imposed by EO 14257 were not fully eliminated, and (3) the challenged tariffs imposed by EOs 14195 and 14228 remain fully in effect.

Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code." *Id.* at 27, 78, 95, 175, 179.

Several of the EOs directed the Secretary of Homeland Security to make the necessary modifications to the Harmonized Tariff Schedule of the United States (HTSUS) to effectuate the increased tariffs, *see, e.g.,* at 19, 23, 29, which she subsequently did, *id.* at 69-76, 81-93. However, EO 14257 directly modified the HTSUS to include the increased tariffs provided for in that EO. *Id.* at 101, 142-63.

## Procedural History

On April 3, 2025, Plaintiff Emily Ley Paper, Inc. (ELP), filed suit in this Court against the President and other Executive Branch officials and agencies (collectively "Defendants") alleging that the increased tariffs on Chinese imports will adversely impact its business through higher costs, reduced demand, and lost profits. A month later, an amended complaint was filed adding four additional plaintiffs who, like ELP, are allegedly adversely affected by the additional tariffs because they make significant purchases from suppliers in China.

Like the original complaint, the amended complaint seeks declaratory and injunctive[4] relief invalidating the tariffs and the modifications to the HTSUS because, according to Plaintiffs, IEEPA does not authorize the imposition of tariffs

---

[4] Plaintiffs did not seek a temporary restraining order, preliminary injunction, or any other form of expedited disposition of the merits of their claims, but they did request an expedited ruling on the motion to transfer in their response to that motion. *See* Doc. 21 at 35-36.

(Count I); the President has not shown that the additional tariffs on Chinese imports are "necessary" to address the declared national emergency (Count II); IEEPA violates the nondelegation doctrine to the extent that it authorizes the imposition of tariffs (Count III); and the modifications to the HTSUS violate the Administrative Procedure Act (APA) (Count IV).

Defendants responded to the complaint with a motion to transfer this case to the United States Court of International Trade (CIT)[5] under 28 U.S.C. §1631.[6]  The motion is fully[7] briefed and is ripe for a ruling.  Oral argument is not needed to rule on the motion.  *See* N.D. Fla. Loc. R. 7.1(K) ("The Court may—and most often does—rule on a motion without oral argument, even if a party requests oral argument").

## Analysis

The amended complaint raises interesting and important issues about the scope and extent of the President's powers under IEEPA, but those issues are not

---

[5]  The CIT, like this Court, is an "Article III court" with judges who are nominated by the President, confirmed by the Senate, and have life tenure and salary protection, *see* 28 U.S.C. §§251(a), 252, and as its name suggests, it has jurisdiction over cases involving trade issues.

[6]  This statute "authorizes inter-court transfers … to cure want of jurisdiction," and it can be used to transfer a case to the CIT when that court has exclusive jurisdiction over the subject-matter of the case.  *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 366 n.3 (1998).

[7]  The parties and amici submitted over 170 pages of briefing on the motion to transfer.

currently before the Court.[8]  Instead, the narrow issue framed by Defendants' motion to transfer is which court has jurisdiction to adjudicate the substantive issues raised in the amended complaint—this Court or the CIT.

To answer that jurisdictional question, the Court first looks to the statute cited by Plaintiffs as the basis for invoking this Court's jurisdiction.  That statute—28 U.S.C. §1331—broadly grants the district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  The claims alleged in the complaint clearly arise under a federal law—IEEPA and the APA—so at first blush, it appears that this Court has jurisdiction under §1331 to adjudicate those claims.

Defendants do not dispute that the claims alleged in the complaint arise under the "laws … of the United States."  Instead, they argue that another statute—28

---

[8]  Despite this, only one of the three amicus briefs filed in support of Plaintiffs couched its arguments in terms of jurisdiction, *see* Doc. 32-1 at 2, 26 (Brennan Center for Justice); the other two were essentially merits briefs because they did not include any analysis of the jurisdictional issue framed by Defendants' motion to transfer, *see* Doc. 26-1 ("former high ranking governmental officials and professors"); Doc. 27-1 (Cato Institute).  The Court recognizes that there is overlap between the jurisdictional issue and the merits, but contrary to Plaintiffs' argument that "the decision on whether IEEPA is a tariff statute and whether this court has jurisdiction to hear the case must rise and fall together," Doc. 21 at 35, there must be at least a little daylight between those issues.  Otherwise, the "former high ranking governmental officials and professors" could not have credibly argued, as they did in *V.O.S. Selections, Inc. v. Trump*, CIT Case No. 1:25-cv-66, ECF No. 31, at 11, 34, that the CIT should issue a preliminary injunction in favor of the plaintiffs in that case because the CIT could only grant that relief if it has jurisdiction over the case and it arguably only has jurisdiction if IEEPA "provides for" tariffs.

U.S.C. §1581—divests this Court of jurisdiction by granting the CIT exclusive jurisdiction over cases involving tariffs.

The Supreme Court has held that the district courts are "divested of jurisdiction" over an action that falls "within one of [the] several specific grants of exclusive jurisdiction to the [CIT]" in §1581.  *K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182-83 (1988).  Likewise, the Federal Circuit[9] has held that §1581 "removes specific actions from the general federal-question jurisdiction of the district courts (under 28 U.S.C. §1331) and places them in the jurisdiction of the [CIT]."  *Orleans Int'l, Inc. v. United States*, 334 F.3d 1375, 1378 (Fed. Cir. 2003). Thus, resolution of Defendants' motion to transfer boils down to whether the claims asserted in the complaint fall within §1581 because if they do, this Court lacks jurisdiction over those claims.

Section 1581 establishes the jurisdiction of the CIT and grants that court "exclusive jurisdiction" over disputes arising under certain laws, including specific sections of the Tariff Act of 1930, the Trade Act of 1974, and the Trade Agreements Act of 1979, *see* 28 U.S.C. §1581(a)-(g), (j), and certain pre-importation rulings of the Secretary of Treasury, *id.* at §1581(h).  Additionally, and most pertinent to the

---

[9] The Federal Circuit is the court of appeals that reviews the final decisions of the CIT, *see* 28 U.S.C. §1295(a)(5), so its opinions pertaining to §1581 and trade-related issues are particularly persuasive.

issues framed by Defendants' motion to transfer, §1581 grants the CIT "exclusive

jurisdiction" over:

> any **civil action** commenced **against the United States**, its agencies,
> or its officers, that **arises out of any law** of the United States **providing
> for**—
>
>     &ast; &ast; &ast;
>
>  (B) **tariffs**, duties, fees, or other taxes **on the importation of
> merchandise** for reasons other than the raising of revenue ….
>
>     &ast; &ast; &ast;
>
>  (D) **administration and enforcement** with respect to the matters
> referred to in subparagraphs (A) through (C) of this paragraph ….

*Id.* at §1581(i)(1) (emphasis added).

This is a civil action commenced against the United States and it "arises out

of" a federal law—IEEPA—so the dispositive question framed by the parties' filings

is whether IEEPA "provid[es] for … tariffs." Defendants contend that it does;

Plaintiffs contend that it doesn't. The Court agrees with Defendants for the reasons

that follow.

IEEPA grants the President broad economic powers to deal with "any unusual

and extraordinary [foreign] threat … to the national security, foreign policy, or

economy of the United States" on which a national emergency has been declared.[10]

---

[10] The amicus brief filed by the Brennan Center for Justice (Doc. 32-1) includes an
extensive dissertation about the history of the NEA and the limitations it imposed on the President's
power to declare national emergencies, but the brief stops short of arguing (1) that the President

50 U.S.C. §1701(a).  Most pertinent here, those powers include the authority to "regulate … importation … of … any [foreign] property … by any person … subject to the jurisdiction of the United States" "by means of instructions, licenses, or otherwise."  50 U.S.C. §1702(a)(1)(B)

The parties and amici have not cited—and the Court has not located—any case from the Supreme Court, the Federal Circuit, or the Eleventh Circuit addressing whether the authority granted by IEEPA to "regulate importation" of foreign property includes the power to impose import tariffs on such property.  However, that question was effectively answered 50 years ago by the predecessor court to the Federal Circuit—the Court of Customs and Patent Appeals (CCPA)—when it held that the statute on which IEEPA was patterned authorized the President to impose import duties.  *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975).

*Yoshida* involved a challenge to a presidential proclamation that imposed an additional "import duty surcharge" of up to 10% on "all dutiable articles."  *Id.* at 567.  The predecessor court to the CIT—the Customs Court—invalidated the duty because it concluded that the duty exceeded the President's delegated powers under the two trade acts cited in the proclamation and the Trading with the Enemy Act

---

exceeded his authority by declaring the national emergencies on which the tariffs at issue in this case were based, or (2) that this Court (or any court) has the authority to review the merits of those declarations.  Moreover, any argument about the scope of the President's authority under the NEA or the propriety of his exercise of that authority in this case would be an academic exercise because the amended complaint expressly disclaims any challenge to the declarations of the emergencies underlying the tariffs at issue in this case.  *See* Doc. 20 at ¶5 (last sentence).

(TWEA).[11]  *Id.* at 569-71.  The CCPA reversed because it concluded that the authorization provided by TWEA to "regulate importation" included the power to impose duties on imports.  *Id.* at 576.

The CCPA reasoned that the power to regulate commerce necessarily includes the power to tax and lay duties on imports, *id.* at 575 n.20 (citing cases), and that TWEA's broad delegation of authority to regulate "by means of instructions, licenses, or otherwise" authorized the President to impose import duties, *id.* at 576 (emphasis added).  The reasoning in *Yoshida* is persuasive, and the Court sees no reason why it would not apply to IEEPA because the operative language of IEEPA is identical to the operative language in TWEA.  *Compare* 50 U.S.C. §1702(a)(1)(B) (IEEPA) *with* 50 U.S.C. §4305(b)(1)(B) (TWEA); *see also Regan v. Wald*, 468 U.S. 222, 228 (1984) (noting that the powers granted to the President in IEEPA are "essentially the same as" those in TWEA).  Thus, based the reasoning in *Yoshida*, IEEPA is a "law … providing for … tariffs."[12]

---

[11]  The proclamation did not cite TWEA as a source of its authority, but the Government argued (and the Customs Court agreed) that the two trade acts cited in the proclamation were not the "sole sources of authority" for the import duty surcharge because the proclamation stated that the President was "acting under the authority vested in [him] by the Constitution and statutes, including, but not limited to" the two trade acts.  *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155, 1168 (Cust. Ct. 1974) (emphasis added).

[12]  This is not intended to be a determination of the merits of Plaintiffs' claims regarding the legal authority for the tariffs because even though there is some overlap in the jurisdictional issue currently before the Court and the merits of Plaintiffs' claims, this Court only has jurisdiction to decide the jurisdictional issue.  Thus, it will be up to the CIT to determine how, if at all, the jurisdictional determination that IEEPA is a "law … providing for … tariffs" impacts the merits of Plaintiffs' claims.

Plaintiffs resist this conclusion by arguing that (1) IEEPA "does not refer to tariffs or any synonym for that word"; (2) the authority to "regulate" imports does not include the authority to tax them through tariffs; (3) IEEPA is unlike other tariff laws; and (4) construing IEEPA to authorize the imposition of tariffs would contravene the "major questions" doctrine.  None of these arguments are persuasive, at least insofar as they implicate the jurisdictional question framed by Defendants' motion to transfer.

The first three arguments were considered, and rejected, by the CCPA in *Yoshida* when construing the identically worded TWEA.  *See* 526 F.2d at 573-78. Although Plaintiffs argue that the analysis used by the court in *Yoshida* to interpret the scope of authority delegated by TWEA is "obsolete and discredited," that decision is binding precedent in the Federal Circuit[13] and this Court agrees with the

---

Moreover, the conclusion that IEEPA is a "law … providing for … tariffs" does not necessarily mean that the tariffs at issue in this case are lawful because, as recognized in *Yoshida*, "[t]he President's choice of means of execution must also bear a <u>reasonable relation</u> to the particular emergency confronted."  526 F.2d at 579 (emphasis added); *see also id.* at 583 (explaining that "[t]he mere incantation of a 'national emergency' cannot … sound the death-knell of the Constitution" and that "[t]he declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules," but also recognizing that the delegation of broad authority to the President in the area for foreign affairs "should not be hemmed in or 'cabined, cribbed, confined' by anxious judicial binders") (quoting *S. Puerto Rico Sugar Trading Co. v. United States*, 334 F.2d 622, 632 (Ct. Cl. 1964)).  However, the question of whether the tariffs at issue in this case are "reasonably related" to the national emergencies declared by the President is an issue for the CIT (not this Court) to decide in the first instance.

[13] *See South Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (holding that the decisions of the CCPA announced on or before September 30, 1982, are "binding as precedent" in the Federal Circuit).

CCPA's bottom-line conclusion that the authority to "regulate imports" includes the authority to impose tariffs or duties on imports as a means of regulation. *Id.* at 575 n.20 ("Though the power to tax and to lay duties on imports and the power to regulate commerce are distinct, it is well established that the first power can be employed in the exercise of the second."). Moreover, using the definition of "regulate" proffered by Plaintiffs, *see* Doc. 21 at 16 (quoting *Regulate*, Black's Law Dictionary (4th ed. 1968)), the imposition of a tariff can be reasonably viewed as the "regulation" of importation because it "fix[es]," "establish[es]," and "direct[s] by rule or restriction" a condition on which imports are allowed—i.e., upon payment of the tariff.

The argument regarding the major questions doctrine presents a slightly closer question because, as Plaintiffs argue, the Supreme Court has in recent years more closely scrutinized efforts of the Executive Branch to use old statutes in novel ways that have significant political or economic impacts. *See*, *e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023); *West Virginia v. EPA*, 597 U.S. 697 (2022); *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109 (2022). However, assuming the major questions doctrine applies in this context,[14] the Court agrees with Defendants that Congress provided the "clear authorization" required under the modern major questions doctrine cases when it incorporated TWEA's operative language—along

---

[14] *See* Doc. 35 at 14-15 (arguing that the major questions doctrine is not implicated where, as here, the statute at issue delegates authority directly to the President on matters involving national security and foreign policy).

with *Yoshida*'s judicial gloss on that language—into IEEPA verbatim. *See generally Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change. So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.") (internal citations omitted); *see also Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123, 131 (2019) (applying this principle to settled precedent from the Federal Circuit in an area of law over which that court had exclusive appellate jurisdiction).

On the latter point, the Court did not overlook Plaintiffs' argument that there is nothing in the legislative history of IEEPA showing that it was intended to authorize the imposition of tariffs. However, it is noteworthy that Plaintiffs do not point to anything in the legislative history of IEEPA showing that its operative provisions were intended to have different meanings than the identical provisions of TWEA. Thus, putting aside the question of whether legislative history should carry any weight when construing a statute, *see Lawson v. FMR LLC*, 571 U.S. 429, 459-

13

60 (2014) (Scalia, J., concurring in the judgment), IEEPA's legislative history is

certainly not dispositive here.[15]

_____

[15] The Court recognizes that, after the Customs Court's decision in *Yoshida*, Congress passed a specific statute authorizing the President to impose temporary import surcharges to address trade imbalances like those that gave rise to the proclamation at issue in *Yoshida*. *See* 19 U.S.C. §2132. That statue provided the authority that the Customs Court found lacking for the proclamation at issue in *Yoshida*, but the Court sees nothing in the language of that statute, or the act amending TWEA and creating IEEPA, that undermines the CCPA's subsequent decision finding that the proclamation was authorized by TWEA—particularly since the CCPA explained that the authority provided by the TWEA is supplemental to the authority provided in other statutes. *See Yoshida*, 526 F.2d at 578 ("The existence of limited authority under certain trade acts does not preclude the existence of other, broader authority under a national emergency powers act."). Moreover, although *Yoshida* included a footnote stating in dicta that "[a] surcharge imposed after [the effective date of §2132] must, of course, comply with th[at] statute," *id.* at 581 n.33, the Court does not read that footnote to undermine the CCPA's explicit holding that the authority to "regulate importation" includes the power to impose duties and tariffs—at least insofar as the duties or tariffs are imposed based on something other than a mere trade imbalance.

The Court also did not overlook the legislative history extensively discussed in the amicus briefs filed by the "former high ranking governmental officials and professors" and the Brennan Center for Justice, but that history is not as definitive as those amici argue. The committee report on the bill through which IEEPA was enacted explained that the bill "separate[d] war and nonwar authorities and procedures, preserving existing Presidential powers in time of war declared by Congress, and providing somewhat narrower powers subject to congressional review in times of 'national emergency' short of war." H. Rep. No. 95-459, at 1 (1977); *see also id.* at 10 (explaining that the bill created and conferred on the President "a new set of international economic powers, more restricted than those available during time of war"). However, when analyzing the grant of authority that is now codified in 50 U.S.C. §1702, the report stated that it "basically parallels" the grant of authority in TWEA with four specific exceptions: "(1) the power to vest, i.e., to take title to foreign property; (2) the power to regulate purely domestic transaction; (3) the power to regulate gold or bullion; and (4) the power to seize records." *Id.* at 14-15 (footnote omitted); *see also id.* at 10 (explaining that powers granted by IEEPA were intended to be "sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies"). Thus, although the committee report suggests that IEEPA was intended to grant more limited powers to the President than he had under TWEA, the report does not show that the authority to impose import duties was one of the excepted powers. Moreover, because the legislative history shows that Congress was specifically aware of the prior use of TWEA to impose import duties and the *Yoshida* decision upholding that use, *id.* at 5, the fact that such power was not specifically excepted from the powers granted by IEEPA supports an inference that IEEPA (like TWEA) includes that power. *Cf.* 50 U.S.C. §1702(b) (providing other specific exceptions to the authority granted to the President under IEEPA).

The conclusion that IEEPA authorizes the imposition of tariffs does not end the Court's analysis because the jurisdictional grant in §1581(i)(1)(B) is limited to actions arising out of statutes that provide for tariffs "for reasons other than the raising of revenue." Thus, if the only purpose of the tariffs authorized by IEEPA was to raise revenue, then §1581(i)(1)(B) would not apply.

The regulatory authority granted by IEEPA is for the purpose of dealing with "threat[s] … to the national security, foreign policy, or [the] economy of the United States," 50 U.S.C. §1701(a), not raising revenue. Likewise, the stated purpose of the tariffs at issue in this case is to help stem the flow of illicit drugs into the United States and to remedy an ongoing trade imbalance, not to raise revenue. The fact that the tariffs may have an incidental benefit to the public fisc (and the fact that the President has touted the additional revenues that the government will receive from the tariffs) is not enough to show that the reason for them was to raise revenue. That being the case, this case falls within the exclusive jurisdiction of the CIT under §1581(i)(1)(B).[16]

---

[16] Based on this conclusion, the Court need not consider the argument raised by the America First Legal Foundation (AFLF) in its amicus brief that the CIT also has jurisdiction over this case under §1581(i)(1)(C) because IEEPA authorizes the President to impose "embargos" for reasons unrelated to public health or safety. That said, even if AFLF is correct that IEEPA is a statute providing for embargos, it is hard to see how that would give the CIT jurisdiction over a case arising out of the imposition of tariffs, not an "embargo" as that term is commonly understood. *See K-Mart*, 485 U.S. at 184 (explaining that "an embargo is a government order prohibiting commercial trade with individuals or businesses of other nations" and "a policy which prevents goods from entering a nation") (cleaned up). That is true even though the practical effect of a 145% tariff may be the same as an embargo.

This conclusion is consistent with two recent decisions—one from the CIT and one from a Montana district court—in cases challenging the tariffs imposed by the EOs at issue in this case. The CIT decision, *V.O.S. Selections, Inc. v. Trump*, Case No. 1:25-cv-66, ECF No. 13 (Ct. Int'l Trade Apr. 22, 2025), does not expressly analyze that court's jurisdiction over challenges to tariffs imposed under IEEPA, but by denying the plaintiff's motion for a temporary restraining order on the merits and establishing a briefing schedule on the plaintiff's motion for a preliminary injunction, the CIT at least implicitly determined that it had jurisdiction to consider challenges to the tariffs even though they were imposed under IEEPA.[17] The Montana district court decision, *Webber v. U.S. Dep't of Homeland Sec.*, 2025 WL 1207587 (D. Mt. Apr. 25, 2025), did address the jurisdictional issue framed by Defendants' motion to transfer and it expressly (and persuasively) concluded that it did not have jurisdiction to consider a challenge to the tariffs imposed on imports

---

Likewise, the Court need not consider whether this case also (or alternatively) falls within the exclusive jurisdiction of the CIT under §1581(i)(1)(D). Defendants cited that provision in passing in their motion to transfer, but it was not until their reply to the amicus briefs that they fleshed out how the CIT's exclusive jurisdiction under that statute might be implicated. *See* Doc. 36 at 13 ("[P]laintiffs' challenge—by contesting the [HTSUS] and asking the Court to order the government to modify that schedule—meets a broader provision of the CIT's exclusive-jurisdiction statute because plaintiffs' challenge is to the 'administration and enforcement *with respect to* the matters *referred to* in subparagraph[]' (B).") (quoting 28 U.S.C. §1581(i)(1)(D)) (emphases in original).

[17] This implicit jurisdictional determination was confirmed at the oral argument on the plaintiff's motion for preliminary injunction in *V.O.S.* when the presiding judge specifically commented about the "appropriate[ness]" of that case being heard in "a national courthouse [sic] with exclusive jurisdiction." Doc. 35-1 at 6. That view was not questioned by any of the other judges on the panel.

from Canada by the same EOs at issue in this case because the CIT had exclusive jurisdiction to hear that challenge even though the EOs were based on IEEPA.

The conclusion that the CIT has jurisdiction over this case is not undercut by Plaintiffs' argument that district courts routinely exercise jurisdiction over cases arising out of other executive actions under IEEPA. *See* Doc. 21 at 31-32. First, it does not appear that any of the cases cited by Plaintiffs in support of this argument involved executive actions that potentially implicated any of the statutory grants of exclusive jurisdiction to the CIT like this case plainly does. Second, consistent with Plaintiffs' argument that the CIT does not have jurisdiction over all Endangered Species Act (ESA) actions simply because it has jurisdiction over actions challenging "embargos" authorized by the ESA, *id.* at 31, 33-34 (discussing *Earth Island Inst. v. Christopher*, 6 F.3d 648 (9th Cir. 1993)), the district courts do not have jurisdiction over all IEEPA actions simply because some actions under that act plainly fall outside the CIT's limited jurisdiction.

The conclusion that this case should be transferred to the CIT furthers §1581's purpose of "ensur[ing] uniformity in the judicial decisionmaking process" on trade issues. *K-Mart Corp.*, 485 U.S. at 188 (quoting H.R. Rep. No. 96-1235, p. 47 (1980)). Moreover, as AFLF persuasively argues in its amicus brief, it "makes perfect sense" to channel suits like this to the CIT because:

> it ensures a single trial-level court hears challenges to civil suits arising out of statutes related to certain trade actions that are national—really,

international—in effect. Rather than a multitude of challenges brought in different district courts whenever the President invokes such a law, with each court potentially reaching contradictory determinations, there will instead be a single court reaching a single determination.

Doc. 7-1 at 13. Indeed, at this point, it makes no sense for this case to remain in this Court because the CIT is already considering multiple nearly identical suits and the panel of judges[18] presiding over two of those cases held a preliminary injunction in one of the cases (*V.O.S.*) last week and scheduled a preliminary injunction/summary judgment hearing in the other case (*State of Oregon v. Trump*, CIT Case No. 1:25-cv-77) for tomorrow.

## Conclusion

In sum, for the reasons stated above, it is **ORDERED** that:

1.     Defendants' motion to transfer (Doc. 5) is **GRANTED**, and this case is **TRANSFERRED** to the United States Court of International Trade under 28 U.S.C. §1631.

2.     The Clerk shall effectuate the transfer and then close this case.[19]

---

[18] Another benefit of transferring this case to the CIT is that, unlike this Court, the CIT has the authority to decide cases like this with a panel of three judges. *See* 28 U.S.C. §255 (authorizing the chief judge of the CIT to "designate any three judges of the court to hear and determine any civil action which the chief judge finds: (1) raises an issue of the constitutionality of an Act of Congress, a proclamation of the President or an Executive order; or (2) has broad or significant implications in the administration or interpretation of the customs laws.").

[19] The Court declines to stay the transfer so Plaintiffs can seek appellate review of this order, *see* Doc. 21 at 37 n.11 (requesting that relief), because the Eleventh Circuit expressly held in *Alimenta (USA), Inc. v. Lyng*, 872 F.2d 382 (11th Cir. 1989), that transfer orders under §1631 are not appealable, either as final orders or under the collateral order doctrine. This does not leave Plaintiffs without a remedy because they can raise the jurisdictional issue in the CIT and, subject

**DONE AND ORDERED** this 20th day of May, 2025.

_____
**T. KENT WETHERELL, II
UNITED STATES DISTRICT JUDGE**

---

to law-of-the-case principles, that court can revisit this Court's jurisdictional determination. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). Additionally, if the CIT determines that it has jurisdiction (or, at least, that "the transfer decision [was] plausible," *id.* at 819) and rules against Plaintiffs on the merits, they can raise the jurisdictional issue on appeal in the Federal Circuit. *See Alimenta*, 872 F.2d at 385.