Harvey Rosenfield, SBN 123082
William Pletcher, SBN 212664
**CONSUMER WATCHDOG**
6330 San Vicente Blvd., Suite 250
Los Angeles, CA 90048
Tel. (310) 392-0522
Fax (310) 861-0862
harvey@consumerwatchdog.org
will@consumerwatchdog.org

Alan Butler Morrison *(Admitted Pro Hac Vice)*
**GEORGE WASHINGTON LAW SCHOOL**
2000 H Street NW
Washington, DC 20052
Tel. (202) 994-7120
abmorrison@law.gwu.edu

Donald B. Cameron *(Admitted Pro Hac Vice)*
Edward John Thomas III *(Admitted Pro Hac Vice)*
R. Will Planert *(Admitted Pro Hac Vice)*
**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Avenue, Suite 800
Washington D.C. 20036
Tel. (202) 216-4800
dcameron@mmmlaw.com
ethomas@mmmlaw.com
wplanert@mmmlaw.com

*Attorneys for Proposed Amicus Curiae Consumer Watchdog*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA and GAVIN NEWSOM, in his official capacity as Governor of California,<br><br>        Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, et al.,<br><br>        Defendants. | Case No. 3:25-cv-03372-JSC<br><br>**UNOPPOSED MOTION OF CONSUMER WATCHDOG FOR LEAVE TO FILE AMICUS CURIAE BRIEF; [PROPOSED] BRIEF FOR AMICUS CURIAE CONSUMER WATCHDOG**<br><br>Hon. Jacqueline Scott Corley |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................2

UNOPPOSED MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF ...................................5

INTEREST OF THE AMICUS CURIAE ...............................................................................7

DISCUSSION ...............................................................................................................8

THE COURT SHOULD CONSTRUE IEEPA TO PRECLUDE THE PRESIDENT FROM USING IT TO ISSUE ANY TARIFFS, THEREBY AVOIDING HAVING TO DECIDE WHETHER THE DELEGATION OF THAT POWER IS UNCONSTITUTIONAL. ..................................................................................................8

I.     IEEPA Does Not Confer Unambiguous Authority to Impose Tariffs. ......................8

       A.     IEEPA's Focus on Foreign Property Interests Undermines Defendants' Interpretation. ..........................................................................................9

II.    The Major Questions Doctrine Counsels Against Presidential Tariff Authority Under IEEPA. ..................................................................................................9

III.   If IEEPA Authorizes the President to Impose Tariffs, It Would Constitute an Unconstitutional Delegation of Legislative Authority..........................................10

       A.     IEEPA's Sweeping Grant of Discretion Lacks Any Meaningful Guardrails. ............10

       B.     Precedent Confirms the Limits of Delegation in Tariff and Regulatory Contexts. ..............................................................................................13

       C.     The Recent FCC Case Underscores the Government's Own Concessions on Delegation Limits..................................................................................15

       D.     Judicial Review Cannot Cure the Absence of Legislative Limits. ...........................19

       E.     *Yoshida* Is No Defense—And Was Wrongly Decided. ...............................20

       IEEPA's Delegation, If Upheld, Would Sanction Rule by Executive Fiat............................21

CONCLUSION.............................................................................................................21

BRIEF FOR AMICUS CURIAE CONSUMER WATCHDOG

1

# TABLE OF AUTHORITIES

2

**Cases**

*A. L. A. Schechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935) ..................................................................19

*Am. Inst. for Int'l Steel v. United States,*
   806 Fed. Appx. 982 (Fed. Cir),
   *cert. denied*, 141 S. Ct. 133 (2020) ....................................20

*Am. Inst. for Int'l Steel v. United States,*
   376 F. Supp.3d 1335, (2019) ....................................................20

*Biden v. Nebraska*, 600 U.S. 477 (2023) ...................................10

*FCC v. Consumer Research,*
   Supreme Court of U.S., 24-354,
   argued March 26, 2025...........................................11,13,15,16,17

*FCC v. Consumer Research,*
   109 F.4th 743 (2024) ..............................................................15

*Federal Energy Administration v. Algonquin SNG, Inc.,*
   426 U.S. 548 (1976) ..............................................................19

*Gundy v. United States,*
   588 U.S. 128 (2019) .........................................................13, 14, 15, 18

*Hoptowit v. Ray,*
   682 F. 2d 1237 (9th Cir. 1982),  ..............................................6

*J.W. Hampton, Jr., & Co. v. United States,*
   276 U.S. 394 (1928) ..............................................................13

*Marshall Field & Co. v. Clark,*
   143 U.S. 649 (1892)..........................................................13, 14

*Michael Simon Design, Inc. v. United States,*
   609 F.3d 1335 (Fed. Cir. 2010)..............................................19

*Mistretta v. United States,*
   488 U.S. 361 (1989)..............................................................14

*Paul v. United States,*
   140 S. Ct. 342 (2019) ............................................................15

*Robertson v. Seattle Audubon Society,*
   503 U.S. 429 (1992)..............................................................10

*Sandin v. Conner,*
   515 U.S. 472 (1995)..............................................................6

*Sonoma Falls Devs., LLC v. Nevada Gold & Casinos, Inc.,*
   272 F. Supp. 2d 919 (N.D. Cal. 2003) ....................................5

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

*United States v. Yoshida International, Inc.*,
    526 F.2d 560 (CCPA 1975) ...............................................................................20, 21

*V.O.S. Selections, Inc. v. Trump*,
    Court of International Trade, No 25-00066,
    April 30, 2025 ...............................................................................................19

*West Virginia v. Environmental Protection Agency*,
    597 U.S. 697 (2022) .......................................................................................10

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)...............................................................................14, 15, 21

*Yakus v. United States*,
    321 U.S. 414 (1944).......................................................................................18

*Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ...........................................................................................10

## Statutes

18 U.S.C. § 3551 .......................................................................................................14

19 U.S.C. § 1336 .........................................................................................................8

19 U.S.C. § 1862 ...........................................................................................8, 16, 19, 20

19 U.S.C. § 2251 .........................................................................................................8

19 U.S.C. § 2411 .........................................................................................................8

42 U.S.C. § 7408 .......................................................................................................15

42 U.S.C. § 7409 .......................................................................................................14

47 U.S.C. § 254 .........................................................................................................16

50 U.S.C. § 1701 .......................................................................................................18

50 U.S.C. § 1702 ...........................................................................................8, 9, 10, 12, 19

50 U.S.C. § 1701 .........................................................................................................1

## Other Authorities

Article I, Constitution of the United States.............................................................9, 12

Executive Order 14245 (March 24, 2025) ...............................................................11

Mishkin, Shaina, *Trump Reaffirms Tariffs in Truth Social Post. It Will Be an Uneasy
    Weekend for Investors,* Barron's (Apr. 5, 2025) ...............................................10

Proclamation No. 9705, 83 Fed. Reg 11625 (Mar. 15, 2018)...............................20

Reed Smith, Trump Compliance Resource Hub, Tariff Tracker .......................................12

BRIEF FOR AMICUS CURIAE CONSUMER WATCHDOG

Trump, Donald (@realDonaldTrump), Truth Social (Apr. 5, 2025, 5:34 A.M.)................................ 10

Washington Post, *White House eased China tariffs after warnings of harm to
    "Trump's people"*, May 15, 2025  .............................................................................12

BRIEF FOR AMICUS CURIAE CONSUMER WATCHDOG

**UNOPPOSED MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF**

Consumer Watchdog respectfully seeks the Court's leave to file the attached brief as amicus curiae in support of Plaintiffs.

Consumer Watchdog is a non-profit, non-partisan public interest organization based in California. It is dedicated to protecting consumers from economic harm caused by unfair market practices, corporate abuses, and improper governmental actions. For four decades, Consumer Watchdog has advocated on behalf of consumers through litigation, advocacy, and public education. Although Consumer Watchdog has not previously appeared in this litigation, its mission is directly implicated by the questions at issue. This case concerns President Trump's unprecedented imposition of tariffs under the International Emergency Economic Powers Act (IEEPA), which raises serious questions about the constitutional separation of powers and the potential economic impact on California consumers. Tariffs of the magnitude at issue here inevitably raise consumer prices and threaten the economic security of working families and small businesses in California. Because the outcome of this case may affect markets, trade practices, and consumer welfare beyond the immediate parties, Consumer Watchdog's perspective will assist the Court in reaching a just decision.

Consumer Watchdog has a special interest in the subject matter and outcome of this case because the challenged tariffs function as a regressive tax that disproportionately burdens working families and economically vulnerable consumers. Interpreting IEEPA to authorize such sweeping and unchecked presidential power not only threatens constitutional separation of powers, but also exposes consumers to arbitrary and unaudited price increases—effectively allowing the executive branch to impose tax-like burdens without congressional approval. Such a reading risks turning emergency powers into a novel backdoor taxing power that undermines consumer protections, economic fairness, and democratic accountability.

The issues in this matter are also of significant importance to California consumers. "District courts frequently welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved . . . ." *Sonoma Falls Devs., LLC v. Nevada Gold & Casinos, Inc.*, 272 F. Supp. 2d 919, 925 (N.D. Cal. 2003). "[A] district court has broad discretion to appoint

1  amici curiae." *Hoptowit v. Ray*, 682 F. 2d 1237, 1260 (9th Cir. 1982), *overruled on other grounds*,

2  *Sandin v. Conner*, 515 U.S. 472 (1995).

3      The attached proposed amicus brief is offered to provide the Court with additional analysis of

4  IEEPA and the doctrine of constitutional avoidance as they pertain to the President's tariff authority. In

5  particular, Consumer Watchdog's brief explains why Congress's delegation of tariff-setting power

6  without explicit limits raises serious statutory and constitutional concerns, which supports Plaintiffs'

7  position that the challenged tariffs exceed the President's lawful authority. The proposed brief, submitted

8  with this motion, is intended to assist the Court in its consideration of the issues presented by this case.

9      Counsel for Consumer Watchdog has contacted counsel for the parties. Plaintiffs and Defendants

10 have indicated that they do not oppose filing of the proposed brief.

11     For these reasons, Consumer Watchdog respectfully requests that the Court grant leave to file the

12 attached amicus curiae brief.

13 Dated:  May 23, 2025              By:    */s/ William Pletcher*
                                          William Pletcher (SBN: 212664)
14                                        CONSUMER WATCHDOG
                                          6330 San Vicente Blvd., Suite 250
15                                        Los Angeles, CA 90048
                                          Telephone: (310) 392-0522
16                                        Fax: (310) 392-8874
                                          will@consumerwatchdog.org
17
                                          Attorney for Proposed Amicus Curiae
18

19

20

21

22

23

24

25

26

27

28

BRIEF FOR AMICUS CURIAE CONSUMER WATCHDOG

1

**INTEREST OF THE AMICUS CURIAE**

Consumer Watchdog (CW) respectfully submits this brief as amicus curiae in support of Plaintiffs State of California and Governor Gavin Newsom. CW is a nonpartisan, nonprofit public-interest organization dedicated to protecting consumers by advocating for consumer rights, economic fairness, and government accountability. For four decades, CW has vigorously protected consumers from economic harms caused by unfair market practices, corporate abuses, and improper governmental action.

CW's interest in this case flows directly from its mission to protect consumers—especially working families and economically vulnerable communities—from unjustifiable financial harm. President Trump's unprecedented use of tariffs, purportedly authorized under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1710. (IEEPA), directly threatens consumers' economic security. These tariffs inevitably raise prices, impairing consumers' ability to afford essential goods and services. Further, the tariffs disproportionately affect working families by imposing regressive costs, destabilizing markets relied upon by consumers and small businesses, and risking significant economic downturn and job losses.

The question in this case is not whether the tariffs are good or bad policy, but whether any President has the legal authority to do what this President did. Amicus agrees with the State that the President lacks the statutory authority under the IEEPA (or any other law) to impose the tariffs at issue here. It is submitting this brief to offer an additional reason why this Court should agree with the State's reading of IEEPA.

If IEEPA is read as the President does, that would require the Court to decide whether IEEPA would violate the prohibition against Congress delegating legislative power to the President. As this brief explains, there are no explicit limits or guardrails in IEEPA that prevent the President from doing whatever he pleases with tariffs, including imposing them on any or all countries, raising them as high as 145 percent, and stacking them on top of other existing tariffs. The doctrine of constitutional avoidance thus provides a further reason to construe IEEPA as the State does and to hold that the challenged tariffs are not authorized as a matter of statutory construction, without having to reach the very substantial questions about the constitutionality of the delegation here.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

As the complaint and Plaintiffs' moving papers show, President Trump has imposed tariffs on the three largest trading partners with the United States (and California), as well as other universal and reciprocal tariffs on most (but not all) other countries. It is not simply that these tariffs were imposed once and have remained unchanged; there have been almost constant on-again, off-again changes for selected tariffs and countries, which is the epitome of a lawless and capricious regime—one for which IEEPA provides no statutory justification. To illustrate the uncertainty that this back and forth has produced and to further assist the Court and the parties, CW has prepared a chart, contained in the Addendum to this brief, that sets forth the most significant of the decisions that imposed, removed, and/or exempted these tariffs to date.

## DISCUSSION

**THE COURT SHOULD CONSTRUE IEEPA TO PRECLUDE THE PRESIDENT FROM USING IT TO ISSUE ANY TARIFFS, THEREBY AVOIDING HAVING TO DECIDE WHETHER THE DELEGATION OF THAT POWER IS UNCONSTITUTIONAL.**

**I.    IEEPA Does Not Confer Unambiguous Authority to Impose Tariffs.**

Section 1702(a)(1)(B) is the operative portion of IEEPA on which the President relies to impose the tariffs at issue in this case. Neither the word "tariff" nor the verb "impose" appear anywhere in section 1702. Conversely, there is a whole volume of the US Code—Title 19—that deals exclusively with tariffs and other trade related subjects, including provisions that expressly delegate to the President the power to impose new tariffs or adjust existing ones, subject to various statutory conditions. Sometimes, the authorization applies only on a product-by-product basis, 19 U.S.C. § 1862 ("section 232"), but may also apply to a specific product from all countries if "serious injury" is found, 19 U.S.C. § 2251 ("section 201"). For others, the tariff can be applied only to the imports from a particular country that has been engaging in particularly unfair trade practices, 19 U.S.C. § 2411 ("section 301"). In some cases, the new tariffs can only apply to products for which there are existing tariffs (19 U.S.C. § 1336(a)), and even then, with a cap of one kind or another, although others (e.g., section 232) have no such limits. The point is that Congress knows very well how to authorize the President, or those in agencies subject to his control, to

BRIEF FOR AMICUS CURIAE CONSUMER WATCHDOG

change the tariffs that Congress has enacted or to fill in where Congress has not acted, and it did not do so in IEEPA.

Subparagraph (B), on which Defendants rely, begins with a string of seven verbs (or combinations of verbs) of which the only one cited by Defendants is "regulate," which is an unusual way to authorize the imposition of tariffs. It then follows with a similar series of nouns, and of these, Defendants cite "importation." To be sure, a person that seeks to import a product must pay any duties owed, but imposing a tariff is normally referred to as a duty, tax or levy; a "regulation" is not normally concerned with what may be imported into this country, and under what conditions. Indeed, Article I, section 8 of the Constitution differentiates between "regulation," as in the power to "Regulate commerce with foreign nations" in clause 3, and the power in clause 1 "To lay and collect taxes, Duties, Imposts and Excises," which is how tariffs are imposed. Absent evidence to the contrary, it is reasonable to assume that, in delegating power to the President through IEEPA, Congress did not intend to use "regulate" as a shorthand for "impose tariffs."

## A. IEEPA's Focus on Foreign Property Interests Undermines Defendants' Interpretation.

Moreover, paragraph (a) applies only to "property in which any foreign country or any national thereof has any interest." This excludes at least two common scenarios where these tariffs might otherwise be thought to apply: (1) a U.S. importer buys products abroad and owns them outright upon arrival in the United States, so that the property is owned entirely by a United States person; and (2) a U.S. automaker operates a foreign plant—for example, in Mexico—that manufactures car parts that it ships to the United States, so that no foreign person has an interest in the imported parts. Even though there are cases where these exclusions don't apply, it would surely be a strange way to grant the President broad-based tariff authority, by using language riddled with exceptions that swallow the rule.

## II. The Major Questions Doctrine Counsels Against Presidential Tariff Authority Under IEEPA.

As the State's brief shows, there are many additional reasons why the Defendants' reading of section 1702 is mistaken or, at the very least, ambiguous as to whether it authorizes the President to use it to impose tariffs at all. This ambiguity brings into play the Supreme Court's "major question" doctrine.

9

*See*, *e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023); *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022). Under it, the courts should presume that Congress did not intend to delegate to an agency (or the President) a power to make significant rules unless Congress clearly so provides, which Congress has not done in section 1702. Finally, there is one presidential posting on Truth Social that accurately characterizes the impact of these tariffs and definitively establishes that the President's actions on tariffs fall in the major question category: they are what he describes as an "economic revolution."[1]

### III. If IEEPA Authorizes the President to Impose Tariffs, It Would Constitute an Unconstitutional Delegation of Legislative Authority.

> Before this country declared independence, the law of England entrusted the King with the exclusive care of his kingdom's foreign affairs. … The People of the United States had other ideas when they organized our Government. They considered a sound structure of balanced powers essential to the preservation of just government, and international relations formed no exception to that principle.

*Zivotofsky v. Kerry*, 576 U.S. 1, 67 (2015) (Scalia, J., dissenting).

There is a final reason to reject Defendants' reading of section 1702. If the Court were inclined to accept that reading, it would then require the Court to decide whether Congress had unconstitutionally delegated to the President the power to make laws that only Congress may make. Utilizing the principle of constitutional avoidance, the Court should read section 1702 as the State does, and in that way avoid the need to rule on the constitutional issue. "As between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [a court's] plain duty is to adopt that which will save the act." *Robertson v. Seattle Audubon Society*, 503 U.S. 429, 441 (1992) (brackets and citation omitted).

### A. IEEPA's Sweeping Grant of Discretion Lacks Any Meaningful Guardrails.

Although the Supreme Court has not struck down a statute on delegation grounds since 1935, it also has never encountered a law like IEEPA as applied to the imposition of tariffs. Before turning to the case law on delegation, including the position of the United States as articulated by the Solicitor General

---

[1]    Donald Trump (@realDonaldTrump), Truth Social (Apr. 5, 2025, 5:34 A.M.), https://truthsocial.com/@realDonaldTrump/posts/114285375813275308; *see also* Shaina Mishkin, *Trump Reaffirms Tariffs in Truth Social Post. It Will Be an Uneasy Weekend for Investors,* Barron's (Apr. 5, 2025), https://www.barrons.com/articles/trump-tariffs-news-truth-social-66efbf8c.

in a case now pending before the United States Supreme Court (*FCC v. Consumer Research,* 24-354, argued March 26, 2025), it is essential to understand that if Congress granted the President the authority in IEEPA to impose tariffs, it put no limits whatsoever on that authority:

- There are no limits in terms of dollars or percentage increases for new or additional tariffs.
- Tariffs may be imposed on goods for which there are no tariffs or for which Congress already has fixed tariffs.
- There is no requirement for an expiration date for any tariff.
- Tariffs may be imposed on a single product or on as many products as the President desires.
- The President may impose a tariff for any reason or no reason, as long as he identifies it in the declaration of emergency, on which he has the final word.
- The President may turn a tariff off at any time and then turn it back on, solely within his discretion.
- The President may exempt whole countries entirely (as he has done for Russia) or from some tariffs and not others.
- The President may impose higher tariffs for some countries for the same products than for others and may exempt some countries for a specific product only.
- The President may override the U.S.–Mexico–Canada Trade Agreement that was approved by Congress in December 2019 and that was signed and negotiated by President Trump himself during his prior term as President.
- The President may set up an exception process by which importers may obtain exemptions or reduced tariffs based on criteria solely determined by the President or an agency to which he has delegated exemption authority, which may include the identity of the person seeking an exception.[2]

---

[2] Section 2(b) of Executive Order 14245 (March 24, 2025), authorizes the Secretary of State, in consultation with other Cabinet officers, to "determine in his discretion whether the tariff of 25 percent

BRIEF FOR AMICUS CURIAE CONSUMER WATCHDOG

- There is no investigation, report, or other process that the President or an agency that reports to him must follow before the President decides to impose a tariff.
- The tariffs may be made effective immediately, even though as a practical matter, for both the exporter and the importer, those tariffs have a retroactive effect for those products for which contracts are already in effect.
- There is no substantive judicial review of any of the foregoing determinations provided by any statute, almost certainly because there is nothing in IEEPA that would enable a court to determine whether the President has complied with its directives or limitations.

If Congress had enacted these tariffs, there would be no constitutional objection, both because Congress has the constitutional authority to make all of these policy choices, and because, as provided in Article I, section 7 of the Constitution, such a law would have been passed by both Houses of Congress and either signed by the President or approved by two-thirds of both Houses if he vetoed it. But none of that happens when, as with these tariffs, the President acts unilaterally and promulgates them on his own, solely based on his views of what the tariff policy of the United States shall be on any given day.[3] Therefore, if the Court concludes that section 1702 authorizes the President to do what he did here, the Court would have to confront the question of whether Congress has essentially ceded the entirety of its legislative power to raise tariffs to the President. If so, that would be a violation of Article I of the Constitution, which provides that "all legislative power" shall be vested in the Congress. As amicus now shows, if section 1702 is read as Defendants urge, it would run afoul of the non-delegation doctrine.

---

will be imposed [by this Executive Order] on goods from any country that imports Venezuelan oil, directly or indirectly, on or after April 2, 2025."

[3] Since the date of the first tariff announcement on February 1, 2025, and as of the submission of this brief, President Trump has modified, paused, amended, or revoked those tariffs multiple times in significant ways. See Addendum to this brief and York Declaration (ECF 17) ¶¶ 29–42. In addition, the law firm Reed Smith has a Tariff Tracker that is a more complete report on the "on-again, off-again" approach of President Trump to the imposition of tariffs. https://www.tradecomplianceresourcehub.com/2025/05/14/ trump-2-0-tariff-tracker/; Washington Post, *White House eased China tariffs after warnings of harm to "Trump's people"*, May 15, 2025, https://www.washingtonpost.com/business/2025/05/14/trump-tariffs-china-trade/ (recounting how "[the] president has backtracked repeatedly on his tariff policies").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.    Precedent Confirms the Limits of Delegation in Tariff and Regulatory Contexts.**

The Supreme Court has decided scores of delegation cases since 1935. Rather than attempting to review and reconcile them all, amicus will focus on two tariff cases and two regulatory cases. This brief will then turn to *Gundy v. United States*, 588 U.S. 128 (2019), which signals an imminent shift in the Court's delegation jurisprudence, and conclude with a discussion of the pending case of *FCC v. Consumer Research*, in which the Government has made several statements strongly supportive of the position of amicus here that federal statutes that contain no guardrails cannot be sustained against a non-delegation challenge.

The basic test that the Court uses to determine whether a delegation is excessive asks whether there is an "intelligible principle" provided by Congress to guide the executive; if there is, the statute passes constitutional muster. That test is derived from *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 401 (1928), which, like the instant case, involved the imposition of import duties by the President. However, the statute under review in *Hampton* placed signficant limits on the President's authority. Duties could be imposed only in order to "equalize the . . . differences in costs of production in the United States and the principal competing country" for the product at issue. *Id.* Production costs are an objectively verifiable fact, which provide a clear, objective limit on when duties may be increased under the statute. And even then, under that law, the duties could be imposed only to "equalize" those costs, not in any amount that the President chose. Moreover, those duties could be applied only with respect to "the principal competing country," which further limited the statute's reach, and the statute expressly provided that any increase may not exceed "50 per centum of the rates specified in" existing law. *Id.* Further, those limits were enforceable through judicial review in the United States Customs Court and eventually in the Supreme Court. Based on those significant limits, the Court concluded that Congress had provided an intelligible principle to guide the executive. The IEEPA statute at issue here contains no similar limitations. To the contrary, the President contends that the IEEPA statute delegates to him the authority to impose tariffs in any amount, at any time, against imports from any source, and of indefinite duration.

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), illustrates how Congress can provide meaningful limits on the President's powers without having to write a law that eliminates his discretion

BRIEF FOR AMICUS CURIAE CONSUMER WATCHDOG

entirely. The statute at issue there was appliable only to countries that produced any of five enumerated duty-free products. *Id*. at 680. If that country imposed "duties or other exactions upon the agricultural or other products of the United States," and if the President concluded that those duties were "reciprocally unequal and unreasonable," his only remedy was to suspend the duty-free status of the imported products from the offending country. *Id*. Moreover, the President had no discretion as to the remedy: if he made the requisite findings, he was required to re-impose the suspended duties, but he could not impose new or additional duties on his own. *Id*. at 693.

At issue in *Mistretta v. United States*, 488 U.S. 361 (1989), was the constitutionality of the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551–3586, in which Congress established the Sentencing Commission within the judicial branch. Congress assigned the Commission the responsibility to create guidelines that district judges would be required to follow in imposing sentences for persons found guilty of federal crimes. The Court rejected a dual challenge on delegation and separation of powers grounds, with only Justice Scalia dissenting. The most legally significant boundaries in that Act were the statutory maximums (and in some cases minimums) that Congress had enacted and continued to enact and amend for every federal crime, and the fact that they only applied to those convicted of a federal crime. In addition to those limits, the Court summarized in over four pages in the US Reports the many other prohibitions and requirements that Congress included in the statute. 488 U.S. at 374–77. Those directions did not provide answers to every question, nor completely eliminate the Commission's discretion. Thus, as Justice Scalia noted in his dissent, the law left open "decisions [that] . . . . are far from technical, but are heavily laden (or ought to be) with value judgments and policy assessments." 488 U.S. at 414. Whether those guidelines, which are now only advisory, would survive under the dissent in *Gundy*, *infra*, remains unclear. What is clear is that, unlike section 1702 of IEEPA, there were significant limits on what the Commission could do.

The Clean Air Act at issue in *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001), directed "the EPA to set 'ambient air quality standards … which in the judgment of the Administrator, based on [the] criteria [documents of § 108] and allowing an adequate margin of safety, are requisite to protect the public health'" (quoting 42 U.S.C. § 7409(b)(1)). Those standards, which had to be reviewed every five

years, could only be issued for air pollutants found on a public list promulgated by the agency under 42 U.S.C. § 7408. *Id.* at 462. The opinion for the Court, written by Justice Scalia, who had dissented in *Mistretta,* read the statute to require that these standards must "reflect the latest scientific knowledge," that "EPA must establish uniform national standards," and that the agency must set them "at a level that is requisite to protect public health from the adverse effects of the pollutant in the ambient air," where requisite "mean[s] sufficient, but not more than necessary." *Id.* at 473. In upholding the delegation, the Court concluded that "we interpret [the law] as requiring the EPA to set air quality standards at the level that is 'requisite' that is, not lower or higher than is necessary—to protect the public health with an adequate margin of safety,'" and that, as so construed, the Clean Air Act "fits comfortably within the scope of discretion permitted by our precedent." *Id.* at 475–76.

The Supreme Court's most recent non-delegation jurisprudence can be found in *Gundy v. United States*, 588 U.S. 128 (2019). The four-Justice plurality construed the statute in a way that avoided the delegation question. Three Justices disagreed with that reading of the law at issue and, in a lengthy dissent, expressed dissatisfaction with the intelligible principle test. Those Justices concluded that the test sustained too many laws in which they believed the delegation to be excessive. *Gundy*, 588 U.S. at 149–179 (Gorsuch, J.; Roberts, C.J.; and Thomas, J., dissenting). Justice Alito voted to uphold the law there, while agreeing that he would be open to reconsidering the non-delegation doctrine in an appropriate case. *Gundy*, 588 U.S. at 148–149 (Alito, J., concurring). Justice Kavanaugh, who had not been confirmed when *Gundy* was argued, did not participate in the decision, but, in a subsequent case, indicated his willingness to reconsider the applicable test. *Paul v. United States*, 140 S. Ct. 342 (2019) (statement respecting denial of rehearing).

### C.    The Recent *FCC* Case Underscores the Government's Own Concessions on Delegation Limits.

Most recently, on March 26, 2025, the Supreme Court heard argument in *FCC v. Consumer Research,* No. 24-354, in which the principal issue is whether the statute authorizing the FCC to assess providers of telecommunications services to pay for the statute's Universal Service Program (USP) is unconstitutional in violation of the nondelegation doctrine, as the Fifth Circuit held en banc. 109 F.4th 743 (2024). The principal basis for the attack on that law is the assertion that there are no boundaries, and

in particular that there is neither a specific maximum rate (or amount) for these assessments, nor any other limits in the law on how much the FCC can demand of the companies that are supporting the USP or what services the assessments can be used to support. Unlike IEEPA, which never mentions tariffs, the statute at issue in the FCC case is plainly directed at establishing a USP and contains numerous provisions that detail how the USP is supposed to operate. 47 U.S.C. § 254. Thus, considered at a high level of generality, the statute easily establishes an "intelligible principle," to guide the operation of the USP, but that left a remaining disagreement is over whether the existing constraints are sufficient to satisfy the constitutional prohibition against excess delegation by Congress.[4]

A decision in this case is expected by the end of June. If the Court agrees with respondents, that would be a major expansion of the nondelegation doctrine that would upend the settled understanding of the intelligible principle test. But even if the statute is upheld, the Government has made a number of very significant concessions as to the scope of the delegation doctrine that bear directly on the application of the doctrine to the imposition of tariffs under IEEPA. Those concessions, which were made in the FCC's reply brief and at oral argument by the Trump administration, fall into two categories: (1) to be a permissible delegation to the executive, the statute itself must set some limits, boundaries, or guardrails; and (2) the availability of judicial review is essential to assure that the limits are maintained.

Preliminarily, the Government in the FCC case recognized that the intelligible principle doctrine places real limits on the authority that Congress may confer on the executive branch. "Distinguishing lawful conferrals of discretion from unlawful delegations requires more than just asking 'in the abstract whether there is an 'intelligible principle.' Congress must delineate both the 'general policy' that the agency must pursue and the 'boundaries of th[e] delegated authority.'" Reply Brief of Federal Petitioners

---

[4] One counsel for the amicus in this case submitted a brief in the FCC case on behalf of the National Foreign Trade Council, urging the Court to uphold the statute. *See* Brief of Amicus Curiae National Foreign Trade Council, *FCC v. Consumer Research*, (No. 24-354) (Jan. 15, 2025), available at https://www.supremecourt.gov/DocketPDF/24/24-354/337366/20250115140028623_FCC%20Amicus%20Brief.pdf. The brief also urged the Court to augment the intelligible principle doctrine by requiring that there be some limits on what an agency (or the President) can do, or put another way, that the Government identify actions that *cannot* be taken to assure that the doctrine retains some teeth. In support of its position, that brief focused on the open-ended nature of section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862. That brief was filed before any of the tariffs in this case, which rely solely on IEEPA, were issued.

at 3, *FCC v. Consumer Research* (No. 24-354) (Mar. 13, 2025) (citations omitted). At oral argument (Tr. 21–22), the Acting Solicitor General, in response to a question from Justice Gorsuch asking whether "in distinguishing between lawful delegations, that … requires more than asking in the abstract whether there is an intelligible principle," replied affirmatively: "We think the -- to the extent the Court is interested in looking to past precedents to tighten their reins, the better approach is not just say, you know, there is kind of mush for the intelligible principle, look to past cases, but to look at the parameters I talked about."[5]

The Government was even more specific on the need for statutory limits when the Government is assessing payments from others. The opening to its reply brief answered respondents' charge that the law created "[u]nbounded" power to levy taxes, subject at most to "precatory" standards and "'aspirational' principles" in this way: "If the Universal Service Fund really worked that way, the government would not defend its constitutionality. *Congress may not vest federal agencies with an unbounded taxing power*." Reply Brief of Federal Petitioners at 1–2, *FCC v. Consumer Research* (No. 24-354) (emphasis added). In response to respondents' allegation that the FCC statute is "too 'hazy' or 'contentless,'" the FCC replied: "Were these provisions contentless, the government would not defend their constitutionality." *Id.* at 11. This was followed by the Government's detailed refutation of the claim that the statute lacks boundaries, in which it pointed to the many specific ways in which the agency's ability to impose assessments was constrained. *Id.* at 12–15. At oral argument, FCC counsel emphasized this point over and over, referring to various provisions as "a real limit" (Tr. at 7) and asserting that "we are not arguing for a no limits at all approach where you can just raise whatever revenue we feel like … there are qualitative limits that are baked into the statutory scheme, not raise whatever amount of money; you know, a trillion dollars." Tr. at 7. The Acting Solicitor General did not argue that the nondelegation doctrine requires rigid lines because "obviously there is a judgment line on how much discretion is too much, but at a minimum

---

[5] The problem with the intelligible principle standard is that it can always be met at a sufficiently high level of generality. For example, in *Mistretta*, the decision to shift from a system in which judges decided on their own what the appropriate sentence should be to one with mandatory guidelines is an "intelligible principle," but without the pages of other limitations, the law would have authorized the Sentencing Commission, not Congress, to make scores of policy decisions with no guard posts to restrain it.

Congress is obviously having to provide parameters that you can tell, yes or no, did the agency transgress the boundaries?" *Id.* at 61.

Perhaps most significant of all, the Government recognized the constitutional significance of judicial review in the nondelegation analysis. After reiterating the importance of statutory guidance to the agency, the FCC's reply brief stated that "the guidance must be 'sufficiently definite' to permit meaningful judicial review of agency action. *Gundy*, 588 U.S. at 158 (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944))." Reply Brief at 4. And in defending the delegation in the USP, that brief (at 13) emphasized that "Courts have invalidated FCC action that violates those requirements. See Gov't Br. 34." As the Acting Solicitor General explained at oral argument, "one of the most important" parameters to comply with the nondelegation doctrine asks: "is there sufficiently definite and precise language in the statute to enable Congress, *the courts,* and the public to ascertain whether Congress's rules are followed?" Tr. at 22 (emphasis added).

Justice Gorsuch followed up by asking whether judicial review is "possible," to which counsel replied "Absolutely." Later on, Justice Gorsuch returned to the same point, asking if there was judicial review where a party objected to the use of money as unauthorized by the statute, and the response was that "would be something that someone could challenge." *Id.* at 42–43. And if someone objects to the way that the FCC is interpreting the statute, "you can bring a challenge to exceeding the scope of the statutory authority." *Id.* at 43.

The foregoing discussion about judicial review was not needed to clarify whether the FCC statute provided for judicial review. That was never in doubt. The FCC case is about the nondelegation doctrine. The availability of judicial review is relevant to the question of whether the statute constitutes a valid delegation because judicial review is an essential means to assure that the agency or the President has stayed within the limits provided by law. Under both IEEPA and trade statutes generally, the President and his lawyers have long contended that his decisions are NOT subject to judicial review because they are discretionary and not bound by the applicable statute. [6]

---

[6] Just last month, the Government reiterated its position that the means chosen to combat a national emergency under IEEPA is not a matter for the courts: "IEEPA, by using 'may,' 50 U.S.C. § 1701, and

1

    **D.**    **Judicial Review Cannot Cure the Absence of Legislative Limits.**

2        But that argument fails in this context because the absence of boundaries in the statute is the very

3    heart of the nondelegation problem. That problem would be readily apparent if the Court were to try to

4    assess whether any of these tariffs stayed within a statutory boundary found in IEEPA. The problem for

5    the Defendants is that there is not a single limit on the amount or duration of any tariff, and not a word

6    that provides whether tariffs must be applied equally to all countries or products, whether a system of

7    exemptions is permissible and if so on what basis, and what evidence must the President have before

8    imposing a particular tariff. Put another way, if Congress had provided for judicial review of tariffs issued

9    under IEEPA, there would be nothing for the courts to examine in the statute to determine whether the

10    President had been faithful to the law. The absence of judicial review in IEEPA is no accident—it reflects

11    Congress's assignment of "lawmaking" power to the President, but "laws," unlike decisions by agencies

12    and the President, are not subject to normal judicial review. The problem with IEEPA is that Congress

13    may not hand over that power to the President consistent with the nondelegation doctrine and Article I.

14        Although not discussed by the dissent in *Gundy,* the decision in *Federal Energy Administration v.*

15    *Algonquin SNG, Inc.*, 426 U.S. 548 (1976), is an example of how the intelligible principle test was misused

16    to uphold a statute that effectively delegated to the President the power in the field of international trade

17    "to exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable for the

18    rehabilitation and expansion of trade or industry." *A. L. A. Schechter Poultry Corp. v. United States,* 295

19    U.S. 495, 537–38 (1935). The statute at issue in *Algonquin* was section 232 of the Trade Expansion Act

20    of 1962, *supra,* which gave the President power to "adjust imports" when the national security of the

21    United States was threatened, and in *Algonquin* he had chosen to impose license fees, rather than tariffs

22    or import quotas. Algonquin contended that the statute did not include license fees as an option, and, to

23    authorizing a variety of actions, *id.* § 1702(a)(1)(B), gives the President discretion over how to deal with

24    the relevant threat. How the President uses that discretion is, again, not subject to judicial review and is

        instead a matter for the political branches to work out. *See, e.g.*, *Michael Simon Design, Inc. v. United*

25    *States*, 609 F.3d 1335, 1342–44 (Fed. Cir. 2010) (use of 'may' in statutory authorization to the President

26    meant that 'the President's exercise of his discretion is not subject to judicial review')." Defendants'

        Response in Opposition to Motion for Preliminary Injunction and Summary Judgment, *V.O.S. Selections,*

27    *Inc. v. Trump*, Court of International Trade, No 25-00066, April 30, 2025.

28

BRIEF FOR AMICUS CURIAE CONSUMER WATCHDOG

support that position, it argued that if section 232 were read to permit the use of license fees, it would be an unconstitutional delegation of legislative authority. In that posture, with no other claim of excess presidential discretion, this Court upheld section 232 as providing the necessary intelligible principle and rejected the limited challenge made there.

Forty-two years later, President Trump exercised his authority under section 232 to impose a 25% tariff on all imported steel from all countries except Canada and Mexico. Proclamation No. 9705, 83 Fed. Reg 11625 (Mar. 15, 2018). A consortium of importers and users of steel product challenged the tariffs on delegation grounds, but their claims were rejected by the lower courts, which concluded that they were bound by *Algonquin*, and the Supreme Court denied review. *Am. Inst. for Int'l Steel v. United States,* 806 Fed. Appx. 982 (Fed. Cir), *cert. denied*, 141 S. Ct. 133 (2020). Unlike IEEPA, there is no doubt that section 232 authorizes the President to impose tariffs and that *Algonquin*'s delegation ruling extends only to section 232. Moreover, as the concurring judge in the Court of International Trade made clear in *Am. Inst. for Int'l Steel*, but for *Algonquin,* he would have found section 232 to be unconstitutional. 376 F. Supp.3d 1335, 1345–52 (2019) (Katzman, J., dubitante).

### E. *Yoshid*a Is No Defense—And Was Wrongly Decided.

The Government relies on *United States v. Yoshida International, Inc.,* 526 F.2d 560 (CCPA 1975), both to sustain its claim that IEEPA allows the President to impose tariffs and to respond to the claim in other IEEPA cases that the delegation to the President is unconstitutional. Amicus agrees with California that the Court of Customs and Patent Appeals erred in concluding that the similarly-worded predecessor of IEEPA permitted the President to use it to impose even the very limited tariffs there. The core of the CCPA's position on the delegation issue was the following statement:

> presidential actions must be judged in the light of what the President actually did, not in the light of what he could have done. To this we would add, 'and not in the light of what he might do.' Each Presidential proclamation or action under § 5(b) must be evaluated on its own facts and circumstances. To uphold the specific surcharge imposed by Proclamation 4074 is not to approve in advance any future surcharge of a different nature, or any surcharge differently applied or any surcharge not reasonably related to the emergency declared.

526 F.2d at 577.

Under that approach, it was not surprising that the CCPA did not find the delegation there to be excessive. The tariff was only 10% on "all dutiable items," but, even then, if that "would cause the total duty or charge payable to exceed the total duty charge payable at the rate prescribed in column 2 of the Tariff Schedule of the United States, then the column 2 rate shall apply." *Id.* at 568. Moreover, the additional duties lasted only from August 15, 1971, to December 20, 1971, and they were imposed because of a decline in the U.S.'s monetary reserves, producing a balance of payments problem, which appears to be at the core of IEEPA's predecessor. *Id.* at 567, 569.

### F.    IEEPA's Delegation, If Upheld, Would Sanction Rule by Executive Fiat.

The Supreme Court has now made it clear in *Whitman v. Am. Trucking Ass'ns* that the CCPA got it wrong in a very important respect. In *Whitman*, the Court ruled that the courts must resist the temptation to answer the delegation question by focusing solely on what the agency did, rather than on the breadth of the statutory delegation:

> In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency. … The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory. The very choice of which portion of the power to exercise—that is to say, the prescription of the standard that Congress had omitted—would *itself* be an exercise of the forbidden legislative authority. Whether the statute delegates legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer.

571 U.S. at 472–73 (emphasis in original). Stated another way, the court in *Yoshida* erred by asking whether the actual tariffs were excessive, rather than whether the statute would permit the President to impose the kind and extent of tariffs that President Trump did here. Accordingly, *Yoshida* is not a proper basis to reject a claim that IEEPA is an unconstitutional delegation of legislative power to the President.

### CONCLUSION

For the foregoing reasons, and those advanced by the Plaintiffs, this Court should hold that the President lacked authority under IEEPA to impose the tariffs at issue. Such a holding would appropriately avoid the serious constitutional questions raised by the President's actions—questions that, if reached, would compel the conclusion that IEEPA, as interpreted by Defendants, violates the Constitution's separation of powers and the nondelegation doctrine. However, if this Court does reach the constitutional

1  nondelegation question, it should hold the delegation in IEEPA is unconstitutional. Under either analysis,

2  the Court should reject this sweeping and dangerous assertion of executive power.

3

4  Dated: May 23, 2025                          Respectfully submitted,

5

                                  By:      s/ *William Pletcher*_____
6                                          William Pletcher
                                           Harvey Rosenfield
7                                          CONSUMER WATCHDOG

8                                          Alan Butler Morrison *(Admitted Pro Hac Vice)*
9                                          GEORGE WASHINGTON LAW SCHOOL

10                                         Donald B. Cameron *(Admitted Pro Hac Vice)*
                                           Edward John Thomas III *(Admitted Pro Hac Vice)*
11                                         R. Will Planert *(Admitted Pro Hac Vice)*
                                           MORRIS, MANNING & MARTIN, LLP
12
                                           *Counsel for Proposed Amicus Curiae Consumer Watchdog*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF FOR AMICUS CURIAE CONSUMER WATCHDOG

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2025, I filed the foregoing with the Clerk of the Court using the Court's CM/ECF system that will send notification of such filing to all parties of record.

DATED: May 23, 2025          By:     *s/ William Pletcher*
                                              William Pletcher
                                              Consumer Watchdog

                                              *Counsel for Proposed Amicus Curiae Consumer Watchdog*