YAAKOV M. ROTH
Acting Assistant Attorney General
ERIC J. HAMILTON
Deputy Assistant Attorney General
PATRICIA M. McCARTHY
Director, National Courts
CLAUDIA BURKE
Deputy Director, National Courts
JUSTIN R. MILLER
Attorney-In-Charge, International Trade Field Office
LUKE MATHERS
Trial Attorney

       U.S. Department of Justice
       Civil Division
       Commercial Litigation Branch
       26 Federal Plaza, Suite 346
       New York, New York 10278
       Telephone: (212) 264-9236
       luke.mathers@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA and GAVIN NEWSOM, in his official capacity as Governor of California, <br><br>     Plaintiffs, <br><br>   v. <br><br> DONALD J. TRUMP, et al., <br><br>     Defendants. | Case No. 3:25-cv-03372-JSC <br><br> **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** <br><br> Date:    June 26, 2025 <br> Time:   10:00 a.m. |

# TABLE OF CONTENTS

INTRODUCTION & SUMMARY OF ARGUMENT ..................................................................1

BACKGROUND ...............................................................................................................4

I.     The President's Authority To Regulate Importation During National Emergencies ....................4

II.    Factual Background ................................................................................................4

       A.    Mexico and Canada Executive Orders ..........................................................4

       B.    China Executive Orders ................................................................................5

       C.    Reciprocal Tariff Executive Orders ..............................................................5

       D.    Plaintiffs Sue to Enjoin Enforcement of the Executive Orders .....................6

STANDARD OF REVIEW ..................................................................................................7

ARGUMENT ....................................................................................................................7

I.     Plaintiffs Fail To Show A Likelihood That This Court Has Jurisdiction .......................7

       A.    The CIT Has Exclusive Jurisdiction Over Plaintiffs' Action Challenging Tariffs ...............................................................................................................7

       B.    Plaintiffs Lack Standing To Challenge Tariffs That They Have Not Paid ........7

II.    Plaintiffs Fail To Show Likely Success On The Merits Because IEEPA Clearly Includes Tariff Authority ......................................................................................11

III.   Plaintiffs Fail To Show the Remaining Preliminary-Injunction Factors .....................23

IV.   Any Preliminary Injunction Should Be Stayed, Limited Only To Plaintiffs, And Would Require Them To Post A Bond ......................................................................24

CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Al-Bihani v. Obama*,
   619 F.3d 1 (D.C. Cir. 2010) .................................................................... 18

*Alcan Sales v. United States*,
   693 F.2d 1089 (Fed. Cir. 1982) ............................................................. 12

*Almendarez-Torres v. United States*,
   523 U.S. 224 (1998) ................................................................................ 15

*Animal Legal Defense Fund v. Quigg*,
   932 F.2d 920 (Fed. Cir. 1991) ............................................................... 11

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ..................................................................... 9

*Bd. of Trs. of Univ. of Ill. v. United States*,
   289 U.S. 48 (1933) .................................................................................. 12

*Becker v. Skype Inc.*,
   2014 WL 556697 (N.D. Cal. Feb. 10, 2014) ........................................... 9

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ................................................................................ 22

*Burnett v. Convergent Outsourcing, Inc.*,
   982 F.3d 1067 (7th Cir. 2020) ............................................................... 11

*B-West Imports, Inc. v. United States*,
   75 F.3d 633 (Fed. Cir. 1996) ................................................................. 18

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ................................................................. 11

*Chicago v. Barr*,
   961 F.3d 882 (7th Cir. 2020) ................................................................. 25

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .................................................................................. 8

*Colo. Outfitters Ass'n v. Hickenlooper*,
   823 F.3d 537 (10th Cir. 2016) ................................................................. 8

*Common Cause v. Dep't of Energy*,
   702 F.2d 245 (D.C. Cir. 1983) ............................................................... 11

*Corbett v. TSA*,
   19 F.4th 478 (D.C. Cir. 2021) ............................................................... 22

*Cornet Stores v. Morton*,
   632 F.2d 96 (9th Cir. 1980) ............................................................................ 12

*Ctr. for Bio. Diversity v. EPA*,
   937 F.3d 533 (5th Cir. 2019) ............................................................................ 8

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) .................................................................................... 4, 16

*Dep't of Navy v. Egan*,
   484 U.S. 518 (1988) ...................................................................................... 19

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
   426 U.S. 548 (1976) ........................................................................ 12, 13, 14

*Florida v. HHS*,
   19 F.4th 1271 (11th Cir. 2021) ................................................................ 22, 25

*Florsheim Shoe Co. v. United States*,
   744 F.2d 787 (Fed. Cir. 1984) ........................................................................ 18

*Forces Action Proj. LLC v. State*,
   2000 WL 20977 (N.D. Cal. Jan. 5, 2000) ........................................................ 11

*Forest Grove Sch. Dist. v. T.A.*,
   557 U.S. 230 (2009) ...................................................................................... 15

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ........................................................................ 23

*Georgia v. President of the United States*,
   46 F.4th 1283 (11th Cir. 2022) ...................................................................... 20

*Georgia v. Public.Resource.Org, Inc.*,
   590 U.S. 255 (2020) ...................................................................................... 16

*Gibbons v. Ogden*,
   22 U.S. 1 (1824) .......................................................................................... 12

*Guenther v. Cooper Life Scis.*,
   759 F. Supp. 1437 (N.D. Cal. 1990) ................................................................ 8

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) .................................................................................. 8, 25

*Herb Reed Enters. v. Fla. Entm't Mgmt.*,
   736 F.3d 1239 (9th Cir. 2013) ...................................................................... 23

*Humane Soc'y of U.S. v. Clinton*,
   236 F.3d 1320 (Fed. Cir. 2001) ...................................................................... 18

*Iowa v. Block*,
  771 F.2d 347 (8th Cir. 1985) ............................................................................. 9

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ........................................................................................... 15

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ............................................................................. 20

*Lorillard v. Pons*,
  434 U.S. 575 (1978) ........................................................................................... 15

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ........................................................................... 20

*Louisiana v. Dep't of Energy*,
  90 F.4th 461 (5th Cir. 2024) ............................................................................. 9

*Louisiana v. DHS*,
  726 F. Supp. 3d 653 (E.D. La. 2024) ............................................................... 9

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................... 8, 9, 10

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir. 2023) ....................................................................... 19, 20

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ........................................................................................... 7

*Miller v. Cal. Pac. Med. Ctr.*,
  991 F.2d 536 (9th Cir. 1993) ............................................................................. 23

*Miller v. French*,
  530 U.S. 327 (2000) ........................................................................................... 15

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ......................................................................................... 8, 25

*Nat'l Treas. Emps. Union v. Trump*,
  2025 WL 1441563 (D.C. Cir. May 16, 2025) ................................................. 25

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) ............................................................................... 20

*NFIB v. Dep't of Lab.*,
  595 U.S. 109 (2022) ........................................................................................... 19

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................... 23

*Oakland Trib., Inc. v. Chronicle Pub. Co.*,
   762 F.2d 1374 (9th Cir. 1985) ........................................................................... 23

*Orangeburg v. FERC*,
   862 F.3d 1071 (D.C. Cir. 2017) ........................................................................... 9

*Panoche Energy Ctr., LLC v. EPA*,
   2024 WL 3043005 (9th Cir. June 18, 2024) ....................................................... 22

*Pennsylvania v. Kleppe*,
   533 F.2d 668 (D.C. Cir. 1976) ............................................................................. 9

*PrimeSource Bldg. Prods. v. United States*,
   535 F. Supp. 3d 1327 (Ct. Int'l Trade 2021) ..................................................... 25

*Pritikin v. Dep't of Energy*,
   254 F.3d 791 (9th Cir. 2001) ............................................................................. 10

*Pulsifer v. United States*,
   601 U.S. 124 (2024) ........................................................................................... 13

*QBE Syndicate 1036 v. Compass Mins. Louisiana, Inc.*,
   95 F.4th 984 (5th Cir. 2024) ............................................................................. 14

*Regan v. Wald*,
   468 U.S. 222 (1984) ....................................................................................... 4, 16

*Salinas v. United States*,
   522 U.S. 52 (1997) ............................................................................................. 15

*San Francisco v. Trump*,
   896 F.3d 1225 (9th Cir. 2018) ........................................................................... 25

*Sec. Pac. Nat. Bank v. Iran*,
   513 F. Supp. 864 (C.D. Cal. 1981) ................................................................... 16

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) ........................................................................................... 19

*Sires v. Washington*,
   314 F.2d 883 (9th Cir. 1963) ............................................................................... 7

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................................. 9

*Taggart v. Lorenzen*,
   587 U.S. 554 (2019) ........................................................................................... 16

*Tex. Dep't of Housing & Comm. Affairs v. Inclusive Comms. Project, Inc.*,
   576 U.S. 519 (2015) ........................................................................................... 15

*TikTok Inc. v. Trump*,
   507 F. Supp. 3d 92 (D.D.C. 2020) ............................................................................... 14

*Totes-Isotoner Corp. v. United States*,
   594 F.3d 1346 (Fed. Cir. 2010) ................................................................................... 10

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ..................................................................................................... 19

*Trump v. Int'l Refugee Assistance Project*,
   582 U.S. 571 (2017) ..................................................................................................... 24

*Trump v. Wilcox*,
   2025 WL 1464804 (U.S. May 22, 2025) ..................................................................... 24

*United States v. Bozarov*,
   974 F.2d 1037 (9th Cir. 1992) ..................................................................................... 21

*United States v. Cal. Stem Cell Treatment Ctr.*,
   117 F.4th 1213 (9th Cir. 2024) ................................................................................... 21

*United States v. Gurrola-Garcia*,
   547 F.2d 1075 (9th Cir. 1976) ..................................................................................... 21

*United States v. Kuok*,
   671 F.3d 931 (9th Cir. 2012) ....................................................................................... 21

*United States v. Shih*,
   73 F.4th 1077 (9th Cir. 2023) ..................................................................................... 20

*United States v. Texas*,
   599 U.S. 670 (2023) ....................................................................................................... 9

*United States v. White*,
   97 F.4th 532 (7th Cir. 2024) ....................................................................................... 22

*United States v. Yoshida Int'l, Inc.*,
   526 F.2d 560 (C.C.P.A. 1975) ............................................................................ passim

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ..................................................................................................... 19

*Webber v. DHS*,
   2025 WL 1207587 (D. Mont. Apr. 25, 2025) .......................................................... 2, 7

*Weissman v. Nat'l R.R. Passenger Corp.*,
   21 F.4th 854 (D.C. Cir. 2021) ....................................................................................... 9

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ................................................................................. 19, 20, 21, 22

*Westerman v. FTI Consulting, Inc.*,
    2025 WL 256978 (N.D. Cal. Jan. 21, 2025) ....................................................... 23

*Widakuswara v. Lake*,
    2025 WL 1288817 (D.C. Cir. May 3, 2025) ................................................. 24, 25

*Winter v. NRDC*,
    555 U.S. 7 (2008) .......................................................................... 3, 7, 23, 24

*Wyoming v. DOI*,
    674 F.3d 1220 (10th Cir. 2012) ........................................................................ 9

*XY Planning Network, LLC v. SEC*,
    963 F.3d 244 (2d Cir. 2020) ........................................................................... 11

*Yoshida Int'l Inc. v. United States*,
    378 F. Supp. 1155 (Cust. Ct. 1974) ................................................................ 17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ....................................................................................... 20

**Statutes**

19 U.S.C. § 1806(2) .............................................................................................. 14

19 U.S.C. § 1862(c) .............................................................................................. 14

19 U.S.C. § 2132 .................................................................................................. 17

19 U.S.C. § 2481(2) .............................................................................................. 14

50 U.S.C. § 1701(a) ............................................................................................... 4

50 U.S.C. § 1702(a)(1)(B) .............................................................................. passim

50 U.S.C. § 1702(b) .............................................................................................. 16

50 U.S.C. § 4302 ................................................................................................... 4

First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838 (1941) .................... 4, 15

Trading With the Enemy Act, Pub. L. No. 65-91, 40 Stat. 411 (1917) .............. 4

**Rules**

Fed. R. Civ. P. 65(c) ............................................................................................ 25

**Executive Actions**

Executive Order 12959,
  *Prohibiting Certain Transactions With Respect to Iran*,
  60 Fed. Reg. 24,757 (May 9, 1995) ............................................................. 21

Executive Order 13873,
  *Securing the Information and Communications Technology Services Supply Chain*,
  84 Fed. Reg. 22,689 (May 15, 2019) ............................................................. 20

Executive Order 14193,
  *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*,
  90 Fed. Reg. 9,113 (Feb. 7, 2025) ................................................................. 5

Executive Order 14194,
  *Imposing Duties to Address the Situation at Our Southern Border*,
  90 Fed. Reg. 9,117 (Feb. 7, 2025) ................................................................. 5

Executive Order 14195,
  *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*,
  90 Fed. Reg. 9,121 (Feb. 7, 2025) ................................................................. 5

Executive Order 14197,
  *Progress on the Situation at Our Northern Border*,
  90 Fed. Reg. 9,183 (Feb. 10, 2025) ............................................................... 5

Executive Order 14198,
  *Progress on the Situation at Our Southern Border*,
  90 Fed. Reg. 9,185 (Feb. 10, 2025) ............................................................... 5

Executive Order 14228,
  *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*,
  90 Fed. Reg. 11,463 (Mar. 7, 2025) .............................................................. 5

Executive Order 14231,
  *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*,
  90 Fed. Reg. 11,785 (Mar. 11, 2025) ............................................................ 5

Executive Order 14232,
  *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border*,
  90 Fed. Reg. 11,787 (Mar. 11, 2025) ............................................................ 5

Executive Order 14257,
  *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*,
  90 Fed. Reg. 15,041 (Apr. 7, 2025) ........................................................... 5, 6

Executive Order 14259,
  *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China,*
  90 Fed. Reg. 15,509 (Apr. 14, 2025) ................................................................................. 6

Executive Order 14266,
  *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment,*
  90 Fed. Reg. 15,625 (Apr. 15, 2025) ................................................................................. 6

Executive Order 14298,
  *Modifying Reciprocal Tariff Rates To Reflect Discussions With The People's Republic of China,*
  90 Fed. Reg. 21,831 (May 21, 2025) ................................................................................. 6

Proclamation 10886,
  *Declaring a National Emergency at the Southern Border of the United States,*
  90 Fed. Reg. 8,327 (Jan. 29, 2025) ................................................................................... 4

Proclamation 10896,
  *Adjusting Imports of Steel Into the United States,*
  90 Fed. Reg. 9,817 (Feb. 18, 2025) ................................................................................. 10

Proclamation 10908,
  *Adjusting Imports of Automobiles and Automobile Parts Into the United States,*
  90 Fed. Reg. 14,705 (Mar. 26, 2025) ............................................................................... 10

Proclamation 4074,
  *Imposition of Supplemental Duty for Balance of Payments Purposes,*
  36 Fed. Reg. 15,724 (Aug. 17, 1971) ......................................................................... 4, 17

**Legislative Materials**

H.R. Rep. No. 95-459 (1977) ........................................................................................ 4, 16

S. Rep. No. 93-1298 (1974) ............................................................................................... 17

**Other Authorities**

11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2025) .................................... 23

Cong. Rsch. Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use,*
  R45618 (Jan. 30, 2024) ................................................................................................... 21

*Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Prods.,*
  6 U.S. Op. Off. Legal Counsel 644 (1982) ....................................................................... 18

*Regulate,* Black's Law Dictionary 1156 (5th ed. 1979) ....................................................... 12

## INTRODUCTION & SUMMARY OF ARGUMENT

The United States is today engaged in high-stakes negotiations, diplomacy, and preparation on multiple precarious fronts around the globe. In Asia, the United States tactfully brokered a ceasefire in an escalating confrontation between two nuclear powers, India and Pakistan. The United States is also navigating and addressing a range of extremely consequential threats from strategic acquisitions to naval drills to the export of deadly substances. The success of the Nation, in these endeavors and into the future, is built off the dispatch of the Executive, girded by necessary tools.

The International Emergency Economic Powers Act (IEEPA) is one of those critical tools—giving the President the broad and flexible tools to handle complex, delicate, and high-stakes foreign relations and to protect the United States from foreign threats. Invoking IEEPA, President Trump found two types of unusual and extraordinary threats to the United States's national security, economy, and foreign policy; declared national emergencies as to these threats; and imposed tariffs to deal with these emergencies. With the leverage the President has created in this delicate, complex, and intertwined sphere of foreign relations, the President has already achieved many successes and is on the brink of achieving more. *See, e.g.*, Lutnick Decl. ¶¶ 7-12. Any judicial interference with these sensitive matters would be unprecedented, unravel the progress the President has achieved, and hurl the United States into further danger.

Plaintiffs dispute none of this. They tacitly concede that President Trump correctly identified the emergencies and correctly found the threats to be unusual and extraordinary. They tacitly concede that President Trump's chosen means are effectively dealing with the declared emergencies. And they cannot meaningfully dispute that interfering with the President's actions would have cascading and devastating consequences to the United States, as declarations from four cabinet members explain.

Still, plaintiffs seek to deny the President a critical tool that, in his judgment, is necessary to deal with these concededly real and extraordinary emergencies and cause catastrophic harm to the United States's national security, economy, and foreign policy. This Court should deny plaintiffs' preliminary-injunction request for several independent reasons. This Court lacks jurisdiction to adjudicate this case because the Court of International (CIT) has exclusive jurisdiction over these matters, and in any event, plaintiffs have not established standing. IEEPA's text, history, and purpose clearly show that the phrase "regulate … importation" includes the authority to impose tariffs. And the equities strongly favor

1    defendants, especially given that plaintiffs delayed in suing and moving for a preliminary injunction.

2    ***First***, as defendants explained in their transfer motion, the CIT has exclusive jurisdiction over this

3    case. Docs. 9, 14. Defendants' position has been confirmed by a recent CIT decision concluding it has

4    exclusive jurisdiction over a similar challenge, Doc. 15 at 5-10, *Barnes v. United States*, No. 25-00043

5    (CIT May 23, 2025) (*Barnes*), two district-court decisions transferring similar challenges to the CIT,

6    *Webber v. DHS*, 2025 WL 1207587 (D. Mont. Apr. 25); Doc. 35-1, *Emily Ley Paper, Inc. v. Trump* (N.D.

7    Fla. May 20, 2025) (*Emily Ley*), and statements by the three-judge panel of the CIT indicating they view

8    the CIT as the sole forum to adjudicate these IEEPA suits, *V.O.S.* Tr. 5:25-6:3 (Attachment); *Oregon* Oral

9    Arg. at 20:30-22:03, 1:41:48-1:41:56, www.cit.uscourts.gov/sites/cit/files/20250521-25-00077-3JP.mp3.

10   Regardless, both California and its Governor lack standing to challenge tariffs that they never

11   claim to have paid. Plaintiffs show no cognizable injury but at best, alleges speculative injuries not fairly

12   traceable to the challenged IEEPA tariffs or redressable by enjoining these tariffs.

13   ***Second***, though plaintiffs concede that the President is effectively addressing the declared

14   emergencies through the challenged tariffs, plaintiffs argue that IEEPA is an emergency statute that

15   somehow does not give the President the power the President has determined is necessary to address the

16   declared emergencies. Per California, IEEPA gives the President *greater* powers like imposing an

17   embargo or quota on foreign imports but does not give him the *lesser* and *more flexible* power to impose

18   tariffs to leverage foreign countries and to directly affect the importation of illicit drugs into the United

19   States that created a public-health crisis or the untenable trade deficit that has ravaged the United States's

20   manufacturing capacity, access to critical supply chains, and the defense-industrial base.

21   Text, context, history, and purpose all say otherwise. IEEPA's use of "regulate … importation"

22   clearly authorizes the President to impose tariffs. 50 U.S.C. § 1702(a)(1)(B). The Federal Circuit's

23   predecessor interpreted identical language in IEEPA's predecessor to authorize tariffs. *United States v.*

24   *Yoshida Int'l, Inc.*, 526 F.2d 560, 575-76 (C.C.P.A. 1975). Congress knew of this holding when it chose

25   to adopt the identical language in IEEPA and incorporate that interpretation in IEEPA. That is confirmed

26   by the long line of cases concluding that tariffs are a form of regulating importation and that emergency

27   statutes, especially those like IEEPA that involve national security and foreign affairs, must be read

28   broadly to ensure that the President has the flexibility necessary to successfully address emergencies. *Infra*

21-22 (collecting cases). That is why it is unsurprising that the Ninth Circuit has already concluded that identical language in TWEA "clearly shows" that Congress "unambiguously authorized" President Nixon's tariffs. *United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1081 n.10 (9th Cir. 1982).

**Finally,** the other preliminary-injunction factors weigh emphatically against plaintiffs. Plaintiffs fail to show any imminent irreparable harm, let alone harm *before* this Court could adjudicate this case on the merits: At most, plaintiffs allege speculative economic loss, loss vitiated by the fact that plaintiffs waited months to file their preliminary-injunction motion.

The equities and public interest profoundly favor the government and compel denying the motion. Four cabinet members have submitted declarations explaining the devastating foreign-policy and national-security consequences of issuing a preliminary injunction. The Secretary of State warns that a preliminary injunction "would cause significant and irreparable harm to U.S. foreign policy and national security" and "threaten broader U.S. strategic interests internationally." Rubio Decl. ¶ 3. The U.S. Trade Representative notes that an injunction will cause a "foreign policy disaster scenario." Greer Decl. ¶ 12. The Commerce Secretary has stated that an injunction "would destroy" a carefully negotiated agreement with China and "severely disrupt the Department of Commerce's coordination of foreign policy-related economic actions on behalf of the President." Lutnick Decl. ¶¶ 15, 19. And the Treasury Secretary adds that an injunction will threaten to "shatter our negotiations with dozens of countries" to address national-security emergencies, creating an immediate risk that our trading partners "feel a renewed boldness to take advantage of" a perceived "new vulnerability by retaliating against the United States." Bessent Decl. ¶¶ 10-11.

In short, a preliminary injunction threatens to undo more than a month of intensive negotiations in pursuit of a top foreign policy priority that has been the focus of much of the country's global diplomacy over the last six weeks. That would create a foreign policy disaster, signal to our trading partners and adversaries that the United States is vulnerable to retaliation, and threaten the country's national security during declared and uncontested national emergencies. Those compelling equities alone warrant denying a preliminary injunction without even reaching the merits. *See Winter v. NRDC*, 555 U.S. 7, 23-28 (2008).

At the very least, it is imperative to stay any relief against the United States to maintain the status quo and avoid interfering with delicate and complex international diplomacy while the United States seeks

1    further relief from appellate courts. With refunds available for proper plaintiffs in the right forum,

2    plaintiffs, unlike the United States, will not suffer any irreparable harm from a stay pending appeal.

## BACKGROUND

### I.    The President's Authority To Regulate Importation During National Emergencies

5    Before IEEPA, the Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917),

6    as amended by the First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838, 839-40 (1941), authorized the

7    President to "regulate … importation" of foreign goods during war or a national emergency. In 1971,

8    President Nixon invoked this authority to impose tariffs during peacetime to address a balance-of-

9    payments deficit that threatened the United States's economy and national security. Procl. 4074, 36 Fed.

10    Reg. 15,724 (Aug. 17, 1971); H.R. Rep. No. 95-459, at 5 (1977). The Federal Circuit's predecessor upheld

11    the lawfulness of those tariffs, rejecting an argument that "regulate … importation" in TWEA did not

12    authorize the President to impose tariffs. *Yoshida*, 526 F.2d at 575-76.

13    Later, Congress modified TWEA through IEEPA. Congress limited TWEA to apply only during

14    declared wars. *See* 50 U.S.C. § 4302. Congress through IEEPA then extended the President's authority to

15    periods of declared national emergencies during peacetime. *See Regan v. Wald*, 468 U.S. 222, 227-28

16    (1984). The broad powers granted to the President under IEEPA are "essentially the same as" those under

17    TWEA. *Id.* IEEPA's operative language was "directly drawn" from TWEA. *Dames & Moore v. Regan*,

18    453 U.S. 654, 671-72 (1981). IEEPA authorizes the President to exercise those powers "to deal with any

19    unusual and extraordinary threat, which has its source in whole or substantial part outside the United

20    States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). If

21    the President declares a national emergency relating to such a threat, IEEPA empowers the President to

22    "regulate … importation … with respect to any property, subject to the jurisdiction of the United States."

23    § 1702(a)(1)(B). Unlike TWEA, IEEPA provides exceptions to this broad authority, but none of those

24    exceptions bars the President from imposing tariffs. § 1702(b)(1)-(4).

### II.    Factual Background

#### A.    Mexico and Canada Executive Orders

27    In January 2025, the President declared the flow of contraband drugs like fentanyl and the resulting

28    public-health crisis to be a national emergency. Procl. 10886, 90 Fed. Reg. 8,327 (Jan. 29, 2025). On

February 1, the President found that the actions of Canada and Mexico contributed to this crisis. E.O. 14193, 90 Fed. Reg. 9,113, 9,114 (Feb. 7, 2025); E.O. 14194, 90 Fed. Reg. 9,117, 9,118 (Feb. 7, 2025). Using IEEPA, the President is dealing with the unusual and extraordinary threat to the United States, by ordering a 25-percent duty on most Canadian and Mexican imports. E.O. 14193, 90 Fed. Reg. at 9,114; E.O. 14194, 90 Fed. Reg. at 9,118.

On February 3, the President recognized that Canada and Mexico had taken immediate steps to alleviate their role in the emergency, but finding that additional time was needed to assess those steps' sufficiency and thus pausing most of the tariffs until March 4. E.O. 14197, 90 Fed. Reg. 9,183 (Feb. 10, 2025); E.O. 14198, 90 Fed. Reg. 9,185 (Feb. 10, 2025). Shortly after that pause lapsed, the President exempted all Canadian and Mexican goods that qualify for duty-free entry under the United States-Mexico-Canada Agreement. E.O. 14231, 90 Fed. Reg. 11,785 (Mar. 11, 2025); E.O. 14232, 90 Fed. Reg. 11,787 (Mar. 11, 2025). As a result, most Canadian and Mexican goods are not subject to these tariffs.

### B.    China Executive Orders

On February 1, the President invoked IEEPA to address an unusual and extraordinary threat from the People's Republic of China (PRC), including the PRC's failure to stem the flow of contraband drugs to the United States. E.O. 14195, 90 Fed. Reg. 9,121 (Feb. 7, 2025). To address the national emergency, the President imposed a 10-percent tariff on most goods imported from the PRC. *Id.* at 9,122-23. The President later raised the duty to 20 percent and imposed tariffs on low-value imports, as smugglers try to hide illicit substances with these seemingly lawful imports. E.O. 14228, 90 Fed. Reg. 11,463 (Mar. 7, 2025); E.O. 14256, 90 Fed. Reg. 14,899 (Apr. 7, 2025).

### C.    Reciprocal Tariff Executive Orders

On April 2, the President declared a national emergency, finding "that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States." E.O. 14257, 90 Fed. Reg. 15,041 (Apr. 7, 2025). In particular, the President found, these "large and persistent annual U.S. goods trade deficits" have "atrophied" our nation's "domestic production capacity" to the point where, now, the United States's

"military readiness" and "national security posture" are "comprise[d]"—an "especially acute" emergency given "the recent rise in armed conflicts abroad." *Id.* at 15,044-55. The President found that "[t]he future of American competitiveness depends on reversing" the hemorrhage of manufacturing and manufacturing jobs to create "the industrial base" America "needs for national security," as well as safeguarding the vitality of the Nation's food and agriculture sectors. *Id.* at 15,044.

Invoking IEEPA, the President is dealing with this unusual and extraordinary threat to the United States's national security and economy, through a 10-percent duty on most imported goods. *Id.* at 15,045. These duties took effect on April 5, 2025, with select countries having additional duties imposed on April 9. *Id.* Since the initial declaration, the President has taken additional actions to address this emergency, including raising the duty rate for Chinese products and pausing the country-specific duties for 90 days for countries that he determined to have taken meaningful steps to negotiate and align with the United States's interests. E.O. 14266, 90 Fed. Reg. 15,625 (Apr. 15, 2025); E.O. 14259, 90 Fed. Reg. 15,509 (Apr. 14, 2025). More recently, the additional tariffs imposed on China were "suspend[ed]" for 90 days "[i]n recognition of the intentions of the PRC to facilitate addressing th[is] national emergency." E.O. 14298, 90 Fed. Reg. 21,831 (May 21, 2025).

The 10-percent duty on most imported goods imposed on April 5, and the additional country-specific duties starting on April 9, do not currently apply to Canadian or Mexican goods. E.O. 14257, 90 Fed. Reg. at 15,041 (Apr. 7, 2025). The President's actions have opened discussions with trading partners on solutions that will strengthen our country. Bessent Decl. ¶¶ 6-8; Greer Decl. ¶¶ 7-9; Lutnick Decl. ¶¶ 7-12; Rubio Decl. ¶¶ 8-9. "[M]ore than 75 … foreign trading partners … have approached the United States to address the lack of trade reciprocity in our economic relationships and our resulting national and economic security concerns." E.O. 14266, 90 Fed. Reg. at 15,625.

### D.    Plaintiffs Sue to Enjoin Enforcement of the Executive Orders

Months after the first Executive Orders, Plaintiffs, the State of California and Governor Gavin Newsom, sued on April 16, and moved for a preliminary injunction on May 13—nearly a month later. Compl., Doc. 1; Mot., Doc. 15. In their motion, plaintiffs do not question the President's emergency declarations, threat determinations, or the wisdom of the President's action. *See* Mot. Instead, they argue only that IEEPA does not authorize the President to impose tariffs on imports. *Id.* 8-20.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Plaintiffs must show they are "likely to succeed on the merits" and are "likely to suffer irreparable harm in the absence of preliminary relief," "the balance of equities tips in" their favor, and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. Plaintiffs satisfy none of the factors.

## ARGUMENT

### I.    Plaintiffs Fail To Show A Likelihood That This Court Has Jurisdiction

#### A.    The CIT Has Exclusive Jurisdiction Over Plaintiffs' Action Challenging Tariffs

As explained in defendants' motion to transfer, the CIT has exclusive jurisdiction over plaintiffs' civil action challenging the imposition of tariffs, and this Court consequently lacks subject-matter jurisdiction. Docs. 9, 14. The CIT itself has recognized its exclusive jurisdiction over challenges to these orders. *Barnes* at 5-10. Two other district courts have reached that same conclusion in materially identical challenges to the IEEPA tariffs challenged here, and *no* court has reached a contrary conclusion. *Webber*, 2025 WL 1207587; *Emily Ley*. Indeed, *Emily Ley* considered and rejected many of the same arguments against the CIT's jurisdiction that plaintiffs make here: that IEEPA "does not refer to tariffs," that "the authority to 'regulate' imports does not include the authority [impose] tariffs," that "IEEPA is unlike other tariffs laws," and that the "'major questions' doctrine" precluded interpreting IEEPA to include the power to impose tariffs. *Id.* at 11. "None of these arguments are persuasive," the court concluded, "at least insofar as they implicate the jurisdictional question framed by Defendants' motion to transfer." *Id.* Twelve other States have also recognized that the "Court [of International Trade] has subject-matter jurisdiction" over litigation challenging these orders. *Oregon v. Trump*, No. 1:25-cv-77, Doc. 2 at 4 (CIT Apr. 23, 2025).

This Court should likewise conclude that it lacks jurisdiction and plaintiffs' suit belongs at the CIT and deny the motion. *Sires v. Washington*, 314 F.2d 883, 884 (9th Cir. 1963) (a district court lacking jurisdiction "may not entertain an application for an injunction").

#### B.    Plaintiffs Lack Standing To Challenge Tariffs That They Have Not Paid

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," which plaintiffs "bear[] the burden of establishing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

(1992). Plaintiffs here have not even tried to bear that burden for Governor Newsom, who thus lacks standing to bring any claims here. *See Guenther v. Cooper Life Scis.*, 759 F. Supp. 1437, 1441 (N.D. Cal. 1990); *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) ("standing is not dispensed in gross"); *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016) ("we consider only those arguments in favor of standing that the parties have adequately briefed"); *Ctr. for Bio. Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing … can be forfeited."). For its part, plaintiffs try but fail to meet their burden for the State.

**Injury In Fact:** California does not establish a concrete harm that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). California alleges price increases, Mot. 7, but fails to show actual or imminent concrete harm. The Shell Declaration, for example, says "some" vendors have "indicat[ed] a desire" to increase prices, Shell Decl. ¶ 9—but does not say that vendors have actually done so. It likewise describes a handful of price increase "requests," *id.* ¶ 11—but makes clear that such requests are subject to California's "approv[al]," *id.* ¶ 10. And *if* California refuses the requests, there are still more contingencies—vendors "may refuse" to perform the contracts, and the State "may" lose access to goods. *Id.* ¶ 15; *see* Bignami Decl. ¶ 7 ("if" products become more expensive, "there could be" impacts on public health programs because the increase "might" exceed the budget and there could be "possible" supply chain impacts). Similarly, California offers a "simulat[ion]" of "potential" increased costs. York Decl. ¶ 61. These speculative assertions are not sufficient. *Lujan*, 504 U.S. at 560; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410-18 (2013).[1]

Even if California's evidence were stronger, it would still be insufficient as a matter of law. "Federal policies frequently generate indirect effects on state revenues or state spending." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). But courts regularly and properly reject the idea that such common and peripheral effects suffice to give a state standing. *See id.*; *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) ("Are we really going to say that any federal regulation … that imposes peripheral costs on a State

---

[1] California also cites a declaration discussing harms to "California consumers" and "workers and firms in California." Clausing Decl. at 7-19. Such harms cannot confer standing even if established, because States lack standing as *parens patriae* to sue based on their citizens' interests. *Murthy*, 603 U.S. at 76; *Haaland v. Brackeen*, 599 U.S. 255, 294-95 (2023).

creates a cognizable Article III injury for the State to vindicate in federal court?"); *Wyoming v. DOI*, 674 F.3d 1220, 1231 (10th Cir. 2012) ("economic losses and adverse displacement effects"); *Iowa v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) ("forc[e] unemployment up and state tax revenues down"); *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) ("virtually all federal policies" carry "unavoidable economic repercussions," suggesting that "impairment of state tax revenues should not, in general, be … sufficient injury in fact to support state standing."); *Louisiana v. DHS*, 726 F. Supp. 3d 653, 675 (E.D. La. 2024) ("claimed economic injuries in the form of a reduction in their ad valorem tax collections").

The allegations' speculative nature also makes plaintiffs' cited cases inapposite. The "lost opportunity" injury in *Louisiana v. Dep't of Energy*, 90 F.4th 461, 467 (5th Cir. 2024), occurred because a regulation *precluded* any opportunity to buy certain products. The challenged tariffs here do not preclude the opportunity to buy imported products, and California does not establish that it has lost any such opportunity. *Becker v. Skype Inc.*, 2014 WL 556697, at *2 (N.D. Cal. Feb. 10) (rejecting "vague suggestions of lost opportunity," where plaintiff "provide[d] no allegations relating to any specific work he set aside or was forced to forgo"). Likewise, the D.C. Circuit has explained that "lost opportunity" injury looks to "whether the challenged action made a consumer's desired product … not readily available, and whether it rendered the product unreasonably priced." *Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854, 858 (D.C. Cir. 2021); *see Orangeburg v. FERC*, 862 F.3d 1071, 1078 (D.C. Cir. 2017). Again, California does not establish either factor.

**Traceability And Redressability:** California also cannot show that its alleged injuries are "fairly traceable to the challenged action" and "redress[able] by a favorable decision," *Lujan* 504 U.S. at 560-61, for at least two reasons. First, California's declarations describe the effect of tariffs *generally*. But this action does not challenge *all* tariffs; it challenges only certain tariffs imposed under IEEPA. Compl. ¶ 1. California fails to trace the alleged price increases and tax-revenue effects to the challenged IEEPA tariffs. Mot. 7-8; *see Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009) (no standing where harm alleged was "not tied to application of the challenged regulations"). In fact, California's own evidence reveals that its claimed harms flow from unchallenged tariffs on steel, aluminum, automobiles, and other products that

were imposed under *other* statutes, not IEEPA.[2] *See* Shell Decl. ¶ 12 (anticipating price increase requests "as a result of the imposition of new federal tariffs for food products, aluminum or steel products or parts contributing to finished products such as vehicles"); Mitra Decl. ¶¶ 5-6 ("key assumptions" underlying the tax revenue forecast "include 25 percent tariffs on imports of steel and aluminum, automobiles, certain automobile parts, and goods from Canada and Mexico"); White Decl. ¶ 5 (the tax revenue downgrade "is due in large part to tariffs" generally, without discussing IEEPA tariffs); York Decl. ¶ 62 (relying on research on "all the potential tariffs," "including IEEPA tariffs as well as potential sectoral specific tariffs"); Clausing Decl. 7-19 (discussing impact of tariffs generally).

Independently, traceability and redressability are lacking because California never says that it (or its arms or instrumentalities) is an importer of record that directly pays tariffs. *See Barnes* at 15 (plaintiff merely "concerned by the possibility that costs of goods will increase" because of IEEPA tariffs is "not a member of a group that may have a particularized injury, such as importers"). Just the opposite; California admits importers are third-party "vendors and suppliers or their subcontractors." Shell Decl. ¶ 14. As a purchaser, not an importer, California "ha[s] no remedy to challenge" a tariff because its alleged injury— increased prices—results from independent action by the third-party vendors who set their own prices. *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1352 (Fed. Cir. 2010); *see Lujan*, 504 U.S. at 560; *Pritikin v. Dep't of Energy*, 254 F.3d 791, 800-01 (9th Cir. 2001) (no traceability or redressability where third parties were "the direct source" of the asserted injury). California argues that vendors are increasing their prices "due to tariffs," Mot. 7, but its own declarant admits that "each vendor may pass along the additional cost of the new tariffs in different ways" and "it may not be administratively possible … to review every purchase made under every agreement to determine the tariff impact," Shell Decl. ¶¶ 16-17.

California's admission is consistent with market realities. Prices are set by independent private actors and informed by multiple, complex market forces. California cannot reasonably infer that importers will uniformly pass on not just costs but also any savings (like duty refunds or post-tariff price decreases) to consumers—let alone to the State specifically. Indeed, even if the Court were to grant injunctive relief, vendors may retain higher prices for any number of reasons independent of the IEEPA tariffs. California's

---

[2] *See, e.g.*, Procl. 10896, 90 Fed. Reg. 9,817 (Feb. 18, 2025) (imposing tariffs under section 232 of the Trade Expansion Act); Procl. 10908, 90 Fed. Reg. 14,705 (Mar. 26, 2025) (same).

"disregard [of] the complex free market and assum[ing] away [of] a multitude of market-driven reasons for the price of … products" makes clear that traceability and redressability are lacking. *Forces Action Proj. LLC v. State*, 2000 WL 20977, at *3 (N.D. Cal. Jan. 5), *aff'd in relevant part*, 16 F. App'x 774 (9th Cir. 2001); *see Animal Legal Defense Fund v. Quigg*, 932 F.2d 920, 934-95 (Fed. Cir. 1991) ("speculation as to market actors and their activities further beclouds the issue of causation as it concerns the farmers' alleged economic injury"); *Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983) ("where injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses"). The same goes for California's fears of decreased tax revenues. *See, e.g.*, *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 252-53 (2d Cir. 2020) (no state standing based on prospect of decreased tax revenue, as tax revenue "is driven by countless variables").

Strikingly, California addresses traceability and redressability in just two conclusory sentences. Mot. 8. The sole case it cites on traceability and redressability concerned "the violation of a procedural right," which can be asserted "without meeting all the normal standards for traceability and redressability." *California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018) (cleaned up). But California has not asserted any procedural harm and must abide by "the normal standards for traceability and redressability." *Id.*

Fundamentally, plaintiffs' theory of standing is that any governmental regulation that might increase costs for downstream purchasers causes a judicially redressable injury in fact traceable to that regulation. But if that were true, "everyone would have standing to litigate about everything." *Burnett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020). Plaintiffs are thus unlikely to succeed in showing their standing to challenge the IEEPA tariffs.

## II.    Plaintiffs Fail To Show Likely Success On The Merits Because IEEPA Clearly Includes Tariff Authority

The President imposed the challenged tariffs under the authority granted to him by IEEPA to "regulate … importation" to deal with a national emergency. 50 U.S.C. § 1702(a)(1)(B). The Ninth Circuit has already held that the identical language in TWEA "clearly shows" that Congress "unambiguously authorized" President Nixon's tariffs. *Spawr*, 685 F.2d at 1081 n.10. Plaintiffs are unlikely to succeed on the merits given that holding. Even if precedent did not control, IEEPA's text, context, history, and purpose

compel the same result.

**1. Text and Context.** IEEPA's plain text authorizes the President to impose tariffs. If a national emergency is declared:

> [T]he President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise … investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in … *any property* in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B) (emphases added). Imposing tariffs falls within the power to "regulate … importation" of foreign goods. *Id.* Tariffs set the terms on which foreign goods enter the United States. That is consistent with the definition of "regulate." *See Regulate*, Black's Law Dictionary 1156 (5th ed. 1979) ("[F]ix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws").

Precedent confirms this straightforward reading. Interpreting identical relevant language in TWEA, the Federal Circuit's predecessor upheld a tariff imposed by President Nixon, explaining that the phrase "regulate importation" permitted the President to "impos[e] an import duty surcharge." *Yoshida*, 526 F.2d at 576; *accord Alcan Sales v. United States*, 693 F.2d 1089, 1093 (Fed. Cir. 1982); *Spawr*, 685 F.2d at 1081 n.10. Courts have likewise long held that tariffs are a form of regulation of commerce. *See, e.g.*, *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933) ("well established" that import duties are an "exercise of the power to regulate commerce"); *Gibbons v. Ogden*, 22 U.S. 1, 202 (1824) ("[D]uties … in fact often are[] imposed … with a view to the regulation of commerce[.]"); *Yoshida*, 526 F.2d at 575 n.20 ("it is well established that" the power to "lay duties upon imports" "can be employed in the exercise of" "the power to regulate commerce" (collecting cases)); *id.* at 575 ("to impose duties can be to 'regulate'"); *Cornet Stores v. Morton*, 632 F.2d 96, 99 (9th Cir. 1980) ("principal purpose of the surcharge was the regulation of imports"). This makes sense: a tariff controls importation "as much as a quota," because both actions have "initial and direct impact on imports." *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 571 (1976). Rather than tie the President's hands, Congress clearly granted the President flexibility to determine what action to take to address an emergency, including choosing an

1  import control that, "[u]nlike quotas and other forms of action," can "be quickly imposed and removed"

2  and is "administratively less complex." *Id.* at 580.

3      Statutory context reinforces this conclusion. The power to "regulate" imports by imposing tariffs

4  is similar to the other powers granted in § 1702(a)(1)(B), like the power to "block" the import of goods

5  during an investigation, or the power to "prevent or prohibit" those imports. Each term grants the President

6  a significant power over foreign commerce. And many partially or fully overlap, suggesting that Congress

7  entrusted the President with wide-ranging powers with respect to imports rather than carefully picking

8  and choosing isolated types of interventions. For example, the provision's list of powers includes two

9  obvious pairs of belt-and-suspenders terms: "direct and compel" and "prevent or prohibit." *Id.* It confers

10  the overlapping powers to "nullify" and "void" various transactions. *Id.* Similarly, the power to "prevent

11  or prohibit" imports could be used to "block" imports during an investigation, but the statute goes out of

12  its way to grant both powers. *Id.*

13      Attempting to read § 1702(a)(1)(B)'s list as enumerating discrete powers instead of providing

14  broad Presidential authority would lead to the same conclusion about "regulation." If each power

15  articulated in the list is distinct, then "regulation" of imports must include actions such as tariffs;

16  otherwise, it would mean little, if anything, other than the power to "prevent or prohibit" imports—leaving

17  the term largely superfluous. *See, e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 141-43 (2024) (rejecting

18  reading that would leave a provision "without any operative significance").

19      Plaintiffs seek to narrow IEEPA's plain text by arguing that "regulate" cannot mean "tax." Mot. 8-

20  11. That argument ignores the longstanding contrary authority just discussed. And plaintiffs do not offer

21  any real examples of what regulating imports could mean other than the power to impose tariffs, fees, or

22  similar monetary exactions. At best, plaintiffs argue that "regulate" might mean to "limit[] the times when

23  imports can be brought in" or to "subject[] them to inspection," Mot. 10, but IEEPA already delegates to

24  the President the power to "investigate" and "prevent or prohibit" importation "by means of instructions"

25  or "otherwise." Again, "regulate" cannot simply mean to "investigate" or to "prevent or prohibit" under

26  particular "instructions." *See, e.g.*, *Pulsifer*, 601 U.S. at 141-43.

27      Plaintiffs' suggestion that it would be odd to describe exactions imposed on undesirable conduct

28  as "regulation" of that conduct, Mot. 10, also misses the mark. The question is not what "regulate" means

in isolation, but rather what "regulate … importation" means—and precedent is clear that it includes imposing tariffs. More generally, though, the verb "regulate" comfortably encompasses imposing fees to discourage or steer consumption. Authorities also commonly "regulate" the examples of conduct that plaintiffs give (like pollution) by imposing monetary exactions.[3]

Indeed, Congress understands that tariffs "regulate" importation because that is how it describes tariffs in non-emergency trade statutes. Section 232 of the Trade Expansion Act of 1962, for instance, delegates to the Executive Branch the power to "adjust … imports" to protect national security, 19 U.S.C. § 1862(c), which the Supreme Court has explained includes the power to impose "monetary exactions" like "license fees and duties" on imports, *Algonquin*, 426 U.S. at 562. Section 232 "clearly … grant[ed] [the President] a measure of discretion in determining the method to be used to adjust imports." *Id.* at 561. There was "no support in the language of the statute for [the] contention that the authorization to the President to 'adjust' imports should be read to encompass only … quotas as opposed to monetary methods." *Id.* And elsewhere in that same Act, as well as in the Trade Act of 1974, Congress defined the phrase "duty or other import restriction" as encompassing not just duties but also "exaction[s] other than dut[ies]" that are "imposed for the *regulation of imports*." 19 U.S.C. §§ 1806(2), 2481(2) (emphasis added). Regulating importation thus includes the power to impose tariffs.

Finally, plaintiffs say "regulate … importation" must not include tariff authority because the IEEPA power to "regulate … exportation" cannot include tariff authority. Mot. 11. That makes no sense, which is why no other challenger to these IEEPA tariffs has made the argument. Statutory language must be read in context (as plaintiffs agree, *id.* 9), and the verb "regulate" requires an object "to express a complete thought." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 103 (D.D.C. 2020); *QBE Syndicate 1036 v. Compass Mins. Louisiana, Inc.*, 95 F.4th 984, 995 (5th Cir. 2024) (transitive verbs "*require* an object to complete the thought"). Thus, there is nothing inconsistent about reading the phrase "regulate importation" to include the power to impose tariffs but reading the phrase "regulate exportation" to convey a different set

---

[3] On that note, plaintiffs complain that a plain reading of "regulate" would too broadly permit the President to tax acquisitions, holdings, withholdings, and so forth, Mot. 10, but ignore that IEEPA already authorizes the President the more drastic authority to *prohibit* such conduct. It is thus unclear how reading "regulate" naturally to include the less economically disruptive power to impose tariffs is somehow "a transformative expansion in presidential authority," *id.*

1  of authorities. In each case, the object determines the phrase's scope. Because the different phrases can

2  bear different meanings, plaintiffs' attempt to reading based on "regulate … exportation" lacks force.

3  Even if IEEPA authorizes the President to impose monetary fees on exportation, that would not

4  require a narrow construction of the phrase "regulate … importation." As defendants have explained, and

5  plaintiffs do not deny, fees can be constitutionally imposed on exports under certain circumstances—for

6  example, user fees and sanctions, or taxes on goods exported from territories. Doc. 14 at 13. And that a

7  statute might be unconstitutionally applied in just one hypothetical situation, *see* Mot. 17-18, does not

8  require the Court to discard the normal tools of statutory interpretation. "If constitutional avoidance means

9  anything, it means not reaching out to address hypothetical interpretive or constitutional questions not

10 directly presented." Doc. 14 at 13 (citing *Almendarez-Torres v. United States*, 523 U.S. 224, 237-39

11 (1998); *Salinas v. United States*, 522 U.S. 52, 60 (1997)). Regardless, avoidance applies "only when, after

12 the application of ordinary textual analysis, the statute is found to be susceptible of more than one

13 construction." *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). Text, context, history, and purpose show

14 that IEEPA clearly authorizes the President to impose tariffs on imports; plaintiffs' reading is thus "plainly

15 contrary to the intent of Congress" and should not be adopted. *Miller v. French*, 530 U.S. 327, 341 (2000).

16 **2. History.** IEEPA's history confirms that it authorizes the President to impose tariffs. "Congress

17 is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that

18 interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978);

19 *see Tex. Dep't of Housing & Comm. Affairs v. Inclusive Comms. Project, Inc.*, 576 U.S. 519, 536 (2015);

20 *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 n.11 (2009). Congress drew the relevant language

21 directly from TWEA, and it did so *after* the Federal Circuit's predecessor interpreted that identical

22 language to permit the President to impose tariffs in 1975. During the legislative process for IEEPA,

23 Congress was well aware of the relevant language and the court's decision interpreting the language to

24 authorize the President to impose tariffs but chose to keep the language when it enacted IEEPA in 1977.

25 The key language in IEEPA, "regulate … importation," was left unaltered from TWEA. *See* First

26 War Powers Act, ch. 593, title III, § 301, 55 Stat. 839 (1941) (authorizing the President to "investigate,

27 *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use,

28 transfer, withdrawal, transportation, *importation* or exportation of, or dealing in…" (emphases added));

50 U.S.C. § 1702(a)(1)(B). Courts, including the Supreme Court, have repeatedly recognized the close relationship between the substantive powers in IEEPA and TWEA. *See, e.g.*, *Dames*, 453 U.S. at 671-72 (this section of IEEPA was "directly drawn" from TWEA); *Regan*, 468 U.S. at 227-28 ("[T]he authorities granted to the President [under] IEEPA are essentially the same as those [under] TWEA."); *Sec. Pac. Nat. Bank v. Iran*, 513 F. Supp. 864, 875 (C.D. Cal. 1981) (§1702 of "IEEPA is, except for stylistic changes, a reenactment of the powers previously conferred on the President by §5(b) of the TWEA").

Congress also knew of *Yoshida*'s interpretation of TWEA when it chose to use the same language in IEEPA. The House Report on IEEPA cited *Yoshida* and explained its holding. H.R. Rep. No. 95-459, at 5. It recounted that "section 5(b) [of TWEA] came into play when … President Nixon declared a national emergency … and under that emergency imposed a surcharge on imports," that the Customs Court invalidated the action by holding that "section 5(b) … did not" authorize duties, and that "the Appeals Court reversed." *Id.* Aware of this holding of the appellate court with exclusive jurisdiction over the matter, Congress used the same language in IEEPA.

The language Congress drew directly from TWEA carries the same meaning in IEEPA. "[W]hen Congress 'adopt[s] the language used in [an] earlier act,'" courts "presume that Congress 'adopted also the construction given'" to that language. *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020) (citation omitted); *see Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'"). That Congress provided specific exceptions to the broad grant of authority under IEEPA and that none of those exceptions curtailed the President's authority to impose tariffs to deal with a declared national emergency confirms that Congress incorporated *Yoshida*'s interpretation and TWEA's scope unless Congress specifically said otherwise. *See* 50 U.S.C. § 1702(b) (listing "Exceptions to Grant of Authority"). Courts, including the Supreme Court, have recognized this by applying TWEA precedent to interpret IEEPA. *See Dames*, 453 U.S. at 672 ("[B]oth the legislative history and cases interpreting the TWEA fully sustain the broad authority of the Executive when acting under this congressional grant of power [*i.e.*, IEEPA]."); *Sec. Pac. Nat. Bank*, 513 F. Supp. at 877 ("[T]he substantial body of judicial interpretation of the TWEA should be applied to interpret the powers of the President under the IEEPA.").

Plaintiffs say the tariffs at issue in *Yoshida* were not imposed under TWEA and "did not apply to all imports across the board," Mot. 18-19, but they have the history wrong. As *Yoshida* explained, "TWEA was not cited in Proclamation 4074 by name (though it [was] incorporated by 'but not limited to') because it would be inappropriate in a proclamation affecting 'friendly' or 'neutral' nations," but TWEA nonetheless provided the tariff authority for the proclamation. 526 F.2d at 575 n.22. And the 10-percent surcharge was "across the board"—it was "imposed on *all dutiable articles*," with limited exceptions. *Id.* at 567 (emphasis added) (quoting Procl. 4074). Plaintiffs also try to discount *Yoshida* because it says the court did not follow its preferred textual analysis. Mot. 19 n.12. But that does not change that Congress knew of and clearly incorporated *Yoshida*'s interpretation of "regulate … importation."

Finally, plaintiffs contend that the enactment of Section 122 of the Trade Act of 1974 (19 U.S.C. § 2132) means that Congress somehow carved out tariffs from TWEA. Mot. 19-20. This gets the history wrong again. *Yoshida* was decided *after* Section 122 was enacted, yet that court rejected the idea that statutes applicable in non-emergency situations—including Section 122—can narrow the powers available in an emergency. *See* 526 F.2d at 578 ("trade acts" that do not involve "national emergency powers" did not narrow TWEA's scope). In any event, plaintiffs' contention is belied by the intersecting timelines of the *Yoshida* litigation and the passage of the Trade Act of 1974. In July 1974, the trial court in *Yoshida* concluded that TWEA did not authorize tariffs. 378 F. Supp. 1155 (Cust. Ct. 1974). In response, Congress passed the Trade Act of 1974, which authorized the President to impose a limited surcharge to address certain balance-of-payments issues. *See* S. Rep. No. 93-1298, at 88 (1974) (Trade Act was "necessary … *in the light of the recent decision by the … Customs Court*," despite Congress's view that the President's "authority" to impose import surcharges was already "manifest" (emphasis added)). But the appellate court's decision reversing the trial court and holding that "regulate … importation" authorizes tariffs was issued *after* the enactment of Section 122. Thus, when Congress enacted Section 122 in 1974, it sought only to ensure that, if the appellate court did not reverse the trial court, the President would still have a mechanism to impose tariffs to address balance-of-payments problems. And when it enacted IEEPA in 1977, the most recent change in the statutory landscape was *Yoshida*—not Section 122. Plaintiffs point to *no* history supporting the notion that Congress enacted a non-emergency statute (Section 122) to strip

1   the President's authority to impose tariffs in an emergency (IEEPA). *See Emily Ley* at 14 n.15 (explaining

2   why Section 122 and IEEPA's history confirm that IEEPA includes the power to impose tariffs).

3       **3. Purpose.** Finally, IEEPA's evident purpose confirms that it includes the power to impose tariffs.

4   The purpose of emergency statutes, like IEEPA, is to give the President broad and flexible powers to

5   effectively address problems associated with a national emergency. "[T]he primary implication of an

6   emergency power is that it should be effective to deal with a national emergency successfully." *Yoshida*,

7   526 F.2d at 573. "The delegation in" IEEPA, like TWEA "is broad and extensive; it could not have been

8   otherwise if the President were to have, within constitutional boundaries, the flexibility required to meet

9   problems surrounding a national emergency with the success desired by Congress." *Id.*; *accord Spawr*,

10  685 F.2d at 1080 (same). Indeed, "the legislative history of [IEEPA] notes that the authorities available to

11  the President should be sufficiently broad and flexible to enable the President to respond as appropriate

12  and necessary to unforeseen contingencies." 6 U.S. Op. Off. Legal Counsel 644, 681 (1982). Interpreting

13  IEEPA to include the power to impose tariffs furthers Congress's purpose to give the President the critical

14  tools and flexibility to handle national emergencies.

15      "[S]tatutes granting the President authority to act in matters touching on foreign affairs are to be

16  broadly construed." *B-West Imports v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996). Indeed, in foreign

17  affairs, "broad grants by Congress of discretion to the Executive are common." *Florsheim Shoe Co. v.*

18  *United States*, 744 F.2d 787, 795 (Fed. Cir. 1984). IEEPA "is intimately involved with foreign affairs, an

19  area in which congressional authorizations of presidential power should be given a broad construction and

20  not hemmed in or cabined, cribbed, confined by anxious judicial blinders." *Id.* at 793 (cleaned up); *see,*

21  *e.g.*, *Al-Bihani v. Obama*, 619 F.3d 1, 38-39 (D.C. Cir. 2010) (Kavanaugh, J., concurring). When foreign

22  affairs and national security are involved, "the President plays a dominant role," and "it is generally

23  assumed that Congress does not set out to tie the President's hands; if it wishes to, it must say so in clear

24  language." *Humane Soc'y of U.S. v. Clinton*, 236 F.3d 1320, 1329 (Fed. Cir. 2001). Plaintiffs cannot point

25  to clear language cabining the President's authority. Just the opposite—text, history, and context all show

26  that IEEPA authorizes the President to impose tariffs.

27      **4. The Major-Questions Doctrine.** In plaintiffs' view, the Court should not presume that Congress

28  delegated authority to the President because of the tariffs' economic and political significance. Mot. 14-

17. But the major-questions doctrine does not apply here, and the statute is clear in any event.

At the threshold, the major-questions doctrine does not apply because "the statute at issue" does not "confer[] authority upon an administrative agency." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). It confers authority on the President. The Supreme Court has never applied the doctrine to a delegation to the President. It instead describes the doctrine as applying to statutes giving authority to agencies. The major-questions "label … took hold because it refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem: *agencies* asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 724 (cleaned up) (emphasis added). Unlike the President, agencies lack political accountability. *See NFIB v. Dep't of Lab.*, 595 U.S. 109, 125 (2022) (Gorsuch, J., concurring) (allowing Congress to "hand off all its legislative powers to unelected agency officials" would replace "government by the people" with "government by bureaucracy"). No political-accountability justification applies here, where "the Framers made the President the most democratic and politically accountable official in Government," *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020), and the President directs an action in an executive order. A unanimous panel of the Ninth Circuit recognized that "[t]he Major Questions Doctrine is motivated by skepticism of agency interpretations" and "does not apply to Presidential actions." *Mayes v. Biden*, 67 F.4th 921, 933, 934 (9th Cir. 2023), *vacated as moot by* 89 F.4th 1186 (9th Cir. 2023).

Similarly, the major-questions doctrine does not apply to national-security and foreign-policy matters. A major-questions approach treats a decision with a "measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That approach is irreconcilable with longstanding precedent compelling the opposite approach in these contexts. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (acknowledging "the deference traditionally accorded the President" on these matters); *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (recounting the "utmost deference to Presidential responsibilities" that courts have "traditionally shown" in these matters). In this area, unlike in major-questions cases, there is no "reason to hesitate before concluding that Congress meant to confer" significant authority to regulate foreign commerce on the President. *West Virginia*, 597 U.S. at 721 (cleaned up). The President's overlapping powers in the national-security and foreign-affairs realm further diminish any concerns of unauthorized overreach. There, the President's "authority is at its maximum" when he acts pursuant to the

"authorization of Congress," and in those circumstances he "may be said" to "personify the federal sovereignty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-36 (1952) (Jackson, J., concurring in the judgment).[4]

Even if the major-questions doctrine were not categorically inapplicable, plaintiffs press no persuasive argument that it would apply to the challenged tariffs. The Supreme Court has identified several traits of regulatory action that, in combination, implicate the major-questions doctrine when an agency takes a sufficiently significant action. No one doubts the significance of the challenged tariffs, but significance alone is not enough; otherwise, the doctrine would apply to countless government actions, including every emergency statute and, paradoxically, to any matter of national security. None of the remaining indicia of major questions—let alone an adequate combination—are present here.

IEEPA raises no nondelegation concerns, as plaintiffs concede. *See United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (rejecting nondelegation challenge to IEEPA). The President's use of IEEPA is also not an exercise of "unheralded" power, Mot. 14, especially given the President's exercise of his tariff power under materially identical language in IEEPA's predecessor statute. *West Virginia*, 597 U.S. at 724. Likewise, the President's challenged actions accord with a robust history of similar exercises of power under IEEPA to achieve foreign-policy objectives by regulating imports and exports—often with even more serious measures like total or near-total embargoes. *See, e.g.*, E.O. 13873, 84 Fed. Reg. 22,689 (May 15, 2019) (invoking IEEPA to bar the "importation … of any information and communications

---

[4] Plaintiffs claim "every Court of Appeals" has "applied the major-questions doctrine" to presidential action, Mot. 15, but their count is off. Since *Mayes* unanimously held the doctrine inapplicable, one Ninth Circuit judge applied the doctrine to the President. *Nebraska v. Su*, 121 F.4th 1, 20 (9th Cir. 2024) (Nelson, J., concurring), *pet. for reh'g pending,* No. 23-13179. The *Su* majority expressly declined to address the "argument that this doctrine does not apply to congressional delegations of authority to the President." *Id.* at 14 n.6. Authority in other circuits is mixed. The Eleventh Circuit has not held the doctrine applies to presidential action. A single judge signed the lead opinion in *Georgia v. President of the United States*, 46 F.4th 1283, 1289 (11th Cir. 2022). An opinion concurring in the result makes no mention of the major-questions doctrine. *Id.* (Edmondson, J., concurring in the result). And the panel's third judge would have held the doctrine inapplicable. *Id.* at 1313 (Anderson, J., concurring in part and dissenting in part). Judge Anderson recognized that "the President … does not suffer from the same lack of political accountability that agencies may, particularly when the President acts on a question of economic and political significance." *Id.* A dissenting judge in *Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022), would have followed Judge Anderson's reasoning. *Id.* at 1038 (Graves, J., dissenting). As for the Sixth Circuit, in *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022), the court "never squarely addressed its reasoning for treating presidential action the same as agency action." *Mayes*, 67 F.4th at 933-34.

technology" that was "designed, developed, manufactured, or supplied, by persons owned by, controlled by, or subject to the jurisdiction or direction of a foreign adversary"); E.O. 12959, 60 Fed. Reg. 24,757 (May 9, 1995) (invoking IEEPA to bar "the importation into the United States or the financing of such importation of any goods or services of Iranian origin," with certain exceptions); Cong. Rsch. Serv., *IEEPA: Origins, Evolution, and Use*, R45618, 58-62 (Jan. 30, 2024) (collecting dozens of similar uses of IEEPA to regulate imports and exports).

IEEPA's authorization of the President to regulate imports in an emergency is not a catch-all clause or "modest words" in an "ancillary provision" of the statute. *West Virginia*, 597 U.S. at 723-24. Just the opposite: the power is conferred as one of the enumerated terms in a list of powers making up one of the statute's "key provisions," *United States v. Cal. Stem Cell Treatment Ctr.*, 117 F.4th 1213, 1221 (9th Cir. 2024), and that term straightforwardly grants the President broad, consequential powers over foreign commerce to deal with broad, consequential problems facing the country. Section 1702(a)(1)(B), by including authorization for the President to "regulate … importation," could never be mistaken for a mousehole—*especially* when Congress expressly acknowledged that the appellate court with exclusive jurisdiction over the matter had just conclusively interpreted that language to convey tariff authority.

Applying the major-questions doctrine would also conflict with the strong presumption that statutes granting the President authority to act in foreign-affairs matters are often broadly written and broadly construed. "[T]he Supreme Court has consistently emphasized that broad delegations are appropriate in the foreign policy arena because of the political nature of the decisions and the compelling need for uniformity," which is why Congress "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *United States v. Bozarov*, 974 F.2d 1037, 1044 (9th Cir. 1992). After all, "it would be impossible for Congress to revise [statutory authorities] quickly enough to respond to the fast-paced developments in the foreign policy arena." *Id.*; *see United States v. Gurrola-Garcia*, 547 F.2d 1075, 1079 (9th Cir. 1976) ("[T]he principle that Congress may delegate broad authority to the President in foreign affairs is clearly controlling law today."). It would be "unwis[e]" to "requir[e] Congress in this field of governmental power to lay down narrowly definite standards." *United States v. Kuok*, 671 F.3d 931, 939 (9th Cir. 2012). So it is "far from 'implausible' that Congress contemplated" giving the President broad powers including tariffs "as a means of achieving its clear directive." *Panoche*

*Energy Ctr., LLC v. EPA*, 2024 WL 3043005, at *1 (9th Cir. June 18); *Corbett v. TSA*, 19 F.4th 478, 488 (D.C. Cir. 2021) (Broad statutory language "'reflects an intentional effort to confer the flexibility necessary' for TSA to address yet unknown threats to transportation security and safety as they arise.").

Finally, the major-questions doctrine compares the statute's text to the power exercised. The doctrine is more likely to apply when the power exercised amounts to "a fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind," *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) (cleaned up)—or, put differently, whether the power goes "beyond what Congress could reasonably be understood to have granted," *West Virginia*, 597 U.S. at 724. These considerations are already accounted for. But to sum up: IEEPA unambiguously confers far-reaching emergency powers over foreign trade, the President has repeatedly exercised those powers in comparable actions and contexts, and those powers fall within the President's core competencies of national security and foreign affairs. The exercise of tariff authority is thus not transformative or surprising. The major-questions doctrine is not implicated here.

Even if it were, the Executive Orders would still be supported by the "clear congressional authorization for the power" to impose and modify tariffs in response to unfair foreign trade practices. *West Virginia*, 597 U.S. at 723. The major-questions doctrine provides no basis to invalidate an action where the statute "specifically authorizes the [agency] to make decisions like th[e] one" under review. *United States v. White*, 97 F.4th 532, 540 (7th Cir. 2024). That remains true when the authorization is couched in clear but broad language. *See Florida v. HHS*, 19 F.4th 1271, 1288 (11th Cir. 2021) (major-questions doctrine did not apply because "a broad grant of authority" that "plainly encompasses the [agency's] actions … does not require an indication that specific activities are permitted"); *Nebraska*, 600 U.S. at 511 (Barrett, J., concurring) (unlike true "clear-statement" rules, major-questions doctrine does not require "an 'unequivocal declaration' from Congress authorizing the *precise* agency action under review"); *West Virginia*, 597 U.S. at 723 ("something more than a merely *plausible* textual basis for the agency action is necessary" (emphasis added)). Indeed, the Ninth Circuit has found the relevant language here to be "*unambiguous*" and to "*clearly* show[] that the President's actions [imposing tariffs] were in accordance with the power Congress delegated." *Spawr*, 685 F.2d at 1081 n.10 (emphases added). So has the U.S. District Court for the Northern District of Florida, which recently concluded in a similar case

1  "that Congress provided the 'clear authorization' required under the modern major questions doctrine

2  cases when it incorporated TWEA's operative language—along with *Yoshida*'s judicial gloss on that

3  language—into IEEPA verbatim." *Emily Ley* at 12-13.

4  **III.     Plaintiffs Fail To Show the Remaining Preliminary-Injunction Factors**

5          Plaintiffs also cannot meet their heavy burden to show they will be irreparably injured before being

6  heard on the merits. *Winter*, 555 U.S. at 22. "[S]peculation on future harm" and "unsupported and

7  conclusory statements" are insufficient. *Herb Reed Enters. v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1250 (9th

8  Cir. 2013). Simply showing some possibility of irreparable injury fails to satisfy this factor—the injury

9  must be "likely." *Winter*, 555 U.S. at 22. Conclusory statements in affidavits from an interested party have

10 limited value. *See Oakland Trib., Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

11         To start, plaintiffs' delay in moving for preliminary-injunctive relief strongly suggests they will

12 not be irreparably harmed absent an injunction. A "long delay before seeking a preliminary injunction

13 implies a lack of urgency and irreparable harm." *Miller v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir.

14 1993). Indeed, preliminary relief exists to give a court enough time to engage in the ordinary adjudicative

15 process. Thus, "[o]nly when the threatened harm would impair the court's ability to grant an effective

16 remedy is there really a need for preliminary relief." 11A Wright & Miller, *Federal Practice and*

17 *Procedure* § 2948.1 (3d ed. 2025). But here, plaintiffs waited nearly *four months* after the first IEEPA

18 tariffs were imposed, and a month after they filed their action, to move for a preliminary injunction. This

19 pace belies any claim that time is of the essence. Both the Ninth Circuit and this Court have held that

20 similar delays justify the denial of extraordinary relief. *See, e.g.*, *Garcia v. Google, Inc.*, 786 F.3d 733, 746

21 (9th Cir. 2015) (five months); *Westerman v. FTI Consulting, Inc.*, 2025 WL 256978, at *3 (N.D. Cal. Jan.

22 21) (four months). Plus, plaintiffs now say they prefer *dismissal* over transfer to a court that could decide

23 their preliminary injunction motion, further belying any claim that they fear imminent irreparable harm.

24 In any event, California's speculative claims of potential price increases unmoored from the challenged

25 tariffs fail to meet the high bar required for preliminary injunctive relief. *See, e.g.*, *Herb Reed Enters.*, 736

26 F.3d at 1250.

27         Regardless, any harm to plaintiffs would still be outweighed by the balance of hardships and the

28 public interest, which "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418,

435 (2009). Just last week, in staying a district court's interim relief, the Supreme Court reaffirmed that "[t]he purpose of … interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. Wilcox*, 2025 WL 1464804, at *1 (U.S. May 22) (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)). Here, this factor dramatically favors defendants. The President has declared a national emergency in light of threats to the United States's economy, military preparedness, and national security. A preliminary injunction would seriously, immediately, and irreparably harm ongoing United States diplomatic efforts, foreign policy, and national security. Bessent Decl. ¶¶ 9-13; Greer Decl. ¶¶ 6, 9-15; Lutnick Decl. ¶¶ 1, 7-15, 19; Rubio Decl. ¶¶ 3, 8-16. A preliminary injunction could shatter current diplomatic efforts, eliminating the premise of ongoing negotiations with dozens of countries.  Bessent Decl. ¶¶ 10-13; Greer Decl. ¶¶ 7, 9-13; Lutnick Decl. ¶¶ 7, 11-13, 15, 19; Rubio Decl. ¶¶ 8-12. Negotiations cannot simply be paused and resumed at a moment's notice. This disruption of negotiations with other countries would irreparably harm United States diplomacy and national security.  Bessent Decl. ¶¶ 11-13; Greer Decl. ¶¶ 6, 11-15; Lutnick Decl. ¶¶ 1, 11-19; Rubio Decl. ¶¶ 3-4, 10-16; *see Widakuswara v. Lake*, 2025 WL 1288817, at *5 (D.C. Cir. May 3) (interfering with foreign affairs irreparably harms the government).

These grave and certain harms to the federal government and the public interest mandate denial of injunctive relief here. In *Wilcox*, the Supreme Court held that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." 2025 WL 1465804, at *1. It was enough that interim relief would create a "disruptive effect of … repeated removal and reinstatement of officers." *Id.* Here, the stakes for the government are even higher, and the "disruptive effect" of interim equitable relief would be extraordinarily harmful to the conduct of American foreign policy and destabilize the economy. *E.g.*, *Winter*, 555 U.S. at 23-28 (interference with national-security needs independently precluded preliminary injunction).

## IV.    Any Preliminary Injunction Should Be Stayed, Limited Only To Plaintiffs, And Would Require Them To Post A Bond

For substantially the same reasons, if the Court were to grant a preliminary injunction, it is imperative that the Court temporarily stay the injunction so that defendants can appeal and seek emergency

relief without incurring immediate, irrevocable harm to ongoing diplomatic efforts.

If this Court were to issue a preliminary injunction, its order must be limited in scope to the plaintiffs. Nationwide injunctions are only available in "exceptional cases." *San Francisco v. Trump*, 896 F.3d 1225, 1244 (9th Cir. 2018); *see Florida*, 19 F.4th at 1282 (appropriate circumstances for issuing a nationwide injunction "are rare"); *Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020) ("[s]uch injunctions present real dangers, and will be appropriate only in rare circumstances"). Here, plaintiffs cannot show why a preliminary injunction is necessary at all, let alone a universal one. Certainly, they cannot show that they will be deprived of complete relief without a universal injunction. *Cf. Florida*, 19 F.4th at 1281. And any relief must run only to the State of California—not to all who import there. Again, California does not have standing as *parens patriae* to seek relief on behalf of all those who import through its ports. *Murthy*, 603 U.S. at 76; *Haaland*, 599 U.S. at 294-95.

The Court must also require plaintiffs to "give[] [a] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[I]njunction bonds are generally required," and cannot be avoided by arguing that a bond would "conflict with [the] right to seek judicial review." *Nat'l Treas. Emps. Union v. Trump*, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16). In the tariff context, Rule 65 requires a plaintiff to post single transaction bonds for each importation of goods that would have otherwise been subject to the challenged tariffs. *See, e.g.*, *PrimeSource Bldg. Prods. v. United States*, 535 F. Supp. 3d 1327, 1330 (Ct. Int'l Trade 2021). That plaintiffs are not importers who have paid tariffs again confirms that injunctive relief is inappropriate. But if the Court entered broader relief, plaintiffs would be required to post a bond in the amount of revenue lost by the U.S. government from interim relief—a figure that could easily reach billions depending on the scope of relief. The bond must be measured by *all* the tariffs that importers would have paid absent an injunction. If the Court will not impose an injunction bond, then the equities favor defendants even more. *See Widakuswara*, 2025 WL 1288817, at *5 (finding irreparable harm to the government when district court does not require an injunction bond).

## CONCLUSION

For these reasons, the Court should deny plaintiffs' motion for a preliminary injunction.

DATED: May 27, 2025

OF COUNSEL:


ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

SOSUN BAE
Senior Trial Counsel
BLAKE W. COWMAN
CATHERINE M. YANG
COLLIN T. MATHIAS
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch

PATRICK ROBBINS
Acting United States Attorney
PAMELA JOHANN
Assistant United States Attorney
Chief, Civil Division
450 Golden Gate Avenue
P.O. Box 36066
San Francisco, California 94102
(415) 436-7025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

*s/Claudia Burke*
CLAUDIA BURKE
Deputy Director

*s/Justin R. Miller*
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office


*s/Luke Mathers*
LUKE MATHERS
Trial Attorney
U.S. Department of Justice
Civil Division
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-9236
luke.mathers@usdoj.gov

Attorneys for Defendants