UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>DONALD J. TRUMP, et al.,<br><br>　　　　Defendants. | Case No. 25-cv-03372-JSC<br><br>**ORDER RE: MOTION TO TRANSFER**<br><br>Re: Dkt. No. 9 |

Beginning February 1, 2025, President Trump issued a series of executive orders imposing, pausing, and modifying tariffs. On April 16, 2025, the State of California—by and through Attorney General Rob Bonta—and Gavin Newsom (together "California") sued the President and several federal agencies (together, "the Government") to enjoin the tariffs and declare them unlawful. (Dkt. No. 1.) California contends the tariffs are *ultra vires* because the International Economic Emergency Powers Act ("IEEPA"), which President Trump invokes as statutory authority, does not authorize the tariffs imposed. And California contends the President violated the separation-of-powers doctrine by usurping the power vested in Congress "[t]o lay and collect Taxes, Duties, Imposts, and Excises." U.S. Const. art. I, § 8.

Pending before the Court is the Government's motion to transfer this case to the U.S. Court of International Trade ("CIT"). The question before the Court is not whether the challenged tariffs are constitutional; instead, the question is whether this action arises out of a law providing for tariffs such that the CIT has exclusive jurisdiction to decide whether the President was authorized to impose tariffs in the manner, and under the circumstances, in which he has. *See* 28 U.S.C. § 1581(i). Having carefully considered the parties' submissions, and with the benefit of oral argument on May 22, 2025, the Court concludes this action falls within the CIT's exclusive

1  jurisdiction. Because this lawsuit arises out of executive orders imposing tariffs, and because
2  those executive orders are "provisions of law for all purposes," 19 U.S.C. § 3004(c), this action
3  arises out of laws providing for tariffs and this Court is divested of jurisdiction. Because
4  California requests dismissal rather than transfer to the CIT, transfer is not in the interest of
5  justice. So, the Court DENIES the motion to transfer and DISMISSES the case without prejudice.

## BACKGROUND

## I.   THE TARRIF EXECUTIVE ORDERS

### A.   Country-Specific Tariffs

On January 20, 2025, President Trump "declare[d] that a national emergency exists at the southern border of the United States." Proclamation No. 10,866, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 29, 2025) ("Southern Border Proclamation"). Finding the southern border "overrun by cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans," the President found it "necessary for the Armed Forces to take all appropriate action to assist the Department of Homeland Security in obtaining full operational control of the southern border." *Id.*

On February 1, 2025, the President—citing this Southern Border Proclamation—issued three executive orders imposing tariffs on imports from Mexico, Canada, and China. *See* Exec. Order No. 14,194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 7, 2025) (imposing a 25% tariff on products from Mexico); Exec. Order No. 14,193, *Imposing Duties to Address the Flow of Drugs Across our Northern Border*, 90 Fed. Reg. 9113 (Feb. 7, 2025) (imposing a 25% tariff on products of Canada, with the exception of energy resources, subject to a 10% tariff); Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 7, 2025) (imposing a 10% tariff on products of the People's Republic of China).

Each executive order "expand[ed] the scope of the national emergency declared" in the Southern Border Proclamation. 90 Fed. Reg. at 9118. That is, the executive order imposing tariffs on Mexico expanded the Proclamation's scope "to cover the failure of Mexico to arrest, seize,

detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." *Id.* The executive order imposing tariffs on Canada expanded the Proclamation's scope to cover the threat posed by Canada's failure "to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." 90 Fed. Reg. at 9114. And the executive order imposing tariffs on China expanded the Proclamation's scope "to cover the failure of the PRC government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." 90 Fed. Reg. at 9122.

In each executive order, the President invokes IEEPA as the source of authority:

> I have decided to impose, consistent with law, ad valorem tariffs on articles that are products of Mexico as set forth in this order. In doing so, I invoke my authority under section 1702(a)(1)(B) of IEEPA, and specifically find that action under other authority to impose tariffs is inadequate to address this unusual and extraordinary threat.

90 Fed. Reg. at 9118; 90 Fed. Reg. at 9114 (same); 90 Fed. Reg. at 9122 (same). And each executive order instructs the Secretary of Homeland Security to "determine the modifications necessary to the Harmonized Tariff Schedule of the United States (HTSUS) in order to effectuate this order consistent with law and shall make such modifications to the HTSUS through notice in the *Federal Register*." 90 Fed. Reg. at 9118; *see also id.* at 9115 (same); *id.* at 9123 (same).

The President has since issued numerous executive orders pausing the tariffs, exempting certain goods, and adjusting tariff rates. *See, e.g.*, Exec. Order No. 14,198, *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 26 (Feb. 10, 2025 ("In recognition of the steps taken by the Government of Mexico, and in order to assess whether the threat described in section 1 of this order has abated, the additional 25 percent ad valorem rate of duty shall be paused and will not take effect until March 4, 2025."); Exec. Order No. 14,231, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border,* 90 Fed. Reg. 46 (Mar. 11, 2025) ("In order to minimize disruption to the United States automotive industry and automotive workers, it is appropriate to adjust tariffs imposed on articles of Canada in Executive Order 14193

3

of February 1, 2025."); Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* (Mar. 7, 2025) ("In recognition of the fact that the PRC has not taken adequate steps to alleviate the illicit drug crisis, section 2(a) of Executive Order 14195 is hereby amended by striking the words '10 percent' and inserting in lieu thereof the words '20 percent.'").

### B.     Universal and Reciprocal Tariffs

On April 2, 2025, the President issued an executive order imposing a 10% tariff on "all imports from all trading partners," with some exceptions.  Exec. Order No. 14,257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (Apr. 7, 2025).  For certain enumerated countries, the executive order sets tariff rates to increase to a specified rate, ranging from 11% to 50%.  *Id.* at 15049-50.

The executive order simultaneously declares a national emergency, stating:

> I, DONALD J. TRUMP, President of the United States of America, find that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States. That threat has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system. I hereby declare a national emergency with respect to this threat.

*Id.* at 15041.  This executive order, like the executive orders described above, cites IEEPA as the source of authority.  *Id.* ("By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)(IEEPA) . . . .").  And the order explicitly modifies the Harmonized Tariff Schedule of the United States, stating, for example, that "subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified by inserting the following new headings in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS . . . ."  90 Fed. Reg. at 15090.

4

The President has since issued executive orders pausing and modifying some of the tariffs. *See, e.g.,* Exec. Order No. 14,226, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625, 15626 (Apr. 15, 2025) ("I have determined that it is necessary and appropriate to address the national emergency declared . . . by modifying the HTSUS to temporarily suspend, for a period of 90 days, except with respect to the PRC, application of" specified tariffs imposed on foreign trading partners).

## II. THE PRESENT SUIT

California sued "to block the tariffs imposed by President Trump pursuant to IEEPA because they are not authorized by that statute." (Dkt. No. 1 ¶ 12.)[1] The complaint alleges the "tariffs imposed as of April 2, 2025, are projected to shrink the U.S. economy by $100 billion annually, increase inflation by 1.3%, and cost the average American family $2,100." (*Id.* ¶ 68.) "California, as a leader in global trade, bears an inordinate share of these costs." (*Id.* ¶ 69.) For example, "California's ports process one-third of all exports and 40% of all containerized imports for the *entire world*, generating an estimated $9 billion in state and local tax revenue annually." (*Id.* ¶¶ 117, 126.) The tariffs, "if left in place . . . will undoubtedly cause decreased activity at the ports, resulting in untold consequences for the hundreds of thousands of Californians who work there" and impact "the State's tax revenue, which relies on money from the ports to fund various programs." (*Id.* ¶ 127.)

California brings two causes of action. Count I alleges *ultra vires* conduct in excess of statutory authority. (*Id.* ¶¶ 140-41.) Count II alleges a violation of the separation-of-powers doctrine on the ground "[t]he Constitution provides that 'Congress shall have the Power To lay and collect Taxes, Duties, Imposts and Excises . . . .'" (*Id.* ¶ 147 (quoting U.S. Const. art. I, § 8).) California seeks a declaration "that President Trump's IEEPA Tariff Orders are unlawful and void, because they were issued *ultra vires* in excess of statutory authority and/or because they are unconstitutional and violate separation of powers." (*Id.* at 22.) And California seeks to enjoin the agency defendants (Secretary Noem, DHS, Acting Commissioner Flores, and CBP) "from taking

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

any action to implement or enforce President Trump's IEEPA Tariff Orders." (*Id.*)

The Government moves to transfer this case to the CIT on the ground the CIT has exclusive jurisdiction over California's claims under 28 U.S.C. § 1581(i).

## DISCUSSION

A federal statute, 28 U.S.C. § 1581, provides for the CIT's exclusive jurisdiction of certain civil actions:

> [T]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, **that arises out of any law of the United States providing for—**
>
> (A) revenue from imports or tonnage;
>
> (B) **tariffs**, duties, fees, or other taxes on the importation of merchandise **for reasons other than the raising of revenue**;
>
> (C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
>
> (D) **administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C)** of this paragraph and subsections (a)-(h) of this section.

28 U.S.C. § 1581(i) (emphasis added). So, if this lawsuit "arises out of" a United States law "providing for" tariffs, or the "administration and enforcement" of tariffs, it belongs in the CIT.

## I. THE ACTION ARISES OUT OF A LAW OF THE UNITED STATES

This action arises out of President Trump's executive orders imposing tariffs. That is, the lawsuit challenging President Trump's imposition of tariffs originates from, grows out of, and flows from the executive orders through which the President imposed tariffs. *See In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1220 (9th Cir. 2019) (noting "arising out of" is "ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to, or having connection with'"). Those executive orders are laws of the United States. They modify, or instruct the Department of Homeland Security to modify, the Harmonized Tariff Schedule, which is a statutory provision. 19 U.S.C. § 3004(c)(1)(A). Accordingly, the modifications themselves are statutory provisions. Section 3004, setting forth the status of the Harmonized Tariff schedule, confirms this:

> **(1) The following shall be considered to be statutory provisions of law for all purposes:**
> (A) The provisions of the Harmonized Tariff Schedule as enacted by this chapter.
> (B) Each statutory amendment to the Harmonized Tariff Schedule.
> **(C) Each modification or change made to the Harmonized Tariff Schedule by the President under authority of law** (including section 604 of the Trade Act of 1974).

19 U.S.C. § 3004(c) (emphasis added). Because the executive orders imposing tariffs are laws of the United States, California's lawsuit challenging those executive orders "arises out of" a "law of the United States providing for . . . tariffs." So, pursuant to section 1581(i), this matter falls within the CIT's exclusive jurisdiction.

California disputes this conclusion in a footnote in its opposition, arguing "President Trump's executive orders are not 'law[s] of the United States.'" (Dkt. No. 12 at 19 n.4.) The two cases California cites to support this proposition do not bear on the present case. In *Leath v. Stetson*, 686 F.2d 769, 771 (9th Cir. 1982), the Ninth Circuit stated an executive order was "not a law of the United States for purposes of giving district courts jurisdiction under the federal question statute." The *Leath* court said nothing about whether executive orders imposing tariffs are laws of the United States for purposes of section 1581. California also cites *Sierra Club v. United States Department of Energy*, 134 F.4th 568, 573 (D.C. Cir. 2025), in which the court stated "an executive order is not 'law' within the meaning of the Constitution." Again, this case says nothing about whether executive orders regarding tariffs are laws within the meaning of section 1581. Moreover, *Sierra Club*—and *California v. Environmental Protection Agency*, 72 F.4th 308, 318 (D.C. Cir. 2023), which it cites—involved executive orders "devoted solely to the internal management of the executive branch." *California*, 72 F.4th at 318 (involving an executive order requiring agencies to consider environmental effects of their actions on minorities and low-income populations); *Sierra Club*, 134 F.4th at 572 (involving an executive order directing agencies to review "any of the previous administration's regulations, orders and other actions that might affect the environment"). The executive orders at issue are not broad formulations of policy or directions regarding Executive Branch management, but instead modifications to the Harmonized Tariff Schedule set by statute. To conclude these executive orders are not laws of the

7

1  United States would contradict section 3004, which states "modification[s] . . . to the Harmonized
2  Tariff Schedule by the President under authority of law" "shall be considered to be statutory
3  provisions of law for all purposes."

4  At oral argument, California also argued President Trump's executive orders imposing
5  tariffs fall outside the scope of section 3004 because the executive orders were not made under
6  authority of law. *See* 19 U.S.C. § 3004(c) (stating modifications made "by the President under
7  authority of law" are statutory provisions). As an initial matter, section 3004 does not say "under
8  authority of valid law" or something suggesting courts should conduct a threshold review to
9  decide whether the President's modification to the Harmonized Tariff Schedule is lawful. More to
10 the point, to decide whether the tariffs were authorized by law would require the Court to decide
11 whether IEEPA permits the tariffs President Trump imposed—the very question the CIT recently
12 ruled on. As discussed below, it would contravene Congressional intent for this Court to
13 separately make that determination.

## II. CONGRESS INTENDED UNIFORM ADMINISTRATION OF CUSTOMS LAWS

Section 1581 was intended to "create[] a comprehensive system of judicial review of civil actions arising from import transactions:"

> The Committee believes that the clarification and expansion of the customs courts' jurisdiction will help to assure access to judicial review of civil actions arising from import transactions. The customs courts are national courts and their decisions are nationwide in impact. Thus, a clarification of jurisdiction will eliminate the possibility of conflicting decision on any one point of dispute. This, coupled with their current expertise in the area, would enable the customs courts to render extremely expeditions decisions in matters which are important both to our country and to our trading partners.

S. Rep. No. 96-466, at 3-4 (1979). Specifically, subsection (i) of section 1581 was added to "grant[] broad residual jurisdiction to the United States Court of International Trade." S. Rep. 96-1235, at 33 (1980). While the statute as initially proposed conferred jurisdiction when a civil action against the government "involve[d]" certain enumerated statutes, legislators were concerned "that the listing of specific statutes would result in an inadvertent omission of a statute, thereby creating further confusion in the minds of international trade law litigants." *Id.* at 33-34.

8

So, "rather than a specific listing of statutes," Congress opted for "a generic approach . . . in an effort to provide greater protection for the rights of persons involved in disputes arising out of import transactions." *Id.* at 34. That is, section 1581 was amended to provide the CIT with "jurisdiction over those civil actions which arise out of a law of the United States pertaining to international trade." *Id.* This action arises out of a law pertaining to international trade—whether that law is the Harmonized Tariff Schedule the executive orders modified, the executive orders themselves, or IEEPA. So, concluding the CIT has exclusive jurisdiction over this matter is consistent with Congressional intent. *See Pentax Corp*, 72 F.3d at 711 (quoting *Conoco, Inc. v. United States Foreign–Trade Zones Bd.,* 18 F.3d 1581, 1589 (Fed Cir.1994)) (an area of law is "within the exclusive jurisdiction of the CIT" when "that area is 'within the parameters of' section 1581 and deals with 'type of issues with which CIT is acknowledged to have expertise'").

That is especially so here, where multiple cases challenging the same executive orders are before the CIT. *See V.O.S. Selections, Inc. v. Trump,* No. 25-cv-66 (Ct. Int'l Trade Apr 14, 2025)*; Oregon v. Trump*, No. 25-cv-66 (Ct. Int'l Trade Apr. 23, 2025); *Princess Awesome, LLC v. United States Customs and Border Protection*, No. 25-cv-78 (Ct. Int'l Trade Apr 24, 2025). In all three cases, the CIT chief judge—"[p]ursuant to 28 U.S.C. §§ 253(c) and 255 and Rule 77(e) of the Rules of this Court"—assigned the cases to a three-judge panel. (Case No. 25-cv-66, Dkt. No. 8; Case No. 25-cv-77, Dkt. No. 6; Case No. 25-cv-78, Dkt. No. 12.) *See* 28 U.S.C. § 255(a) (permitting the CIT chief judge "to designate any three judges of the court to hear and determine any civil action which the chief judge finds: (1) raises an issue of the constitutionality of an Act of Congress, a proclamation of the President or an Executive order; or (2) has broad or significant implications in the administration or interpretation of the customs laws"). On May 28, 2025, the CIT granted the *V.O.S. Selections* and *Oregon* plaintiffs' motions for summary judgment. *V.O.S. Selections, Inc. v. United States*, No. 25-00066, 2025 WL 1514124, at *1 (Ct. Int'l Trade May 28, 2025). In so doing, the CIT stated it "has exclusive jurisdiction to hear this action under 28 U.S.C. § 1581(i)." *Id.* at *8 ("For the purpose of locating jurisdiction under 28 U.S.C. § 1581(i), an action involving a challenge to a presidential action that imposes tariffs, duties, or other import restrictions is one that arises from a 'law providing for' those measures.").

Another CIT judge considering a motion to dismiss an action challenging the tariffs imposed by President Trump likewise concluded "it has Section 1581(i) jurisdiction over this case." (Dkt. No. 51-1 at 10.) Moreover, two district courts granted motions to transfer to the CIT cases challenging the same tariff executive orders. *Webber v. U.S. Dep't of Homeland Sec.*, No. CV 25-26-GF-DLC, 2025 WL 1207587, at *7 (D. Mont. Apr. 25, 2025) (cleaned up) ("Consolidating tariff matters with the Court of International Trade ensures a necessary degree of uniformity and consistency throughout the United States."); *Emily Ley Paper, Inc., v. Trump*, No. 3:25-CV-464-TKW-ZCB, 2025 WL 1482771, at *1 (N.D. Fla. May 20, 2025) (cleaned up) ("The conclusion that this case should be transferred to the CIT furthers § 1581's purpose of ensuring uniformity in the judicial decisionmaking process on trade issues.").

It would be inconsistent with Congressional intent for this Court to nevertheless exercise its jurisdiction, as California urges, to decide whether the tariffs are lawful. That inconsistency becomes apparent when considering a hypothetical scenario in which this Court exercises jurisdiction over California's lawsuit and reaches a different result than the CIT as to whether to enjoin the tariffs. What, then, of the Harmonized Tariff Schedule? What duties would be collected on imports? Such a result would contravene Congress's goal of "ensuring a uniform procedure for the judicial review of international trade disputes." S. Rep. 96-1235 at 30.

### III. DISMISSAL IS APPROPRIATE UNDER SECTION 1631

Because executive orders modifying the Harmonized Tariff Schedule are laws of the United States, and because the executive orders at issue here indisputably provide for tariffs, this civil action "arises out of [a] law of the United States providing for . . . tariffs." So, the CIT has exclusive jurisdiction under 28 U.S.C. § 1581(i)(1). And because the action falls within the CIT's exclusive jurisdiction, this Court lacks jurisdiction. *See K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182–83 (1988) ("The District Court would be divested of jurisdiction . . . if this action fell within one of several specific grants of exclusive jurisdiction to the Court of International Trade."); *see also* 28 U.S.C. § 1340 ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Court of International Trade.").

The Government seeks to transfer the case to the CIT pursuant to 28 U.S.C. § 1631, which provides "[w]henever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed." At oral argument, California asked the Court, if it concludes it lacks jurisdiction, to dismiss rather than transfer the action to allow California to appeal the decision. *See* 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States"). As the Government argued in *Webber v. U.S. Department of Homeland Security*—in which the plaintiffs challenging the tariff executive orders appealed a Montana District Court order transferring the case to the CIT—the Ninth Circuit "lacks appellate jurisdiction to review the district court's interlocutory transfer order" because the Ninth Circuit "reviews final orders" and "an order transferring a case under 28 U.S.C § 1631 for litigation to continue in another court is necessarily not final." (Case No. 25-2717, Dkt. No. 7.)

Under section 1631, transfer is not mandatory upon finding a lack of jurisdiction. The statute provides the court shall transfer the case *if it is in the interest of justice.* "Normally transfer will be in the interest of justice because normally dismissal of an action that could be brought elsewhere is time-consuming and justice-defeating." *Amity Rubberized Pen Co. v. Mkt. Quest Grp. Inc.*, 793 F.3d 991, 996 (9th Cir. 2015) (cleaned up). The Ninth Circuit applied this rule to transfer cases when the plaintiff was "unaware of or confused about the proper forum in which to file their action," *Munns v. Kerry*, 782 F.3d 402, 415 (9th Cir. 2015) (cleaned up), and when "[t]he statutory period for seeking interlocutory review ha[d] elapsed." *Kennecott Corp. v. U.S. Dist. Ct. for S. Dist. of California*, 873 F.2d 1292, 1293 (9th Cir. 1989). As these cases indicate, the "interest of justice" analysis emphasizes the plaintiff's interests. *See also Amiti*, 793 F.3d at 991 ("[T]ransfer will often serve as a means to prevent the injustice of penalizing a party for an honest procedural mistake"); *In re McCauley*, 814 F.2d 1350, 1352 (9th Cir. 1987) (cleaned up) (stating section 1631 "serves to aid litigants who were confused about the proper forum for review"); *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) (concluding district court abused its discretion for failing to determine whether prisoner's petition for writ of habitus corpus "could

11

have been brought in the district of [his] 'regular place of incarceration' and whether transfer would have been in the interest of justice" under section 1631). In this case, when California—the party who filed the lawsuit—requests dismissal rather than transfer, it is not in the interest of justice to transfer the case.

At oral argument, the Government could not articulate why transfer over California's objection serves the interests of justice. The Government argued it is in the interest of justice to ensure the correct forum rules on California's claims. The Court agrees, and dismissal facilitates that result by allowing the Ninth Circuit to decide whether this Court has jurisdiction over a lawsuit challenging the President's imposition of tariffs and/or to what extent district courts should consider the merits of a case in deciding if a matter falls within the CIT's exclusive jurisdiction.

The Government also argued Ninth Circuit precedent requires transfer rather than dismissal, noting in *Pentax Corp. v. Myhra*, 72 F.3d 708, 711 (9th Cir. 1995), the Ninth Circuit "conclude[d] the prudent thing to do [was] to direct the district court to transfer the case to the CIT so that the CIT [could] determine the question of its own jurisdiction." In *Pentax*, the plaintiff had argued "the interests of justice require . . . transfer, because if the case is not transferred [the plaintiff's] claim may be barred by the statute of limitations." *Id.* Without expressing an "opinion on the statute of limitations issue or whether the CIT would have had original jurisdiction," the Ninth Circuit transferred the case "so that the CIT [could] determine the question of its own jurisdiction." *Id.* Like the section 1631 cases described above, the *Pentax* court's decision to transfer was based on the plaintiff's interest in resolving its claim. The Court does not understand *Pentax*—or *United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829, 836–37 (9th Cir. 2004), which cites *Pentax*—to mean section 1631 requires transfer over the plaintiff's objection. Nor does the Court understand *Pentax* to mean the Court must transfer whenever there is ambiguity about the CIT's jurisdiction. Such interpretation would conflict with the language of section 1631, which requires transfer if it is in the interest of justice "[w]henever . . . a court . . . finds that there is a want of jurisdiction." 28 U.S.C. § 1631. So, section 1631 applies when a court has found jurisdiction lacking, not when a court thinks jurisdiction could be lacking.

Following oral argument, the Government sought leave to file a supplemental brief

12

1  responding to California's request to dismiss rather than transfer the case.  (Dkt. No. 59.)  The

2  Court granted the request.  (Dkt. No. 61.)  Having reviewed the Government's supplemental brief,

3  the Court is not persuaded transfer is in the interest of justice in this case.  The section 1631 cases

4  the Government cites reinforce transfer as the proper remedy when it advances the plaintiff's

5  interests.  For example, in *Taati v. Cigna Healthcare, Inc.*, No. CV 08-05164 MMM (PLAx), 2008

6  WL 11423917, at *7 (C.D. Cal. Sept. 19, 2008), the court transferred the case to a forum where all

7  the defendants were subject to personal jurisdiction to "protect [the plaintiff] from any prejudice

8  resulting from her confusion."  The court observed "[n]othing suggest[ed] that [the plaintiff] filed

9  her action in California in bad faith; rather, given that she is pro se, and given the interpretation of

10  the personal jurisdiction rules set out in her pleadings, it is clear that she was confused about the

11  proper forum for review.  *Id.* (quotation marks omitted).  And in *Amerijet International, Inc. v.*

12  *United States Department of Homeland Security*, 43 F. Supp. 3d 4, 21 (D.D.C. 2014), the court

13  concluded "transfer, not dismissal, [was] the preferable disposition" when it was the plaintiff who

14  sought transfer and the defendants who "firmly reject[ed]" that proposition.  Here, the roles are

15  reversed: California, the plaintiff—whose interest courts seek to protect in evaluating transfer

16  under section 1631—requests dismissal whereas the Government requests transfer.

17  The Government's other case citations are unpersuasive because they involved different

18  provisions.  *See Dearth v. Mukasey*, 516 F.3d 413, 415-16 (6th Cir. 2008) (considering transfer for

19  improper venue pursuant to sections 1404 and 1406); *Concha v. London*, 62 F.3d 1493, 1506 (9th

20  Cir. 1995) (considering voluntary dismissal under Rule 41(a)(1)).  The Government also argues

21  Congress "decided against making transfer orders immediately appealable" and dismissal here

22  would "create a loophole to appellate jurisdiction."  (Dkt. No. 59-1 at 2.)  But under section 1631,

23  transfer is only required when it is "in the interest of justice."  So, the statute apparently

24  contemplates the present situation—in which the court concludes it lacks jurisdiction and that

25  transfer is not in the interest of justice, leaving dismissal as the proper course of action.

## CONCLUSION

27  Pursuant to section 1581(i), this action falls within the CIT's exclusive jurisdiction and this

28  Court is without jurisdiction.  Because California opposes transfer and instead requests dismissal,

transfer is not in the interest of justice under section 1631.  So, the Court DENIES the Government's motion to transfer and DISMISSES the case without prejudice.  A separate judgment order will issue.

This Order disposes of Docket No. 9.

**IT IS SO ORDERED.**

Dated: June 2, 2025

_____
JACQUELINE SCOTT CORLEY
United States District Judge